## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RECEIPT # 65342
AMOUNT $ 250.00
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ✓
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. CMG
DATE 7-1-05

**UNITED STATES FIDELITY AND GUARANTY COMPANY,**

    **Plaintiff,**

v.

**PAUL A. BORDIERI and ANDREA J. COSTA, Trustees of JACKSON CONSTRUCTION COMPANY, a Massachusetts Business Trust, PAUL A. BORDIERI, Individually**

    **Defendants,**

and

**SOVEREIGN BANK OF NEW ENGLAND, NA, APPLETON PARTNERS, INC. and CAMBRIDGE APPLETON TRUST, NA,**

    **Trustee Process Defendants.**

# 05  11397 NMG

C.A. No. _____

MAGISTRATE JUDGE _____

## COMPLAINT

In this action, United States Fidelity & Guaranty Company ("USF&G") seeks to enforce its common law and contractual rights to indemnification and other financial protection, as surety, against its principal Jackson Construction Company ("Jackson") and Jackson's beneficial owner, Paul A. Bordieri. USF&G has executed numerous surety bonds guarantying obligations of Jackson under construction contracts. Jackson has notified USF&G that it is financially unable to perform its contracts, but has not complied with USF&G's demands that it post collateral or make its books and records available to USF&G for inspection. Further, Jackson

and Bordieri, at the same time Jackson has sought financial assistance from USF&G, fraudulently have transferred assets out of Jackson to Bordieri or other entities over which Bordieri exercises control. USF&G seeks to rescind those transactions and return assets to Jackson for the performance or satisfaction of Jackson's obligations to USF&G. By trustee process and attachment, USF&G seeks security for its ultimate recovery from Jackson and Bordieri.

## PARTIES

1.     The Plaintiff, United States Fidelity and Guaranty Company ("USF&G") is a Maryland Corporation with a principal place of business at One Tower Square, Hartford, Connecticut. USF&G is a member of the St. Paul Travelers Group of Insurance Companies.

2.     The Defendants, Paul A. Bordieri and Andrea J. Costa are Trustees of Jackson Construction Company, a Massachusetts Business Trust created under a Declaration of Trust dated January 28, 1982, as subsequently amended ("Jackson"). Jackson has a principal place of business at 20 Dan Road, Canton, Massachusetts and is a construction firm engaged in general contracting and construction management.

3.     Paul A. Bordieri is a citizen of the Commonwealth of Massachusetts and resides at 376 West Street, Reading, Massachusetts. In addition to being one of the trustees of Jackson, he is the sole shareholder of Jackson or otherwise controls or exercises control over its operations.

4.     Andrea J. Costa is a citizen of the Commonwealth of Massachusetts and resides at 20 Brookview Road, Millis, Massachusetts. She is a trustee of Jackson

2

5.      Appleton Partners, Inc. is a Massachusetts corporation engaged in the investment management business, with a principal place of business at 45 Milk Street, Boston, Massachusetts.

6.      Cambridge Appleton Trust, NA is a joint venture of Appleton Partners and Cambridge Savings Bank with a principal place of business at 45 Milk Street, Boston, Massachusetts. It provides trust services to clients of Appleton Partners, Inc.

7.      Sovereign Bank of New England is a federally chartered savings bank with a principal place of business at 75 State Street, Boston, Massachusetts.

## JURISDICTION AND VENUE

8.      Jurisdiction in this case is based upon the diversity of citizenship among the parties pursuant to 28 USCA, Section 1332(a)(1). The amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.      Venue is appropriate in this district because all of the defendants reside in or are located in the Commonwealth of Massachusetts.

## FACTUAL BACKGROUND

10.     Beginning in April, 1997, USF&G began to provide surety bonds needed by Jackson in connection with its construction business. Bonds provided included bid bonds guaranteeing bids submitted by Jackson on construction projects, performance bonds guaranteeing performance by Jackson of work required under its construction contract and payment bonds guaranteeing payment for labor and materials provided to Jackson on such projects by its subcontractors.

3

11.     On May 20, 1997, Jackson and USF&G entered into two separate agreements

relating to the relationship between the parties.

12.     The first was a Master Surety Agreement (a copy is attached as Exhibit A) which

provided, in part, as follows:

> I(A) This agreement binds [Jackson] and the heirs, personal representatives,
> successors and assigns thereof, jointly and severely to [USF&G] in connection
> with all bonds heretofor or hereafter executed, provided or procured by [USF&G]
> in behalf of [Jackson] in any penal sum and in favor of any obligees;
>
> . . .
>
> III (A) [Jackson] shall exonerate, hold harmless, indemnify and keep indemnified
> (USF&G) from and against any and all demands, claims, liabilities, losses and
> expenses of whatsoever kind or nature (including but not limited to interest, court
> costs and counsel fees) imposed upon, sustained, or incurred [USF&G] by reason
> of: (1) [USF&G] having executed, provided or procured bonds in behalf of
> [Jackson], or (2) [Jackson's] failure to perform or comply with any provisions of
> this agreement;
> (B) in order to exonerate, hold harmless and indemnify [USF&G], [Jackson] shall
> upon demand of [USF&G], place [USF&G] in funds before [USF&G] makes any
> payment; such funds shall be, at [USF&G's] option, money or property, or liens
> or security interests in property. (The amount of such money or property or the
> value of the property to become subject to liens or security interests, shall be
> determined by [USF&G].)
>
> . . .

13.     The second agreement of May 20, 1997 between Jackson and USF&G was a

Retention of Surplus Agreement (copy attached as Exhibit B). That agreement provided as

follows:

> It is hereby understood that the USF&G is providing surety credit based upon the
> strength of the financial condition [of Jackson] at July 31, 1996 after allowing for
> a stock redemption of approximately $3,350,000.
>
> [Jackson] understand[s] that [USF&G's] ability to provide sufficient bonding
> capacity to cover that scope of [Jackson's] operation is dependent upon the
> maintenance of [Jackson's] working capital and net worth.

4

> *For that purpose, it is agreed [by Jackson] that no distribution to shareholders, except for amounts needed to pay income taxes on current year earnings, will be made subsequent to fiscal year end without the prior knowledge of the USF&G,* provided, that the foregoing shall not be construed to prevent the payment of compensation, expense reimbursements and benefits to employees who are also shareholders. (Emphasis added)

14.     Pursuant to the Master Surety Agreement, from time to time after May 1997, USF&G executed bonds on behalf of Jackson. In connection with issuing such bonds, USF&G periodically reviewed the financial condition of Jackson. As part of this review, USF&G obtained and reviewed annual audited financial statements prepared by Jackson and provided by it to USF&G.

15.     USF&G relied upon these financial statements in continuing to execute bonds on behalf of Jackson.

16.     Starting in at least 2001, Jackson's audited annual financial reports listed as an asset of Jackson a stock account with the financial services firm Appleton Partners, Inc. ("Appleton"). Partial copies of Jackson's audited financial statements for the years ending December 31, 2002 and 2001 and December 31, 2003 and 2002, showing the Appleton Account as an asset of Jackson, are attached as Exhibit C. A partial copy of Jackson's unaudited financial statement for the year ending December 31, 2004, again showing the stock account as a Jackson asset, was shown by Jackson to USF&G.

17.     Prior to 2001, Jackson provided other information to USF&G that it owned, as a Trust asset, marketable securities.

18.     USF&G relied upon this asset in executing bonds on behalf of Jackson.

19.     During its review of Jackson's finances in 2004, USF&G determined that it no longer would execute bonds on behalf of Jackson.

5

20.     In late 2004 and early 2005, USF&G became aware of an increasing trend of claims of late payment and lack of payment by Jackson's subcontractors both on projects with respect to which USF&G had executed bonds on behalf of Jackson and on two separate projects where USF&G had hired Jackson to complete work under bonds issued to a third party.

21.     In April, 2005, Jackson, acting through Paul A. Bordieri, notified USF&G that it was experiencing financial difficulty, was in need of financial assistance, was unable to obtain financing from a source other than USF&G and could not continue to perform its work on its projects without financial assistance from USF&G.

22.     USF&G indicated that in order to consider Jackson's request, it would need to conduct a review of Jackson's financial condition and the status of the projects.

23.     At that time, Jackson, acting through Mr. Bordieri, informed USF&G that USF&G had misunderstood Jackson's request and Jackson was not seeking financial assistance from USF&G.

24.     On or about April 29, 2005, by a series of transactions, Mr. Bordieri transferred the assets held on behalf of Jackson by Appleton out of the control of Jackson and into his own personal control.  Neither Jackson nor Bordieri provided prior notice to USF&G of this transaction.  Attached as Exhibit D are April 30, 2005 and May 2005 report from Appleton Partners showing the activity on Appleton Partners Account No. A0525 – Jackson Construction Company.  Attached as Exhibit E is a copy of Jackson's Trial Balance statement for the month ending May 31, 2005.  These reports shows the distribution of the stock account asset from Jackson to shareholder in the amount of $1,984,143.64.

6

25.     Thereafter, Jackson, again through Mr. Bordieri, again contacted USF&G indicating a need for financial assistance to complete work on both its bonded projects and the USF&G completion projects.

26.     USF&G again told Jackson that it would need to review Jackson's financial condition in order to make any determination on the request for financial assistance. Upon such review USF&G determined that the $1,984,143.64 stock account no longer was in the possession or control of Jackson.

27.     USF&G asked Mr. Bordieri what happened to the stock account. Mr. Bordieri informed USF&G that he had taken the asset, that the stock account was his own personal property, and not that of Jackson and that it had been included in Jackson's audited financial reports as an asset of Jackson by mistake. Each of these statements was false.

28.     On June 22, 2005, in connection with consideration of Mr. Bordieri and Jackson's request for financial assistance, USF&G and its representatives met with Jackson and Bordieri at Jackson's offices in Canton, Massachusetts to review both financial documents and records regarding projects on which USF&G had executed surety bonds.

29.     During the course of that meeting, USF&G representatives disclosed to Mr. Bodieri that USF&G had contacted the project owners on bonded contracts to inquire as to the status of those projects. In response, Mr. Bordieri became angry and ordered USF&G and its representatives immediately to leave Jackson's premises or he would call the police. Mr. Bordieri tried to prevent USF&G or its representatives to take with them any information relating to Jackson's financial condition or the status of the projects.

30.     At that time, Mr. Bordieri told USF&G that the $1,984,143.64 stock asset had been transferred to a "family trust" and would not be returned to Jackson.

31.    Prior to throwing USF&G and its representatives out of Jackson's premises,

Jackson and Bordieri made certain financial disclosures regarding the status of projects on which

USF&G had executed bonds. Included among these disclosures was what Jackson projected to

be funding shortfalls on six of the eight bonded projects. Those Jackson shortfall projections are

as follows:

| | |
|---|---|
| Boston University Hillel Project: | $ 256,576.00 |
| City of Woburn, White School Project: | $   55,242.00 |
| City of Waltham, New Plympton School Project: | $ 297,823.00 |
| City of Lowell, Stoklosa School Project | $1,401,873.00 |
| Town of Winchester, Ambrose School Project | $ 326,825.00 |
| Olin College East Hall Project | $1,154,439.00 |

31.    The total funds shortfall on these Projects is $3,492,778.

32.    On June 30, 2005, St. Paul Travelers, acting on behalf of USF&G, issued to

Jackson a demand for collateral pursuant to Section III(B) of the Master Surety Agreement in the

amount of $3,492,778.

33.    Jackson has not responded to this demand. Based upon Jackson's prior

disclosures and statements, Jackson cannot or will not meet this collateral demand, in part

because Jackson and Bordieri fraudulently transferred assets out of Jackson.

## COUNT I: CONTRACTUAL INDEMNITY
### (Jackson)

34.    USF&G incorporates as if set forth herein the allegations of paragraphs 1 through

33.

35.    Under the Master Surety Agreement, Jackson is obligated (a) to indemnify and

hold harmless USF&G from and against losses or liabilities of any kind under the Bonds and (b)

to place USF&G in funds prior to payment by USF&G of any such loss in an amount determined

by USF&G.

8

36.    Jackson has provided information to USF&G indicating a funds shortfall on the

Projects totaling $3,492,778.

37.    According to that information, the funds shortfall is the total of Jackson's unpaid

commitments, less the contract balances due on the Projects.

38.    Based upon the information provided to it by Jackson, USF&G expects that it will

have to pay the amount of the funds shortfall because of its execution of the Bonds on behalf of

Jackson.

39.    Jackson has not complied with USF&G's demand that Jackson place in it funds

by posting of collateral.

40.    Under the terms of the Master Surety Agreement, USF&G is entitled (1) to

indemnification from Jackson for all such payments and (2) to the immediate payment by

Jackson to USF&G of $3,492,778.

## COUNT II: *QUIA TIMET*
### (Jackson)

41.    USF&G incorporates as if fully set forth herein the allegations of paragraphs 1

through 40.

42.    Because of the funds shortfall and its obligations as Surety under the Bonds,

USF&G is in fear of incurring liability on account of the failure by or inability of Jackson, as

Principal, to complete its work on the contracts underlying the Bonds.

43.    Therefore, under the equitable doctrine of *Quia Timet*, USF&G is entitled to an

immediate order that Jackson pay to USF&G the amount of the funds shortfall, $3,492,778.

9

## COUNT III: FRAUDULENT CONVEYANCE
### (M.G.L. c. 109A (Bordieri and Jackson))

44.     USF&G incorporates as if further set forth herein the allegations of paragraphs 1 through 43.

45.     The transfer of the Appleton Partners stock account asset from Jackson to Bordieri was fraudulent as to USF&G because it was made with the actual intent of Jackson and Bordieri to hinder, delay and defraud USF&G.

46.     The transfer of the Appleton Partners stock account asset from Jackson to Bordieri was fraudulent as to USF&G because Jackson (a) received either no consideration or inadequate consideration in exchange for the asset and (b) Jackson's remaining assets were unreasonably small in relation to its business and insufficient to pay Jackson's debts as they came due.

47.     The transfer of the Appleton Partners stock account asset from Jackson to Bordieri was fraudulent as to USF&G because Jackson was insolvent when the transfer was made or became insolvent as a result of the transfer.

48.     Pursuant to M.G.L. Chapter 109, section 8, the USF&G is entitled to (a) avoidance of the fraudulent transfer, (b) an order that Bordieri return the asset to Jackson and (c) judgment against Bordieri individually in the value of the asset transferred, $1,984,143.64.

## COUNT V: RESCISSION
### (Bordieri)

49.     USF&G incorporates as if set forth herein the allegations of paragraphs 1 through 48.

50.     Under the terms of the Master Surety Agreement and common law, USF&G is subrogated to the rights of Jackson against Bordieri.

10

51.    The transfer of the Appleton Partners stock account was unauthorized, or

invalidly authorized, by Jackson and was made without valid consideration to Jackson.

52.    Jackson is entitled to rescission of the transfer and return of the asset to Jackson.

## COUNT VI:  M.G.L. C. 93A, § 11
### (Jackson)

53.    USF&G incorporates as if set forth herein the allegations of paragraphs 1 through
52.

54.    USF&G and Jackson are engaged in the conduct of trade or commerce with each

other pursuant to the Master Surety Agreement, the Retention of Surplus Agreement and the

Bonds.

55.    By transferring the Appleton Partners stock account asset from Jackson to himself

(or an entitled controlled by him) without notice to USF&G, Jackson breached the Retention of

Surplus Agreement and unfairly and deceptively deprived USF&G of its right to be held

harmless and secured against loss under the Master Surety Agreement.

56.    These actions constitute unfair and deceptive acts and practices under M.G.L. c.

93A, § 2 which occurred primarily in the Commonwealth of Massachusetts.

57.    These actions were willful and knowing unfair and deceptive acts and practices

under M.G.L. c. 93A, § 2.

58.    USF&G has suffered damages on account of such unfair and deceptive acts and

practices.

## COUNT VII:  TRUSTEE PROCESS
### (Sovereign, Appleton and Cambridge Appleton)

66.    USF&G incorporates as if fully set forth herein the allegations of paragraphs 1

through 65.

11

67. The Trustee Process Defendants (Sovereign Bank of New England, Appleton Partners and Cambridge Appleton) each hold and are in custody of one or more accounts, money or other intangible assets of Bordieri and Jackson. Included among these accounts are Appleton Account No. A0525 – Jackson Construction Company and Sovereign Bank Account Nos. 62104941653 and 62104941616

68. USF&G is reasonably likely to prevail on the merits of its claims against Bordieri in the amount of the fraudulently transferred Appleton stock account, $1,984,143.64.

69. USF&G is reasonably likely to prevail on the merits of its claims against Jackson in the amount of the $3,492,778 funds shortfall.

70. USF&G will suffer irreparable harm if it is not granted security against losses under the bonds.

71. USF&G is not aware of the existence of any liability insurance available to satisfy any judgment against Bordieri or Jackson.

## **COUNT IX: INJUNCTION**

72. USF&G incorporates as if fully set forth herein the allegations of paragraphs 1 through 71.

73. USF&G is reasonably likely to prevail on the merits of its claims against Bordieri in the amount of the fraudulently transferred Appleton stock account, $1,984,143.64.

74. USF&G will suffer irreparable harm if Bordieri does not return the assets he stole from Jackson.

75. USF&G is entitled to an order that Bordieri pay into an escrow account the sum of $1,984,143.64 to be distributed in a manner approved or ordered by the Court.

12

## RELIEF REQUESTED

Wherefore, the Plaintiff USF&G requests that the Court grant the following relief:

1.   Under Count I, order that Jackson immediately deliver to USF&G cash or other collateral in the amount or value of $3,492,778;

2.   Under Count I, order that Jackson indemnify and hold harmless USF&G from and against any and all losses or liabilities under the Bonds, including USF&G's expenses and attorney's fees;

3.   Under Count I, order that Jackson immediately make available to USF&G all of its books and records relating to its financial condition and the Projects with respect to which USF&G has executed bonds on Jackson's behalf;

4.   Under Count II, order that Jackson indemnify and hold harmless USF&G from and against any and all losses or liabilities under the Bonds, including USF&G's expenses and attorney's fees;

5.   Under Count III, order that Bordieri immediately pay the sum of $1,984,143.64 to USF&G, or to an escrow account subject to the control of the Court;

6.   Under Count III, order that the transfer of the Appleton stock account from Jackson to Bordieri or an entity controlled by him was fraudulent as to USF&G;

7.   Under Count III, order that the transfer of the Appleton stock account from Jackson to Bordieri or an entity controlled by him is rescinded;

8.   Under Count IV, the actual damages suffered by USF&G, plus costs and reasonable attorneys fees;

9.   Under Count IV, double or treble the actual damages suffered by USF&G, plus costs and reasonable attorneys fees;

10.    Under Count V, order that Bordieri immediately pay the sum of $1,984,143.64 to

USF&G, as subrogee of Jackson;

11.    Under Count VII, order the attachment by trustee process of all accounts funds or

other intangible assets of Bordieri, up to the amount of $1,984,143.64 held by the

trustee process defendants;

12.    Under Count VII, order the attachment by trustee process of all accounts funds or

other intangible assets of Jackson, up to the amount of $3,492,778.00, held by the

trustee process defendants;

13.    Under Count VIII, order that Bordieri pay into an escrow account subject to the

control of the Court the sum of $1,984,143.64; and

14.    Order such other and further relief as is just and appropriate at law or in equity.


                              UNITED STATED FIDELITY AND GUARANTY
                              COMPANY,
                              By its attorneys,



                              Kevin J. O'Connor    BBO 555248
                              Scott S. Spearing    BBO 562080
                              HERMES, NETBURN, O'CONNOR
                                    & SPEARING, P.C.
                              111 Devonshire Street, Eighth Floor
                              Boston, MA  02110
                              (617) 728-0050
Dated:  July 1, 2005          (617) 728-0052 (F)
G:\DOCS\KJO\St Paul Travelers\Pleadings\Complaint.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05  11397 NMG**

1. Title of case (name of first party on each side only) ___United States Fidelity ° Guaranty Co v___
___Paul A. Barleri, trustee___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

___  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

___  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

✓  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
          315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
          380, 385, 450, 891.

___  IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
          690, 810, 861-865, 870, 871, 875, 900.

___  V.    150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

___NONE___

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                    YES ☐        NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                    YES ☐        NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                    YES ☐        NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                    YES ☐        NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                    YES ☒        NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  ☒        Central Division  ☐        Western Division  ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,  residing in Massachusetts reside?

        Eastern Division  ☐        Central Division  ☐        Western Division  ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                                                    YES ☐        NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___Kevin J. O'Connor    Hermes Netburn O'Connor + Spearing, P.C.___
ADDRESS ___111 Devonshire St. Boston MA 02109___
TELEPHONE NO. ___617 728 0050___

(CategoryForm.wpd -5/2/05)

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET   05  11397 NMG

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States Fidelity & Guaranty Company

**DEFENDANTS** Paul A. Bordieri and Andrea J. Costa, Trustees of Jackson Construction Co., Paul Bordieri

Trustee Process Defendants:  Sovergin Bank of N.E., Appleton Partners, Cambridge Appleton Trust

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Hartford, CT
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Norfolk
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kevin J. O'Connor, Scott S. Spearing
Hermes, Netburn, O'Connor & Spearing, P.C.
111 Devonshire Street, Boston, MA 02109

ATTORNEYS (IF KNOWN)   Samuel M. Starr
Mintz Levin
One Financial Center
Boston, MA 02111

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Claim by contract surety against defaulted principal to enforce common law and contractual rights of indemnification and related claims, including fraudulent conveyance claims.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $5.4 million

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):   NONE
JUDGE _____   DOCKET NUMBER _____

DATE   7/1/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## UNITED STATES FIDELITY AND GUARANTY COMPANY
## FIDELITY AND GUARANTY INSURANCE COMPANY
## FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC.

### MASTER SURETY AGREEMENT

This AGREEMENT is made and entered into by:
ENTER NAME, ADDRESS, AND SOCIAL SECURITY OR TAX ID NUMBER.

Jackson Construction Company, 280 Bridge Street, Dedham, MA 02027, 04-2312639

Paul A. Bordieri, 376 West Street, Reading, MA 01867, 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

Paul A. Bordieri Acting as Sole Trustee of Jackson Construction Company A Massachusetts Business Trust

In favor of UNITED STATES FIDELITY AND GUARANTY COMPANY, FIDELITY AND GUARANTY INSURANCE COMPANY, FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC., and any and all affiliated, associated and subsidiary companies thereof, now existing or hereafter created, assumed or otherwise acquired (hereinafter referred to as SURETY), their successors and assigns.

In this AGREEMENT the words BOND, PERSON, UNDERSIGNED and PRINCIPAL are defined:

BOND: (1) Contract of suretyship, guaranty or indemnity; (2) the continuation, extension, alteration, renewal or substitution of such contract; (3) a letter from SURETY to a PERSON or PRINCIPAL wherein SURETY represents to such PERSON or PRINCIPAL that it is prepared and willing to execute in behalf of PRINCIPAL the BOND(S) required by such PERSON'S invitation for bids or proposals and referred to herein as a BID LETTER.

PERSON: Individual(s), partnership(s), association(s), corporation(s) or any other legal or commercial entity(ies);

UNDERSIGNED: PERSON(S) who execute this agreement.

PRINCIPAL: One or more UNDERSIGNED or any partnership, association, corporation or other legal or commercial entity in which UNDERSIGNED have a substantial, material and/or beneficial interest to the extent that the partnership, association, corporation or other legal or commercial entity would be considered a subsidiary, associated or affiliated company of UNDERSIGNED who, alone or with other PERSON(S), have secured, or may secure the performance and fulfillment of obligations by BOND(S) (whether or not required to do so by statute, ordinance, contract, order of court, rule of court, or otherwise), executed, provided, or procured by SURETY.

In consideration of SURETY'S:

(1) heretofore having executed, provided or procured BOND(S) in behalf of PRINCIPAL; or
(2) receiving requests for BOND(S) from UNDERSIGNED and determining whether or not SURETY will execute, provide or procure the BOND(S) requested; or
(3) hereafter executing, providing or procuring BOND(S) in behalf of PRINCIPAL;

UNDERSIGNED covenant and agree that:

I (A) This AGREEMENT binds UNDERSIGNED and the heirs, personal representatives, successors and assigns thereof, jointly and severally, to SURETY in connection with all BOND(S) heretofore or hereafter executed, provided or procured by SURETY in behalf of PRINCIPAL in any panel sum and in favor of any obligee(s);

CONT 5 (1-92)

(CONTINUED)
PAGE 1 OF 4

(B) This AGREEMENT shall not be construed an offer by UNDERSIGNED to indemnify SURETY which SURETY must accept prior to its executing, providing or procuring BOND(S) in behalf of PRINCIPAL, but will be construed as part of the consideration on which SURETY has relied or will rely in executing, providing or procuring BOND(S) in behalf of PRINCIPAL;

(C) SURETY has relied upon and will rely on the covenants and agreements of UNDERSIGNED as consideration for the BOND(S) executed, provided or procured in behalf of PRINCIPAL;

(D) This AGREEMENT inures to the benefit of any cosurety or reinsurer of SURETY in said BOND(S) and in the event SURETY procures the execution of BOND(S) by other sureties, this AGREEMENT shall inure to the benefit of such other sureties.

II UNDERSIGNED will pay or cause to be paid to SURETY, its successors and assigns, the premium charged or to be charged by SURETY for executing, providing or procuring BOND(S) for PRINCIPAL.

III (A) UNDERSIGNED shall exonerate, hold harmless, indemnify and keep indemnified SURETY free and against any and all demands, claims, liabilities, losses and expenses of whatsoever kind or nature (including but not limited to, interest, court costs and counsel fees) imposed upon, sustained, or incurred by SURETY by reason of: (1) SURETY having executed, provided or procured BOND(S) in behalf of PRINCIPAL, or (2) UNDERSIGNED'S failure to perform or comply with any of the provisions of this AGREEMENT;

(B) In order to exonerate, hold harmless, and indemnify SURETY, UNDERSIGNED shall upon demand of SURETY, place SURETY in funds before SURETY makes any payment; such funds shall be, at SURETY'S option, money or property, or liens or security interests in property. (The amount of such money or property or the value of the property to become subject to liens or security interests, shall be determined by SURETY.)

(C) SURETY may reduce the amount of UNDERSIGNED'S liability to SURETY hereunder by applying to such liability any money payable to UNDERSIGNED by SURETY; (Such liability may arise from UNDERSIGNED'S obligation to exonerate, to hold harmless and to indemnify SURETY and may be liquidated or unliquidated; and, the "money payable to UNDERSIGNED" may be, but is not limited to, any money payable by SURETY as an insurer of UNDERSIGNED or another PERSON to return to UNDERSIGNED an unearned or other premium or to settle a claim of UNDERSIGNED against SURETY or a PERSON insured by SURETY.)

IV (A) The liability of UNDERSIGNED hereunder shall extend to and include all amounts paid by SURETY in good faith under the belief that: (1) SURETY was or might be liable therefor; (2) such payments were necessary or advisable to protect any of SURETY'S rights or to avoid or lessen SURETY'S liability or alleged liability;

(B) the liability of UNDERSIGNED to SURETY shall include interest from the date of SURETY'S payments at the maximum rate permitted in the jurisdiction in which this AGREEMENT is enforced, or is enforceable;

(C) the voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn to by an officer of SURETY shall be prima facie evidence of the fact and extent of the liability of UNDERSIGNED to SURETY.

V (A) Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising;

(B) each UNDERSIGNED is the agent for all UNDERSIGNED for the purpose of accepting service of any process in the jurisdiction in which the UNDERSIGNED accepting the process resides, is domiciled, is doing business or is found;

(C) in the event SURETY should file suit at law or in equity to enforce the terms of this AGREEMENT, SURETY shall be entitled to recover its own reasonable attorney's fees and expenses from UNDERSIGNED in connection with such suit.

VI When BOND(S) secure the performance and fulfillment of contracts, PRINCIPAL and UNDERSIGNED, agree that:

(A) (1) SURETY has the rights of indemnification, exoneration and subrogation; and (2) SURETY'S rights of indemnification, exoneration and subrogation may be enforced as provided by applicable law or, at option of SURETY, as follows:

(a) with respect to each specific contract secured by BOND(S) all money and property representing the consideration for the contract is dedicated for: (i) the performance of the contract; (ii) the payment of obligation(s) to subcontractor(s), laborer(s) and supplier(s) of material(s) and service(s) incurred or to be incurred in the performance of the contract for which SURETY is liable under BOND(S) and, (iii) the satisfaction of the obligations herein and all other indebtednesses and liabilities of PRINCIPAL or UNDERSIGNED to SURETY;

(b) to partially implement this dedication SURETY may, in its sole discretion, demand that PRINCIPAL request delivery of the consideration for the contract to a bank designated by SURETY for deposit of the proceeds of the consideration for the contract(s) in an account in the name of PRINCIPAL designated as a "Special Account" and withdrawal(s) from said "Special Account" shall be by check(s), payable to the beneficiaries of this dedication, signed by a representative of PRINCIPAL and by a representative of SURETY;

(c) this dedication may be implemented in any other manner provided at law or in equity;

(B) in the event of: (1) any breach of any of the agreements herein; (2) any breach, delay or default in any contract secured by BOND(S); (3) any breach or default of BOND(S); (4) any change or threat of change in the character, identity, control, beneficial ownership or existence of PRINCIPAL; (5) any assignment by PRINCIPAL for the benefit of creditors; (6) the appointment of a receiver or trustee or any application for appointment of a receiver or trustee for PRINCIPAL, whether insolvent or not; (7) any proceedings or the exercise of any rights by any PERSON which deprives or impairs PRINCIPAL'S use of its plant, machinery, equipment, plans, drawings, tools, supplies or materials; (8) upon the happening of any event other than those specified in (1) through (7) and completely different from those events, which, in its sole opinion may expose SURETY to loss, cost or expense.

(a) SURETY shall have the right, its discretion, to take possession of any or all of the work under contract(s) secured by BOND(S) (toget. with plant, machinery, equipment, job boo. and records, plans, drawings, tools, supplies or material wherever located and owned or useable by PRINCIPAL) and, at the expense of UNDERSIGNED, to complete or cause completion of any such work, or relet or consent to the reletting or completion of such contract(s), and;

(b) SURETY is authorized and empowered to assert, pursue and prosecute, in its discretion, and at the expense of UNDERSIGNED (in the name of PRINCIPAL or in the name of SURETY), all claim(s) of PRINCIPAL arising or growing out of contract(s) and work done thereunder secured by BOND(S) against: (i) Obligee(s) in BOND(S); or (ii) any PERSON, government or governmental agency. (The authority and power to prosecute said claim(s) is deemed to include the authority to settle said claim(s) or any part thereof; and the money or property awarded by Obligee(s) representative, a judicial or quasi-judicial officer or a panel or board, or the money or property to become due in settlement of said claim(s) is deemed to be a portion of the "money or property representing the consideration for the contract" and subject to the dedication in subparagraph (A) of this paragraph).

VII (A) UNDERSIGNED are not obligated to request SURETY to execute, provide or procure BOND(S) required of them in the performance and fulfillment of obligations;
(B) SURETY has the right to decline to execute, provide or procure BOND(S) requested by PRINCIPAL;
(C) if SURETY executes, provides or procures a bid or proposal bond or furnishes a BID LETTER in behalf of PRINCIPAL, SURETY has the right to decline to execute the final BOND(S) (including, but not limited to performance, payment or maintenance bond(s)) that may be required in connection with any award that may be made under the bid, proposal or tender for which the bid or proposal bond or BID LETTER is given.

VIII UNDERSIGNED shall not be relieved of liability hereunder by any change, addition, substitution, continuation, renewal, extension, successor or new obligation in connection with BOND(S) or any contract(s) secured thereby, whether known or consented to by SURETY, and notice of SURETY'S consent is hereby waived.

IX (A) SURETY'S rights hereunder shall be deemed to be cumulative with, and in addition to, all other rights of SURETY, however derived;
(B) SURETY is not required to exhaust its remedies or rights against PRINCIPAL or to await receipt of any or final dividends from the legal representative(s) of PRINCIPAL before asserting its rights hereunder against UNDERSIGNED;
(C) This AGREEMENT shall be liberally construed so as to protect, hold harmless, exonerate and indemnify SURETY.

X (A) At any time during business hours and until such time as (1) the liability of SURETY under BOND(S) is terminated or (2) SURETY is fully reimbursed all its losses, cost and expenses as a result of having executed, provided, or procured BOND(S) in behalf of PRINCIPAL, SURETY shall have access to the books, records and accounts of UNDERSIGNED;
(B) when requested by SURETY, banks, depositories, obligees in BOND(S), materialmen, supply houses, or other PERSON(S) are hereby authorized to furnish SURETY any information requested with respect to PRINCIPAL, or UNDERSIGNED.

XI (A) There shall be no waiver, modification or change of the terms of this AGREEMENT without the written approval of an officer of SURETY;
(B) if an UNDERSIGNED previously executed an agreement of indemnity or MASTER SURETY AGREEMENT in favor of SURETY and upon which SURETY relied when it executed, provided or procured BOND(S) in behalf of any PERSON as PRINCIPAL, SURETY'S acceptance of this AGREEMENT neither terminates such agreement of indemnity or MASTER SURETY AGREEMENT nor relieves such UNDERSIGNED from liability to SURETY therein in connection with such BOND(S).
(C) this AGREEMENT may be terminated as to any UNDERSIGNED upon written notice given to SURETY by such UNDERSIGNED or such UNDERSIGNED'S legal representatives or successors by Registered or Certified Mail addressed to SURETY at its Home Office in Baltimore, Maryland;
(D) if an UNDERSIGNED: (1) dies; (2) becomes physically or mentally disabled to the extent that he or she is unable to perform the duties of owner, partner, officer or employee of an UNDERSIGNED which is or may become PRINCIPAL in BOND(S); (3) terminates his or her marriage by annulment or divorce; or, (4) sells or disposes of his or her interest in an UNDERSIGNED which is or may become PRINCIPAL in BOND(S); this AGREEMENT may be terminated as to such UNDERSIGNED upon receipt by SURETY at its Home Office in Baltimore, Maryland, of written notice of such death, disability, annulment, divorce, sale or disposition (such written notice shall be given as specified in Subparagraph XI (C);
(E) termination of this AGREEMENT pursuant to Subparagraph XI (C) or XI (D) shall not be effective until thirty (30) days after receipt of said written notice by SURETY;
(F) termination of this AGREEMENT pursuant to Subparagraph XI (C) or XI (D) shall not relieve any UNDERSIGNED from liability to SURETY arising out of BOND(S) executed, provided or procured by SURETY in behalf of PRINCIPAL prior to the effective date of such termination and for which this AGREEMENT is part of the consideration on which SURETY relied in executing, providing or procuring such BOND(S).

XII In the event that the execution of this AGREEMENT by any one or more of UNDERSIGNED is defective or invalid for any reason, such defect or invalidity shall have no effect upon the validity of this AGREEMENT as to any other UNDERSIGNED. Similarly, should any portion of this AGREEMENT be deemed invalid or unenforceable, the remaining provisions shall be valid and enforceable.

XIII This AGREEMENT constitutes the entire AGREEMENT between the parties and all previous representations, negotiations, discussions and promises concerning SURETY'S willingness to provide, procure or execute bonds in any specific amount, single limit or aggregate work program, or concerning SURETY'S intention to enforce or refrain from enforcing any of the terms of this AGREEMENT or exempt any specific assets or waive any of the terms hereof are hereby merged into this AGREEMENT.

(CONTINUED)
PAGE 3 OF 4

## CAUTION! READ BEFORE SIGNING!

The UNDERSIGNED represent to the SURETY that they have carefully read the entire AGREEMENT and that by executing this AGREEMENT they are bound to the SURETY with respect to all BOND(S) executed, provided, or procured or to be executed, provided or procured by. SURETY in behalf of PRINCIPAL as defined on page 1.

IN WITNESS WHEREOF, the UNDERSIGNED who are individuals have hereunto set their hands and seals, and the UNDERSIGNED who are partnerships, corporations or unincorporated associations have caused this AGREEMENT to be duly executed by their duly authorized representatives all on this 20TH day of _May_, 19 97.

Jackson Construction Company

WITNESS: _____    _____
ADDRESS:  NOTARY PUBLIC    Paul A. Bordieri, President
                          As President and not individually

WITNESS: _____    _____
ADDRESS:                   Paul A. Bordieri

WITNESS: _____    _____
ADDRESS:  NOTARY PUBLIC    Paul A. Bordieri Acting as Sole Trustee of
                          Jackson Construction Company a Massachusetts
                          Business Trust
                          As President and not individually

---

### ALL SIGNATURES MUST BE WITNESSED

IF A CORPORATION, AFFIX SEAL. ATTACH COPY OF BOARD OF DIRECTORS RESOLUTION RATIFYING OFFICER'S EXECUTION OF THIS AGREEMENT.

PAGE 4 OF 4

UNITED STATES FIDELITY AND GUARANTY COMPANY
FIDELITY AND GUARANTY INSURANCE COMPANY
FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC.

## MASTER SURETY AGREEMENT

This **AGREEMENT** is made and entered into by:
**ENTER NAME, ADDRESS, AND SOCIAL SECURITY OR TAX ID NUMBER.**

In favor of UNITED STATES FIDELITY AND GUARANTY COMPANY, FIDELITY AND GUARANTY INSURANCE COMPANY, FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC., and any and all affiliated, associated and subsidiary companies thereof, now existing or hereafter created, assumed or otherwise acquired (hereinafter referred to as SURETY), their successors and assigns.

In this AGREEMENT the words BOND, PERSON, UNDERSIGNED and PRINCIPAL are defined:

**BOND:** (1) Contract of suretyship, guaranty or indemnity; (2) the continuation, extension, alteration, renewal or substitution of such contract; (3) a letter from SURETY to a PERSON or PRINCIPAL wherein SURETY represents to such PERSON or PRINCIPAL that it is prepared and willing to execute in behalf of PRINCIPAL the BOND(S) required by such PERSON'S invitation for bids or proposals and referred to herein as a BID LETTER.

**PERSON:** Individual(s), partnership(s), association(s), corporation(s) or any other legal or commercial entity(ies);

**UNDERSIGNED:** PERSON(S) who execute this agreement.

**PRINCIPAL:** One or more UNDERSIGNED or any partnership, association, corporation or other legal or commercial entity in which UNDERSIGNED have a substantial, material and/or beneficial interest to the extent that the partnership, association, corporation or other legal or commercial entity would be considered a subsidiary, associated or affiliated company of UNDERSIGNED who, alone or with other PERSON(S), have secured, or may secure the performance and fulfillment of obligations by BOND(S) (whether or not required to do so by statute, ordinance, contract, order of court, rule of court, or otherwise), executed, provided, or procured by SURETY.

In consideration of SURETY'S:

(1) heretofore having executed, provided or procured BOND(S) in behalf of PRINCIPAL; or
(2) receiving requests for BOND(S) from UNDERSIGNED and determining whether or not SURETY will execute, provide or procure the BOND(S) requested; or
(3) hereafter executing, providing or procuring BOND(S) in behalf of PRINCIPAL;

UNDERSIGNED covenant and agree that:

I (A) This AGREEMENT binds UNDERSIGNED and the heirs, personal representatives, successors and assigns thereof, jointly and severally, to SURETY in connection with all BOND(S) heretofore or hereafter executed, provided or procured by SURETY in behalf of PRINCIPAL in any penal sum and in favor of any obligee(s);

CONT 5 (1-92)                                      (CONTINUED)
                                                    PAGE 1 OF 4

(B) This AGREEMENT shall not be const.      an offer by UNDERSIGNED to indemnify SU.      which SURETY must accept prior to its executing, providing or procuring BOND(S) in behalf of PRINCIPAL, but shall be construed as part of the consideration on which SURETY has relied or will rely in executing, providing or procuring BOND(S) in behalf of PRINCIPAL;
(C) SURETY has relied upon and will rely on the covenants and agreements of UNDERSIGNED as consideration for the BOND(S) executed, provided or procured in behalf of PRINCIPAL;
(D) This AGREEMENT inures to the benefit of any cosurety or reinsurer of SURETY in said BOND(S) and in the event SURETY procures the execution of BOND(S) by other sureties, this AGREEMENT shall inure to the benefit of such other sureties.

II UNDERSIGNED will pay or cause to be paid to SURETY, its successors and assigns, the premium charged or to be charged by SURETY for executing, providing or procuring BOND(S) for PRINCIPAL.

III (A) UNDERSIGNED shall exonerate, hold harmless, indemnify and keep indemnified SURETY from and against any and all demands, claims, liabilities, losses and expenses of whatsoever kind or nature (including but not limited to, interest, court costs and counsel fees) imposed upon, sustained, or incurred by SURETY by reason of: (1) SURETY having executed, provided or procured BOND(S) in behalf of PRINCIPAL, or (2) UNDERSIGNED'S failure to perform or comply with any of the provisions of this AGREEMENT;
(B) In order to exonerate, hold harmless, and indemnify SURETY, UNDERSIGNED shall upon demand of SURETY, place SURETY in funds before SURETY makes any payment; such funds shall be, at SURETY'S option, money or property, or liens or security interests in property. (The amount of such money or property or the value of the property to become subject to liens or security interests, shall be determined by SURETY.)
(C) SURETY may reduce the amount of UNDERSIGNED'S liability to SURETY hereunder by applying to such liability any money payable to UNDERSIGNED by SURETY; (Such liability may arise from UNDERSIGNED'S obligation to exonerate, to hold harmless and to indemnify SURETY and may be liquidated or unliquidated; and, the "money payable to UNDERSIGNED" may be, but is not limited to, any money payable by SURETY as an insurer of UNDERSIGNED or another PERSON to return to UNDERSIGNED an unearned or other premium or to settle a claim of UNDERSIGNED against SURETY or a PERSON insured by SURETY.)

IV (A) The liability of UNDERSIGNED hereunder shall extend to and include all amounts paid by SURETY in good faith under the belief that: (1) SURETY was or might be liable therefor; (2) such payments were necessary or advisable to protect any of SURETY'S rights or to avoid or lessen SURETY'S liability or alleged liability;
(B) the liability of UNDERSIGNED to SURETY shall include interest from the date of SURETY'S payments at the maximum rate permitted in the jurisdiction in which this AGREEMENT is enforced, or is enforceable;
(C) the voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn to by an officer of SURETY shall be prima facie evidence of the fact and extent of the liability of UNDERSIGNED to SURETY.

V (A) Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising;
(B) each UNDERSIGNED is the agent for all UNDERSIGNED for the purpose of accepting service of any process in the jurisdiction in which the UNDERSIGNED accepting the process resides, is domiciled, is doing business or is found;
(C) in the event SURETY should file suit at law or in equity to enforce the terms of this AGREEMENT, SURETY shall be entitled to recover its own reasonable attorney's fees and expenses from UNDERSIGNED in connection with such suit.

VI When BOND(S) secure the performance and fulfillment of contracts, PRINCIPAL and UNDERSIGNED, agree that:

(A) (1) SURETY has the rights of indemnification, exoneration and subrogation; and (2) SURETY'S rights of indemnification, exoneration and subrogation may be enforced as provided by applicable law or, at option of SURETY, as follows:

(a) with respect to each specific contract secured by BOND(S) all money and property representing the consideration for the contract is dedicated for: (i) the performance of the contract; (ii) the payment of obligation(s) to subcontractor(s), laborer(s) and supplier(s) of material(s) and service(s) incurred or to be incurred in the performance of the contract for which SURETY is liable under BOND(S) and, (iii) the satisfaction of the obligations herein and all other indebtednesses and liabilities of PRINCIPAL or UNDERSIGNED to SURETY;
(b) to partially implement this dedication SURETY may, in its sole discretion, demand that PRINCIPAL request delivery of the consideration for the contract to a bank designated by SURETY for deposit of the proceeds of the consideration for the contract(s) in an account in the name of PRINCIPAL designated as a "Special Account" and withdrawal(s) from said "Special Account" shall be by check(s), payable to the beneficiaries of this dedication, signed by a representative of PRINCIPAL and by a representative of SURETY;
(c) this dedication may be implemented in any other manner provided at law or in equity;

(B) In the event of: (1) any breach of any of the agreements herein; (2) any breach, delay or default in any contract secured by BOND(S); (3) any breach or default of BOND(S); (4) any change or threat of change in the character, identity, control, beneficial ownership or existence of PRINCIPAL; (5) any assignment by PRINCIPAL for the benefit of creditors; (6) the appointment of a receiver or trustee or any application for appointment of a receiver or trustee for PRINCIPAL, whether insolvent or not; (7) any proceedings or the exercise of any rights by any PERSON which deprives or impairs PRINCIPAL'S use of its plant, machinery, equipment, plans, drawings, tools, supplies or materials; (8) upon the happening of any event other than those specified in (1) through (7) and completely different from those events, which, in its sole opinion may expose SURETY to loss, cost or expense.

(CONTINUED)
PAGE 2 OF 4

(a) SURETY shall have the rig.    \.  its discretion, to take possession of a.    _.. or all of the work under contract(s) secured by BOND(S) (together with plant, machinery, equipment, job books and records, plans, drawings, tools, supplies or material wherever located and owned or useable by PRINCIPAL) and, at the expense of UNDERSIGNED, to complete or cause completion of any such work, or relet or consent to the reletting or completion of such contract(s), and;

(b) SURETY is authorized and empowered to assert, pursue and prosecute, in its discretion, and at the expense of UNDERSIGNED (in the name of PRINCIPAL or in the name of SURETY), all claim(s) of PRINCIPAL arising or growing out of contract(s) and work done thereunder secured by BOND(S) against: (i) Obligee(s) in BOND(S); or (ii) any PERSON, government or governmental agency. (The authority and power to prosecute said claim(s) is deemed to include the authority to settle said claim(s) or any part thereof; and the money or property awarded by Obligee(s) representative, a judicial or quasi-judicial officer or a panel or board, or the money or property to become due in settlement of said claim(s) is deemed to be a portion of the "money or property representing the consideration for the contract" and subject to the dedication in subparagraph (A) of this paragraph).

VII (A) UNDERSIGNED are not obligated to request SURETY to execute, provide or procure BOND(S) required of them in the performance and fulfillment of obligations;
(B) SURETY has the right to decline to execute, provide or procure BOND(S) requested by PRINCIPAL;
(C) if SURETY executes, provides or procures a bid or proposal bond or furnishes a BID LETTER in behalf of PRINCIPAL, SURETY has the right to decline to execute the final BOND(S) (including, but not limited to performance, payment or maintenance bond(s)) that may be required in connection with any award that may be made under the bid, proposal or tender for which the bid or proposal bond or BID LETTER is given.

VIII UNDERSIGNED shall not be relieved of liability hereunder by any change, addition, substitution, continuation, renewal, extension, successor or new obligation in connection with BOND(S) or any contract(s) secured thereby, whether known or consented to by SURETY, and notice of SURETY'S consent is hereby waived.

IX (A) SURETY'S rights hereunder shall be deemed to be cumulative with, and in addition to, all other rights of SURETY, however derived;
(B) SURETY is not required to exhaust its remedies or rights against PRINCIPAL or to await receipt of any or final dividends from the legal representative(s) of PRINCIPAL before asserting its rights hereunder against UNDERSIGNED;
(C) This AGREEMENT shall be liberally construed so as to protect, hold harmless, exonerate and indemnify SURETY.

X (A) At any time during business hours and until such time as (1) the liability of SURETY under BOND(S) is terminated or (2) SURETY is fully reimbursed all its losses, cost and expenses as a result of having executed, provided, or procured BOND(S) in behalf of PRINCIPAL, SURETY shall have access to the books, records and accounts of UNDERSIGNED; (B) when requested by SURETY, banks, depositories, obligees in BOND(S), materialmen, supply houses, or other PERSON(S) are hereby authorized to furnish SURETY any information requested with respect to PRINCIPAL, or UNDERSIGNED.

XI (A) There shall be no waiver, modification or change of the terms of this AGREEMENT without the written approval of an officer of SURETY;
(B) if an UNDERSIGNED previously executed an agreement of indemnity or MASTER SURETY AGREEMENT in favor of SURETY and upon which SURETY relied when it executed, provided or procured BOND(S) in behalf of any PERSON as PRINCIPAL, SURETY'S acceptance of this AGREEMENT neither terminates such agreement of indemnity or MASTER SURETY AGREEMENT nor relieves such UNDERSIGNED from liability to SURETY thereon in connection with such BOND(S).
(C) this AGREEMENT may be terminated as to any UNDERSIGNED upon written notice given to SURETY by such UNDERSIGNED or such UNDERSIGNED'S legal representatives or successors by Registered or Certified Mail addressed to SURETY at its Home Office in Baltimore, Maryland;
(D) if an UNDERSIGNED: (1) dies; (2) becomes physically or mentally disabled to the extent that he or she is unable to perform the duties of owner, partner, officer or employee of an UNDERSIGNED which is or may become PRINCIPAL in BOND(S); (3) terminates his or her marriage by annulment or divorce; or, (4) sells or disposes of his or her interest in an UNDERSIGNED which is or may become PRINCIPAL in BOND(S); this AGREEMENT may be terminated as to such UNDERSIGNED upon receipt by SURETY at its Home Office in Baltimore, Maryland, of written notice of such death, disability, annulment, divorce, sale or disposition (such written notice shall be given as specified in Subparagraph XI (C);
(E) termination of this AGREEMENT pursuant to Subparagraph XI (C) or XI (D) shall not be effective until thirty (30) days after receipt of said written notice by SURETY;
(F) termination of this AGREEMENT pursuant to Subparagraph XI (C) or XI (D) shall not relieve any UNDERSIGNED from liability to SURETY arising out of BOND(S) executed, provided or procured by SURETY in behalf of PRINCIPAL prior to the effective date of such termination and for which this AGREEMENT is part of the consideration on which SURETY relied in executing, providing or procuring such BOND(S).

XII In the event that the execution of this AGREEMENT by any one or more of UNDERSIGNED is defective or invalid for any reason, such defect or invalidity shall have no effect upon the validity of this AGREEMENT as to any other UNDERSIGNED. Similarly, should any portion of this AGREEMENT be deemed invalid or unenforceable, the remaining provisions shall be valid and enforceable.

XIII This AGREEMENT constitutes the entire AGREEMENT between the parties and all previous representations, negotiations, discussions and promises concerning SURETY'S willingness to provide, procure or execute bonds in any specific amount, single limit or aggregate work program, or concerning SURETY'S intention to enforce or refrain from enforcing any of the terms of this AGREEMENT or exempt any specific assets or waive any of the terms hereof are hereby merged into this AGREEMENT.

## CA    JN! READ BEFORE SIGNING!

The UNDERSIGNED represent to the SURETY that they have carefully read the entire AGREEMENT and that by executing this AGREEMENT they **are bound to the SURETY with respect to all BOND(S) executed, provided, or procured or to be executed, provided or procured by SURETY in behalf of PRINCIPAL as defined on page 1.**

IN WITNESS WHEREOF, the UNDERSIGNED who are individuals have hereunto set their hands and seals, and the UNDERSIGNED who are partnerships, corporations or unincorporated associations have caused this AGREEMENT to be duly executed by their duly authorized

representatives all on this _____ day of _____, 19_____.


## ALL SIGNATURES MUST BE WITNESSED

IF A CORPORATION, AFFIX SEAL. ATTACH COPY OF BOARD OF DIRECTORS RESOLUTION RATIFYING OFFICER'S EXECUTION OF THIS AGREEMENT.



**Jackson
Construction
Company**

(A Massachusetts Business Trust)

May **20TH** , 1997

Mr. Donald McCarter
USF&G Company
300 Crown Colony Drive
Quincy, MA 02169

RE: <u>Retention of Surplus Agreement</u>

Dear Mr. McCarter:

It is hereby understood that the USF&G is providing surety credit based on the
strength of the financial condition at July 31, 1996 after allowing for a stock
redemption of approximately $3,350,000.

We understand that your ability to provide sufficient bonding capacity to cover
that scope of our operation is dependent upon the maintenance of our working
capital and net worth.

For that purpose, it is agreed that no distribution to shareholders, except for
amounts needed to pay income taxes on current year earnings, will be made subsequent
to fiscal year end without the prior knowledge of the USF&G, provided, that the
foregoing shall not be construed to prevent the payment of compensation, expense
reimbursement and benefits to employees who are also shareholders.

JACKSON CONSTRUCTION COMPANY

BY: _____
As President and not individually

BY: _____
Paul Bordieri, Shareholder
As President and not individually

JACKSON CONSTRUCTION COMPANY
(a Massachusetts Business Trust)

Financial Statements and
Supplementary Information

For the Years Ended December 31, 2002 and 2001

# JACKSON CONSTRUCTION COMPANY
Table of Contents

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Financial Statements |  |
| Balance Sheets | 2 |
| Statements of Operations and Retained Earnings | 3 |
| Statements of Cash Flows | 4 - 5 |
| Notes to Financial Statements | 6 - 11 |
| Independent Auditors' Report on Supplementary Information | 12 |
| Schedules of Other Income | 13 |
| Schedules of General and Administrative Expenses | 14 |
| Schedule of Contracts in Progress | 15 |
| Schedule of Completed Contracts | 16 |

**000019**

# Ziner, Kennedy & Lehan LLP

**Independent Auditors' Report**

To the Board of Directors of
Jackson Construction Company

We have audited the accompanying balance sheets of Jackson Construction Company as of December 31, 2002 and 2001, and the related statements of operations and retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Jackson Construction Company as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Ziner, Kennedy & Lehan LLP*

Ziner, Kennedy & Lehan LLP

March 11, 2003
Quincy, Massachusetts

**000020**

-1-

2300 Crown Colony Drive, Suite 301 • Quincy, Massachusetts 02169 • (617) 472-0700 *phone* • (617) 472-0528 *fax*
24 Federal Street, 9th floor • Boston, Massachusetts 02110 • (617) 472-0700 *phone* • (617) 556-2869 *fax*
*Certified Public Accountants & Management Consultants*

# JACKSON CONSTRUCTION COMPANY
### (a Massachusetts Business Trust)
### Balance Sheets
### December 31, 2002 and 2001

## ASSETS

|  | 2002 | 2001 |
| --- | --- | --- |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ | |
| Securities available for sale | 1,710,322 | 1,678,369 |
| Accounts receivable - contracts (including retainage of $1,329,693 and $1,933,280) | | |
| Costs and estimated earnings in excess of billings on uncompleted contracts | | |
| Prepaid corporate income taxes | | |
| Prepaid expenses and other current assets | | |



**PROPERTY AND EQUIPMENT - NET**

**OTHER ASSETS**
Accounts receivable - long-term
Cash surrender value of life insurance
Deposit

$

## LIABILITIES AND STOCKHOLDER'S EQUITY

**CURRENT LIABILITIES**
Accounts payable and accrued expenses (including retainage of $1,709,411 and $1,947,166)                                     $
Billings in excess of costs and estimated earnings on uncompleted contracts
Corporate income taxes payable
Current portion of capital lease obligation

**STOCKHOLDER'S EQUITY**
Common stock, no par value - authorized 20,000 shares, issued 9,500 shares of which 9,200 shares are in treasury
Additional paid-in capital
Retained earnings
Unrealized gain (loss) on securities available for sale

Less treasury stock, at cost



$

The accompanying notes are an integral part of the financial statements.

## JACKSON CONSTRUCTION COMPANY
(a Massachusetts Business Trust)
Notes To Financial Statements
For the Years Ended December 31, 2002 and 2001

**Note 1 - Summary of Significant Accounting Policies (Continued)**



**Note 2 - Securities Available for Sale**

The Company's investment in debt securities consists of U. S. Government and Federal Agency Bonds that have a readily determinable fair market value.  Management determines the appropriate classification of its investments at the time of purchase and re-evaluates such determination at each balance sheet date.

Since the Company does not intend to sell these securities in the near term, they are classified as available for sale and reported at fair market value, with unrealized gains and losses reported as a separate component within the stockholder's equity section of the balance sheet. Gross unrealized gains at December 31, 2002 and 2001 were $55,547 and $29,346 and gross unrealized losses at December 31, 2002 and 2001, were $0 and $739, respectively.  Realized gains and losses on all marketable securities are determined by specific identification and are charged or credited to current earnings.

The scheduled maturities of securities available for sale at December 31, 2002 and 2001 are shown below. Expected maturities may differ from contractual maturities because issuers may have the right to call or prepay obligations with or without call or prepayment penalties:

|  | 2002 | 2001 |
|---|---|---|
| Due in one year or less | $ 281,220 | $ 0 |
| Due from one year to five years | 1,303,985 | 1,529,104 |
| Due from five to ten years | 125,117 | 149,265 |
|  | $ 1,710,322 | $ 1,678,369 |

The Company maintains an account with a brokerage firm.  The account is invested in a money market fund and several securities issued and guaranteed by the U.S. Government.  Sales proceeds and realized gain and losses on securities available for sale for the years ended December 31, 2002 and 2001 were:

|  | Amortized Cost | Realized Gain | Sales Proceeds |
|---|---|---|---|
| 2002  Mortgage & asset backed securities | $ 974,719 | $ 281 | $ 975,000 |
| 2001  Mortgage & asset backed securities | $ 918,739 | $ 59 | $ 918,798 |

-7-

000026

### JACKSON CONSTRUCTION COMPANY
(a Massachusetts Business Trust)

Financial Statements and
Supplementary Information

For the Years Ended December 31, 2003 and 2002

000000

# JACKSON CONSTRUCTION COMPANY
Table of Contents

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Financial Statements |  |
| Balance Sheets | 2 |
| Statements of Operations and Retained Earnings | 3 |
| Statements of Cash Flows | 4 - 5 |
| Notes to Financial Statements | 6 - 11 |
| Independent Auditors' Report on Supplementary Information | 12 |
| Schedules of Other Income | 13 |
| Schedules of General and Administrative Expenses | 14 |
| Schedule of Contracts in Progress | 15 |
| Schedule of Completed Contracts | 16 |

# Ziner, Kennedy & Lehan LLP

## Independent Auditors' Report

To the Board of Directors of
Jackson Construction Company

We have audited the accompanying balance sheets of Jackson Construction Company as of December 31, 2003 and 2002, and the related statements of operations and retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Jackson Construction Company as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Ziner, Kennedy & Lehan LLP*

Ziner, Kennedy & Lehan LLP

April 5, 2004
Quincy, Massachusetts

**000002**

-1-

2300 Crown Colony Drive, Suite 301 • Quincy, Massachusetts 02169 • (617) 472-0700 *phone* • (617) 472-0528 *fax*
24 Federal Street, 9th floor • Boston, Massachusetts 02110 • (617) 472-0700 *phone* • (617) 556-2869 *fax*

# JACKSON CONSTRUCTION COMPANY
### (a Massachusetts Business Trust)
### Balance Sheets
### December 31, 2003 and 2002

## ASSETS

|  | 2003 | 2002 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | | |
| Securities available for sale | 1,860,487 | 1,710,322 |
| Accounts receivable - contracts (including retainage of | | |
| Costs and estimated earnings in excess of billings on uncompleted contracts | | |
| Prepaid corporate income taxes | | |
| Prepaid expenses and other current assets | | |



**PROPERTY AND EQUIPMENT - NET**

**OTHER ASSETS**
Accounts receivable - long-term
Deposit

## LIABILITIES AND STOCKHOLDER'S EQUITY

**CURRENT LIABILITIES**
Accounts payable and accrued expenses (including retainage of $        )
Billings in excess of costs and estimated earnings on uncompleted contracts
Current portion of note payable



**NOTE PAYABLE - LONG TERM**

**STOCKHOLDER'S EQUITY**
Common stock, no par value - authorized 20,000 shares, issued 9,500 shares of which 9,200 shares are in treasury
Additional paid-in capital
Retained earnings
Unrealized gain (loss) on securities available for sale

Less treasury stock, at cost



The accompanying notes are an integral part of the financial statements.

**000003**

# JACKSON CONSTRUCTION COMPANY
## (a Massachusetts Business Trust)
### Notes To Financial Statements
For the Years Ended December 31, 2003 and 2002

**Note 1 - Summary of Significant Accounting Policies  (Continued)**



**Note 2 - Securities Available for Sale**

The Company's investment in debt securities consists of U. S. Government and Federal Agency Bonds that have a readily determinable fair market value.  Management determines the appropriate classification of its investments at the time of purchase and re-evaluates such determination at each balance sheet date.

Since the Company does not intend to sell these securities in the near term, they are classified as available for sale and reported at fair market value, with unrealized gains and losses reported as a separate component within the stockholder's equity section of the balance sheet.  Gross unrealized gains at December 31, 2003 and 2002 were $29,693 and $55,547 and gross unrealized losses at December 31, 2003 and 2002, were $3,791 and $0, respectively.  Realized gains and losses on all marketable securities are determined by specific identification and are charged or credited to current earnings.

The scheduled maturities of securities available for sale at December 31, 2003 and 2002 are shown below. Expected maturities may differ from contractual maturities because issuers may have the right to call or prepay obligations with or without call or prepayment penalties:

|  | 2003 | 2002 |
|---|---|---|
| Due in one year or less | $          0 | $    281,220 |
| Due from one year to five years | 1,860,487 | 1,303,985 |
| Due from five to ten years | 0 | 125,117 |
|  | $  1,860,487 | $  1,710,322 |

The Company maintains an account with a brokerage firm.  The account is invested in a money market fund and several securities issued and guaranteed by the U.S. Government.  Sales proceeds and realized gain and losses on securities available for sale for the years ended December 31, 2003 and 2002 were:

|  |  | Amortized Cost | Realized Gain(Loss) | Sales Proceeds |
|---|---|---|---|---|
| 2003 | Mortgage & asset backed securities | $ 1,275,079 | $      (79) | $ 1,275,000 |
| 2002 | Mortgage & asset backed securities | $    974,719 | $      281 | $    975,000 |

**000008**

MAY. 24. 2005  2:29PM    APPLETON PARTNERS, INC.    NO. 2522  P. 2

# Account Summary and Performance

## A0525 - JACKSON CONSTRUCTION COMPANY
### April 30, 2005
### MGR DCC

### PORTFOLIO SUMMARY - CURRENT INVESTMENT CATEGORIES

| | Market Value | % of Total | Current Yield(%) |
|---|---|---|---|
| Cash and Equiv. | 100,828 | 100.0 | 1.2 |
| Total | $100,828 | 100.0 | 1.2 |



### PORTFOLIO APPRAISAL - CURRENT INVESTMENT CATEGORIES

| | Quarter 03-31-05 | Year 12-31-04 |
|---|---|---|
| Portfolio Beginning Value | $1,955,752 | $1,963,476 |
| Accrued Interest | $18,446 | $19,943 |
| Net Additions/Withdrawals | -1,885,760 | -1,888,215 |
| Expenses | 0 | 0 |
| Change in Mkt Val (Realized) | 781 | 219 |
| Change in Mkt Val (Unrealized) | 5,923 | -17,802 |
| Interest Received | 24,132 | 43,149 |
| Dividends Received | 0 | 0 |
| Change in Accrued Interest | -18,446 | -19,343 |
| Portfolio Value on 04-30-05 | $100,828 | $100,828 |
| Accrued Interest | $0 | $0 |
| Total | $100,828 | $100,828 |

### PERFORMANCE

| | Month To Date | Quarter To Date | Year To Date |
|---|---|---|---|
| Total Portfolio | 0.53 | 0.53 | 0.19 |
| Taxable Fixed Income | 0.57 | 0.57 | 0.18 |
| Citi Gov't/Credit 1-3 | 0.64 | 0.64 | 0.38 |

000098

APPLETON PARTNERS, INC.

Appleton Partners, Inc.

# PORTFOLIO APPRAISAL

## A0525 - JACKSON CONSTRUCTION COMPANY

*April 30, 2005*

| Quantity | Security | Purchase Date | Unit Cost | Total Cost | Current Price | Market Value | Percent Assets | Unrealized Gain/Loss | Estimated Annual Income | Curr. Yield | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | | | |
| CASH | | | | 100,827.91 | | 100,827.91 | 100.0 | | 1,260.35 | 1.2 | |
| **TOTAL PORTFOLIO** | | | | 100,827.91 | | 100,827.91 | 100.0 | 0.00 | 1,260.35 | 1.2 | 0.00 |

The pricing information and descriptions used in this report have been provided to us by third party vendors believed to be reliable.

4

APPLETON PARTNERS, INC.

000099

Appleton Partners, Inc.
## INCOME SUMMARY

**A0525 - JACKSON CONSTRUCTION COMPANY**
*From 04-01-05 Through 04-30-05*

| Trade | Settle | Security | Amount |
|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | |
| 04-29-05 | 04-29-05 | CASH | 202.91 |
| | | | 202.91 |
| **GOVERNMENT BONDS** | | | |
| 04-11-05 | 04-11-05 | FEDERAL AGRIC MTG CORP MNTS B 5.230% Due 04-11-07 | 2,615.00 |
| 04-16-05 | 04-16-05 | FEDERAL FARM CR BKS CONS 3.600% Due 04-16-08 | 1,350.00 |
| 04-27-05 | 04-27-05 | FEDERAL HOME LN BKS 2.500% Due 07-27-07 | 625.00 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 3.600% Due 05-07-08 | 1,290.00 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 2.650% Due 08-04-06 | 625.69 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 3.000% Due 05-26-06 | 1,275.00 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 4.125% Due 11-18-09 | 1,844.79 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 3.375% Due 08-23-07 | 618.75 |
| 04-29-05 | 04-29-05 | FEDERAL AGRIC MTG CORP MNTS B 5.230% Due 04-11-07 | 261.50 |
| 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 3.600% Due 04-16-08 | 97.50 |
| 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 3.250% Due 06-29-07 | 1,083.33 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 3.510% Due 05-26-09 | 899.44 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 2.500% Due 07-09-07 | 763.89 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 5.125% Due 05-09-07 | 2,420.14 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.540% Due 08-01-07 | 1,109.78 |
| 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.000% Due 08-25-08 | 711.11 |

6

000100

Appleton Partners, Inc.
INCOME SUMMARY
A0525 - JACKSON CONSTRUCTION COMPANY
From 04-01-05 Through 04-30-05

| Trade | Settle | Security | Amount |
|-------|--------|----------|--------|
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.750% Due 01-02-07 | 1,157.81 |
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 5.000% Due 01-15-07 | 2,166.67 |
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.000% Due 09-02-08 | 633.33 |
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.750% Due 09-15-08 | 458.33 |
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.530% Due 10-19-07 | 1,823.83 |
| 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.510% Due 10-19-07 | 98.06 |
| | | | 23,928.95 |
| NET INCOME | | | 24,131.86 |

Appleton Partners, Inc.
## CONTRIBUTIONS/WITHDRAWALS
### A0525 - JACKSON CONSTRUCTION COMPANY
From 04-01-05 To 04-30-05

| Tran Code | Trade Date | Settle Date | Security | Amount | Quantity | Broker Code | Commission |
|---|---|---|---|---|---|---|---|
| **CONTRIBUTIONS** | | | | 0.00 | | | |
| **WITHDRAWALS** | | | | | | | |
| lo | 04-21-05 | 04-21-05 delivery fee | CASH | 75.00 | | | |
| lo | 04-29-05 | 04-29-05 | CASH | 125,929.27 | | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL AGRIC MTG CORP MNTS B 5.230% Due 04-11-07 | 261.50 | | | |
| lo | 04-29-05 | 04-29-05 | FEDERAL AGRIC MTG CORP MNTS B 5.230% Due 04-11-07 | 102,429.70 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 1.600% Due 04-16-08 | 97.50 | | | |
| lo | 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 3.600% Due 04-16-08 | 73,968.75 | 75,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 3.250% Due 06-29-07 | 1,083.33 | | | |
| lo | 04-29-05 | 04-29-05 | FEDERAL FARM CR BKS CONS 3.250% Due 06-29-07 | 98,531.25 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 3.510% Due 06-26-09 | 859.44 | | | |
| lo | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 3.510% Due 06-26-09 | 73,101.56 | 75,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 2.500% Due 07-09-07 | 763.89 | | | |
| lo | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 2.500% Due 07-09-07 | 97,062.50 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 5.125% Due 05-09-07 | 2,420.14 | | | |

8

000102

APPLETON PARTNERS, INC.

Appleton Partners, Inc.
## CONTRIBUTIONS/WITHDRAWALS
## A0525 - JACKSON CONSTRUCTION COMPANY
From 04-01-05 To 04-30-05

| Tran Code | Trade Date | Settle Date | Security | Amount | Quantity | Broker Code | Commission |
|---|---|---|---|---|---|---|---|
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 5.125% Due 05-09-07 | 100,031.25 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.540% Due 08-01-07 | 1,109.78 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.540% Due 08-01-07 | 100,281.25 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.000% Due 08-25-08 | 711.11 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN BKS 4.000% Due 08-25-08 | 99,437.50 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 3.600% Due 05-07-08 | 1,290.00 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 3.600% Due 05-07-08 | 74,027.32 | 75,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 2.650% Due 08-04-06 | 625.69 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 2.650% Due 08-04-06 | 98,679.09 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 3.000% Due 05-26-06 | 1,275.00 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 3.000% Due 05-26-06 | 99,288.50 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 4.125% Due 11-18-09 | 1,844.79 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG 4.125% Due 11-18-09 | 99,473.30 | 100,000 | | |

9

000103

## Appleton Partners, Inc.
## CONTRIBUTIONS/WITHDRAWALS
### A0525 - JACKSON CONSTRUCTION COMPANY
From 04-01-05 To 04-30-05

| Tran Code | Trade Date | Settle Date | Security | Amount | Quantity | Broker Code | Commission |
|---|---|---|---|---|---|---|---|
| sa | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 3.375% Due 08-23-07 | 618.75 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL HOME LN MTG CORP MTN 3.375% Due 08-23-07 | 98,687.50 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.750% Dec 01-02-07 | 1,157.81 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.750% Due 01-02-07 | 75,890.62 | 75,000 | | |
| ss | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 5.000% Due 01-15-07 | 2,166.67 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 5.000% Due 01-15-07 | 152,812.50 | 150,000 | | |
| ss | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.000% Due 09-02-08 | 633.33 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 4.000% Due 09-02-08 | 99,250.00 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.750% Due 09-15-08 | 458.33 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.750% Due 09-15-08 | 98,500.00 | 100,000 | | |
| sa | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.530% Due 10-19-07 | 98.06 | | | |
| io | 04-29-05 | 04-29-05 | FEDERAL NATL MTG ASSN 3.530% Due 10-19-07 | 98,343.75 | 100,000 | | |

1,883,315.73

EXPENSE ACCOUNTS

0.00

000104

APPLETON PARTNERS, INC.

## Appleton Partners, Inc.
### CONTRIBUTIONS/WITHDRAWALS
### A0525 - JACKSON CONSTRUCTION COMPANY
From 04-01-05 To 04-30-05

| Tran Code | Trade Date | Settle Date | Security | Amount | Quantity | Broker Code | Commission |
|---|---|---|---|---|---|---|---|

**AFTER FEE PERFORMANCE EXPENSE ACCOUNTS**
| dp | 04-25-05 | 04-25-05 | MANAGEMENT FEE | 2,444.69 | | | |

PORTFOLIO ACCOUNT TOTAL: 2,444.69

**AFTER FEE PERFORMANCE EXPENSE ACCOUNTS PAID BY CLIENT** 0.00

**EXPENSE ACCOUNTS PAID BY CLIENT** 0.00

**GRAND TOTAL:** 0.00

000105

APPLETON PARTNERS, INC.

11

Appleton Partners, Inc.

REALIZED GAINS AND LOSSES

A0525 - JACKSON CONSTRUCTION COMPANY

From 01-01-05 Through 04-30-05

| Open Date | Close Date | Quantity | Security | Original Cost | Adjusted Cost Basis | Proceeds | Gain Or Loss | |
|-----------|------------|----------|----------|---------------|---------------------|----------|--------------|------|
| | | | | | | | Short Term | Long Term |
| 07-15-04 | 04-27-05 | 100,000 | FEDERAL HOME LN BKS 2.500% Due 07-27-07 | 100,000.00 | 100,000.00 | 100,000.00 | 0.00 | |
| TOTAL GAINS | | | | --- | --- | --- | 0.00 | |
| TOTAL LOSSES | | | | | | | | |
| TOTAL REALIZED GAIN/LOSS | | 0.00 | | $100,000.00 | 100,000.00 | 100,000.00 | 0.00 | |

APPLETON PARTNERS, INC.

000106

Appleton Partners, Inc.
CASH LEDGER

## A0525 - JACKSON CONSTRUCTION COMPANY
### MGR: DCC  BANK: SSB - BL6025
*From 04-30-05 To 05-23-05*

| Trade Date | Settle Date | Transaction | Tran Code | Security | Amount | Balance |
|---|---|---|---|---|---|---|
| CASH | | | | | | |
| 04-30-05 | | Beginning Balance | | | | 100,827.91 |
| 05-04-05 | | Addition | | Deliver in long    to Portfolio | 1,748.83 | 102,576.74 |
| RESIDUAL CASH | | | | | | |
| 05-05-05 | | Withdrawal | | Deliver out long    from Portfolio | -100,827.91 | 1,748.83 |
| 05-23-05 | | Ending Balance | | | | 1,748.83 |

000115

**Jackson Construction Company**
Trial Balance
April 30, 2005

| Account Number | Account Title | Beginning Balance | Current Period Activity | Current Balance |
|---|---|---|---|---|
| | | | | |
| **Assets, Liabilities & Equity** | | | | |
| | | | | |
| 1000 | CASH-SOVEREIGN BANK A/P | $ (195,472.63) | $ (292,636.40) | $ (488,109.03) |
| 1001 | CASH-SOVEREIGN BANK P/R | (39,683.47) | 17,282.33 | (22,401.14) |
| 1004 | CASH-FLEET BANK NH | .00 | .00 | .00 |
| 1005 | CASH-1ST TRADE UNION SV | (4,561.40) | 15,552.19 | 10,990.79 |
| 1030 | CASH-SOVEREIGN BANK US | 261,564.60 | 518.69 | 262,083.29 |
| 1040 | CASH-MMA APPLETON PARTN | 122,660.13 | (122,660.13) | .00 |
| 1041 | CASH-REPURCHASE AGREEME | 941,266.19 | (462,970.60) | 478,295.59 |
| 1042 | CASH-FEDL. NATL. MTG. A | 523,085.94 | (523,085.94) | .00 |
| 1043 | CASH-FANNIE MAE | .00 | .00 | .00 |
| 1044 | CASH-FEDL. HOME LOAN BA | 1,035,916.43 | (1,035,916.43) | .00 |
| 1045 | FED AGRICULTURE MTG COR | 274,089.57 | (274,089.57) | .00 |
| 1099 | BANK CLEARING ACCOUNT | .00 | .00 | .00 |
| 1200 | ACCOUNTS RECEIVABLE | 7,408,921.33 | (718,838.62) | 6,690,082.71 |
| 1210 | RETAINAGE RECEIVABLE | 5,953,102.75 | 201,372.74 | 6,154,475.49 |
| 1220 | ACCOUNTS RECEIVABLE - O | 44,900.00 | .00 | 44,900.00 |
| 1230 | A/R Long Term | .00 | .00 | .00 |
| 1299 | COST IN EXCESS OF BILLI | 1,963,487.00 | (1,038,999.00) | 924,488.00 |
| 1900 | PREPAIDS | .00 | .00 | .00 |
| 1902 | PREPAID TAXES-MA | 1,934.12 | .00 | 1,934.12 |
| 1904 | PREPAID TAXES-NH | .00 | .00 | .00 |
| 1906 | PREPAID EXPENSES - OTHE | .00 | .00 | .00 |
| 1908 | PREPAID INSURANCE | 27,621.76 | 100.00 | 27,721.76 |
| 1910 | PREPAID RENT | .00 | .00 | .00 |
| 1912 | EMPLOYEE ADVANCES | 20,750.10 | .00 | 20,750.10 |
| 1914 | PLAN DEPOSITS - REFUNDA | 2,050.00 | .00 | 2,050.00 |
| 1916 | ACCRUED INT. REC. - APP | 18,446.29 | (18,446.29) | .00 |
| 1918 | SECURITY DEPOSIT RECEIV | 50,000.00 | .00 | 50,000.00 |
| 1920 | ALLOW. - MKTBLE. SEC. V | .00 | .00 | .00 |
| 1950 | OTHER ASSETS | .00 | .00 | .00 |
| 1951 | CASH SURRENDER VALUE LI | .00 | .00 | .00 |
| 1960 | PROPERTY, PLANT & EQUIP | .00 | .00 | .00 |
| 1962 | MOTOR VEHICLES | 50,885.75 | .00 | 50,885.75 |
| 1964 | ACCUM. DEPR. - MOTOR V | (47,323.00) | .00 | (47,323.00) |
| 1966 | MACHINERY & EQUIPMENT | 22,710.00 | .00 | 22,710.00 |
| 1968 | ACCUM. DEPR. - MACH. & | (22,710.00) | .00 | (22,710.00) |
| 1970 | OFFICE FURNITIURE & FIXT | 243,833.70 | .00 | 243,833.70 |
| 1972 | ACCUM. DEPR.- OFF. FURN | (200,941.21) | .00 | (200,941.21) |
| 1974 | BUILDING | .00 | .00 | .00 |
| 1976 | ACCUM. DEPR. - BUILDING | .00 | .00 | .00 |
| 1978 | NH - FURNITURE & FIXTUR | .00 | .00 | .00 |
| 1980 | ACCUM. DEPR. - NH FURN | .00 | .00 | .00 |
| 1982 | LEASEHOLD IMPROVEMENTS | 719,765.80 | .00 | 719,765.80 |
| 1984 | ACCUM. DEPR. - LEASEHOL | (397,909.05) | .00 | (397,909.05) |
| 1986 | LAND | 2,500.00 | .00 | 2,500.00 |
| 2000 | ACCOUNTS PAYABLE | (11,180,123.42) | 480,661.84 | (10,699,461.58) |
| 2001 | ACCOUNTS PAYABLE RETAIN | (6,329,549.40) | (103,180.48) | (6,432,729.88) |
| 2005 | W/C & G/L INSURANCE PAY | (68,953.73) | (16,892.01) | (85,845.74) |
| 2006 | HEALTH, DENTAL & DISAB | .00 | .00 | .00 |
| 2100 | NOTE PAYABLE SOVEREIGN | .00 | .00 | .00 |
| 2210 | FICA/MED WITHHOLDING - | .00 | .00 | .00 |
| 2211 | FICA/MED WITHHOLDING - | (10,281.68) | 2,214.76 | (8,066.92) |
| 2212 | FEDERAL WITHHOLDING | (10,487.40) | 2,607.30 | (7,880.10) |

000090

**Jackson Construction Company**
Trial Balance
April 30, 2005

| Account Number | Account Title | Beginning Balance | Current Period Activity | Current Balance |
|---|---|---|---|---|
| 2213 | FUTA LIABILITY | $ (3,347.67) | $ 3,240.61 | $ (107.06) |
| 2215 | MA WITHHOLDING | (3,348.71) | 3,348.71 | .00 |
| 2216 | MA HEALTH INS TAX LIAB | (887.27) | 833.27 | (54.00) |
| 2217 | MA SUTA LIABILITY | (41,031.33) | 24,666.64 | (16,364.69) |
| 2225 | NH SUTA LIABILITY | .00 | .00 | .00 |
| 2250 | FRINGE BENEFITS PAYABLE | .00 | .00 | .00 |
| 2251 | UNION DUES WITHHOLDING | .00 | .00 | .00 |
| 2275 | OTHER P/R DEDUCTIONS WI | (50.00) | (4,094.08) | (4,144.08) |
| 2301 | ACCRUED PAYROLL | .00 | .00 | .00 |
| 2303 | ACCRUED AUDIT | .00 | .00 | .00 |
| 2305 | ACCRUED LEGAL | .00 | .00 | .00 |
| 2306 | ACCRUED EXPENSES | .00 | .00 | .00 |
| 2307 | LOSS CLAIMS & SETTLEMEN | .00 | .00 | .00 |
| 2309 | TAXES PAYABLE - MA | 22,000.00 | .00 | 22,000.00 |
| 2311 | TAXES PAYABLE - NH | .00 | .00 | .00 |
| 2313 | BILLINGS IN EXCESS OF C | (980,967.00) | 25,812.00 | (955,155.00) |
| 2315 | CAPITAL LEASE- CURRENT | .00 | .00 | .00 |
| 2401 | CAPITAL LEASE- LONG TER | .00 | .00 | .00 |
| 2501 | CAPITAL STOCK | (450,000.00) | .00 | (450,000.00) |
| 2502 | PAID IN CAPITAL | (79,427.00) | .00 | (79,427.00) |
| 2503 | RETAINED EARNINGS | (6,694,888.80) | .00 | (6,694,888.80) |
| 2504 | TREASURY STOCK | 5,941,160.00 | .00 | 5,941,160.00 |
| 2505 | DISTRIBUTIONS | .00 | 1,984,143.64 | 1,984,143.64 |
| 2506 | UNREALIZED GAIN (LOSS) | 23,920.77 | (12,389.97) | 11,530.80 |
| | Total | $ (1,085,371.94) | $ (1,861,844.80) | $ (2,947,216.74) |

**Income & Expenses**

| Account Number | Account Title | Beginning Balance | Current Period Activity | Current Balance |
|---|---|---|---|---|
| 4000 | INCOME - REQUISITIONS | $ (12,439,221.43) | $ (3,029,912.73) | $ (15,469,134.16) |
| 4001 | (Over)/Under Billings | (1,507,147.00) | 1,125,940.16 | (381,206.84) |
| 4010 | INCOME - MISC. BILLINGS | .00 | .00 | .00 |
| 4020 | INCOME - MISC. BILLINGS | .00 | .00 | .00 |
| 4040 | INCOME - USF&G EXTRA WO | .00 | .00 | .00 |
| 4052 | INCOME-HANDLING FEES | (87.95) | (34.96) | (122.91) |
| 4054 | INCOME-PURCHASE DISCOUN | (52.69) | .00 | (52.69) |
| 4056 | INCOME-INTEREST (MA BAN | (25,568.59) | (2,014.91) | (27,583.50) |
| 4058 | INCOME-INTEREST (NON-MA | .00 | .00 | .00 |
| 4060 | INCOME-INTEREST (US OBL | .00 | .00 | .00 |
| 4062 | INCOME-INSURANCE PROCEE | .00 | .00 | .00 |
| 4064 | INCOME-W/C & G/L INSURA | .00 | .00 | .00 |
| 4066 | INCOME-CLAIM SETTLEMENT | .00 | .00 | .00 |
| 4068 | INCOME-GAIN ON SALE OF | .00 | .00 | .00 |
| 4070 | INCOME-DIVIDENDS | (1,938.63) | (518.69) | (2,457.32) |
| 4072 | INCOME-MISCELLANEOUS OT | .00 | .00 | .00 |
| 5010 | SUBCONTRACTOR COSTS | 11,914,068.97 | 3,138,042.41 | 15,052,111.38 |
| 5011 | MATERIAL COSTS | 472,444.25 | 101,492.23 | 573,936.48 |
| 5012 | LABOR COSTS | 760,741.26 | 194,639.95 | 955,381.21 |
| 5013 | LABOR BURDEN | 285,265.90 | 64,421.70 | 349,687.60 |
| 5014 | EQUIPMENT COSTS | .00 | .00 | .00 |
| 5015 | OVERHEAD COSTS | .00 | .00 | 000091 .00 |
| 5016 | OTHER COSTS | 1,390,821.50 | 258,731.58 | 1,649,553.08 |
| 5018 | COMPLETED PROJECTS COST | .00 | .00 | .00 |

**Jackson Construction Company**
Trial Balance
April 30, 2005

| Account Number | Account Title | Beginning Balance | Current Period Activity | Current Balance |
|---|---|---|---|---|
| 5020 | PROVISION FOR CONTRACT | $ .00 | $ (112,753.16) | $ (112,753.16) |
| 5060 | PAYROLL - OFFICER'S | 26,000.00 | 8,000.00 | 34,000.00 |
| 5063 | PAYROLL - OFFICE/ADMIN | 93,237.60 | 25,688.40 | 118,926.00 |
| 5066 | PAYROLL - ESTIMATING | (48,667.60) | 11,500.40 | (37,167.20) |
| 5067 | PAYROLL - HUMAN RESOURC | .00 | .00 | .00 |
| 5069 | PAYROLL - YARD | .00 | .00 | .00 |
| 5072 | PAYROLL - NON-JOB SUPER | .00 | .00 | .00 |
| 5075 | PAYROLL - MARKETING | 20,020.00 | 6,160.00 | 26,180.00 |
| 5076 | STAIRWAY TECHNOLOGY COS | .00 | .00 | .00 |
| 5077 | PAYROLL - EDUCATION/TRA | .00 | .00 | .00 |
| 5078 | OFFICER'S LIFE INSURANC | 15,075.00 | .00 | 15,075.00 |
| 5079 | 401(k) COMPANY CONTRIBU | (50,000.00) | .00 | (50,000.00) |
| 5081 | HEALTH INSURANCE EXPENS | 18,161.55 | 10,066.65 | 28,228.20 |
| 5084 | HOLIDAY EXPENSE | 3,540.67 | .00 | 3,540.67 |
| 5087 | DISABILITY INSURANCE | 1,205.91 | 553.16 | 1,759.07 |
| 5090 | DENTAL PLAN INSURANCE | 3,284.78 | 1,489.59 | 4,774.37 |
| 5095 | PAYROLL TAXES-FICA | 14,635.39 | 3,787.18 | 18,422.57 |
| 5096 | PAYROLL TAXES-FUTA | 725.81 | .00 | 725.81 |
| 5097 | PAYROLL TAXES-SUTA | 8,575.17 | 826.95 | 9,402.12 |
| 5098 | PAYROLL TAXES-MA HEALTH | 184.33 | 17.44 | 201.77 |
| 5099 | MARKETING & MATERIALS | 543.64 | .00 | 543.64 |
| 5102 | ADVERTISING | .00 | .00 | .00 |
| 5105 | CONTRIBUTIONS | 100.00 | .00 | 100.00 |
| 5108 | SEMINARS-EDUCATION & TR | .00 | .00 | .00 |
| 5111 | DUES & SUBSCRIPTIONS | 2,734.08 | 232.00 | 2,966.08 |
| 5114 | INSURANCE EXPENSE | .00 | .00 | .00 |
| 5117 | COMP & LIABILITY INSURA | 241.19 | 60.40 | 301.59 |
| 5120 | LEGAL | 18,886.87 | 4,552.98 | 23,439.85 |
| 5123 | AUDIT | (11,300.00) | .00 | (11,300.00) |
| 5126 | RENT | 48,031.26 | 23,510.42 | 71,541.68 |
| 5129 | ELECTRIC | 783.72 | 219.22 | 1,002.94 |
| 5130 | OFFICE ALARM/SECURITY | .00 | .00 | .00 |
| 5132 | OFFICE BLDG. MAINTENANC | 2,740.21 | 975.90 | 3,716.11 |
| 5135 | YARD REPAIRS & MAINT. | 450.00 | 270.00 | 720.00 |
| 5138 | OFFICE SUPPLIES AND EXP | 15,299.84 | 5,251.82 | 20,551.66 |
| 5139 | PLAN EXPENSE | 14,943.23 | .00 | 14,943.23 |
| 5141 | TELEPHONE | 4,787.90 | 1,268.87 | 6,056.77 |
| 5144 | CAPITAL LEASE-EQUIPMENT | .00 | .00 | .00 |
| 5147 | OPERATING LEASE-COMPUTE | .00 | .00 | .00 |
| 5150 | FEES | 4,977.68 | 9,455.46 | 14,433.14 |
| 5153 | COMPUTER NETWORK | 1,294.25 | 607.25 | 1,901.50 |
| 5156 | CONSULTANTS | 7,000.00 | .00 | 7,000.00 |
| 5159 | TEMPORARY HELP | .00 | .00 | .00 |
| 5162 | BANK SERVICE CHARGES | 1,193.83 | 411.70 | 1,605.53 |
| 5165 | TRAVEL & ENTERTAINMENT | 5,639.24 | 3,712.65 | 9,351.89 |
| 5168 | AUTO EXPENSE | 11,655.35 | 5,215.34 | 16,870.69 |
| 5170 | TAXES-LEASE | .00 | .00 | .00 |
| 5171 | TAXES-PROPERTY | .00 | .00 | .00 |
| 5174 | TAXES-EXCISE | 115.00 | .00 | 115.00 |
| 5177 | TAXES-STATE & LOCAL | .00 | .00 | .00 |
| 5180 | TAXES-NEW HAMPSHIRE | .00 | .00 | .00 |
| 5184 | DEPR - MOTOR VEHICLES | .00 | .00 | 000092 .00 |
| 5188 | DEPR - MACH & EQUIP | .00 | .00 | .00 |
| 5192 | DEPR - OFFICE FURN & FI | .00 | .00 | .00 |

**Jackson Construction Company**
Trial Balance
April 30, 2005

| Account Number | Account Title | Beginning Balance | Current Period Activity | Current Balance |
|---|---|---|---|---|
| 5194 | DEPR - LEASHLD IMPROVE. | $ .00 | $ .00 | $ .00 |
| 5197 | BAD DEBT EXPENSE | .00 | .00 | .00 |
| 5199 | INTEREST ON LOAN | .00 | .00 | .00 |
| 5200 | PENALTIES & INTEREST EX | .00 | .00 | .00 |
| 5203 | EXCHANGE | (49.55) | (22.56) | (72.11) |
| 5210 | LOSS ON SALE OF INVESTM | .00 | .00 | .00 |
| 5212 | GAIN/LOSS ON DISPOSAL O | .00 | .00 | .00 |
| 5215 | CLOSED JOB ADJUSTMENTS | .00 | .00 | .00 |
| 9000 | DEFAULT ACCOUNT | .00 | .00 | .00 |
| 9999 | SUSPENSE | .00 | .00 | .00 |
| | Total | $ 1,085,371.94 | $ 1,861,844.80 | $ 2,947,216.74 |
| | **GRAND TOTAL** | **$ .00** | **$ .00** | **$ .00** |

000093