United States District Court
District of Massachusetts

| | |
|---|---|
| United States Fidelity and Guaranty Company, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| Paul A. Bordieri and Andrea Costa, ) | |
| Trustees of Jackson Construction Company, ) | |
| Paul A. Bordieri, Individually, ) | |
| ) | |
| Defendants ) | CASE # 05 - 11397-NMG |
| ) | |
| and ) | |
| ) | |
| Sovereign Bank of New England, NA, ) | |
| Appleton Partners, Inc. and ) | |
| Cambridge Appleton Trust, NA, ) | |
| ) | |
| Trustee Process Defendants ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO VACATE OR MODIFY THE ATTACHMENTS BY TRUSTEE PROCESS

Defendants, Paul A. Bordieri and Andrea J. Costa, Trustees of Jackson Construction Company (Jackson), a Massachusetts business trust, [1] and Paul A. Bordieri, individually, submit this memorandum in support of their Motion to Vacate or Modify the ex parte trustee attachments secured by United States Fidelity & Guaranty Company (USF&G) in this matter.

### Statement of Facts

Mr. Paul Bordieri has been involved in the construction business with Jackson since 1963. In 1997, Mr. Bordieri became the sole owner of Jackson Construction

---

[1] Ms. Costa has been removed as a trustee and a motion to dismiss her from the action will be presented to the Court.

Company when he bought out his then partner, Phil Jackson. In connection with this transaction, distributions of capital of Jackson Construction Company were made to the two shareholders, the departing Mr. Jackson and the remaining Mr. Bordieri. As set forth in Mr. Bordieri's affidavit, Mr. Bordieri left the funds, which were his personal funds, in the company, both because it was convenient to do so and because Mr. Bordieri was willing to have those funds available to Jackson Construction Company in the event of a financial crisis at the company.

USF&G has been writing surety bonds for Jackson since 1997. Over that period of time, USF&G has written literally hundreds of millions of dollars worth of bonds, for which it has been paid hundreds of thousands of dollars by Jackson in the form of bond premiums, and USF&G has never paid out a single dollar on a Jackson bonded project.

For the year ending December 31, 2003, prepared in March 2004, Jackson's financials showed that it had suffered a loss of approximately $1 million dollars because of defaults and bankruptcies of subcontractors. Apparently as a result, USF&G informed Jackson that it would no longer write surety bonds for Jackson. Notwithstanding its announcement that it would no longer write surety bonds for Jackson, USF&G thereafter entered into completion contracts with Jackson to perform over $15 million dollars worth of completion work on two projects (Shrewsbury and Westford) on which USF&G's principal, Standen Contracting Company, had defaulted. There are two significant aspects of the completion contracts: neither has a required completion date, and neither has a so-called "pay-if-paid" clause. These provisions are significant because of positions taken by USF&G as set forth more fully below.

2

On the Shrewsbury project, Jackson commenced work in March 2004 without a contract and worked at its own expense for over three months before a contract was executed and Jackson received its first payment. Jackson advanced over $1 million dollars in good faith to assist the surety in getting the Shrewsbury school project completed so that the school could open in September of 2004. Jackson succeeded: the school opened in time for the school year and Jackson received commendation letters from Shrewsbury for its extraordinary work in completing the project in time for the start of the school year.

However, Shrewsbury had claims for delay against USF&G's defaulted principal. Despite the fact that Jackson is not under any circumstances liable for delay damages caused by the defaulted original general contractor, and despite the fact that the completion contract had no required completion date, USF&G took the position that Jackson was responsible for any delay claims by Shrewsbury and USF&G withheld approximately $600,000.00 from Jackson of funds received by the surety from Shrewsbury. In addition, USF&G has failed to pay to Jackson an additional approximately $1.5 million dollars in contract payments on account of a monetized punch list by Shrewsbury which USF&G agreed was grossly over-valued. Jackson has not received any payment on the Shrewsbury project since December of 2004 and is owed over $2.5 million dollars on that project alone.

On the Westford project, USF&G has withheld payment to Jackson in the approximate amount of $600,000.00. In a classic catch-22, USF&G complains that subcontractors on the Shrewsbury project are making complaints of non-payment (a circumstance created by USF&G's non-payment to Jackson) and that therefore USF&G

will not make payments to Jackson on the Westford project. Non-payment by USF&G on the Westford project produces two results: complaints of non-payment by subcontractors on that project, and an inability of Jackson to pay its own expenses including the expenses attributable to the Shrewsbury project.

During the spring and early summer of 2005, USF&G and Jackson were in virtually daily communication regarding Jackson's complaint of non-payment by USF&G and USF&G's complaints that subcontractors were not being paid on these projects. USF0&G thereupon performed a form of "reverse cherry picking." It picked the least successful projects, ignored the claims for additional compensation by Jackson, and thereby presented a materially misleading view of Jackson's financial posture. Jackson repeatedly brought to the attention of the surety that it was misrepresenting the overall financial posture of the projects by looking at only the worst projects, not offsetting them by profitable projects, and not taking into account claims which would reduce or eliminate the losses projected on the selected projects. Throughout this period of time, Mr. Bordieri was in virtually constant communication with Mr. James Peters at USF&G and Jackson's corporate counsel, Samuel M. Starr of Mintz Levin, was in frequent contact with counsel for USF&G who, beginning July 1, 2005, was Attorney Spearing.

The circumstances under which Mr. Bordieri removed his money from Jackson in April 2005 are set forth in his affidavit. Certainly, USF&G was entitled to inquire about the circumstances of the removal and it did. USF&G did not like the answer it received and therefore has concluded that the answer is false and the removal fraudulent. Mr. Mack, USF&G's affiant, who has literally no knowledge of the source of the money, swears that the money was not Mr. Bordieri's. After USF&G learned of the transfer and

4

complained about it to Jackson, and on the same day that USF&G, unbeknownst to Jackson, commenced this action, Mr. Bordieri instructed Samuel M. Starr, corporate counsel for Jackson, to inform Mr. Spearing, counsel for USF&G, that the funds would remain in the Appleton account of which USF&G was fully aware, and Mr. Starr did so. Nevertheless, counsel for USF&G did not in any papers filed in this Court disclose Mr. Starr s representation and Mr. Bordieri's commitment.

In its calculation of the amount for which USF&G demanded "collateral" and which USF&G has used in this Court as the principal sum demanded in its attachments, USF&G picked the projects which showed losses, and ignored the projects showing profits. In addition, USF&G did not take into account any of the claims by Jackson on the projects, thereby materially over-stating the so-called projected loss. USF&G did so in a deliberate attempt to mislead the Court and to present to the Court not only a worst case scenario, but a never-will-happen scenario.

Throughout the spring and early summer of 2005, Jackson and its counsel were in virtually daily contact with USF&G and specifically on the millions of dollars owed by USF&G to Jackson. Apparently, USF&G grew tired of Jackson's demands for the monies to which it was entitled, and, determined to bankrupt Jackson by depriving it of all its and Mr. Bordieri's cash and revenue stream, directed owners not to pay Jackson, and commenced this action.

## Argument

Under M.R.C.P. Rule 4.2(h), the plaintiff has the burden of justifying every finding in the ex parte order which the defendant has challenged by affidavit. USF&G cannot show as a matter of law that it has a likelihood of success in the amount of the

attachments. The only way which USF&G could arrive at this inflated number was to ignore the profit picture on profitable jobs and to deliberately conceal from this Court the claims which will offset in whole or in part losses on the jobs which are projected to show a loss. Moreover, USF&G has made no showing whatsoever, nor even an attempt to show, that Jackson cannot absorb the losses. USF&G as surety is not automatically liable for losses suffered by Jackson on jobs, whether bonded or unbonded. It is only when Jackson defaults on a bonded project and the surety is called upon to complete at a cost greater than the unpaid contract balance that USF&G suffers a loss under the master surety agreement. It is this financial slight of hand, i.e., USF&G's pretending that losses which Jackson might suffer equal amounts which USF&G is entitled to recover from Jackson, which makes the whole premise of the attachment a fraud. USF&G has materially misrepresented to the Court the profit and loss picture, both on the cited jobs and the overall picture, by ignoring the profitable jobs and claims, and then wrongfully equated hypothetical Jackson losses with USF&G "damages."

In its Memorandum at Section II, USF&G asserts that it "expects to pay claims totaling at least the amount of the projected shortfall" on the six projects it selected. This statement is knowingly false. USF&G has failed to inform the Court of the claims on these six projects. USF&G failed to inform the Court of the profit picture on the remaining jobs, which puts the overall loss on the bonded jobs at $1.9 million dollars, and the overall profit picture on all jobs including the completion contracts, at plus $446 968.00. It is USF&G's tactic to ignore the $3 million dollars it owes Jackson on the

6

completion contracts in order to misrepresent the overall status and to construct false "expectation of claims to be paid" by USF&G.

USF&G cannot support its assertion or the Court's finding that, if notified, there is a clear danger that the defendants will conceal the subject assets or withdraw them from the control of the trustee. It was counsel for USF&G's responsibility (and his ethical obligation) to bring to the attention of this Court that Mr. Starr, a distinguished and respected member of the Bar of this Court and of the Commonwealth of Massachusetts, had represented to counsel for USF&G that the funds would not be removed from the account in which they are located and which was known to USF&G. Mr. Bordieri had made no effort whatsoever to conceal the transfer into his own account and USF&G ignored the explanation from Mr. Starr that the funds are and always have been Mr. Bordieri's funds and not owned by Jackson Construction Company despite their having been left in a Jackson Construction Company account by Mr. Bordieri since 1997. It is the defendants' understanding that USF&G failed to disclose to the Court Mr. Starr s explanation of the ownership of the funds and the reasons for the transfer, i.e., that Mr. Bordieri wished to start a new company which would be able to secure bonding and because Mr. Bordieri, at age 67, wanted to accomplish some estate planning. The defendants acknowledge that the transfer was ill-timed and that USF&G's concerns were at first blush not inappropriate. However, USF&G cannot justify concealment of the explanation for the transaction from the Court and, without any factual justification, characterize the transfer as fraudulent. It is an assertion and a characterization as to which Mr. Mack had no knowledge whatsoever and therefore was wrongfully sworn to

7

by him in his affidavit. USF&G cannot justify failing to inform the Court of Mr. Bordieri's commitment and Mr. Starr's representation.

USF&G has shown its true colors in the manner in which it has proceeded in this Court. It has also disclosed the malevolence of its intentions by writing twice, once in its own name and once by its counsel, to owners on the bonded jobs demanding and directing that no further payments be made to Jackson. In doing so, USF&G and its counsel were intentionally interfering with the contractual relationship between Jackson and the owners on the bonded jobs with the intention to render Jackson in default on those projects by causing Jackson to be unable to perform because of an absence of funding. In fact, USF&G demanded as part of its plan that Jackson declare itself voluntarily in default on all of the bonded projects, when USF&G knew that Jackson was not in default on any of the bonded projects. USF&G's reason for doing so is clear and unambiguous: USF&G wishes to drive Jackson out of business, to take over all of the bonded jobs, to realize Jackson's profits on those jobs, and to defraud Jackson of those profits. USF&G by proceeding ex parte and on the basis of the overt falsity and misrepresentations in its affidavit and moving papers has sought to enlist the Court in this process.

Because the entire premise of the USF&G attachment is false and because it is supported by incompetent and false statements in the Mack affidavit, USF&G's attachment should be dissolved. Mr. Bordieri has set forth in his affidavit that he is willing, as he has been all along, to proceed in a fair, reasonable and businesslike fashion to provide USF&G with adequate security that it is not at risk of loss on the bonds. USF&G in turn must, for the first time, act in good faith with respect to Jackson:

8

it must pay the monies due Jackson to Jackson. It must cease asserting knowingly false claims against Jackson. It must undo the damage it has caused Jackson by its letters to the owners on the bonded projects, thereby returning to Jackson the cash flow it has earned. There is a deliberate plan conceived by USF&G and its counsel to destroy Jackson, to drive it into default on jobs on which there was no risk of default and in fact which were profitable to Jackson, and to avoid making millions of dollars in payments due to Jackson. Mr. Bordieri and Jackson request that this Court vacate the attachments with an order to USF&G that it cease its destructive course of action, and enter in good faith into an agreement with Jackson and Bordieri as set forth in Mr. Bordieri's letter of July 7, 2005 to USF&G. In the alternative, the Court should modify the trustee attachments to provide only that amount of security which USF&G can show it is at risk of requiring. In other words, it is the burden of USF&G to show precisely what amount USF&G is at risk of losing on the bonded jobs and it is the burden of USF&G to show why the amounts due to Jackson, on the bonded, unbonded, and completion contracts are not sufficient to hold USF&G harmless from any risk of loss.

Paul A. Bordieri and Andrea J. Costa
Trustees of Jackson Construction Company
and Paul A. Bordieri, Individually
By Their Attorney,

Date: 7-20-05

Kieran B. Meagher
BBO# 340920
Kieran B. Meagher Associates LLC
92 Montvale Avenue, Suite 4180
Stoneham, MA 02180
(781) 246-1101

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2005 I served a copy of the foregoing document, by in-hand delivery to:

Scott S. Spearing, Esq.
Hermes, Netburn, O'Connor & Spearing
111 Devonshire Street – 8th Fl.
Boston, MA 02109

And by first-class mail, postage prepaid, to:

Appleton Partners, Inc.
45 Milk Street, 8th Fl.
Boston, MA 02109

Cambridge Appleton Trust, N.A.
45 Milk Street, 8th Fl.
Boston, MA 02109

Sovereign Bank of New England, N.A.
75 State Street
Boston, MA  02109

_____
Kieran B. Meagher

C:\Shared\KBM\Jackson Const. Co\Memorandum Motion to Vacate 7 18 05.doc

10