United States District Court
District of Massachusetts

United States Fidelity and Guaranty Company, )
)
Plaintiff )
)
v. )
Paul A. Bordieri and Andrea Costa, )
Trustees of Jackson Construction Company, )
Paul A. Bordieri, Individually, )
)
Defendants )        CASE # 05 - 11397-NMG
)
and )
)
Sovereign Bank of New England, NA, )
Appleton Partners, Inc. and )
Cambridge Appleton Trust, NA, )
)
Trustee Process Defendants )

## AFFIDAVIT OF PAUL A. BORDIERI

I, Paul A. Bordieri, on oath depose and say:

1.    I am a resident of the Commonwealth of Massachusetts.  I make this affidavit on personal knowledge in support of the motion filed on behalf of myself, the trustees, and my company, Jackson Construction Company, to vacate or modify the ex parte trustee attachments allowed by the Court in this matter.

2.    I have been employed by Jackson Construction Company (Jackson) since 1963.  In 1997, I became the sole owner of Jackson, at which time my former co-owner received a distribution in the amount of $3,350,000.00 as his share of the company.  All of the remaining assets of Jackson Construction Company, which included cash and securities in the approximate amount of $1,186,000.00 became mine as sole

shareholder.    3.    I left my monies described in the preceding paragraph in the company both because I felt the monies would be helpful in the event of times and circumstances where Jackson might require additional temporary funding, and because it was convenient to do so. I stress that the funds always belonged and continue to belong to me, notwithstanding that they were left in a Jackson account.

4.    In March 2004, Jackson's financial statements for the calendar year ending December 31, 2003 showed a loss of $985,000. Apparently based upon this loss, our bonding company, United States Fidelity & Guaranty Company (USF&G), with whom Jackson has had a bonding relationship since at least 1977, during which time USF&G has written literally hundreds of millions of dollars worth of bonds, received hundreds of thousands of dollars in premiums and never incurred a single dollar of loss, informed us that it would write no new bonds for Jackson. We had eight bonded jobs ongoing which continue to have balances due to Jackson at this time. In addition, there were two Harvard University projects which were not bonded.

5.    In spite of USF&G's notification to us that it would no longer write bonds for Jackson, following that notification USF&G engaged Jackson to be completing contractor on two USF&G bonded projects (Shrewsbury and Westford) on which USF&G's principal, Standen Contracting Company, had defaulted. In the aggregate, the completion contracts on these two jobs were approximately $15.6 million dollars at inception.

6.    Based upon a request from USF&G, Jackson began work on the Shrewsbury project in March, 2004 without a completion contract and worked for over

2

three months without a completion contract, during which time Jackson advanced over $1 million dollars towards completion of the project for the benefit of USF&G.

7.    Jackson did not receive any payment from USF&G until June 2004 on the Shrewsbury project.

8.    We were assigned subcontractors by USF&G on the Shrewsbury project. One of the subcontractors, ESCOA, the electrical subcontractor, was a subcontractor with whom Jackson preferred not to work, but we were directed by USF&G to assume the ESCOA subcontract.

9.    In or about August 2004, ESCOA abandoned the job and defaulted. At that time, there was approximately $300,000 left unpaid in the ESCOA subcontract, some $300,000 less than the unpaid contract amount when Jackson took over the project.

10.    When Jackson engaged Coughlin Electric to complete ESCOA's work, Coughlin quoted a $1.2 million dollar price to complete, much of which was correction of concealed defective work by ESCOA performed prior to the assumption by Jackson of the ESCOA subcontract.

11.    USF&G refused to pay the additional monies necessary to correct and complete ESCOA's work and stated that the approximately $900,000 overrun is entirely Jackson's responsibility.

12.    We believe this position by USF&G is a breach of our suretyship agreement, a breach of the completion contract, a breach of the covenant of good faith and fair dealing, and an unfair and deceptive act by USF&G.

3

13.     Another major issue on the Shrewsbury project is delay damages for which the Town is seeking recovery from USF&G for delays caused by the general contractor who defaulted and whom Jackson replaced.   USF&G is asserting that Jackson is responsible for approximately $600,000 in damages sought by the Town as a result of acts or omissions of the defaulted general contractor.

14.     Jackson has no responsibility for these damages.   The Shrewsbury completion contract, a true copy of which is attached hereto as Exhibit A, did not have a required completion date and we consider USF&G's position to be a breach of the suretyship agreement, a breach of the completion contract, a breach of the covenant of good faith and fair dealing, and an unfair and deceptive trade act or practice by USF&G. In fact, Jackson met its commitment to USF&G and completed the school in time for a September 2004 opening, and we were commended by the Town for our work in achieving this result.

15.     I have reviewed the affidavit of James E. Mack submitted in support of USF&G's ex parte motion for attachment by trustee process.

16.     Jackson has had no dealings with Mr. Mack.  We dispute that he has any personal knowledge.  Further, the hearsay set forth in Mr. Mack's affidavit materially misrepresents the true history and the financial status of the projects.

17.     For example, in paragraph 13 of his affidavit, Mr. Mack makes reference to the Retention of Surplus Agreement from 1997, a true copy of which is attached as Exhibit B.  This document was executed at the time of the stock redemption of my former partner, Phil Jackson. There is nothing in the agreement which says that it was to last in perpetuity.  I stated that the duration of the agreement was for the fiscal year in

4

which the agreement was executed.  The RSA is not mentioned or incorporated or attached to the master surety agreement.

18.    In paragraph 20, Mr. Mack asserts that USF&G became aware of an increasing trend of claims of late payment and lack of payment on the bonded jobs and the completion projects.

19.    On the bonded jobs, Jackson is not now, nor has it at any time been, in default on any of these contracts.  Subcontractors on public projects have a right to make demands for direct payment from the owner where they believe they have not been paid amounts to which they claim to be entitled.  Up until approximately February or March 2005, Jackson had paid all of its subcontractors on the bonded jobs the full undisputed amounts received by Jackson from the owners allocable to those jobs.

20.    At the same time, on the completion jobs, USF&G was and remains grossly in arrears in payments due to Jackson.  Because of the fraudulent effort by USF&G to pass through to Jackson the owner's claims for delays based upon the default of the original general contractor and USF&G's refusal to be responsible for the cost of correcting and completing ESCOA's work, USF&G currently owes Jackson $1,525,979 on the Shrewsbury contract balance and an additional $1.2 million dollars on various claims including the Coughlin Electric claim.

21.    USF&G's wrongful withholding of these monies, approximately $2.7 million dollars in funds due to Jackson, has crippled Jackson's ability to pay its subcontractors on the Shrewsbury project, which USF&G then cites as a basis for refusing to make payment to Jackson.

5

22.    In paragraph 21 of his affidavit, Mr. Mack recites that I notified USF&G that Jackson was experiencing financial difficulty and was in need of financial assistance. In May 2005 I informed USF&G that because of the over $2 million dollars wrongfully withheld by USF&G I was unable to pay subcontractors on the Shrewsbury project and I facetiously asked to borrow money from USF&G against the $2 million dollars they owed Jackson so I could pay the subcontractors. I categorically deny that I ever said that Jackson could not continue to perform its work on its projects without financial assistance from USF&G. I am attaching hereto as Exhibit C my letter to USF&G dated May 12, 2005 in which I make reference to the request to borrow money from USF&G against the $2 million dollars Jackson was owed on the Shrewsbury project.

23.    The response from USF&G was not simply that they would conduct a review of Jackson's financial condition. USF&G threatened to default Jackson on the completion projects, and contact all the owners on the bonded jobs to direct them not to make further payments to Jackson.

24.    In paragraph 27 of his affidavit, Mr. Mack attributes statements to me and then describes the statements as "false." Mr. Mack has literally no knowledge of any such alleged conversations, he has no knowledge of the truth or falsity of any statement attributed to me, and his assertion that my statements concerning the transfer of the funds in the stock account are false, is unfounded and intentionally misleading.

25.    In paragraph 29, Mr. Mack makes further hearsay statements of what USF&G representatives "disclosed" to me. In fact, USF&G did not inquire as to the status of the projects: USF&G instructed the owners not to make further payments to

6

Jackson in spite of the fact that Jackson was not in default on any of the projects. This direction was in furtherance of USF&G's plan to force Jackson to default so that USF&G could take over all of the bonded projects.

26.    In paragraph 34, Mr. Mack asserts that Jackson has not responded to the June 30, 2005 demand for collateral. This statement by Mack is incompetent and false. I responded in writing to the surety on July 7, 2005, a true copy of which is attached hereto as Exhibit D.

27.    In paragraph 31, Mr. Mack grossly misleads the Court on allege shortfall projections on certain Jackson projects. These projects are selected by USF&G to present a "worst case scenario" and further to eliminate from the determination of the final projection meritorious claims by Jackson on these and other projects.

28.    In March 2005, I received draft financial statements showing an approximately $100,000 profit for 2004. I anticipated profit on the USF&G jobs of approximately $1 million dollars, a significant improvement over the 2003 financials. Based upon these numbers, I decided to make a distribution to myself for estate planning and to form a new bondable company. This decision was made by me before USF&G informed us of its intent not to pay us on the completion contracts.

29.    Because the funds in the Appleton account were and always had been my monies as a result of the 1997 stock redemption, I transferred those funds to an account in my own name to start a new company to get bonding and for estate planning. I made no effort whatsoever to conceal the transfer or the new account, and the transfer was not intended to damage Jackson or USF&G.

7

30.    I have had our financial department prepare the spreadsheet attached as Exhibit E showing the full contract picture on all of the bonded jobs, the unbonded jobs, and the completion contracts.  As the Court will see, rather than a shortfall in the amount of $3,492,778, the real number shows a profit of $446,968.  It is my belief, and I therefore assert with due consideration and under oath, that USF&G has deliberately, and in a calculated fashion, omitted all the offsetting claims by Jackson and omitted all the projects which would offset any losses on individual projects, and USF&G has done so solely to secure attachments which have the effect of paralyzing my company. Further, losses suffered by Jackson do not automatically mean loss by USF&G. USF&G only suffers a loss when it is forced to complete a bonded project at a greater cost than the remaining contract balance.   Jackson is not in default on any of the bonded jobs, although USF&G's actions are driving Jackson toward default.

31.    USF&G has not been satisfied with seizing all the liquid assets of Jackson, thereby preventing us from meeting any of our current expenses, including payrolls. Attached hereto as Exhibit B are letters written to the owners on the bonded jobs by USF&G demanding that these owners make no further payments to Jackson.

32.    I repeat and stress to the Court that Jackson is not in default on a single one of these projects.  The effect of USF&G's demands on the owners has been, not surprisingly, that many are reluctant to make any payments to Jackson even of funds indisputably due to Jackson, because of USF&G's threats.  I can think of no reason why a surety would take such a step on jobs in which its principal was not in default other than a deliberate, calculated and malevolent intention to put the principal out of business.

8

33.    If the trustee attachments are not vacated or amended, Jackson will be literally out of business in about two weeks because we will not be able to meet our payroll or pay our suppliers.  USF&G's intentions will have been accomplished.

34.    It is not simply a question of USF&G misrepresenting the facts to the Court, interfering with our contractual relationships with owners on the bonded projects, and seizing literally every account and thereby preventing us from operating.

35.    I am attaching as exhibits the following correspondence in June and July 2005 between Jackson and USF&G setting forth the good faith efforts that Jackson was making to resolve all issues between Jackson and USF&G.  It is noteworthy that during this same time period when we were attempting in good faith to deal honorably with USF&G, USF&G and its attorneys had already secretly filed the action against Jackson and were preparing the ex parte attack, in spite of the fact that USF&G and its attorneys were fully aware of the identity of counsel for Jackson and that I had made no effort to remove any assets from the jurisdiction of this Court.   On June 30, 2005, at my instruction, our corporate counsel, Samuel M. Starr of Mintz Levin, told Scott Spearing the money was in a local account and that I would not move it.   Nevertheless, without disclosure, USF&G filed its complaint and proceeded ex parte without any notice to this Court of Mr. Starr's representation or of my commitment.

36.    By my letter of June 21, 2005, a true copy of which is attached as Exhibit F, I pointed out the nearly $2 million dollars that USF&G owed and continues to owe to Jackson on the completion projects. As part of its plan to destroy Jackson, USF&G had stated in a letter to us dated June 20, 2005 that it would pay subcontractors on the Westford project by joint checks, but would pay Jackson nothing.   Again, this is

evidence of an effort and plan by USF&G to destroy Jackson. Jackson cannot operate without funds to pay its own payrolls and expenses.

37.    Attached hereto as Exhibit G is our Executive Vice President Robert B. Barton Jr.'s letter to USF&G dated June 29, 2005 addressing all the issues raised in a default letter sent to us by USF&G. The declaration of default by USF&G on the Shrewsbury project was without support in fact or in law as set forth in Mr. Barton's letter.

38.    Attached hereto as Exhibit H is my letter of June 30, 2005 to St. Paul Travelers setting forth the terms of a verbal agreement we had reached with USF&G in order that Jackson could make payments to its subcontractors. USF&G reneged on and rescinded the agreement, demanding instead that Jackson execute a so-called loss agreement and voluntary letters of default which recited, contrary to the truth, that Jackson was in default on all the bonded projects. Jackson refused to do so. By letters dated July 1, 2005, true copies of which are attached hereto as Exhibit I, USF&G's counsel asserted in letters to the owners on the bonded projects that "Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract or to pay outstanding subcontractor and suppliers payment claims." This statement is knowingly and intentionally false and is directly contrary to statements made by Jackson to USF&G.

39.    On the contrary, Jackson has repeatedly stated to USF&G that, if USF&G will pay Jackson the monies wrongfully withheld by USF&G to Jackson there will be no unpaid subcontractor claims and Jackson will proceed to complete all the contracts without assistance.

10

40.     On July 7, 2005, I faxed the attached Exhibit J to Mr. Spearing, counsel for USF&G, setting forth a comprehensive plan to resolve the funding and completion issues on all the projects.   Apparently because of his preoccupation with the ex parte proceedings against Jackson, Mr. Spearing nor USF&G has ever responded to this July 7, 2005 effort on the part of Jackson to reach a reasonable, businesslike, and fair solution.

41.     After 42 years of work in Jackson Construction Company, here is the position in which I have been placed by USF&G.  At age 67, I face having my life's work and savings wiped out by the actions of USF&G in misrepresenting to the Court the financial status of the bonded and completion projects, by misrepresenting documents to the court, by misrepresenting the action I took with respect to my funds in the Jackson account, by seizing all our cash, and deliberately interfering with our contractual relationships with the owners on the bonded projects in a calculated effort to cut off all cash flow to Jackson.  If the injunction is not vacated or modified, Jackson will cease business within a few weeks because we will have no money to make payroll or other expenses, or to pay subcontractors and suppliers.  It is USF&G's intention to bring about this result.

42.     On behalf of myself, my family and my company, I request that the Court prevent USF&G from accomplishing this result.  I am, and will continue to be, willing to enter into any reasonable agreement which provides reasonable security to the surety, recognizing the amounts owed by the surety to Jackson and further recognizing the real rather than the misstated profit and loss situation on the projects.  I will agree to joint checks to subcontractors and suppliers.  I agree to place $1 million of my money from

11

the Appleton account as a loan to Jackson to use in the ordinary course of business, and I agree to maintain the balance of the Appleton account pending court order.

Signed under the pains and penalties of perjury this 20TH day of July, 2005.

_____
Paul A. Bordieri

## Certificate of Service

I hereby certify that on this 20th day of July, 2005, I served a copy of the within Affidavit of Paul Bordieri by in-hand delivery to:

Scott S. Spearing, Esq.
Hermes, Netburn, O'Connor & Spearing
111 Devonshire Street, 8th Floor
Boston, MA 02109

And by first-class mail, postage prepaid, to

Appleton Partners, Inc.
45 Milk Street, 8th Fl.
Boston, MA 02109

Cambridge Appleton Trust, N.A.
45 Milk Street, 8th Fl.
Boston, MA 02109

Sovereign Bank of New England, N.A.
75 State Street
Boston, MA 02109

_____
Kieran B. Meagher

12

**EXHIBIT "A"**

# STANDARD FORM OF COMPLETION AGREEMENT
# BETWEEN SURETY AND COMPLETION CONTRACTOR

## COMPLETION AGREEMENT

This Agreement is made with regard to the following:

### PARTIES

SURETY:

> United States Fidelity and Guaranty Company
> MC 41
> 5801 Smith Avenue
> Baltimore, MD 21209

COMPLETION CONTRACTOR:

> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191

### PROJECT

PROJECT:

> Renovation of former Shrewsbury High School into a Middle School
> 45 Oak Street
> Shrewsbury, MA 01545

### ARCHITECT/ENGINEER

ARCHITECT/ENGINEER:

> Lamoureux Pagano Associates
> 14 East Worcester Street
> Worcester, MA 01604

### OWNER

OWNER:

> Town of Shrewsbury
> 100 Maple Avenue
> Shrewsbury, MA 01545

The Surety and the Completion Contractor agree as set forth below:

**JACKSON**
construction
company

## Article 1
### Definitions

1.1    *Obligee*:  Means the party or parties in whose favor the Surety has executed a Performance Bond, and may or may not be either an Owner or a General Contractor.

1.2    *Principal*:  Means the entity or Contractor(s) or Subcontractor(s) on whose behalf the Surety executed Bonds.

1.3    *Project*:  Means the work required under the Contract or Subcontract bonded by Surety.

1.4    *Surety*:  Means United States Fidelity and Guaranty Company

1.5    *Bond(s)*:  Mean any Surety agreements, undertakings, or instruments of guarantee signed by Surety on behalf of Principal.

1.6    *Owner*:  Means the Owner of the Project or the party who has a contract for Construction of the Project with either the Obligee(s), or Principal, and who may or may not also be an Obligee.

1.7    *Completion Contractor*:  Means the entity the Surety Contracts with to complete the project.

## Article 2
### The Relationship of the Parties

2.1    *Relationships*.  On or about October 1, 2002, the Owner awarded a contract in the amount of $14,686,872.00 for the Renovation of former Shrewsbury High School (the Project) to Standen Contracting Company (Principal).

As required by the Contract, and pursuant to the request of the Principal, Surety issued Performance and Payment bonds numbered SW5041, (the Performance and Payment Bonds), naming Standen Contracting Company as Principal and Town of Shrewsbury as Obligee, in the amount of $14,686,872.00. On or about February 25, 2004, Principal executed a letter of voluntary default. As of the date of Principal's default, work remained to be performed under the Contract. Surety has agreed to complete the work, and is negotiating a Takeover Agreement with the Obligee. In turn, the Contractor has agreed to complete the work for the Surety, subject to the terms and conditions of this agreement.

**JACKSON**
construction
company

### Article 3
### Contract Documents

3.1    _The Contract Documents and Incorporation of the Contract to Complete._ The Contract Documents consist of the Standard Form of Completion Agreement between Surety and Contractor (the Contractor and the Contract or Subcontract (collectively called the Contract)) for the Project for which the Surety provided bonds. The Contract is incorporated by reference into this Agreement. The Contract includes, without limitation, the Instructions for Bidders, the Contract Terms and Conditions, the Special Provisions, the General Conditions thereto and the Standard Specifications, and any and all other documents or agreements incorporated into the Contract. The Contract also includes the plans or drawings, schedules, other specifications, addenda, and any modifications thereto. The Contract also includes the change orders, or additional work orders. All of the above are collectively referred to as the "Contract Documents."

3.2    _Contractor's Review and Examination._ The Contractor has reviewed the Contract, including all of its component parts, and understands all of the terms and conditions of the Contract, including those terms and conditions which govern the performance and acceptability of work at the Project. The Contractor has also sufficiently examined the Project site and determined, through its own forces, the nature, quantity and quality of work to be performed under the Contract. Surety does not warrant or guarantee, impliedly or expressly, the accuracy of any of the plans, specifications, drawings, schedules or like documents, or that Contractor can complete the Project within the time provided by the Obligee or Principal's schedule. On the basis of the Contractor's examination of the Contract and the status of the work in place at the site, the Contractor has submitted a proposal to Surety for the completion of the work under the Contract, subject to the terms and conditions of the Contract Documents. Execution of the Standard Agreement by the Contractor is a representation that the Contractor has visited each Project site, become familiar with local conditions under which each Project is to be completed, including, but not limited to, the Contractor's familiarity with the special and unique circumstances of completing work started and partially performed by another contractor.

3.3    _Contractor's Representations and Acknowledgments._ The Contractor represents to Surety that it possesses the skill, licenses, experience and financial strength to complete the work remaining under the Contract expeditiously and in a first-class manner, in strict compliance with the requirements of the Contract. The Contractor also represents that it is not presently debarred from performing work for the Owner of the Project or for any other agency or department of the Owner.

3.4    _Strict Compliance with the Contract._ The Contractor shall be bound to Surety, instead of the Obligee, by all of the provisions of the Contract, as if Contractor had initially executed the Contract in place of the Principal, with respect to the work remaining to be performed under the Contract.

3.5    _Principal's Liabilities._ Notwithstanding Article 3.1, the Contractor shall not have any liability to Surety or the Obligee for the Principal's breach of the Contract, except as specifically set forth in the Standard Agreement. The Contractor shall not be financially responsible for the Principal's billed, but unpaid accounts payable obligations.

3

### Article 4
### The Remaining Work to be Performed

4.1     *Remaining Work.* The Contractor shall perform, furnish and pay for all testing, labor, materials, equipment costs of any nature, quality control, insurances, subcontractors and suppliers, and do all other things necessary, to complete the remaining physical work and all related obligations under each Contract subject to a Purchase Order, promptly and in a first-class manner, in strict compliance with the Contract. (The remaining physical work, and all related contractual obligations, shall be referred to in this Standard Agreement, collectively, as the Remaining Work).

4.2     *The Contractor is bound by Obligee Decisions.* The Contractor shall be bound by all decisions, interpretations, judgments and directives, of every description, issued by the Obligee under the Contract with respect to the Remaining Work, including all decisions, interpretations, judgments and directives resulting from any contractual dispute resolution or mediation process established under the Contract. Any claims arising after Surety issues a Notice to Proceed are the Contractors to pursue and collect from the obligee.

4.3     *Materials and Equipment.* Contractor may use all materials or equipment presently on site or stored without any financial obligation to pay for same. However, Surety does not warrant the sufficiency, quantity, quality, or conformity of any such materials to the Contract Document requirements and any necessary replacements therefore are the Contractor's sole responsibility and expense.

4.4     *Salvage.* Any excess or leftover materials or equipment at the end of the Project shall be the property of and turned over to Surety.

### Article 5
### Schedule for Completion of Remaining Work

5.1     *Commencement and Completion.* The Contractor agrees to commence work at the Project site within five (5) calendar days of Contractor's receipt of a Notice to Proceed and to substantially complete the Remaining Work on or before the date set forth in the Standard Agreement, if any, with final completion to be achieved on or before the date set forth in the Standard Agreement (the Project Schedule), notwithstanding any delays, disruptions, or accelerations, encountered by the Contractor, or previously encountered by the Principal; provided however, that the Contractor shall be afforded whatever extensions of time or other relief that is granted by the Obligee to Surety based on excusable delays arising after execution of the Standard Agreement, but only to the extent provided by the Obligee to Surety under the Contract, all as provided for in this Agreement.

5.2     *Revision of Project Schedule.* The Project Schedule is also subject to revision by the Obligee (including the re-establishment of new substantial and final completion dates), as provided in the Contract.

5.3     *Delays in Completion.* The Contractor acknowledges that any improper performance on its part under the Contract Documents, may cause damages to Surety, including but not limited to either liquidated damages assessed by the Obligee, or the liability of Surety to others, and agrees to compensate Surety for all such direct and consequential damages suffered as a result of such causes, including but not limited to reasonable counsel fees and costs, additional equipment costs, insurance and consultant's costs, if any.

5.4     *Surety Direction to Accelerate.*  Surety, in its sole discretion, may direct the Contractor to work on an accelerated basis (e.g., increased manpower, overtime, holidays, double-shift). When so directed, the Contractor shall immediately comply. If the Remaining Work is proceeding in accordance with the Project Schedule, and the Contractor is not in default under any material provision of the Contract Documents, Surety shall reimburse the Contractor for the actual additional costs for premium time wages, insurance, taxes and actual costs for increased or additional material or equipment required for the acceleration. The Contractor shall not be entitled to any other compensation or damages, except a 10% mark-up of these additional costs for profit, overhead or general and administrative expenses.

5.5     *Surety Direction to Accelerate - Uncompensated.*  If the Contractor fails to perform the Remaining Work expeditiously and in accordance with the Project Schedule, the Contractor shall, at its own expense, work on an accelerated basis, as and when directed by Surety, until the Remaining Work is again proceeding as required by the Project Schedule.

5.6     *Acceleration Claims.*  If the Contractor is ordered to accelerate the Remaining work without an offer of compensation under Article 5, the Contractor shall accelerate the Remaining work, as and when directed by Surety.  To preserve any claim for compensation based upon a direction to accelerate, the Contractor shall provide a written protest to Surety within seventy-two (72) hours of the direction to accelerate and strictly comply with the provisions of Article 6 of the General Conditions.  Any recovery by the Contractor pursuant to the written protest shall be limited to the costs set forth in this Agreement.

### Article 6
### The Contract Sum

6.1     *Not to Exceed Price.*  The Contractor agrees to take over and fully and faithfully perform and complete the Remaining Work, in strict compliance with the Contract, assuming all obligations with respect to the Contract that were to be performed by the Principal, except as otherwise specifically provided to the contrary, in the Standard Agreement or General Conditions.  Under no circumstances shall the Surety be obligated to pay the Contractor any sums in excess of the Not to Exceed Price of $8,051,366.72, (Contract Sum), except as provided for to the contrary in the Standard Agreement or the General Conditions; provided further, however, that Overages or under runs of quantities shall be processed in accordance with, and governed by Article 7.2, hereof.

The Contractor agrees to accept the Contract Sum as full compensation for all testing, labor, material, equipment costs of any nature, quality control, cartage, profit and overhead reasonably necessary or proper to complete the Remaining Work, and whether or not there is a line item or a schedule of value for that testing, labor, material, equipment costs of any nature, quality control, cartage, overhead and profit in any pay estimates, or otherwise.

### Article 7
### Submission of Pay Estimates for Progress
### Payments and Final Payment to the Obligee

7.1     *Pay Estimates to Obligee under the Contract if Applicable.*  In the Surety's name, the Contractor shall prepare for the Surety's benefit and review and approval, the monthly or periodic progress pay estimates, and the final pay estimate, permitted by the Contract, if those pay

estimates were to be prepared by the Principal, instead of the Obligee, in the same form and at the same time, and with the same breakdown by items, quantities and unit prices and/or lump sum amounts is provided for in the Contract. Contractor agrees to cooperate with Surety and the Obligee, and their agents during any preparation for or review process pursuant to the Contract provisions, leading up to and after the issuance of any and all Pay Estimates. This shall include but will not be limited to, the Contractor providing all documents and certifications required under the Contract to justify quantities and/or payment to Surety, including, but not limited, to lien waivers from the Contractor and its subcontractors and suppliers, and payroll certifications attesting to compliance with any applicable labor laws, including but not limited to the Davis Bacon Act or any other applicable prevailing wage law. Additionally, any local, municipal, state or federal taxes or assessments required to be paid by a contracting entity shall also be included in the pay applications. Upon receipt of the pay estimate, whether for a progress or final payment, the Surety shall review and approve or disapprove the pay estimate and, if approved, promptly forward that pay estimate to the Obligee with a copy of that transmittal furnished to the Contractor. If the Surety or the Obligee disapproves a pay estimate, the Surety and Contractor shall confer with or without the Obligee, to resolve any dispute, but in the event they are unable to resolve the dispute, then the Contractor shall be bound by the provisions of this agreement for the resolution of any dispute. Notwithstanding the foregoing, the Surety may, at its sole option, submit a pay estimate to the Obligee, in whatever amount or form the Surety deems appropriate. The Surety reserves the right to reject any pay estimate that is not in conformance with the Contract. The Contractor's failure to diligently and promptly submit Pay Estimates, monthly or final, to the Obligee is an act of default, justifying termination.

Surety shall make progress payments and final payment to the Contractor using the format, schedule of values, and quantities set forth on the attached proposal or as agreed by the parties.

For Quantity Items , Surety shall pay the Contractor for the quantities completed during the billing period at the unit prices set forth in the proposal.

Subject to the provisions of this agreement, Surety shall remit progress payments and final payment to the Contractor within twenty (20) working days from approval of the work by the Obligee.

### Article 8
### Pay Estimates from Contractor to Surety
### and Contract Sum

8.1     *Format and Schedule of Values - Progress Payments and Final Payment, if Principal Prepared Pay Estimates.* The Contractor shall prepare and present pay estimates for progress payments and final payment to the Surety using the format, schedule of values, unit prices and lump sum values set forth on the work order. The Contractor shall submit all pay estimates for progress payments and final payment to the Surety on the same billing cycle as the pay estimates the Contractor prepares on Surety's behalf for submission to the Obligee, e.g., by the 25th of the month. The pay estimate for quantity items shall be based on the format of the Owner's schedule of values. Other items may be listed on a separate invoice with the quantity items added as a separate line item.

8.2     *Complete Documentation for All Pay Estimates.* The Surety shall not consider any Pay Estimates under this Standard Agreement, unless they are accompanied by: (i) the corresponding Pay Estimate from Surety to Obligee, prepared by Contractor for Surety, if

6

applicable; and/or (ii) with all of the documents and certifications required under the Contract to justify payment to Surety under the Contract.

     8.3    *Payment of Subcontractor and Suppliers.*  On receipt of payment from Surety, the Contractor shall promptly pay its subcontractors and suppliers that are entitled to payment. The Contractor shall in all cases, comply with any and all applicable State or Federal laws requiring the prompt payment of subcontractors, laborers, and suppliers.

     8.4    *Work During Pendency of Dispute.*  In the event of a dispute over a Pay Estimate, whether a progress payment or final payment, or a change order or claim whether between the Obligee and Surety, or Surety and Contractor, or any combination thereof, such dispute shall not delay performance of the Remaining Work and the Contractor specifically agrees to continue to complete the Remaining Work, during the pendency of the dispute.

     8.5    *Payment on Occupancy - Not Acceptance.*  The Surety's payments to the Contractor shall not constitute evidence of proper performance by the Contractor or acceptance by Surety or Obligee of latent or patent defects in the Remaining Work, including any work, materials or equipment installed as part of the Remaining Work. Occupancy or use of the Project shall not, under any circumstances, constitute conditional full or final acceptance of the Remaining Work, including any aspect of the Remaining Work.

     8.6    *Contract Sum/Uncompleted Work.*  The Surety shall not be obligated to make payments to Contractor, whether progress payments or final payment, if such payment(s) will result in an unexpended contract sum, including retainage, less than an amount adequate to satisfy the Contractor's obligations under the Contract Documents, as determined by Surety.

     8.7    *Surety Independent Withholdings.*  Surety may withhold payment from the Contractor to the extent necessary, in Surety's estimation, to protect Surety from loss on account of the Contractor: (i) failing to remedy defective work, materials or equipment; (ii) causing or permitting the filing of liens or claims, in violation of the Contract Documents; (iii) failing to make prompt payment to Subcontractors and others; (iv) failing to prosecute the Remaining Work in accordance with the Project Schedule or to perform expeditiously all other aspects of the Remaining Work; (v) causing damage to the property; (vi) causing damages to others for which Surety may be responsible; or (vii) failing in any other respect to perform fully each of its obligations under the Contract and the Contract Documents. Any amount withheld shall not be paid until the cause for withholding has been removed by the Contractor and satisfactory evidence to that effect has been furnished to Surety. Surety reserves the right, and may, in its sole discretion, apply the payment withheld from Contractor to pay or remedy, in whole or in part, items (i) through (vii), inclusive, and deduct those amount(s) from the payment withheld, or any future payments due under the Contract Documents.

     8.8    *Contractor's Acceptance Waiver and Release.*  Acceptance of final payment by the Contractor shall constitute a complete waiver and release by the Contractor of all claims for damages or additional compensation whatsoever against Surety, and those for whom Surety is responsible or to whom it may be liable, under the Contract and the common law, arising from, or any manner relating to, the Contract Documents, the Remaining Work or the Project, except as specifically noted by to the contrary by the Contractor in writing.

     8.9    *Contractor to Discharge Claims or Liens.*  Contractor agrees not to allow any lien or claim to be filed on the project and agrees to discharge or bond around any lien or claim within 7 days of notice by the Surety or the Obligee. If, after final payment, a claim, lien or



JACKSON
construction
company

charge is asserted against Surety, the Obligee, the Project, the Contract, or the funds allocated to the Contract, relating to, or arising from the Remaining Work, by a Subcontractor, supplier or other, the Contractor shall, at its own expense, promptly obtain the discharge of the claim or lien.

## Article 9
## Subcontractors and Suppliers

9.1    *Subcontractors and Suppliers.* The Contractor shall use its best efforts, subject to competitive pricing, to assume Principal's existing or former subcontracts or purchase orders with Subcontractors and Suppliers. The Contractor shall also use its best efforts to administer those subcontracts and purchase orders in such a manner as to limit or eliminate claims related to the Remaining Work. At the Contractor's request, the Surety shall assign to Contractor all of Surety's right, title and interest in and to Principal's subcontracts or purchase orders with third parties for the performance of the work. The Surety may execute such assignment(s) in a blanket form, or separately, as the Contractor requests. The Contractor agrees to request such an assignment for each (or all) of the Principal's subcontracts or purchase orders the Contractor assumes. Upon assumption, and the Surety's subsequent assignment, the Contractor shall assume the Principal's subcontracts or purchase orders, and shall be responsible for paying all sums then due, or due in the future thereunder, including but not limited to, any retention. The Contractor's substitutions of Subcontractors or others or the retention of new Subcontractors or others must conform to the requirements of the Contract. The Contractor is not entitled to any time or price adjustments in the Project Schedule or Contract Sum for: (i) any substitution for existing Subcontractors or others; or (ii) the retention of new Subcontractors, or others; or (iii) the performance or lack of performance of the Principal's existing or former Subcontractors or Suppliers.

## Article 10
## Changes to the Remaining Work

10.1    *Obligee Change Orders.* Without invalidating the Contract Documents, the Obligee may direct the Contractor, in writing, to perform extra, additional or changed work, or to delete work from the Remaining Work, to the extent permitted by the Contract (collectively, a Change Order). The Contractor shall comply with the Change Order, provided however, that the Contractor must obtain Surety's written consent to a Change Order if it involves work valued at more than $5,000 and an adjustment to the Project Schedule of more than five (5) working days. The Contractor has no authority to agree to deductive Change Orders or backcharges of any nature without the Surety's express prior written approval.

10.2    *Contract Documents Apply.* The Contract Documents shall apply to all such Change Orders as if the covered work were initially a part of the Contract. Further, the Contract Documents shall not be terminated as a result, and the Contractor's surety shall not be released or discharged, regardless of the aggregate nature, scope or cost of all Change Orders.

10.3    *Change Order Valuation.* All Change Orders shall be valued in accordance with the relevant provisions of the Contract. Further, the Contractor agrees to accept, as full and complete compensation for each Change Order, regardless of the aggregate number or value of all Change Orders, the compensation and the adjustment to the Project Schedule determined by the

8

Obligee under the Contract, including, where applicable, by reference to rates or unit and/or lump-sum prices, established under the Contract by the Principal, without any claim for additional compensation or extension of time from Surety. In the event the Contractor disagrees with the Obligee's adjustment to the Project Schedule and/or its valuation of the Change Order, the Contractor shall proceed with the work or changes required by the Change Order and give notice of its claim in accordance the terms of the contract.

10.4    *Action to Avoid Casualty.*  Notwithstanding any provision of the Contract Documents to the contrary, the Contractor is expected, at all times, to take whatever action is required to avoid casualty to life and significant property. If the Contractor can subsequently establish, to Surety's satisfaction, that its actions, taken without Surety's prior approval, were necessary and appropriate to avoid such casualty to life and property, associated costs shall be compensable on a time-and-material basis in accordance with the provisions of Article 5.4 of the General Conditions concerning the valuation of corrective work. Notice of any claim for such costs, however, must be given in compliance with Article 6 of the General Conditions.

10.5    *Minor Changes.*  Surety may direct, in writing, minor changes in the Remaining Work. The Contractor shall comply immediately. These changes shall not result in an adjustment to the Project Schedule or to the Contract Sum set forth in the Standard Agreement.

## Article 11
### Defective Work, Defects in Existing Work and Surety Change Orders

11.1    *Defective work of Contractor and Others.*  The Contractor shall be responsible for all defects or defective work on work put in place after the Contractor's receipt of the Notice to Proceed which are caused by or performed by the Contractor or any of its subcontractors or suppliers. The Contractor shall repair such defects or defective work at its own expense and without delay to the Project Schedule.

11.2    *Existing Defects and Latent Existing Defects.*  The Contractor shall be responsible for correcting or repairing any existing defects or existing deficient work (Existing Defects) performed by the Principal or its subcontractors or suppliers, at its own cost as part of completing the Remaining Work; provided, however, if the Contractor corrects or repairs Latent Existing Defects then the Contractor shall be compensated in accordance with this Article, so long as the Surety's prior written approval is secured. "Latent Existing Defects" means a hidden defect in the work put in place prior to the Contractor's receipt of the Notice to Proceed, which a reasonably careful inspection would not reveal, or that cannot be discovered by any known and customary tests. The Contractor shall promptly notify Surety of the Latent Existing Defect in writing at the address set forth in Article 23, and obtain Surety's prior written approval as to scope and cost of the work, before proceeding with any corrective work for which the Contractor intends to seek compensation. For corrective work performed on a Latent Existing Defect by the Contractor with Surety's prior written approval, which is: (i) completed to the satisfaction of the Obligee and Surety; and (ii) accepted under the Contract (Compensable Corrective/Additional Work), Surety shall pay the Contractor an amount equal to its reasonable and necessary direct costs for field labor, associated fringe benefits, taxes and insurances, materials and equipment, together with a mark-up on those direct costs of _10% as full compensation for all other associated elements of direct and indirect cost (excluding field superintendent including for field and home-office overhead) and profit, regardless of the extent or aggregate number of all corrective work items and any resulting impact or delay to the Contractor's other operations.

9

11.3    *Surety Change Orders.*  Surety may also, without a corresponding Change Order from the Obligee, require the Contractor in writing to perform extra, additional or change work, or to delete work from the Remaining Work, without invalidating the Contract Documents or releasing or discharging the Contractor's surety.  Such Surety Change Order work shall also be compensated as provided in the contract.

11.4    *Payment of Compensable Corrective/Additional Work.*  The Contractor may requisition payment for Compensable Corrective/Additional Work on a percentage-complete or unit price basis with its monthly pay estimate, less 5% retainage which shall be withheld until final payment under the Contract Documents.  The Contractor shall maintain current cost records showing its compensable costs under this Article in a form, and with content, acceptable to Surety.  These cost records shall be made available to Surety for review and audit upon reasonable notice during normal business hours.

### Article 12
### Claims for Additional Compensation, Damages and Extensions

12.1    *Notice of Claim.*  The Contractor agrees that it shall not make a claim against Surety under the Contract Documents for an extension of time to complete the Remaining Work, or for additional compensation or damages under the Contract Documents for breach of the Contract Documents or in any manner related to the Remaining Work on the Project, unless it shall first have provided Surety with notice of such claim at the address set forth in Article 23 of this Agreement, at least ten (10) full working days before Surety is, or may be, required to provide such claim notice to the Obligee under the Contract.  In the event of a claim by the Contractor against Surety which would not support, in whole or in part, a corresponding claim by Surety against the Obligee, notice shall be given to Surety no later than five (5) working days after the inception of the claim or causes of delay, injury, damages or entitlement.

12.2    *Claim Notice Contents.*  All notices required under this Article shall be in writing and contain whatever information is required by the Contract and, at a minimum, a specific description of: (i) the cause or causes of the injury, extra cost, damages or delay; (ii) the identity of those entities claimed to be responsible; (iii) the contractual basis, if any, entitling the Contractor to the relief sought; (iv) an estimate of the quantification of the extension, extra costs or damages sought; and (v) a statement setting forth how Surety might mitigate or avoid any further delay, injury or damages.

12.3    *Limited Remedy.*  Where the claim has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from Obligee on account of the claim.  The Obligee granting relief on the claim, and Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor.  The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with this Article or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to the Surety by the Obligee on account of the claim.  The sole remedy of Contractor

shall be whatever relief the Obligee grants to Surety, with the Obligee's granting that relief to Surety as express condition precedent to Surety's obligation to remit the same to the Contractor. If the Surety does not receive any relief from the Obligee, then the Contractor, likewise, shall not receive any relief.

12.4    *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

12.5    *Costs of Claims Preparation and Prosecution.* The Contractor and Surety agree that they must jointly agree to prosecute or settle the claim on whatever terms they deem appropriate, which consent or agreement each party shall not unreasonably withhold, and for which they may provide full releases therefore to the Obligee or others.

### Article 13
### No Damage for Delay/Delay Claims

13.1    *No Damages for Delay - Limited Relief.* Contractor acknowledges that during the course of completion of the Remaining Work, Contractor may experience delays and additional costs related to governmental regulations, acts or omissions of Obligee, subcontractors, suppliers or others. The Contractor also acknowledges that it may experience difficulty in obtaining the type of services, labor, equipment and materials and approvals required for the Remaining Work, including clearance from the Obligee to proceed with some or all of the Remaining Work. The Contractor represents that it has considered these risks in agreeing to the Contract Sum stated in the Standard Agreement. Thus, except as expressly provided to the contrary in contract, the Contractor agrees not to make any claim for an increase in the Contract Sum based upon the escalation of these costs, regardless of the number or extent of delays, disruptions or extensions of the Project Schedule or the Remaining Work.

13.2    *Extension Request - Contractor Limited to Claim against Obligee.* Where a claim for extension has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by the Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to the Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from the Obligee on account of the claim. The Obligee granting relief on the claim, and the Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor. The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with the contract or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to Surety by the Obligee on account of the claim. The cost of any claim's preparation, and presentation, and the prosecution thereof by the Contractor and Surety, is strictly governed by Article 12.5. The sole remedy of Contractor for any delays shall be the Obligee's extension of time for completion and payment of costs directly associated with that extension, with the Surety's obtaining a similar extension from the Obligee for the same amount of time and payment of costs, if any, an express condition precedent to Surety's obligation to remit the same to the

Contractor. If the Surety does not receive an extension of time, or payment of costs from the Obligee, then the Contractor shall not receive an extension or payments.

3.3    *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting that relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

## Article 14
## Administration of the Contract, Reports
## Warranty & Guarantees

14.1    *Administration of the Contract.* The Contractor shall process and handle, for itself and Surety, all Pay Estimates, all paper work, shop and other drawing submittals, sample and cut-sheet submittals, as-built drawings, manual submissions, change orders, additional work orders and supplemental agreements, and all other matters required for the prosecution of the Remaining Work, and in order to obtain acceptance of the Remaining Work in strict accordance with the requirements of the Contract.

14.2    *Books and Records.* The Contractor shall maintain current books, records, accounts and reports, including copies of all submittals and correspondence with the Obligee and/or others concerning the Project (the Project Records) so as to enable Surety to be fully informed at all times as to the progress of the Remaining Work and the administration of the Contract. The Project Records shall be maintained for a minimum of six (6) years following final acceptance of the Remaining Work and shall be made available to Surety for copying promptly upon reasonable notice during normal working hours.

14.3    *Guarantees and Warranty.* Contractor fully assumes at no additional cost all guarantees and warranties relating to work performed, workmanship, material, and job supervision and other acts of Contractor and its subcontractors and suppliers. The guarantee and warranty obligations of the Contractor shall endure for the length of time stated in the Contract and shall be subject to all the conditions and requirements provided for therein. Contractor shall furnish all labor, equipment, tools, material, testing and appurtenances that may be required or necessary to carry out such guarantee and warranty work. Contractor shall be paid its actual costs incurred in performing any warranty work of the Principal plus a markup of 10%.

## Article 15
## Termination of the Agreement/
## Declaration of Default

15.1    *Termination.* The Remaining Work shall be performed in accordance with the Contract. In the event that the Contractor fails to make progress in accordance with the Project Schedule and the delay is not excused under the Contract and the Contract Documents, Surety may provide a written termination notice. If the Contractor does not proceed with the Remaining Work within three (3) calendar days of the written termination notice, Surety may terminate the Contract Documents for default, without further notice or delay.

12

15.2    *Notice of Default.* Surety may, upon written notice to Contractor, declare the Contractor in default of the Contract Documents, if: (i) the Obligee notifies Surety or determines that Surety is in default of its obligations under the Contract and that default is a consequence of the Contractor's breach of the Contract, as incorporated into the Contract Documents; (ii) the Contractor fails to make payment to subcontractors and suppliers in accordance with applicable State and Federal laws; (iii) the Contractor otherwise commits a material breach of the Contract Documents; (iv) a petition under the Bankruptcy Act is filed by or against the Contractor; (v) the Contractor becomes insolvent; (vi) a receiver is appointed for the Contractor; or (vii) the Contractor violates any laws, code, rule, regulation or lawful order of any governmental agency having jurisdiction over the Project or the Contractor, including any safety-related law, code, rule, regulation or lawful order. Unless Contractor cures the event of default to Surety's satisfaction within three (3) calendar days of receipt of the Notice of Default, Surety may immediately terminate the Contract Documents.

15.3    *Assumption/Completion of Remaining Work.* Upon a termination, Surety, in addition to whatever rights it might have by reason of the incorporation of the Contract, may assume and complete the Remaining Work by whatever means it deems expedient and proper. The Contractor shall not be entitled to any payment under the Contract Documents, under any circumstances, until the Remaining Work is finally complete and accepted by the Obligee. Further, if the costs of completing the Remaining Work, including, but not limited to the architectural, engineering, construction and other services, and reasonable counsel fees, if any, together with all deductions, withholdings and damages, suffered or owed to Surety under the Contract Documents, and all other consequential damages arising from the default, exceed the unpaid balance of the Contract Sum stated in the Standard Agreement, then the Contractor and its surety shall immediately pay the difference to Surety. If Surety chooses not to complete the Remaining Work, the Contractor and its surety shall be liable to Surety for all damages, including the damages described in this Article, arising from its default. The Contractor's (and its surety's) obligation to pay Surety under this Article, and the Contractor's (and its surety's) liability to Surety for all damages under the Contract Documents, shall be cumulative with Surety's other rights under the Contract, the Contract Documents and applicable law, and shall survive termination.

15.4    *Taking Possession of Material.* In the event that Surety exercises its right to terminate the contractor's right to proceed and to complete the Remaining Work, Surety may take possession of all materials, appliances and equipment located at the Project for use in completing the Remaining Work. Further, the Contractor shall assign to Surety, upon request, its rights under any subcontracts and purchase orders in connection with the Remaining Work and otherwise cooperate with Surety's efforts to resume and complete the Remaining Work.

15.5    *Termination for Convenience.* The contract may be terminated in whole or in part by the Surety at any time for the Surety's convenience, provided the Contractor is given not less than ten (10) calendar days written notice of the Surety's intent to terminate and an opportunity for consultation with the Surety prior to termination. Upon receipt of the termination notice, the Contractor shall promptly discontinue all services (unless the notice directs otherwise) and deliver or otherwise make available to the Surety all data, drawings, specifications, reports, estimates, summaries, and such other information and materials that may have been accumulated by the Contractor in performing under the contract. The termination of the contract for any reason, whether for convenience or for cause as described in Articles 15.1 and 15.2, shall not relieve the Contractor of its responsibilities under the contract for the work performed and materials supplied, nor shall it relieve the Contractor's surety or the Contractor of its obligations

13

under the Contractor's Performance Bond and Payment Bond for any claims arising out of the work performed and the materials supplied by the Contractor.

If the Contractor is terminated for cause in accordance with Articles 15.1 and 15.2 of these General Conditions, and it is later determined that the Contractor did not fail to fulfill its contractual obligations, then any such termination by the Surety shall be deemed to have been a termination for convenience, and in such event, the Contractor's recovery shall be limited to an adjustment of the Contract Sum as provided for in Article 15.6 for a termination for convenience.

Under any and all circumstances, the Surety shall not be responsible to the Contractor for damages for wrongful termination in excess of the payments set forth in Article 15.6, whether or not such damages are defined as direct or consequential and whether or not determined to be in tort, contract, negligence, strict liability, warranty, expressed or implied, or otherwise.

15.6    *Termination for Convenience - Equitable Settlement.* In the event the Contract is terminated for convenience, then an equitable settlement for the work performed under the Contract prior to such termination shall be made, with the Contractor's measure of damages limited to the amount due under the Contract against prior pay estimates already submitted to Surety prior to termination, plus 10% of the unpaid balance of the Contract Sum, plus all other reasonable and unavoidable costs incurred for demobilizing field forces, plant and equipment, quitting the project site, and terminating subcontracts and purchase orders.

## Article 16
## Indemnification

16.1    *Indemnification.* To the fullest extent permitted by applicable law, the Contractor shall assume the entire responsibility and liability for all damage (including purely economic loss) or injury of any nature (including death) to persons and property, including intangible property, arising out of the execution of the Remaining Work, and hereby expressly waives any Workman's Compensation Immunity, whether granted by statute or otherwise, and agrees to defend (if required by Surety), indemnify and hold harmless Surety and its respective directors, officers, agents, servants, employees, affiliates and subsidiaries (the Indemnitees), from all demands, claims, causes of action, (including but not limited to any claims for payment or otherwise by any of Contractor's subcontractors, suppliers, employees and laborers and also including, but not limited to, the Principal's subcontractors or suppliers, when the Contractor has assumed or accepted assignments of those subcontracts or purchase orders), even if devoid of merit, and losses, costs and expenses, including reasonable counsel fees, arising out of, or related to, in any manner, the execution of the Remaining Work, or asserted against any of the Indemnitees by reason of the acts or omissions of the Contractor, or any entity directly or indirectly engaged by the Contractor in connection with the Remaining Work. In jurisdictions in which the indemnification provided for in this Article is broader than that allowed by applicable law, this Article shall be interpreted as providing the broadest indemnification permitted and should be limited only to the extent necessary to comply with that law.

16.2    *Withholds for Indemnity.* If a demand, claim, cause of action, loss, cost or expense covered by Article 16 is asserted against one or more Indemnitees, the Surety may withhold from any payment otherwise due under the Contract Documents an amount sufficient to protect and indemnify the Indemnitee or Indemnitees to the full extent required under Article 16. If final payment has been made to the Contractor, or if the balance due under the Contract Documents is insufficient to protect and indemnify the Indemnitee or Indemnitees involved, Surety, in its discretion, may require the Contractor to furnish a surety bond, from a surety and

14



upon terms acceptable to Surety, in an amount guaranteeing such protection and indemnity. This bond shall be furnished by the Contractor within seven (7) calendar days after receipt of Surety's written demand.

16.3    *Obligations Survive.*  The obligations of the Contractor under Article 14 shall survive final acceptance of the Remaining Work and final payment to the Contractor and shall be in addition to all other rights and remedies available to Surety under the Contract Documents and applicable law.

### Article 17
### Performance and Payment Bonds and Insurance

17.1    *Performance and Payment Bonds.*  The Contractor shall, at the option of the Surety, furnish separate performance and payment bonds, naming Surety and the Obligee as dual-obligees, in penal amounts equal to the Contract Sum. The terms of the performance and payment bonds, and the surety issuing the bonds, shall be subject to Surety's prior approval. No surety shall be accepted if that surety is not approved by the U.S. Treasury.

17.2    *Contract Documents Incorporated into Bonds.*  The Contractor's performance and payment bonds shall expressly incorporate the Contract Documents, and provide that the surety's obligations and liabilities shall be co-extensive with those of the Contractor. The Contractor's surety shall also expressly agree to join in, and to be bound by, any contractually mandated mediation or arbitration process, or legal action, involving Surety and the Contractor arising from the Project. Finally, the surety shall agree that Change Orders under the Contract Documents may be issued without notice to it and that these modifications, including the addition or deletion of work, shall not operate to discharge the surety, regardless of the scope, nature or extent of all modifications to the Contract Documents.

17.3    *Filing of Bonds.*  The Contractor shall, on its behalf and on behalf of Surety, comply with any applicable law requiring the public filing of all labor and material payment bonds, if any, and it shall, at its own expense, defend (if requested by Surety), indemnify and hold harmless Surety against any and all damages or loss of any nature (including purely economic loss), arising out of, or resulting from, the failure to comply with such law, including counsel fees and court costs to any payment bond claimant.

17.4    *Insurance.*  The Contractor shall obtain and maintain the insurances required under the Contract, with the coverages and in the amounts specified in the Contract. The Obligee and Surety shall be named as co-insureds or additional insureds under all policies of insurance required of the Contractor. Further, the Contractor shall ensure that its insurers waive all rights of subrogation against the Obligee and Surety. The Contractor shall deliver endorsements confirming that the insurances required under the Contract has been obtained and that the Obligee and Surety have been named as co-insureds, or additional insureds. Failure to obtain this insurance, or permitting this insurance to lapse, shall constitute a material breach of the Contract Documents.

### Article 18
### Conditions Precedent to Contract Documents

18.1    *Conditions Precedent.*  Unless waived in writing by the Surety, the Contract Documents and all related agreements, shall be null and void and of no effect unless and until the following conditions precedent occur: (i) a Takeover Agreement mutually satisfactory to Surety

**JACKSON**
construction
company

and the Obligee has been executed covering completion of the Remaining Work; (ii) the Contractor has furnished to Surety the bonds and insurance required under this Agreement (if required); and (iii) the Obligee provides written authorization for Surety to utilize Contractor as the Completing Contractor under the Contract. If the Contract Documents fail to become effective the Contractor shall have no claim against Surety of any description.

### Article 19
### Independent Contractor

19.1    *Independent Contractor.* Except as otherwise provided in the Standard Agreement and General Conditions or the Contract, the Contractor shall be permitted to exercise the full prerogatives of a contractor in prosecuting the Remaining Work, including, but not limited to, selection and classification of supervisors and workers, scheduling, determination of equipment and material requirements and the establishment of work hours and work week, including over time, it being further understood and agreed that the Contractor is an independent contractor in connection with all work to be performed by it pursuant to the Contract. Additionally, pursuant to the Contract, the Contractor shall subsequently designate its project superintendent. The Contractor specifically agrees that it is an employing unit subject as an employer to all applicable Unemployment Compensation statutes so as to relieve the Surety of any responsibility or liability for treating Contractor's employees as employees of the Surety for the purpose of keeping records, making reports and payment of Unemployment Compensation taxes or contributions; and the Contractor agrees to defend, indemnify and hold the Surety harmless and reimburse it for any expense or liability alleged or incurred under said statutes in connection with employees of the Contractor.

### Article 20
### Offset

20.1    *Offset.* All amounts owed to Surety by the Contractor under the Contract Documents may be deducted, at Surety's option, from any amounts owed by Surety to the Contractor.

### Article 21
### Cumulative Remedies

21.1    *Cumulative Remedies.* Surety's various rights and remedies under the Standard Agreement, the General Conditions and the incorporated provisions of the Contract and law are cumulative and shall not be waived by payment for, or acceptance of, the Remaining Work.

### Article 22
### Compliance with Laws

22.1    *Compliance with Laws.* The Contractor shall comply with all applicable provisions of federal, state and local laws and regulations, including provisions of law imposing trust obligations on the Contractor to insure the prompt and full payment of all legitimate debts owed by the Contractor to others for work performed in connection with the Remaining Work. The Contractor shall also comply with all federal, state and local safety and health laws and regulations. The Contractor shall also comply with all laws mandating the payment of prevailing wages and supplements and controlling other terms and conditions of employment. The Contractor further agrees as regards: (i) the production, purchase and sale, furnishing and delivering, pricing and use or consumption of materials, supplies and equipment; (ii) the hire,

tenure or conditions of employment of employees and their hours of work and rates of and the payment of their wages, and (iii) the keeping of records, making of reports, and the payment, collection, and/or deduction of Federal, State and local taxes and contributions, that the Contractor will keep and have available all necessary records and make all payments, reports, collections and deductions, and otherwise do any and all things so as to fully comply with all Federal, State and local laws, ordinances and regulations in regard to any and all said matters insofar as they affect or involve the Contractor's performance of the Contract Documents, all so as to fully relieve the Surety from and protect it against any and all responsibility or liability therefore or in regard thereto.

## Article 23
## Notices

23.1    *Notices - Designated Addresses.*  Notices under the Contract Documents, or pursuant to any law or regulation, shall be in writing, unless otherwise required by the specific law or regulation, and shall be deemed to have been given three (3) calendar days after mailing, provided mailing was by certified mail, with a copy transmitted by telecopier, addressed to the intended recipient at its address set forth below:

To Surety:

> Tiffany Schaak
> Senior Claim Attorney
> MC41
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:  (410) 205-0605

With copy to:

> Russ Werner
> Senior Construction Engineer
> MC41
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:  (410) 205-0605

To the Contractor:

> Robert B. Barton, Jr., P.E., Executive Vice President
> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191
> FAX:  (781) 737-1550

17



All pay estimates or other documents or Notices shall be mailed to the Surety at the above address.

## Article 24
## Conflicts and Interpretations/
## Order of Precedence

24.1    *Conflicts, Interpretations, Order of Precedence.* The Standard Agreement, General Conditions and their component parts, including the incorporated Contract and the attached Exhibits, are intended to be complimentary and are intended to require all work and services by the Contractor necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. The Contractor shall review the Contract Documents, including the Contract and the Exhibits, before signing the Standard Agreement and advise Surety whether any of the parts of the Contract Documents conflict and whether any of the Contract Documents fail to require of the Contractor all work and services necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. In the case of a conflict between the terms of the Standard Agreement, the General Conditions, or the terms of the Contract or of an annexed Exhibit, the following Order of Precedence applies:

(i)    The Standard Agreement (and its Exhibits) has priority over the Contract (and its Exhibits) and any other agreement or document;

(ii)    The Contract (and its Exhibits) has priority over any other agreement or document, except for the Standard Agreement (and its Exhibits).

## Article 25
## Assignment

25.1    *Non-Assignment by Contractor.* The Contractor shall not assign or sublet the Contract Documents or any right or interest therein nor shall the Contractor assign any moneys due or to become due hereunder. Any such assignment of the Contract Documents shall be null and void and of no force and effect and the Surety shall not be required to recognize any such assignment or subletting. The Contractor shall not sub-contract the Contract Documents or any part thereof without the prior written consent of the Surety. If the Contractor shall sub-contract the Contract Documents or any part thereof with the prior written consent of the Surety, the Contractor shall cause to be inserted in every Subcontract the Indemnity and Insurance requirements of Article 16 and Article 17.4 hereof. The Contractor also agrees to comply with all Subcontractor listing or substitution requirements mandated by the Contract or law.

25.2    *Assignment by Surety.* The Surety reserves the right to assign the Contract Documents to the Obligee or others. If the Surety so assigns the Contract Documents, then upon the Contractor's receipt of the notice of that assignment, the Contractor shall complete the Remaining Work for the assignee listed in the notice, all in accordance with the Contract Documents. Any such assignment shall constitute a novation and the Surety shall be automatically released from any liability to the Contractor, and the Contractor shall not have a claim or cause of action against the Surety, arising out of or related to, the Contract Documents, or otherwise.

## Article 26
## Governing Law

18

26.1    *Governing Law.* This Agreement shall be governed by the laws of the State of Massachusetts.

## Article 27
## Modification

27.1    *Modifications.* This Agreement may not be modified orally. All modifications must be in writing and signed by Surety and the Contractor.

## Article 28
## Drug and Substance Abuse

28.1    *Drugs.* The Contractor shall not permit drug or substance abuse by any of its employees, or any employees of its subcontractors or suppliers, and it shall fully and promptly comply, at its own expense, with every rule, regulation and program initiated by the Obligee with respect to this subject matter.

## Article 29
## Confidentiality

29.1    *Confidentiality.* The Contractor shall not divulge to third parties, or use for its own benefit, without prior written consent (which shall not be unreasonably withheld) from Surety, any information obtained from or about Surety, its businesses, transactions and personnel.

## Article 30
## Merger

30.1    *Merger.* The Standard Agreement and the incorporated provisions of the Contract (the Contract Documents), constitute the complete expression of the agreement between Surety and the Contractor. No prior statements, course of dealing or trade usage, shall supplement the terms of the Contract Documents.

## Article 31
## Dispute Resolution

31.1    *Dispute Resolution.* It is the intention of the parties that the Contract Documents and the performance under the Contract Documents, and all suits, actions, and proceedings under the Contract Documents, be construed in accordance with and under and pursuant to the laws of the State of Massachusetts, and that, in any suit, action, or proceeding that may be brought arising out of, in connection with, or by reason of the Contract Documents, the laws of the State of Massachusetts shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any suit, action, or proceeding may be instituted. If any suit or action is filed by either Surety or Contractor, as a result of a dispute arising under the Contract Documents solely between Surety and Contractor, venue shall be in U.S. District Court, District of _____, _____ Division. However in the event Surety believes, at its sole discretion, that the Obligee should be joined in any action, Contractor shall be bound by the dispute resolution procedures set forth in the Contract, and agrees to stay or dismiss any such suit



or action and otherwise follow and comply with the terms of either Article 12 and/or Article 13 of the General Conditions.

### Article 32
### Audit

32.1    If all or a portion of the Completion Contract is performed on a time and material basis with a mark up or a fixed fee, the Contractor agrees that Surety shall have the full right, on reasonable notice and during regular business hours, of access to the books and records of the Contractor to justify and establish the Contractor's entitlement to all costs billed to the Surety. In the event an overpayment is established Contractor shall promptly, on request of Surety, refund the amount of the overpayment to the Surety. If Surety is required to present evidence of costs or payments made pursuant to this Completion Contract, Contractor agrees to cooperate with Surety and provide access to books and records and reasonable assistance necessary to respond to the request.

### Article 33
### Validity of Agreement

33.1    *Validity.* Invalidity of any portion or provisions of the Contract Documents by reason of the laws of any State or for any other reason shall not render any other provisions or portions of the Contract Documents invalid.

### Article 34
### Counterparts/Facsimile Signatures

34.1    *Counterparts/Facsimile.* This Standard Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original with all counterparts constituting but one and the same instrument. The execution of this Standard Agreement by any party hereto will not be effective until counterparts have been executed by all parties. Additionally, facsimile signature shall bind the undersigned.


This Agreement is entered into as of the day and year first written above.

JACKSON CONSTUCTION                UNITED STATES FIDELITY AND GUARANTY
COMPANY                            COMPANY


_____          _____
Robert E. Barton, Jr., P.E.
Executive Vice President_____   _____
Name & Title                          Name & Title


Dated:__ May 11ᵗʰ, 2004_____    Dated:_____

# EXHIBIT "B"



**Jackson
Construction
Company**

(A Massachusetts Business Trust)

May **20**<sup>TH</sup>, 1997

Mr. Donald McCarter
USF&G Company
300 Crown Colony Drive
Quincy, MA 02169

RE:  Retention of Surplus Agreement

Dear Mr. McCarter:

It is hereby understood that the USF&G is providing surety credit based on the
strength of the financial condition at July 31, 1996 after allowing for a stock
redemption of approximately $3,350,000.

We understand that your ability to provide sufficient bonding capacity to cover
that scope of our operation is dependent upon the maintenance of our working
capital and net worth.

For that purpose, it is agreed that no distribution to shareholders, except for
amounts needed to pay income taxes on current year earnings, will be made subsequent
to fiscal year end without the prior knowledge of the USF&G, provided, that the
foregoing shall not be construed to prevent the payment of compensation, expense
reimbursement and benefits to employees who are also shareholders.

JACKSON CONSTRUCTION COMPANY

BY: _____
Paul Bordieri, President
As President and not individually

BY: _____
Paul Bordieri, Shareholder
As President and not individually

# EXHIBIT "C"

May 12, 2005

Mr. James Peters, Vice President
St. Paul Travelers
One Tower Square
Hartford, CT. 06183

Dear Jim,

I am in receipt of your letter dated May 11, 2005.

My request for financial assistance was requested by me since USF&G has had a request for payment since December, 2004 in the amount of $1,019,988 from Jackson Constr. Co..

To date, I have no idea as to when this invoice will be paid.

Perhaps I was being facetious in requesting you loan me some money against that which I am owed but it has been five months since we requested payment and all I do is spend my money to support your cause. The monies due are far and above any scope of work that was presented to Jackson Constr. Co. upon the star of the work.

We have been paid $8,443,613 dollars to date out of a recognized amended scope of work in the sum of $10, 315,202.

Please forward, immediately, our December requisition in the amount of $1,019,988.

Sincerely

Paul Bordieri

# EXHIBIT "D"

JACKSON
construction
company

July 7, 2005

VIA FACSIMILE AND REGULAR MAIL

Thomas McAuley
Bond Claim 4B
St. Paul Travelers
One Tower Square
Hartford, CT. 06183

      **Re:    USF&G / Jackson Co.**
             **June 30, 2005 Demand for Collateral**

Dear Mr. McAuley,

      I am in receipt of your demand for collateral dated June 30, 2005. Your demand is to be paid by the close of business on July 6, 2005. This will not happen. The Surety has breached its obligations, wrongfully and in bad faith damaged Jackson's reputation, interfered in Jackson's rights to do business, and has violated the sanctity of the MSA. It is the Surety, not Jackson who has breached its obligations. Aside from being incorrect, your demand is, to say the least, self serving, inaccurate and misleading.

      Jackson has fully met its obligations to the Surety and under the MSA for 43 years. The demand for collateral stems from USF&G not keeping its payment obligations, wrongfully interfering in the day to day business of Jackson and distributing false documents and information regarding Jackson. This is evidenced by the "Freeze Fund" documents that were sent to our clients on June 28, 2005 by the Surety demanding that no funds, contractually due, be released to Jackson. This was coupled with threats of forfeitures to the Obligee's bond rights should the Obligee not comply with the Surety's demands. At the time the Surety sent these letters to Jackson's clients, Jackson was performing its work on all projects and there was no default by Jackson. The Surety's direct contact with Jackson's clients was a knowing and intentional interference by the Surety with Jackson's contracts and a breach of the MSA. By frightening and threatening Jackson's clients into non-payment, the Surety has further damaged Jackson.

      Further, Jackson is no longer bound by the terms of the expired RSA which you have referenced. The RSA was written in 1997 and was not made part of the MSA. The RSA is not attached to or even mentioned in the MSA. By its plain terms and language, the RSA was obviously intended to be in effect for the then current fiscal year only. I am sure the Surety's files will reflect the limited duration of this document.



Thomas McAuley
July 7, 2005
Page 2

Distributions made by Jackson to shareholder(s) are of no concern to you as such distributions were in accordance with the MSA. Jackson's financial statement for year ending 12-31-2004 shows Jackson making a profit for that fiscal year. On that basis, a distribution was made. The breach of contract, created by the Surety in 2005, caused undue harm to Jackson and its ability to make timely payments to its vendors.

Of the six (6) projects you refer to as having a "shortfall", you neglect to take into account profits from other projects, change orders that are pending and hardships placed upon Jackson by USF&G which is in breach of its payment obligations to Jackson. The Surety has in its possession some $700,000 that is due Jackson and its vendors on the Westford Project. Per Jackson's letter of July 1, 2005, the Surety has breached its Completion Agreement in not remitting progress payments to the contractor within 20 working days from approval of the work by the Obligee. During the July 1, 2005 telephone call between Jackson and Surety representatives, the Surety admitted Jackson was due this approximately $700,000 on the Westford project but the Surety refused to make payment of same to Jackson despite repeated requests. Indisputably, the Surety has breached the Westford contract by refusing to make payment of funds admittedly due.

Similarly, the Surety has breached its payment obligations to Jackson on the Shrewsbury Project. At this point, the Surety owes Jackson approximately $1.5 million for work Jackson has performed. Jackson's June 29 and June 30, 2005 letters to the Surety on the Shrewsbury Project are incorporated herein. The Town of Shrewsbury has asserted its right to withhold payment to the Surety as a result of the Surety's failure to resolve outstanding issues between the Town and the Surety regarding damages caused to the Town by Standen Contracting Co. Inc., not Jackson. Jackson has completed work, approved by the Town, for which the Surety has not paid within the terms of the Completion Agreement therefore breaching the Surety's contract with Jackson. In bad faith and in violation of the Completion Agreement, the Surety is wrongfully dragging Jackson into the Surety's dispute with the Town over the performance and default of Standen. The failure of Standen and the Town's complaints there from are the Surety's problem, not Jackson's. The Surety is in breach of its obligation to Jackson.

Jackson is not responsible for any consulting or legal expenses and any other expenses you claim to have incurred. Jackson has not failed any of its MSA obligations. Jackson rejects your "collateral demands by the close of business on July 6, 2005". There is no basis for your demands or any document that allows you to make such demands. The Surety owes Jackson more than 2 million dollars for work Jackson performed as a completion contractor for the Surety. The Surety's failure to make payment to Jackson has caused great harm to Jackson for which Jackson will hold the Surety accountable. In light of the Surety's substantial breaches of the Westford and Shrewsbury contracts, the Surety's demand for collateral and wrongful interference with Jackson's other projects violates not only the MSA but the Surety's obligations under Chapters 93A and 176D. Simply put, by wrongfully failing to pay Jackson, the Surety has caused Jackson great harm and severely damaged Jackson's good will and reputation for which the Surety will be liable.



Thomas McAuley
July 7, 2005
Page 3

USF&G has already reviewed Jackson's books. Jackson sees no reason for any further review until USF&G honors its contractual obligations.

Jackson reserves all of its rights and defenses under the MSA and the Completion Contracts. Consider this document my prompt reply.

Sincerely

Paul Bordieri
President of Jackson Construction Co.
( NOT INDIVIDUALLY)

Enclosure(s)
cc:    Tony Starr Esquire *(via facsimile and regular mail)*
       Brad Carver, Esquire *(via facsimile and regular mail)*
       Scott Spearing, Esquire *(via facsimile and regular mail)*

LIT 1530525v. 1

# EXHIBIT "E"

| Job Cost Analysis<br>June 10,2005 | Hull<br>Job<br>368 | Hiiell<br>Job<br>370 | White<br>Job<br>371 | Waltham<br>Job<br>374 | Worcester<br>State<br>Job<br>375 | Lowell<br>Stoksoa<br>School<br>Job<br>376 | Winchester<br>Ambrose<br>School<br>Job<br>377 | Olin East Hall<br>Job<br>378 | Harvard 90<br>Mt Auburn<br>Job<br>379 | Harvard 90<br>Mt Auburn<br>Job<br>380 | Shrewsbury<br>Job<br>381 | Westford<br>Job<br>382 | Summary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Contract | 15,730,040 | 10,276,268 | 9,675,800 | 11,158,600 | 7,526,500 | 17,095,000 | 10,898,000 | 13,454,815 | 11,464,791 | 3,190,189 | 8,050,367 | 8,792,501 | 127,312,871 |
| Approved Changes | 273,268 | 229,558 | 122,047 | (181,097) | 1,617,378 | (626,814) | 18,300 | 3,969 | (485) | 0 | 1,910,530 | 308,383 | 3,675,037 |
| Revised Contract | 16,003,308 | 10,505,826 | 9,797,847 | 10,977,503 | 9,143,878 | 16,468,186 | 10,916,300 | 13,458,784 | 11,464,306 | 3,190,189 | 9,960,897 | 9,100,884 | 130,987,908 |
| Payments | 14,886,574 | 9,541,612 | 9,683,575 | 10,252,653 | 7,127,122 | 13,696,962 | 9,788,157 | 12,194,225 | 6,665,060 | 713,518 | 8,443,613 | 7,194,435 | 110,187,506 |
| Balance Due | 1,116,734 | 964,214 | 114,272 | 724,850 | 2,016,756 | 2,771,224 | 1,128,143 | 1,264,559 | 4,799,246 | 2,476,671 | 1,517,284 | 1,906,449 | 20,800,402 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Final Costs |  |  |  |  |  |  |  |  |  |  |  |  |  |
| General Conditions | 1,852,467 | 1,290,609 | 710,423 | 997,646 | 1,225,000 | 930,000 | 915,000 | 1,143,697 | 1,090,488 | 178,405 | 830,000 | 1,502,629 |  |
| Sitework | 1,478,290 | 1,139,091 | 1,178,131 | 940,534 | 362,903 | 1,693,541 | 1,900,000 | 817,805 | 3,121,774 | 0 | 631,698 | 2,315,934 |  |
| Concrete | 296,967 | 568,161 | 572,237 | 548,784 | 160,000 | 658,606 | 509,384 | 619,900 | 1,894,648 | 0 | 71,035 | 1,197,205 |  |
| Masonry | 981,244 | 901,626 | 810,172 | 840,201 | 340,827 | 1,503,590 | 962,612 | 1,058,321 | 205,122 | 0 | 159,707 | 354,586 |  |
| Metals | 763,517 | 877,029 | 710,445 | 967,525 | 197,557 | 1,522,247 | 942,849 | 1,090,086 | 331,245 | 12,590 | 188,904 | 78,465 |  |
| Wood & Plastics | 311,850 | 675,107 | 213,958 | 175,867 | 96,742 | 68,932 | 267,966 | 436,325 | 144,100 | 741,565 | 887,184 | 29,506 |  |
| Moisture Protection | 1,036,234 | 418,017 | 503,800 | 433,799 | 419,202 | 813,376 | 394,735 | 1,012,810 | 197,763 | 4,400 | 471,127 | 58,410 |  |
| Doors & Windows | 1,056,684 | 550,291 | 503,709 | 530,047 | 672,451 | 728,380 | 586,075 | 1,141,262 | 1,592,474 | 84,301 | 507,151 | 248,824 |  |
| Finishes | 2,043,482 | 1,691,729 | 1,324,180 | 1,537,292 | 1,352,386 | 1,947,933 | 1,592,337 | 2,789,693 | 398,777 | 434,303 | 1,391,795 | 447,470 |  |
| Specialties | 272,691 | 152,074 | 77,027 | 141,212 | 82,489 | 184,407 | 119,540 | 38,351 | 98,305 | 45,640 | 251,842 | 211,468 |  |
| Equipment | 538,667 |  | 156,088 | 150,500 |  | 325,450 | 43,300 | 0 | 34,960 | 70,546 | 326,058 | 796,131 |  |
| Furnishings | 544,992 | 802 | 153,275 | 425,567 |  | 474,435 | 346,166 | 2,629 | 0 | 0 | 10,147 | 0 |  |
| Special Constructn | 595,756 |  |  | 237,983 | 237,983 |  | 294,260 |  | 0 | 0 |  | 238,000 |  |
| Elevators | 81,777 | 277,552 | 66,667 | 75,125 | 96,880 | 67,662 | 97,393 | 93,471 | 142,557 | 0 | 50,600 |  |
| Mechanicals | 3,182,335 | 1,622,358 | 1,719,511 | 2,127,142 | 2,547,912 | 3,592,805 | 1,569,423 | 2,395,796 | 1,313,072 | 1,076,795 | 1,245,333 | 1,315,080 |  |
| Electrical | 1,518,903 | 680,014 | 845,027 | 1,198,901 | 1,291,704 | 1,759,564 | 1,090,341 | 806,562 | 921,965 | 493,825 | 1,686,715 | 652,466 |  |
| Backcharges |  |  |  | 312 | 41,590 | 1,507 |  | 934 |  |  |  |  |  |
| Taxes & Insurance | 53,714 | 35,293 | 31,685 | 38,015 | 28,308 | 47,061 | 36,936 | 48,539 |  | 20,000 | 35,000 | 28,276 |  |
| Extras | 6,220 | 31,001 | 8,092 | 111,106 | 171,495 | 5,690 | 7,754 | 31,033 |  | 0 | 156,004 |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Total Final Cost | 16,615,191 | 10,910,754 | 9,584,426 | 11,239,576 | 9,325,428 | 16,325,186 | 11,676,071 | 13,487,217 | 11,566,822 | 3,162,370 | 8,849,700 | 9,525,069 | 132,267,810 |
| Revised Contract | 16,003,308 | 10,505,826 | 9,797,847 | 10,977,503 | 9,143,878 | 16,468,186 | 10,916,300 | 13,458,784 | 11,464,306 | 3,190,189 | 9,960,897 | 9,100,884 | 130,987,908 |
| Gain or Loss | (611,883) | (404,928) | 213,421 | (262,073) | (181,550) | 143,000 | (759,771) | (28,433) | (102,516) | 27,819 | 1,111,197 | (424,185) | (1,279,901) |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Contract Bal Due | 1,116,734 | 964,214 | 114,272 | 724,850 | 2,016,756 | 2,771,224 | 1,128,143 | 1,264,559 | 4,799,246 | 2,476,671 | 1,517,284 | 1,906,449 | 20,800,402 |
| Commits Un Paid | 891,834 | 1,220,790 | 169,514 | 1,022,673 | 1,805,863 | 4,173,097 | 1,454,968 | 2,418,998 | 4,893,131 | 2,440,609 | 1,786,804 | 2,840,154 | 25,118,434 |
| Funds Shortfall | 224,900 | (256,576) | (55,242) | (297,823) | 210,893 | (1,401,873) | (326,825) | (1,154,439) | (93,885) | 36,062 | (269,520) | (933,705) | (4,318,032) |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Claim Potential | 1,000,000 | 300,000 | 0 | 465,000 | 800,000 | 300,000 | 300,000 | 200,000 | 100,000 |  | 1,200,000 | 100,000 | 4,765,000 |
| W/claims | 1,224,900 | 43,424 | (55,242) | 167,177 | 1,010,893 | (1,101,873) | (26,825) | (954,439) | 6,115 | 36,062 | 930,480 | (833,705) | 446,968 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Contract Completion | 24-Jul-04 | 24-Jul-04 | 30-Apr-04 | 24-Jul-04 | 17-Nov-04 | 30-Jun-05 | 2-Jan-05 | 31-Jun-05 | 30-Apr-05 | 30-Apr-05 | 5-Sep-05 | 6-May-05 |  |
| Actual Completion | 31-Mar-05 | 15-Apr-05 | 30-Apr-04 | 21-Jan-05 | 15-Aug-05 | 31-Jul-05 | 30-Jun-05 | 30-Jun-05 | 30-Sep-05 | 30-Sep-05 | 31-Dec-05 | 31-Jul-05 |  |
| LD's | $ 2,000.00 | $ - | $ - | $ 2,500.00 | $ 1,000.00 | $ 2,000.00 | $ 2,000.00 | $ - | $ - | $ - | $ - | $ 500.00 |  |

# EXHIBIT "F"

**JACKSON**
construction
company

June 21, 2005

Via Fax (860)-277-5722 & 1st Class Mail

Russell W. Fuller
Bond Claim Manager
St. Paul Travelers
One Tower Square – Bond
4 PB
Hartford, CT 06183

Re: Town of Westford...Highway Facility
      Town of Shrewsbury... Middle School

Dear Russell,

I am in receipt of your letter dated June 20, 2005 referencing our meeting of June 13, 2005 concerning monies due Jackson on the Westford and Shrewsbury projects. It's amazing how people can be at the same meeting and have different understandings of what transpired.

Your understanding is that "Jackson has failed, and is unable, to pay subcontractors and suppliers amounts due for work performed on the projects."

My interpretation is that Jackson cannot pay anyone until we receive at least the $1,019,988 that is owed us by the Surety since December, 2004 on the Shrewsbury project and the $887,749 that the Town of Westford has paid the Surety on Jackson's behalf and the Surety is withholding payments to Jackson.

You have elected to quote text and verse which does Jackson no good and doesn't pay anyone. As I related to the Surety we have been taking from "Peter to pay Paul" mainly because of the financial situation the Surety has put upon Jackson. Jackson must continue to make these payment decisions unencumbered as we have in the past.

Jackson has performed all the required provisions of the agreement. The Surety however has failed to honor its provision of the agreement which provides for the Surety to pay Jackson within twenty (20) working days from approval of the work by the Obligee. Actions taken by the Surety are hardly representative of the faith and trust Jackson placed in the Surety when signing the "Agreement". As the Shrewsbury Obligee notified the Surety, whatever "problems" exist are between the Surety and the Obligee, Jackson is not involved. Since the Surety has deemed itself to be the sole decider as to whom shall receive payments; we await "Solomon's" decision.

Sincerely,

Paul Bordier

# EXHIBIT "G"

Jun 29th, 2005



JAMES M. PETERS, JR.
VICE PRESIDENT BOND CLAIM 4PB
ST PAUL TRAVELERS BOND
One Tower Square
Hartford, CT 01683

Re:    Standen Contracting Co., Inc.
       Contract: Shrewsbury Middle School - West
       Claim No. 092SCSW504101RG
       Contract: Shrewsbury Middle School West

Jim:

We are in receipt of a fax copy of your letter dated June 28th, 2005 notifying Jackson Construction that USF&G has declared Jackson Construction "in default under the Completion Agreement". As detailed below, Jackson Construction is not in default and has complied with its contract obligations despite St Paul Travelers wrongful failure to pay Jackson Construction.

Jackson Construction has consistently expressed its determination to complete the work as outlined in our agreement; however, we have also expressed the need for St Paul Travelers to honor the terms of this same agreement. A good faith evaluation by St Paul Travelers of the current status of progress payments on this project would reveal that Jackson Construction has been due at least $280,000 since December 2004 without dispute and $1,019,000 had St Paul Travelers reviewed the latent conditions corrected by Jackson Construction and their subcontractor for incomplete or improperly installed electrical work. It is this payment shortfall and not lack of effort on the part of Jackson Construction that has led to the current project status.

Considering the specifics you cite in your June 28th letter. In one of our many meetings with the Town of Shrewsbury, St Paul Travelers' engineer recognized that the $1,377,346 being withheld by the Town of Shrewsbury has no relation to the actual value of the work. We will follow up with a more detailed analysis of this listing, however suffice it to say that we feel the values assigned by the Town in this case are punitive and made in bad faith. We also feel that a careful and reasonable evaluation by St Paul Travelers of this list will lead to the same conclusion. The approved direct pay requests are a consequence of St Paul Travelers failure to pay Jackson Construction for the work that St Paul Traveler's engineer has certified as complete. As to the additional amounts withheld by the Town for "various delay damages"; these are a direct result of Standen Construction's failure and should not be attributed to Jackson Construction's work on the project.

As you state, the uncompleted and defective work has been the subject of many meetings spanning many months. However the ability to bring these matters to a conclusion rests squarely on the failure of the Town and/or St Paul Travelers to honor their commitments in good faith. Contrary to your assertion, Jackson Construction has awarded a subcontract for the Sitework on this project; however, the Sitework subcontractor has refused to return to the project due to a dispute regarding his contract scope. This has been a recurring theme on both the Westford and Shrewsbury projects as scope representations made by St Paul's representative Lovett Silverman during the ratification process are not consistent with either the contract documents or the status of the work when Jackson Construction agreed to complete the project. Jackson Construction will replace this site subcontractor; however this will likely expose St Paul Travelers to considerable and possibly unfavorable litigation.

We have also, contrary to your assertion, spent considerable Jackson Construction resources correcting the door issues – we have had a carpenter full time at our expense doing nothing else for the last four weeks and have only last Thursday reassigned this carpenter. Once again, the values assigned to this work by the Town, have little basis in reality and any cursory good faith review by St Paul Travelers would reveal this.

We have also had subcontractors completing the significant portions of the work which were outlined in the May 6th listing, including the completion of the metal siding panels and the roofing at the entrance canopy – both significant issues (valued at $135,000 on the "deficiency list).

You do not cite the specifics of the over $500,000 the Town is currently withholding for various owner incurred delay damages, but I am sure you are aware that it is the Town's position that these damages are attributable to Standen Construction's failure and not Jackson Construction's failure. The Town Manager, Mr. Morgado, has repeatedly stated that had Jackson Construction not stepped in, the financial impact on the Town and subsequently St Paul Travelers would have been considerable! Jackson Construction's work throughout the late spring and summer of 2004 is the reason that St Paul Travelers is not facing significant and more draconian penalties and claims from the Town.

As to the "substantial volume" of claims you cite, we are aware of *three* (one of the three we received on June 27th). Considering the amount of money in dispute, this is an extraordinarily small amount of claims rather than the "substantial volume" you cite. While Jackson Construction does not have a "condition precedent" clause in our agreement with St Paul Travelers, we do have that clause in our subcontracts with our various subcontractors; therefore any failure by St Paul Travelers to forward funds for the work of these subcontractors precludes Jackson Construction from releasing these same funds to the subcontractors affected.

Finally, the lack of good faith payment by St Paul Travelers of Jackson Construction invoices is the central issue in completing the work remaining on this project. While you weren't involved in the early stages of this project, Jackson Construction funded nearly $1 million dollars to get the project back on track in the spring of 2004. Because of our relationship to St Paul, we financed this work even though St Paul and then St Paul Travelers could not provide this funding due to what we were told as internal administrative issues with the merging of the two companies. St Paul Traveler's engineer will testify to the considerable "flack" Jackson Construction withstood on behalf of St Paul Travelers because of St Paul Traveler's inaction during this period. Jackson Construction once again financed the failure of ESCOA Electrical at the most critical juncture of the project. Despite St Paul Travelers' recent apparent refusal to pay Jackson Construction for this work, Jackson Construction financed over $800,000 to insure the students were able to start school on time.

Jackson Construction finds itself in a an extremely difficult financial position on this and other projects because of our good faith efforts in correcting a potential financial disaster for St Paul Travelers. We would have hoped that St Paul Travelers would act in the same good faith. Rather than issuing default notices, we would have expected a fair review of the issues and payment to Jackson Construction of the funds that are now considerably overdue.

As always, we stand ready to discuss a productive solution to these problems.

JACKSON CONSTRUCTION COMPANY

Robert B. Barton, Jr., P.E.
Executive Vice President

# EXHIBIT "H"

**JACKSON**
construction
company

June 30, 2005

Mr. James Peters
Bond Claim 4 PB
St. Paul Travelers
One Tower Square
Hartford, CT. 06183

Re: Town of Shrewsbury Middle School – West

Dear Jim,

I am in receipt of your letter to Bob Barton wherein the Surety has declared Jackson to be in default and allow us three days to remedy the situation.

Jim, this is so ridiculous it's laughable. We have had meetings, conversations and correspondences on the matter of Jackson requesting past due payment from the Surety for approved work and being put off by the Surety for issues between the Town and the Surety that are not of Jackson's doing.

More so we advised you that we have had Trainor Construction Co. ready, willing and able to perform the site work at the project. Our problem appears to be monies due them on the Winchester School Project and the Worcester State project which is under the direction of Mr. Gordon Patterson, of the same Surety. As we discovered at our meeting of June 3, 2005 with you, Mr. Fuller and Mr. Carver, you could care less about any other Surety problems except "Shrewsbury and Westford". While you pontificate your text and verse from your contract, Jackson and the Surety reached an oral agreement, witnessed by Surety employees, by which Trainor and other subcontractors would be paid. These monies would allow us to step in and complete Shrewsbury obligations and other projects. You were advised that Jackson had used monies from these other projects to pay for contract work and extras on the Shrewsbury project that were approved by the Surety.

On June 22, 2005, at Mr. Patterson's request, Jackson provided Mr. Patterson with our electronic address which would allow the Surety to wire Jackson the sum of $500,000. In return, Jackson agreed to forward the Surety, project receivables ($1,000,000) that were due within days or perhaps hours. With this agreement and commitment in hand, Jackson so notified subcontractors of our arrangement with the Surety and that they could expect payments within 48 hours. Jackson received no such payment from the Surety.

On June 23, 2005, Mr. Patterson visited Jackson's office and advised Jackson that his superiors rescinded the agreement that had been reached and would not consider any further payments until Jackson had signed a "loss agreement" that had been presented to Jackson by Mr. Patterson. I had indicated to Mr. Patterson that I would forward it to my attorney for review.

**JACKSON**
construction
company

Jackson then proceeded to pay its subcontractors, from the above noted receivables, except those on the Shrewsbury and Westford projects because none of these monies belonged to Mr. Peterson. The Surety is now holding the sum of $ 887,749 which has been approved for payment by the Town of Westford. We are assuming that the Surety will hold our June requisition in the amount of $215,433. Since this is the same action the Surety has taken on Shrewsbury, is it any wonder that the Surety is being presented with direct payment requests and bond notifications. If the Surety continues on this course of action, it is probably safe to say that the current efforts made by Jackson may not result in completion of all its projects.

Well Jim, it looks like you, Russ Fuller and me are going to be regular pen pals. For the record, Jackson categorically rejects and denies all of your text and verse accusations. Our completion agreement does not prevent the Surety from paying Jackson within 20 days, any monies that are due Jackson, no matter what the Surety problems are with the Owner.

Jackson has completed $9,960,897 worth of approved contract work and has received $8,443,613 There remains due Jackson Payment in the sum of $1,517,284 which does not include some $354,000 worth of additional work.

You have made Jackson aware that no further payments are forthcoming and Jackson disagrees with your position. Further, Jackson believes the Surety negligently represented the conditions of the Completion Agreement. The Surety has now taken a position of dominant intervention and has imposed itself in Jackson's business affairs and its ability to complete its contracts.

The Sureties problems with the Owner existed well before Jackson entered upon the scene. I strongly suggest that "Surety I" get together with "Surety II" and resolve their differences. The question has been raised of the Sureties ability to honor its financial obligations in light of the losses it has sustained. Please provide some data that will show that the Surety has the monies to support its obligations to Jackson.

We have just sustained a failure by McLaughlin Mechanical Contr. on the Lowell School project. This will clearly impact the completion (40 days) of this project since McLaughlin through its attorney has terminated its contracts with its suppliers and subcontractors. Again I suggest "Surety I & II" get together on these problems and contact Jackson ASAP, if not immediately.

Sincerely,

Paul Bordieri

# EXHIBIT "I"

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOF.
SCOTT S. SPEARINCl
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

Town of Winchester
71 Mount Vernon Street
Winchester, MA 01890

ATTN: Melvin Kleckner

| Re: | Surety: | United States Fidelity & Guaranty |
| --- | --- | --- |
| | Principal: | Jackson Construction Company |
| | Bond No.: | 006-SB-SW5182 |
| | Obligee: | Town of Winchester |
| | Project: | Ambrose Elementary School |

Dear Mr. Kleckner:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that the Town of Winchester release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that the Town of Winchester may be contemplating making payment to Jackson over USF&G's express direction

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

Melvin Kleckner
July 1, 2005
Page 2

and demand to the contrary. USF&G asserts that any Project contract funds must be used to pay subcontractors and suppliers' bills, as well as other completion costs related to this Project. USF&G looks to the remaining contract funds as security for the performance and payment on Jackson's contract obligations. USF&G will regard the release of contract funds by you as an improper release of security. Such a release of security can result in the discharge of USF&G as a surety. Further, in the event that any funds are disbursed on the Project to Jackson without USF&G's approval, USF&G will hold the Town of Winchester responsible for any unpaid subcontractor or supplier bills which should have been paid with the released sums and USF&G will consider its obligations to pay such bills, if any, to be discharged.

If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOCS\SSS\ST Paul Tra clerk\Correspondence\Letter.Obligee.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

City of Woburn
10 Common Street
Woburn, MA 01801

ATTN: John Curran

Re:  Surety:        United States Fidelity & Guaranty
     Principal:     Jackson Construction Company
     Bond No.:      006-SB-SW5163
     Obligee:       City of Woburn
     Project:       White Elementary School

Dear Mr. Curran:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that the City of Woburn release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that the City of Woburn may be contemplating making payment to Jackson over USF&G's express direction and demand

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

John Curran
July 1, 2005
Page 2

to the contrary. USF&G asserts that any Project contract funds must be used to pay subcontractors and suppliers' bills, as well as other completion costs related to this Project. USF&G looks to the remaining contract funds as security for the performance and payment on Jackson's contract obligations. USF&G will regard the release of contract funds by you as an improper release of security. Such a release of security can result in the discharge of USF&G as a surety. Further, in the event that any funds are disbursed on the Project to Jackson without USF&G's approval, USF&G will hold the City of Woburn responsible for any unpaid subcontractor or supplier bills which should have been paid with the released sums and USF&G will consider its obligations to pay such bills, if any, to be discharged.

If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOC\SSS\ST Paul Travelers\Correspondence\Letter.Obligee.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

City of Waltham
610 Main Street
Waltham, MA 02452

ATTN: Jennette McCarthy

Re:  Surety:        United States Fidelity & Guaranty
     Principal:     Jackson Construction Company
     Bond No.:      006-SB-SW5171
     Obligee:       City of Waltham
     Project:       New Plympton Elementary School

Dear Ms. McCarthy:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that the City of Waltham release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that the City of Waltham may be contemplating making payment to Jackson over USF&G's express direction

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

Joseph McDonald
July 1, 2005
Page 2

express direction and demand to the contrary. USF&G asserts that any Project contract funds must be used to pay subcontractors and suppliers' bills, as well as other completion costs related to this Project. USF&G looks to the remaining contract funds as security for the performance and payment on Jackson's contract obligations. USF&G will regard the release of contract funds by you as an improper release of security. Such a release of security can result in the discharge of USF&G as a surety. Further, in the event that any funds are disbursed on the Project to Jackson without USF&G's approval, USF&G will hold the Franklin W. Olin School of Engineering responsible for any unpaid subcontractor or supplier bills which should have been paid with the released sums and USF&G will consider its obligations to pay such bills, if any, to be discharged.

If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOC\SSS\ST First Tn relent\Correspondence\Letter Obligee.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER
(617) 210-7740

July 1, 2005

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

City of Lowell
375 Merrimack Street
Lowell, MA 01852

ATTN: John F. Cox

Re:  Surety:  United States Fidelity & Guaranty
     Principal:  Jackson Construction Company
     Bond No.:  006-SB-SW5179
     Obligee:  City of Lowell
     Project:  Kathryn M. Stoklosa Middle School Lowell, MA

Dear Mr. Cox:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that the City of Lowell release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that the City of Lowell may be contemplating making payment to Jackson over USF&G's express direction and demand to the contrary. USF&G asserts that any Project contract funds must be used to pay

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

John F. Cox
July 1, 2005
Page 2

subcontractors and suppliers' bills, as well as other completion costs related to this Project.
USF&G looks to the remaining contract funds as security for the performance and payment on
Jackson's contract obligations. USF&G will regard the release of contract funds by you as an
improper release of security. Such a release of security can result in the discharge of USF&G as
a surety. Further, in the event that any funds are disbursed on the Project to Jackson without
USF&G's approval, USF&G will hold the City of Lowell responsible for any unpaid
subcontractor or supplier bills which should have been paid with the released sums and USF&G
will consider its obligations to pay such bills, if any, to be discharged.

   If you have any questions regarding this matter, please contact me immediately.

        Very truly yours,

        Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOC\SSS\ST Paul Tri re\nvl\Correspondant\4Letter.Obligee.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

CERTIFIED MAIL RETURN RECEIPT REQUESTED

B'nai B'rith Hillel House
Boston University
223 Baystate Road
Boston, MA 02215

Attention: John

Re: Surety:    United States Fidelity & Guaranty
    Principal:    Jackson Construction Company
    Bond No.:    006-SB-SW-5173
    Obligee:    Boston University
    Project:    B'nai B'rith Hillel House

Dear Sir:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that Boston University release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that Boston University may be contemplating making payment to Jackson over USF&G's express direction and demand

**HERMES, NETBURN, O'CONNOR & SPEARING, P.C.**

Boston University
Attention: John
July 1, 2005
Page 2

to the contrary. USF&G asserts that any Project contract funds must be used to pay
subcontractors and suppliers' bills, as well as other completion costs related to this Project.
USF&G looks to the remaining contract funds as security for the performance and payment on
Jackson's contract obligations. USF&G will regard the release of contract funds by you as an
improper release of security. Such a release of security can result in the discharge of USF&G as
a surety. Further, in the event that any funds are disbursed on the Project to Jackson without
USF&G's approval, USF&G will hold Boston University responsible for any unpaid
subcontractor or supplier bills which should have been paid with the released sums and USF&G
will consider its obligations to pay such bills, if any, to be discharged.

    If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOCS\SSS\ST Paul Tra velers\Correspondence\Letter.Oblige.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNOR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

CERTIFIED MAIL RETURN RECEIPT REQUESTED

Worcester State College
Executive Offices for Administration and Finance
Division of Capitol Asset Management and Maintenance
One Ashburton Place
Boston, MA 01208

ATTN: Mark Swingle

| Re: | Surety: | United States Fidelity & Guaranty |
|-----|---------|-----------------------------------|
|     | Principal: | Jackson Construction Company |
|     | Bond No.: | .006-SB-SW5174 |
|     | Obligee: | Worcester State College |
|     | Project: | Sullivan Academic Center, Worcester State College |

Dear Mr Swingle:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that Worcester State College release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

Mark Swingle
July 1, 2005
Page 2

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that Worcester State
College may be contemplating making payment to Jackson over USF&G's express direction and
demand to the contrary. USF&G asserts that any Project contract funds must be used to pay
subcontractors and suppliers' bills, as well as other completion costs related to this Project.
USF&G looks to the remaining contract funds as security for the performance and payment on
Jackson's contract obligations. USF&G will regard the release of contract funds by you as an
improper release of security. Such a release of security can result in the discharge of USF&G as
a surety. Further, in the event that any funds are disbursed on the Project to Jackson without
USF&G's approval, USF&G will hold Worcester State College responsible for any unpaid
subcontractor or supplier bills which should have been paid with the released sums and USF&G
will consider its obligations to pay such bills, if any, to be discharged.

If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOCS\SSS\ST Paul The ster\Correspondence\Letter.Obligee.doc

# HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

ATTORNEYS AT LAW
111 DEVONSHIRE STREET, EIGHTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 728-0050
TELECOPIER (617) 728-0052

PETER G. HERMES
PETER C. NETBURN
KEVIN J. O'CONNCR
SCOTT S. SPEARING
GINA A. FONTE
JOHN R. FELICE
MICHAEL S. BATSON
RYAN T. KILLMAN

DIRECT DIAL NUMBER

(617) 210-7740

July 1, 2005

## CERTIFIED MAIL RETURN RECEIPT REQUESTED

Leonard Hersh, School Building Committee
7 Hadassah Way
Hull, MA 02045

ATTN: John Reilly

Re:  Surety:      United States Fidelity & Guaranty
     Principal:   Jackson Construction Company
     Bond No.:    006-SB-SK3835
     Obligee:     Town of Hull
     Project:     High School Renovation and Addition, Hull, MA

Dear Mr. Reilly:

This firm represents United States Fidelity & Surety Guaranty Company ("USF&G") which is the payment and performance bond surety for Jackson Construction Co. ("Jackson") with regard to the above-referenced Project. We have been informed that various subcontractors and suppliers of Jackson have asserted numerous claims for payment in connection with the above-referenced payment bond. Further, Jackson has admitted to USF&G that it is financially unable to pay for the completion or to proceed further with its contract for the Project or to pay outstanding subcontractor and suppliers' payment claims. As a consequence of the above, USF&G is exposed to potential liability under its Payment and Performance Bonds furnished for this project. Accordingly, USF&G wrote to you on June 29, 2005 demanding that the Town of Hull release no further funds under the contract for the above-referenced Project to Jackson without USF&G's written consent.

Yesterday, Jackson's President, Paul Bordieri, informed USF&G that the Town of Hull may be contemplating making payment to Jackson over USF&G's express direction and demand to the contrary. USF&G asserts that any Project contract funds must be used to pay

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.

John Reilly
July 1, 2005
Page 2

subcontractors and suppliers' bills, as well as other completion costs related to this Project.
USF&G looks to the remaining contract funds as security for the performance and payment on
Jackson's contract obligations. USF&G will regard the release of contract funds by you as an
improper release of security. Such a release of security can result in the discharge of USF&G as
a surety. Further, in the event that any funds are disbursed on the Project to Jackson without
USF&G's approval, USF&G will hold the Town of Hull responsible for any unpaid
subcontractor or supplier bills which should have been paid with the released sums and USF&G
will consider its obligations to pay such bills, if any, to be discharged.

If you have any questions regarding this matter, please contact me immediately.

Very truly yours,

Scott S. Spearing

cc: Samuel M. Starr
SSS/nwg
G:\DOCS\SSS\ST First Tra clerk\Correspondence\Letter.Obligee.doc

# EXHIBIT "J"



**FOR SETTLEMENT PURPOSES ONLY**

July 7, 2005

**VIA FACSIMILE AND REGULAR MAIL**

Scott S. Spearing, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
111 Devonshire Street, Eighth Floor
Boston, MA. 02109

### Re:    **USF&G/Jackson Construction Company**

Dear Scott:

As I promised when we met in your office last week, I spoke to my family regarding the situation with USF&G. It made my heart feel warm to see that my wife and children were ready to back me, no matter what the outcome, in preserving our company and most of all to fight back against this "eight hundred pound gorilla" as my youngest put it. In an effort to try and put this matter to rest, without litigation, over the weekend I put together a document which I believe is fair to both parties. I believe this document will allow us to go forward, together, with the hope that as we progress, we will also find a solution to what we both believe has been unjust treatment to each of us by the other.

While I worked this out in my mind, I am pretty sure I have put it into words that we can all understand.

**GOAL**: To complete all bonded, payment and performance work…**IMMEDIATELY.** The Surety and Jackson to work as a **TEAM** to accomplish this and avoid any performance problems.

**FUNDING**: Jackson to provide **$1,000,000** and the Surety to provide **$1,000,000** to a joint checking account. Jackson's $1,000,000 will be funded by a loan that I will make to the Company from the funds which were distributed to me as a shareholder in April, 2005.

**JOINT ACCOUNT**: Requires two signatures for check payments…Surety and Jackson.

**ADDITIONAL FUNDING**: **ALL** receivables from bonded projects to be deposited into dual signature joint account.

**EXPENDITURES**: **ALL** bonded job costs, and reasonable Jackson general conditions, to be funded through joint signature account. **ALL** checks to be joint, payable to Jackson and appropriate job vendor; issued under dual signatures for payment.

**JACKSON**
construction
company

Scott S. Spearing, Esquire
July 7, 2005
Page 2

**CONTROLS**: **Mr. Gordon Patterson (Surety) and Mr. Bob Barton (Jackson)** to supervise and approve **ALL** payments to be made. Particulars and procedures to be worked out by Mssrs. Patterson and Barton, includes general conditions, without further delay. Atty. Spearing and Atty. Starr to work out "set up" pending Mr. Patterson's return from vacation.

**HIGHEST URGENCY & PRIORITY**: The Stoklosa School in Lowell MA. and the Sullivan Dormitory at Worcester State College to receive most immediate attention. Both projects are to be completed by August 1, 2005. Liquidated, or actual damages assessments are inevitable unless projects are completed ASAP. Minimal personnel being supplied to projects as a result of the Sureties "freeze fund letters".

**PROJECT SUMMARIES**:

1.    Hull High School:

| | |
|---|---:|
| Original Contract | $15,730,040 |
| Appvd. Changes | 273,268 |
| Revised Contract | 16,003,308 |
| Paid to date | -14,886,574 |
| Bal. Due (incl. ret.) | $ 1,116,734 |

School is occupied; punch list agreement to be completed by July 15, 2005. Approximately $1,000,000 in pending charges to Owner.

2.    Plympton School, Waltham:

| | |
|---|---:|
| Original Contract | $11,158,000 |
| Appvd. Changes | -181,097 |
| Revised Contract | 10,977,503 |
| Paid to date | -10,252,653 |
| Bal. Due (incl. ret.) | $ 724,850 |

Owner owes Jackson $450,000 for having repaired water damages caused by rain flooding. The Owner failed to advise Jackson, in accordance with the contract, that prior to construction, the Owner neglected to purchase all risk insurance which it was contractually bound to purchase. In addition, the Owner is holding $460,000 as liquidated damages for as long as it took Jackson to complete water damage repairs.

3.    Olin College:

Olin is prepared to issue joint checks made out to the appropriate vendors and Jackson after receiving the Surety's approval. Surety's OK could complete this project except for some

Scott S. Spearing, Esquire
July 7, 2005
Page 4

9.    Worcester State College:

There is approximately $1,300,000 in approved changes the Owner has not issued. Any delays in the completion could put this project in jeopardy.

| | |
|---|---|
| Original Contract | $7,526,000 |
| Appvd. Changes | 1,616,018 |
| Revised Contract | 9,142,518 |
| Paid to date | -7,840,885 |
| Bal. Due (incl. ret.) | $1,301,633 |

10.    Westford Hgwy. Facilities:

This project will be included in the above plan. There are subs on duplicate projects that want their monies. Surety is holding three months requisitions which impact other projects. The Surety will have to do their own internal bookkeeping.

| | |
|---|---|
| Original Contract | $8,792,501 |
| Appvd. Changes | 251,746 |
| Revised Contract | 9,044,247 |
| Paid to date | -8,443,613 |
| Surety Monies Withheld | -887,749 |
| Bal. Due (incl. ret.) | $ 599,796 |

11.    Shrewsbury Middle School:

There will be no litigation on this project between the Surety and Jackson until agreed upon by both parties that it is not possible to settle amicably our differences. Jackson and Surety have agreed to conduct a survey, immediately, to ascertain what in fact is outstanding on the project and how best to complete them. A meeting between the Owner, Surety and Jackson should be held to ascertain what punch list items are pending and whose responsibility it is for these outstanding items and any costs the Owner has incurred. Again Jackson has subs on this project that are on other projects and will not come back until reconciliation.

| | |
|---|---|
| Original Contract | $8,051,367 |
| Appvd. Changes | 2,263,835 |
| Revised Contract | 10,315,202 |
| Paid to date | -8,443,613 |
| Bal. Due (incl. ret.) | $1,871,589 |

Scott S. Spearing, Esquire
July 7, 2005
Page 5

A quick summary of these accounts produces the following numbers:

| | |
|---|---|
| Receivables Exclusive of Claims | $11,566,314 |
| Net Unpaid Balances | -13,383,881 |
| Deficit | -1,817,567 |

This deficit, we believe was the impact of $3,791,048 subcontractor failures which Jackson took care of before we asked for an "advance" against what the Surety owes us.

Jackson is requesting that the Surety notify everyone that it sent a "freeze fund" letter and advise all parties that the Surety and Jackson are working jointly to complete all projects as quickly as possible. Jackson would request that this letter from the Surety state that Jackson is not in default and is not financially insolvent. The purpose of this request is that hopefully my family will be able to go forward with the family business, unmarked as much as can be hoped for by all that has occurred within the last two months. It is my intent, after 45 years in the business, to retire.

A closing bookkeeping will take place as soon as possible to ascertain the reasonable expenditures of the Surety and Jackson in completing these projects in order to assign ownership of any surplus funds.

As part of this proposal, I will arrange for $500,000 of the funds that were distributed to me as a shareholder to be placed in a disclosed account where they will remain until we close this matter out by agreement or pursuant to order of a court of competent jurisdiction. As to the balance of those funds, approximately $250,000, I would like to retain that money for the care and benefit of my family including my wife and children.

I learned on July 6, 2005, that last Friday, July 1, 2005, USF&G sued Jackson and me in Federal Court while I and my attorney were busy trying to work in partnership with the Surety and its representatives and find a way to finish the outstanding projects as expeditiously and efficiently as possible. Needless to say, I was surprised and disappointed by the Surety's litigation decision. I believe my proposal of working together is better for both Jackson and USF&G. It is certainly better for USF&G and Jackson that we finish "our" projects quickly and with the appropriate quality and care Jackson is noted for. As part of my proposal, I would expect the litigation the Surety filed would be dismissed for at least 90 days while we work together to finish "our" projects, pay "our" subcontractors, suppliers and employees for their work, and collect "our" receivables from the Owners. That should be the focus of both **JACKSON** and **USF&G** for the next three (3) months.

Scott S. Spearing, Esquire
July 7, 2005
Page 6

My attorney Tony Starr, Bob Barton (Exec. V. P.) and I are available to meet with you and attorney Brad Carver immediately to answer any questions about this proposal and hopefully begin its implementation.

This document is presented for the purpose of reaching a settlement of the MSA between Jackson and the Surety and may be rescinded by Jackson if the parties can not reach an agreement. I look forward to your prompt response. Time is truly of the essence.

Sincerely Yours,

Paul Bordieri,
President of Jackson Construction Co.
(NOT INDIVIDUALLY)

cc:     Tony Starr, Esquire *(via facsimile and regular mail)*
        Brad Carver, Esquire *(via facsimile and regular mail)*

LIT 1530786v.1