# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES FIDELITY AND GUARANTY COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **PAUL A. BORDIERI and ANDREA J. COSTA, Trustees of JACKSON CONSTRUCTION COMPANY, a Massachusetts Business Trust, PAUL A. BORDIERI, Individually** | ) | **C.A. No. 05-11397 NMG** |
| | ) | |
| Defendants, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SOVEREIGN BANK OF NEW ENGLAND, NA, APPLETON PARTNERS, INC. and CAMBRIDGE APPLETON TRUST, NA,** | ) | |
| | ) | |
| Trustee Process Defendants. | ) | |

### AFFIDAVIT OF JAMES M. PETERS, JR. IN SUPPORT OF USF&G'S OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR MODIFY ATTACHMENT BY TRUSTEE PROCESS

I, James M. Peters, Jr., on oath depose and state as follows:

1.      I am employed at St. Paul Travelers as Vice President in the Bond Claim Department in Hartford, Connecticut. In that position, I have responsibility for the oversight, handling and management of claims arising under surety bonds executed by United States Fidelity & Guaranty Company ("USF&G") on behalf of Standen Contracting Co., Inc. ("Standen").

2.      The facts set forth below are true, accurate and complete, based either upon my personal knowledge or my information and belief. To the extent based upon my information and belief, I believe all facts set forth below are true.

3.      I have been employed by USF&G and/or its now affiliated entities for approximately 35 years.

4.      Responsibility for supervising the open surety claim matters pertaining to bonds issued on behalf of Standen was assigned to me in March 2005.

5.      Having been assigned responsibility for the Standen claim matters, I arranged for the claim files pertaining to the Standen claim matter to be transferred to my office in Hartford and commenced the process of reviewing the files and becoming familiar with the facts of this case.

6.      One of the reassigned claim matters involved a construction contract between the Town of Shrewsbury, MA ("Shrewsbury") and Standen for a construction and renovation project known as the Shrewsbury Middle School-West (Shrewsbury Construction Contract). A copy of the Shrewsbury Construction Contract is attached here to as Exhibit "A". In connection with the Shrewsbury Construction Contract, USF&G provided a Performance and Labor and Material Payment Bond on behalf of Standen, as Principal, in favor of Shrewsbury as Obligee.

7.      On or about February 25, 2004, Standen voluntarily defaulted on the Shrewsbury Construction Contract.

8.      The USF&G claim files contain an original counterpart of a Takeover Agreement between USF&G and Shrewsbury dated on or about March 17, 2004. A copy of said Agreement is attached hereto as Exhibit B. The terms of the Takeover Agreement provided, in part, for

2

USF&G as surety, "to procure the completion of the Remaining Work under the Contract subject to the terms and conditions of this Agreement."

9. The Takeover Agreement incorporated by reference the Shrewsbury Construction Contract, "including, without limitation, the Instructions to Bidders, the Contract Terms and Conditions, the Plans or Drawings, and any Special Conditions and Specifications, and all addenda, change orders and modifications to those documents issued in accordance with the Contract, including, without limitation, the Memorandum Agreement dated September 2, 2003."

10 The Invitation to Bid was incorporated into the Shrewsbury Construction Contract, a copy of which is attached hereto as Exhibit "C". Section 1.02 B of the Invitation provides as follows:

> Project Schedule: Owner use of athletic fields, north parking area, etc., until July 1, 2003; Substantial Completion by April 2, 2004; school prepared for occupancy by September, 2004.

11. The Memorandum of Agreement dated September 2, 2003 was executed by and between Shrewsbury and Standen. A copy of said document is attached hereto as Exhibit "D". The Memorandum of Agreement provides, in part:

> "Subject to the approval of the building committee an extension of time of six weeks from April 2, 2004 until May 14, 2004 will be granted for substantial completion."

The Memorandum of Agreement provided no change to the obligation to have the school prepared for occupancy by September, 2004.

12. The USF&G claim files contain an original counterpart of a Standard Form of Agreement Between Surety and Completion Contractor – Completion Agreement dated on or about May 12, 2004 between USF&G and Jackson Construction Co. ("Jackson") ("Shrewsbury Completion Agreement"), a copy of which is attached hereto as Exhibit "E".

3

13.    The Shrewsbury Completion Agreement provides as follows:

    3.1    The Contract includes, without limitation, the Instructions for Bidders…..and any and all other documents or agreements incorporated into the Contract.

    3.2    The Contractor has reviewed the Contract…….sufficiently examined the Project site and determined through its own forces, the nature, quality and quantity of work to be performed under the Contract."……Execution of the Standard Agreement by the Contractor is a representation that the Contractor has visited each project site, become familiar with local conditions under which each Project is to be completed, including, but not limited to, Contractor's familiarity with the special and unique circumstances of completing work started and partially performed by another contractor.

    5.1    Commencement and Completion. "The Contractor agrees to commence work at the Project site within five (5) calendar days of Contractor's receipt of a Notice to Proceed and to substantially complete the Remaining Work on or before the date set forth in the Standard Agreement, if any, with final completion to be achieved on or before the date set forth in the Standard Agreement (the Project Schedule), notwithstanding any delays, disruptions, or accelerations, encountered by the Contractor, or previously encountered by the Principal; provided, however, that the Contractor shall be offered whatever extensions of time or other relief that is granted by the Obligee to Surety based on excusable delays arising after execution of the Standard Agreement, but only to the extent provided by the Obligee to Surety under the Contract, all as provided for in this Agreement.

14.    Other than the extension of time granted by Shrewsbury by virtue of the terms of the September 2, 2003 Memorandum Agreement, I am aware of no other extension of time granted by Shrewsbury. As a result, the obligation "to have school prepared for occupancy by September 2004" remained unchanged.

15.    While Shrewsbury was able to utilize the school in September 2004, numerous areas of the school were not ready for occupancy at that time and many remain to be completed to this day. Examples include playing fields, certain locker rooms, and a variety of other specific

4

construction elements that remain on Shrewsbury's punch list of incomplete and deficient work items, etc.

16.    Shrewsbury has asserted delay damages against USF&G as a result of the failure of Standen and Jackson to complete the project within the Project Schedule. USF&G has not adopted the position that Jackson is responsible for all such damages. Jackson's responsibility for such damages could be mitigated by Jackson to the extent that Jackson is ultimately able to assert its entitlement to extensions of time from Shrewsbury, something that Jackson has been unsuccessful in pursuing thus far.

17.    USF&G calculates that Shrewsbury is asserting damages for the post September 2004 period in amounts that exceed \$240,000.

18.    The Shrewsbury Completion Agreement provides, in part, at Article 5.3, as follows:

> Contractor acknowledges that any improper performance on its part under the Contract documents, may cause damages to Surety, including but not limited to either liquidated damages assessed by the Obligee, or the liability of Surety to others, and agrees to compensate Surety for all such direct and consequential damages suffered as a result of such causes, including but not limited to reasonable counsel fees and costs, additional equipment costs, insurance and consultant's costs, if any.

19.    Accordingly, Jackson is responsible for damages incurred by USF&G as a result of its failure to have the school ready for occupancy by September 2004.

20.    Jackson agreed to perform the work for a fixed price not to exceed \$8,051,366.72. Article 6 of the Shrewsbury Completion Agreement provides, in part, that:

> Contractor agrees to take over and fully and faithfully perform and complete the remaining work, in strict compliance with the Contract, assuming all obligations with respect to the Contract......Under no

5

circumstances shall the Surety be obligated to pay the Contractor any sums in excess of the Not to Exceed Price of $8,051,366.72.

21.     Article 9 of the Shrewsbury Completion Agreement provides, in part:

Contractor shall use its best efforts, subject to competitive pricing, to assume Principal's existing or former subcontractors or purchase orders with Subcontractors and Suppliers. .....At the Contractor's request, the Surety shall assign to Contractor all of Surety's right, title and interest in and to Principal's subcontracts and purchase orders with third parties for the performance of the work. ....The Contractor is not entitled to any time or price adjustments in the Project schedule or Contract Sum for: (i) any substitution for existing Subcontractors or others; (ii) the retention of new Subcontractors, or others; (iii) the performance or lack of performance of the Principal's existing or former Subcontractors or Suppliers.

22.     Electronics Service Company of America, Inc ("ESCOA") entered into a subcontract with Standen to perform electrical work on the Shrewsbury Middle School project.

23.     Following Standen's voluntary default, ESCOA executed a Subcontractor Hold Agreement Conditional Partial Release in favor of USF&G. A copy of the Release is attached hereto as Exhibit "F". Subsequently, Jackson accepted the assignment of ESCOA's ratified subcontract and assumed those responsibilities as set forth in Article 9 above.

24.     Subsequently, ESCOA and Jackson became engaged in a dispute. ESCOA's ratified subcontract was terminated and Jackson arranged for ESCOA's work to be performed by another subcontractor.

25.     Notwithstanding the provisions of Article 9, by letter dated October 29, 2004 Jackson gave notice to USF&G of its intention to seek additional compensation from USF&G under the Shrewsbury Completion Agreement as a result of its determination to "hire Coghlin Electric Contractors, Inc. on a T&M basis not to exceed Price of 1,287,228." Jackson further stated that "This will be for the completion of the project barring any unforeseen deficiencies." A copy of the letter from Jackson dated October 29, 2004 is attached hereto as Exhibit "G".

6

26.    Article 11 of the Shrewsbury Completion Contract provides, in part, as follows:

> if the Contractor corrects or repairs Latent Defects then the Contractor shall be compensated in accordance with this Article, so long as the Surety's prior written approval is secured.

The Shrewsbury Completion Contract defines the term "Latent Existing Defects" to mean "a hidden defect in the work put in place prior to the Contractor's receipt of a Notice to Proceed, which a reasonably careful inspection would not reveal, or that cannot be discovered by any known and customary tests."

27.    Jackson hired Coghlin Electric Contractors, Inc. ("Coghlin") without securing USF&G's prior written approval.

28.    Jackson's October 29, 2004 letter was accompanied by a September 24, 2005 letter from Coghlin addressed to Jackson, a copy of which is attached as Exhibit "H". The letter referenced Coghlin Quote No. JRC04-25 and set forth "a rough order of magnitude to furnish and install the electrical and communication requirements to complete" the Shrewsbury Middle School project.

29.    Coghlin's September 24, 2005 letter broke down its "rough order of magnitude" into a large number of individual line items of work and allocated those individual line items into three general categories:

| | |
|---|---|
| Rework (Electrical) | $ 317,656.00 |
| Work Not Completed by ESCOA | $1,287,228.00 |
| Proposed Change Orders | $ 177,000.00 |

30.    Notwithstanding Jackson's failure to obtain USF&G's prior approval for this work, USF&G proceeded to consider Jackson's request for additional compensation.

7

31.    USF&G agreed to include in its payment of Jackson Pay Application No. 7 the sum of $317,656.00 referenced above as "Rework (Electrical)". This determination by USF&G was made in settlement of a disputed claim and served, for the purposes of such settlement, to acknowledge that the "Rework (Electrical)" constituted a "Latent Existing Defect." However, USF&G declined to include payment for the $1,287,228.00 that Coghlin identified as "Work Not Completed by ESCOA."

32.    Jackson has made no showing that the "Work Not Completed by ESCOA" constitutes and Existing Latent Defect. Other than providing USF&G with a copy of Coghlin's September 24, 2004 letter with its "rough order of magnitude" estimate, Jackson has submitted no evidence of the actual costs which it has incurred for this work. The Coghlin Letter of September 24, 2004 constitutes a quotation to furnish work, not an agreement to provide material services pursuant to a written agreement. In fact, during a meeting with Jackson on June 13, 2005, Jackson conceded that it never entered into written agreement with Coghlin and that Coghlin proceeded to perform its work on a cost plus basis with no limit to the costs to be incurred.

33.    The third category of work set forth in the Coghlin Letter of September 24, 2004 was for "Proposed Change Orders." Jackson has made no showing that USF&G has any responsibility for these changes absent an approval from Shrewsbury, which approval has not been obtained.

34.    By letter dated May 27, 2005, Coghlin gave notice of its intent to file a claim against USF&G seeking to recover $410,442 which it asserts is owed by Jackson in connection with work allegedly performed on the Shrewsbury Middle School Project. A copy of Coghlin's May 27, 2005 letter it attached hereto as Exhibit "I". USF&G has, by letters dated June 22, 2005

8

requested both Coghlin and Jackson to provide documents and statements in support of its

position with respect to this claim. Copies of these letters are attached hereto as Exhibit "J". No

response has been received from either Jackson or Coghlin.

35.     Article 16 of the Shrewsbury Completion Agreement provides, in part,

that:

> Jackson indemnify and hold harmless [USF&G] ........from all demands,
> claims, causes of action (including but not limited to any claims for
> payment or otherwise by any of [Jackson's] subcontractors, suppliers,
> employees and laborers and also including, but not limited to, the
> Principal's [Standen's] subcontractors or suppliers, when [Jackson] has
> assumed or accepted assignments of those subcontracts or purchase orders,
> even if devoid of merit... .

36.     On March 16, 2005, ESCOA commenced a legal action against USF&G and

Jackson in which it alleged that ESCOA had been damaged to the extent of at least $342,438 as a

result of alleged breaches of bond, breaches of contract and unfair and deceptive business

practices. USF&G tendered defense of this action to Jackson. Jackson refused to accept

USF&G's tender and USF&G has had to engage and pay for separate counsel all at its own

expense.

37.     Jackson has been paid in full by USF&G for its work through the period ending

November 30, 2004.

38.     Jackson has asserted that it is due to be paid the sum of $1,019,988 for its

Payment Application 8 for work performed through the period ending December 31, 2004. A

copy of the Payment Application 8 is attached hereto as Exhibit "K".

39.     Jackson's Pay Application No. 8 is related to Shrewsbury's Pay Application No.

23 for the period ending December 31, 2004. Dan Morgado, Town Manger of Shrewsbury, set

forth Shrewsbury's position with respect to its Pay Application 23 in a letter dated April 19,

9

2005. A copy of this letter is attached hereto as Exhibit "L". Mr. Morgado asserts on behalf of Shrewsbury that offsets for the Monetized Punch list, allowances for Unfinished items, other deficiencies and owner incurred expenses result in a determination that no payment would be made by Shrewsbury. In fact, Shrewsbury's analysis is that USF&G would be obligated to make up a deficit to Shrewsbury in the amount of $596,144.78.

40.     It is USF&G's position that most of the offsets asserted by Shrewsbury are chargeable against Jackson. Assuming arguendo Jackson's position that USF&G should assume responsibility for the damages that Shrewsbury has characterized as "Attributed to Standen", a position with which USF&G disagrees, the remaining offsets would result in no payment being due to Jackson.

41.     Shrewsbury's position with regard to Pay Application No. 24 is set forth in a letter from Town Manager Morgado, dated June 21, 2005, a copy of which is attached hereto as Exhibit "M". In that letter, Morgado asserts that substantial offsets remain against any amounts that would otherwise be payable, including offsets for two subcontractors who filed demands for direct payment with Shrewsbury as a result of non-payment from Jackson.

42.     On May 10, 2005, I received a voice message from Paul Bordieri. In his message, Mr. Bordieri indicated that he wanted to talk about money. He said, among other things, "I know it is well over $1 million dollars that we are looking for." I returned Mr. Bordieri's call and he confirmed Jackson's request for funding from USF&G. A transcription of Mr. Bordieri's voice message is attached hereto as Exhibit "N".

43.     In a letter from me to Jackson dated May 11, 2005, a copy of which is attached hereto as Exhibit "O", I confirmed my conversation with Mr. Bordieri and set forth the conditions that would be required in connection with any request for funds.

44.     Mr. Bordieri responded to my May 11, 2005 letter on May 12, 2005 by asserting that "I was being facetious in requesting you loan me some money" and demanded payment of Jackson's December requisition in the amount of $1,019,988. Mr. Bordieri made no reference to the significant issues raised by Shrewsbury with respect to that Pay Application as set forth in the paragraphs above.

45.     In a letter to Jackson dated May 19, 2005, I set forth USF&G's position with regard to his various assertions and suggested a meeting between USF&G and Jackson. A copy of my May 19, 2005 letter is attached as Exhibit "P".

46.     Ultimately, a meeting was held on June 13, 2005 at the offices of Jackson. During that meeting, Jackson provided a series of exhibits. In response to our request for a copy of Jackson's financial statements, Jackson responded that it did not have an audited statement for its December 31, 2004 year end, but provided, instead, an internally prepared financial statement dated April 30, 2005. A copy of the statements are attached hereto as Exhibit "Q". The Balance Sheet reflected a deficit equity in the amount of $3,659,387.38. It also reflected current assets of $14,157,261.68 and Current Liabilities of $18,187,461.05.

47.     During the June 13, 2005 meeting, we discussed the status of the Westford Project, being built for the Town of Westford, MA for the construction of a New Highway Facility ("Westford Project"). Standen was the original contractor. USF&G issued a performance and labor and material payment bond on behalf of Standen, as Principal, in favor of the Town of Westford, MA ("Westford"), as Obligee. Subsequently, Standen voluntarily defaulted. USF&G entered into a Takeover Agreement with Westford (Westford Takeover Agreement). On or about May 12, 2004, USF&G and Jackson entered into a Standard Form of

11

Completion Agreement Between Surety and Completion Contractor. A copy of this document is attached as Exhibit "R".

48. During the June 13, 2005 meeting, Jackson also provided an exhibit titled Westford Payables, a copy of which is attached as Exhibit "S". This exhibit reflected payables on the Westford job for March invoices totaling $391,459 and April invoices of $459,105.

49. USF&G is in receipt of a series of payment bond claims and complaints regarding nonpayment from a number of Jackson subcontractors on the Westford Project. Further, Westford has received a number of demands for direct payment from Jackson subcontractors on the Westford Project.

50. During the June 13, 2005 meeting, I advised Jackson that I had with me a check made payable to Jackson in full payment of its Pay Application No. 12 for the period ending April 30, 2005. I made reference to the accumulating payment demands received from Jackson subcontractors. I advised Jackson that USF&G was willing to release this payment to Jackson provided that Jackson gave USF&G appropriate assurance that the funds received would be dedicated to discharge obligations on the Westford Project and asked for a proposed payment distribution schedule. Jackson refused to provide the requested assurance.

51. On June 20, 2005, Russell Fuller of USF&G wrote to Jackson and offered to release the funds that were being held in the form of checks made jointly payable to Jackson and its subcontractors on the Westford Project.

52. After a series of communications between Jackson, USF&G and its respective counsel, an arrangement was reached whereby USF&G, on July 12, 2005, issued a series of checks made payable to Jackson and its designated subcontractors in an aggregate amount of $684,315.51 in an amount approximately equal to the sum due to Jackson on its Pay Application

12

No. 12 and its subsequent Pay Application No 13. Jackson's supplemental request for joint checks totaling approximately \$22,000 is currently being processed.

53.     Jackson's Pay Application No. 14 is not due for payment because the Town of Westford has not approved payment for work performed through June 30, 2005. No other funds are due to Jackson at the present time. Notwithstanding the release of the joint checks, USF&G continues to receive payment bond claims and complaints of non-payment from Jackson subcontractors.

54.     As a result of Jackson's failure to comply with the terms of the Shrewsbury Completion Agreement, USF&G declared Jackson to be in default on June 22, 2005. A copy of USF&G's letter to Robert Barton, Jr. dated June 28, 2005 is attached hereto as Exhibit "T".

55.     In the absence of any attempt to cure the default cited in the default letter of June 28, 2005 (Exhibit "T"), USF&G terminated Jackson's right to proceed under the Shrewsbury Completion Agreement. A copy of my letter to Jackson dated July 7, 2005 is attached hereto as Exhibit "U".

13

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of July, 2005.

James M. Peters, Jr.

United States Fidelity & Guaranty Company

Notarized by: Carol a Thompson

12-31-07

MY COMMISSION EXPIRES DECEMBER 31, 2007

I hereby certify that a true copy of the above document was served upon (each party appearing PRO SE and) the attorney of record for each other party by mail (by hand) on July 25, 2005

# Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum

## AIA Document A101 – Electronic Format

### AGREEMENT

made as of the  1st  day of October in the year of  2002.

BETWEEN the Owner:
*(Name and address)*
Town of Shrewsbury
100 Maple Avenue
Shrewsbury, MA  01545

# ORIGINAL

and the Contractor:
*(Name and address)*
Standen Contracting Company, Inc.
445 Faunce Corner Road
North Dartmouth, MA  02747

The project is:
*(Name and location)*
Shrewsbury Middle School - West
45 Oak Streeet
Shrewsbury, MA  01545

The Architect is:
*(Name and address)*
Lamoureux Pagano Associates
14 East Worcester Street
Worcester, MA  01604

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

The 1987 Edition of AIA Document A201, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified. This document has been approved and endorsed by the Associated General Contractors of America.

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, copyright 1987 by the American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C. 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.

AIA DOCUMENT A101 - OWNER-CONTRACTOR AGREEMENT - TWELFTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS . 1735 NEW YORK AVENUE, N W WASHINGTON, D.C. 20006-5292. WARNING. Unlicensed photocopying violates U S copyright laws and is subject to legal prosecution. This document was electronically produced under license number 297001995 and can be reproduced without violation until 2/17.97

SHREWSBURY MIDDLE SCHOOL - WEST

15 Oak Street

Shrewsbury, Massachusetts

writing of the actual means, methods, techniques, sequences or procedures which will be employed on the Work, if these differ from those mentioned in the Contract Documents. All loss, damage, or liability, or cost of correcting defective work arising from the employment of any construction means, methods, techniques, sequences or procedures shall be borne by the Contractor, notwithstanding that such construction means, methods, techniques, sequences or procedures are referred to, indicated or implied by the Contract Documents, unless the Contractor has given timely notice to the Owner and Architect in writing that such means, methods, techniques, sequences or procedures are not safe or suitable, and the Owner has then instructed the Contractor in writing to proceed at the Owner's risk.

3.3.2       Change subparagraph 3.3.2 to read as follows:

3.3.2       The Contractor shall be responsible to the Owner for the acts and omissions of all entities or persons performing or supplying the work.

3.5.1       Change the first sentence of subparagraph 3.5.1 to read as follows:

The Contractor warrants that the materials and equipment furnished under the Contract will be new and of recent manufacture unless otherwise specified, and that all Work will be of good quality, free from faults and defects, in conformance with the Contract Documents and with all federal, state and local laws and regulations, the National Fire Protection Association Life Safety Code and with the regulations or code of any other governmental agency or authority having jurisdiction over the Project.

Delete the last two sentences.

3.5.2—

3.5.10       Add new subparagraphs 3.5.2 through 3.5.9 as follows:

3.5.2*       (Statutory reference: M.G.L. c.30 §39M(b); M.G.L. c.149 §44A) Where products or materials are prescribed by manufacturer name, trade name, or catalog reference, the word "or approved equal" shall be understood to follow. An item shall be considered equal to the item so named or described if, in the opinion of the Architect:

a.    it is at least equal in quality, durability, appearance, strength and design;

b.    it performs at least equally the function imposed by the general design for the Work;

c.    it conforms substantially, even with deviations, to the detailed requirements for the items as indicated by the Specifications.

Any structural or mechanical changes made necessary to accommodate substituted equipment under this paragraph shall be at the expense of the Contractor or Subcontractor responsible for the Work item.

3.5.3 The Contractor shall be responsible for determining that all materials furnished for the Work meet all requirements of the Contract Documents. The Architect may require the Contractor to produce reasonable evidence that a material meets such requirements, such as certified reports of past tests by qualified testing laboratories, reports of studies by qualified experts, or other evidence which, in the opinion of the Architect, would lead to a reasonable certainty that any material used, or proposed to be used, in the work meets the requirements of the Contract Documents. All such data shall be furnished at the Contractor's Expense.

This provision shall not require the Contractor to pay for periodic testing of different batches

SUPPLEMENTARY GENERAL CONDITIONS                                        00800-5

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

The Contractor shall employ a competent superintendent, reasonably acceptable to the Owner, and necessary assistants who shall be in attendance at the Project site full time during the progress of the Work until the date of Substantial Completion, and for such additional time thereafter as the Architect may determine to be necessary for the expeditious completion of the Work. The Contractor shall remove the superintendent if requested to do so in writing by the Owner, and shall promptly replace him with a competent person reasonably acceptable to the Owner.

3.10.3       Delete subparagraph 3.10.3.

3.12.7       Change subparagraph 3.12.7 to read as follows:

3.12.7 By approving and submitting Shop Drawings, Product Data, Samples, and similar submittals the Contractor thereby represents that the Contractor has determined and verified all dimensions, quantities, field dimensions, relations to existing work, coordination with Work to be installed later, coordination with information on previously accepted Shop Drawings, Product Data, Samples, or similar submittals and verification of compliance with all the requirements of the Contract Documents. The accuracy of all such information is the responsibility of the Contractor. In reviewing Shop Drawings, Product Data, Samples, and similar submittals the Architect shall be entitled to rely upon the Contractor's representation that such information is correct and accurate.

3.12.9       Add the following at the end of subparagraph 3.12.9:

Unless such written notice has been given, the Architect's approval of a resubmitted Shop Drawing, Product Data, Sample, or similar submittal shall not constitute approval of any changes not requested on the prior submittal.

3.12.11      Change subparagraph 3.12.11 to read as follows:

When professional certification of performance criteria of materials, systems or equipment is required by the Contract Documents, the Contractor shall provide the person or party providing the certification with full information on the relevant performance requirements and on the materials, systems or equipment that are expected to operate at the Project site. The certification shall be based on performance under the operating conditions generally prevailing or expected at the Project site. The Owner shall be entitled to rely upon such certifications and neither the Owner nor the Architect shall be expected to make any independent examination with respect thereto.

3.13.1       Change subparagraph 3.13.1 to read as follows:

3.13.1 The right of possession of the Project site and the improvements made thereon by the Contractor shall remain at all times in the Owner. The Contractor's right to entry and use thereof arises solely from the permission granted by the Owner under the Contract Documents. The Contractor shall confine the Contractor's apparatus, the storage of materials and the operations of the Contractor's workmen to limits indicated by law, ordinances, the Contract Documents and permits and/or directions of the Architect and shall not unreasonably encumber the Project site with the Contractor's materials. The Owner shall not be liable to the Contractor, the Subcontractors, their employees or anyone else with respect to the conditions of the Project site, except only for a condition caused directly and solely by the negligence of the Owner.

3.13         Add the following subparagraphs 3.13.2 — 3.13.4:

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-7

3.13.2  Only materials and equipment which are to be used directly in the Work shall be brought to and stored on the Project site by the Contractor. After equipment is no longer required for the Work, it shall be promptly removed from the Project site. Protection of construction materials and equipment stored at the Project site from weather, theft, damage and all other adversity is solely the responsibility of the Contractor.

3.13.3 The Contractor and any entity for whom the Contractor is responsible shall not erect any sign on the Project site without the prior written consent of the Owner, which consent may be withheld in the sole discretion of the Owner.

3.13.4  Without prior approval of the Owner, the Contractor shall not permit any workers to use any existing facilities at the Project site including, without limitation, lavatories, toilets, entrances and parking areas, other than those designated by the Owner. Without limitation of any other provision of the Contract Documents, the Contractor shall use its best efforts to comply with all rules and regulations promulgated by the Owner in connection with the use and occupancy of the Project site, as amended from time to time. The Contractor shall immediately notify the Owner in writing if, during the performance of the Work, the Contractor finds compliance with any portion of such rules and regulations to be impracticable, setting forth the problems of such compliance and suggesting alternatives through which the same results intended by such portions of the rules and regulations can be achieved. The Owner may, in the Owner's sole discretion, adopt such suggestions, develop new alternatives or require compliance with existing requirements of the rules and regulations. The Contractor shall also comply with all insurance requirements and collective bargaining agreements applicable to use and occupancy at the Project site.

3.14    Add the following subparagraphs 3.14.3 - 3.14.4:

3.14.3  Only trade persons skilled and experienced in cutting and patching shall perform such Work.

3.14.4  The Contractor acknowledges that the Work involves renovation and alteration of existing improvements and, therefore, cutting and patching of the Work is essential for the Project to be successfully completed. In performing any Work which involves cutting, altering, patching and fitting, the Contractor shall use its best efforts to protect and preserve the visual appearance and aesthetics of the Project to the reasonable satisfaction of the both the Owner and the Architect.

3.15.1   Add the following at the end of subparagraph 3.15.1:

Immediately prior to the Architect's inspection for Substantial Completion, the Contractor shall completely clean the Project site. Concrete and ceramic surfaces shall be cleaned and washed. Resilient coverings shall be cleaned, waxed and buff ed. Woodwork shall be dusted and cleaned. Sash, fixtures and equipment shall be thoroughly cleaned. Stains, spots, dust, marks and smears shall be removed from all surfaces. Hardware and all metal surfaces shall be cleaned and polished. Glass and plastic surfaces shall be thoroughly cleaned by professional window cleaners. All damaged, broken or scratched glass or plastic shall be replaced by the Contractor at the Contractor's expense.

3.18    Change the title of paragraph 3.18 to "INDEMNIFICATION AND COVENANT NOT TO SUE"; delete the words "but only to the extent" in the first sentence of subparagraph 3.18.1; in the sixth line of 3.18.1 after the word "Work" add "or arising from violations of laws, regulations or ordinances and requirements of governing authorities due to Contractor's or a

Subcontractor's method of execution of the Work"; and change subparagraph 3.18.3 and add new subparagraph 3.18.4 as follows:

3.18.3   The obligations of the Contractor under this Paragraph 3.18 shall not extend to the liability of the Architect, the Architect's consultants, and agents or employees of any of them arising out of (1) the preparation of maps, Drawings, opinions, reports, surveys, Change Orders, designs or Specifications, or (2) directions or instructions given by the Architect, the Architect's consultants and agents or employees of any of them, provided such instructions or directions are the primary cause of the injury or damage.

3.18.4   The Contractor, or any successor, assign or subrogee of the Contractor, agrees not to bring any civil suit, action or other proceeding in law, equity or arbitration against the Architect, or the officers, employees, agents, or consultants, of the Architect, for the enforcement of any action which the Contractor may have arising out of or in any manner connected with the Work. The Contractor shall assure that this covenant not to sue is contained in all subcontracts and sub - - subcontracts of every tier, and shall assure its enforcement. The Architect, its officers, employees, agents, and consultants are intended third—party beneficiaries of this covenant not to sue, who are entitled to enforce this covenant in law or equity.

## ARTICLE 4: ADMINISTRATION OF THE CONTRACT

4.1.2           Delete subparagraph 4.1.2.

4.1.4           Delete subparagraph 4.1.4.

4.2.7           In subparagraph 4.2.7, add to the end of the first sentence, "and only to the extent which the Architect believes desirable to protect the Owner's interest." Change the second sentence to read:

"The Architect's action will be taken with reasonable promptness, while allowing sufficient time in the Architect's professional judgment to permit adequate review, taking into account the time periods set forth in the latest schedule prepared by the Contractor and approved by the Architect pursuant to subparagraphs 8.2.4 through 8.2.10." In the fifth sentence, delete the words "unless otherwise specifically stated by the Architect."

4.2.10          At the end of subparagraph 4.2.10, add the following:

If no such exhibit has been so incorporated, the duties, responsibilities, and limitations of authority of such Project Representative shall be as set forth in the edition of AIA Document B352 current as of the date of the Agreement. Alternatively, the Owner may employ a Clerk of the Works for. The Project, in which case the Owner shall, upon request of the Contractor, provide the Contractor with a written statement of the duties, responsibilities and limitations of authority of such Clerk of the Works. Except as expressly set forth in such written statement, the Clerk of the Works shall have no authority to approve Work, to approve Changes, or to exercise any of the power and authority of the Owner or the Architect.

4.2.11          Delete the last sentence of subparagraph 4.2.11 and substitute the following:

The Architect may, as the Architect judges desirable, issue additional drawings or instructions indicating in greater detail the construction or design of the various parts of the Work; such drawings or instructions may be effected by field order or other notice to the Contractor, and

provided such drawings or instructions are reasonably consistent with the previously existing Contract Documents, the Work shall be executed in accordance with such additional drawings or instructions without additional cost or extension of the Contract Time. If the Contractor claims additional cost or time on account of such additional drawings or instructions, the Contractor shall give the notice provided in subparagraph 4.3.7.

4.2.13    In the second line, following the word "effect", add the language "in connection with administration of the Contract".

4.3.2    Revise subparagraph 4.3.2 to read as follows:

4.3.2 Claims arising prior to final payment or the earlier termination of the Contract shall be referred initially to the Architect for action as provided in Paragraph 4.4.

4.3.3    Delete the last sentence of subparagraph 4.3.3 and substitute the following:

Claims may also be reserved in writing within the time limit set forth in this subparagraph 4.3.3. If a Claim is reserved, the resolution of claims and disputes procedures described in paragraph 4.4 shall not commence until a written notice from the claimant is received by the Architect. Any notice of Claim or reservation of Claim must clearly identify the alleged cause and the nature of the Claim and include data and information then available to the claimant that will facilitate prompt verification and evaluation of the Claim.

4.3.5    Add the following to the end of subparagraph 4.3.5:

Any Claim which has not been waived in accordance with this subparagraph shall be deemed to have accrued upon discovery by the Owner of the condition or breach upon which such Claim is based, for the purpose of any applicable statute of limitation.

4.3.6    Change subparagraph 4.3.6 to read as follows:

4.3.6* (Statutory reference: M.G.L. c.30 §39N) If, during the progress of the Work, the Contractor or the awarding authority discovers that the actual subsurface or latent physical conditions encountered at the site differ substantially or materially from those shown on the plans or indicated in the Contract Documents, either the Contractor or the awarding authority may request an equitable adjustment in the Contract Sum of the Contract applying to work affected by the differing site conditions. A request for such an adjustment shall be in writing and shall be delivered by the party making such claim to the other party as soon as possible after such conditions are discovered. Upon receipt of such a claim from a Contractor, or upon its own initiative, the awarding authority shall make an investigation of such physical conditions, and, if they differ substantially or materially from those shown on the plans or indicated in the Contract Documents or from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the plans and Contract Documents and are of such a nature as to cause an increase or decrease in the cost of performance of the Work or a change in the construction methods required for the performance of the Work which results in an increase or decrease in the cost of the Work, the awarding authority shall make an equitable adjustment in the Contract Sum and the Contract shall be modified in writing accordingly.

4.3.7    Change subparagraph 4.3.7 to read as follows:

4.3.7 If the Contractor claims that any acts or omissions of the Owner or the Architect, including any instructions or orders, whether oral, written, by Drawings, or otherwise,

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

involve extra cost or time, and the Contractor has not received a written acknowledgment by
the Owner or Architect that extra payment will be made or time extended on account
thereof, the Contractor shall promptly so notify the Architect in writing of such Claim and
shall not proceed with the Work relating to such Claim until the Contractor has received a
further written order to proceed in accordance with Paragraph 4.4 except, as provided in
Paragraph 10.3, in the case of an emergency affecting life or property. No Claim by the
Contractor on account of such acts, omissions, instructions or orders shall be valid unless the
Contractor has so notified the Architect, before proceeding, and has received the further
written order to proceed.

4.3.8.1    Delete the second sentence of subparagraph 4.3.8.1 and substitute the following:

The Contractor shall have the burden of demonstrating the effect of the claimed delay on the
Contract Time, and shall furnish the Architect with such documentation relating thereto as
the Architect may reasonably require.

4.3.8.2    Delete subparagraph 4.3.8.2.

4.4    Replace Paragraph 4.4 with the following:

4.4 REVIEW OF CLAIMS BY ARCHITECT

4.4.1 The Architect shall review Claims and may (1) defer any action with respect to all or
any part of a Claim and request additional information from either party; (2) decline to
render a decision for any reason which he deems appropriate (including but not limited to
the fact that the Claim involves allegations of fault on the part of the Architect); or (3) render
a decision on all or a part of the Claim. The Architect shall notify the parties in writing of his
disposition of such Claim.

If the Architect renders a decision or declines to render a decision, either party may proceed
in accordance with Paragraph 4.5. If the Architect decides that the Work relating to such
Claim should proceed regardless of his disposition of such Claim, the Architect shall issue to
the Contractor a written order to proceed. The Contractor shall proceed as instructed, and all
rights of both parties with respect to such Claim shall be deemed to have been reserved.

4.5.1    Insert the following in line 8 of the first sentence of subparagraph 4.5.1 following the words
"relating to aesthetic effect": "subject to the provisions of subparagraph 4.5.8." Delete the
remainder of the first sentence and the rest of subparagraph 4.5.1, and substitute the
following:

In any such arbitration in which the amount stated in the demand is $100,000 or less, the
American Arbitration Association shall appoint a single arbitrator in accordance with such
Rules, who shall be a lawyer who is a partner in a private law firm with ten or more
partners. In any such arbitration in which the amount stated in the demand is in excess of
$100,000, the demand shall include the name of an arbitrator appointed by the claimant. The
respondent shall appoint a second arbitrator, and shall notify the claimant in writing of such
appointment, within thirty days of receipt of the demand, failing which the matter shall be
decided by the arbitrator named in the claimant's demand. Within thirty days after the
claimant's receipt of notice of the appointment of the second arbitrator, the two arbitrators
shall appoint a neutral arbitrator and shall notify the parties in writing of such appointment,
failing which either party may apply to the American Arbitration Association to appoint
such neutral arbitrator. If such neutral arbitrator is appointed by the American Arbitration
Association, he or she shall be a lawyer who is a partner in a private law firm with ten or

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

more partners!

4.5.2          Delete subparagraph 4.5.2 and substitute the following:

4.5.2  Rules for Arbitration. If the neutral arbitrator is appointed by the American
Arbitration Association, the said Association shall administer the arbitration and its
Construction Industry Arbitration Rules shall govern all aspects of the proceeding including
the enforcement of any award. If the neutral arbitrator is not appointed by the American
Arbitration Association then the panel of arbitrators shall act as the administrator of the
arbitration but the Construction Industry Arbitration Rules of the Association shall
nonetheless govern all aspects of the proceeding, including the enforcement of any award,
provided however that the arbitration panel shall have all of the powers and duties conferred
on the Association pursuant to said rules.

In addition, the following rules shall govern the selection of arbitrators and the proceedings:

4.5.2.1    Neither party may appoint as arbitrator an employee or an owner of that
party, nor the parent, spouse or child of an employee or owner of that party.

4.5.2.2    After the neutral arbitrator has been appointed, neither party may engage in
ex parte communication with the arbitrator appointed by that party.

4.5.4          Change subparagraph 4.5.4 to read as follows:

4.5.4   Demand for arbitration of any Claim arising prior to final payment or the earlier
termination of the Contract may not be made before the earlier of (1) the date on which the
Architect has rendered a written decision on the Claim or has notified the parties in writing
that such decision will not be rendered, or (2) forty-five days following receipt by the
Architect of a written request for a decision sent by registered or certified mail to both the
Architect and the other party to the Contract.

4.5.4.1        Change subparagraph 4.5.4.1 to read as follows:

4.5.4.1  When a written decision of the Architect states that the decision is final, any
demand for arbitration of the matter covered by such decision must be made within thirty
days after the date on which the party making the~ demand receives such decision, and the
failure to demand arbitration within said thirty day period will result in the Architect's
decision becoming final and binding upon the Owner and the Contractor.

4.5.4.2        Change subparagraph 4.5.4.2 to read as follows:

4.5.4.2  A demand for arbitration shall be made within the time limits specified in
subparagraphs 4.5.4 and 4.5.4.1, as applicable, and in no event shall be made after the date
when the institution of legal or equitable proceedings based on such Claim would be barred
by the applicable statute of limitations.

4.5.8          Add a new subparagraph 4.5.8 as follows:

4.5.8 Notwithstanding any provision contained in this Paragraph 4.5 or elsewhere in the
Contract Documents, the Owner reserves the following rights in connection with Claims and
disputes between the Owner and the Contractor, which rights may be exercised by the
Owner unilaterally and in the Owner's sole discretion:

SUPPLEMENTARY GENERAL CONDITIONS                                                00800-12

    .1      the right to institute legal action against the Contractor in any court of competent jurisdiction in lieu of demanding arbitration pursuant to this Paragraph 4.5, in which case the dispute or disputes which are the subject of such action shall be decided by such court, and not by arbitration;

    .2      the right to obtain from any court of competent jurisdiction a stay of any arbitration instituted by the Contractor, provided that the application for such stay is made before the appointment of the neutral arbitrator in such arbitration, in which case the dispute or disputes which are the subject of such arbitration shall be decided by such court, and not by arbitration;

    .3      the right to require the Contractor to join as a party in any arbitration between the Owner and the Architect relating to the Project, in which case the Contractor agrees to be bound by the decision of the arbitrator or arbitrators in such arbitration.

In case the Owner elects to proceed in accordance with 4.5.8.1 or 4.5.8.2 above, the word "litigation" shall be deemed to replace the word "arbitration" wherever the latter word appears in the Contract Documents.

4.6        Add new Paragraph 4.6 as follows:

    4.6*      DECISIONS BY AWARDING AUTHORITY OR ARCHITECT

4.6.1* (Statutory Reference: M.G.L. c.30 §39P) In every case in which the Contract requires the awarding authority, any official, its Architect or Engineer to make a decision on interpretation of the specifications, approval of equipment, material or any other approval, or progress of the Work, the decision shall be made promptly and, in any event, no later than thirty days after the written submission for decision; but if such decision requires extended investigation and study, the awarding authority, the official, Architect or Engineer shall, within thirty days after the receipt of the submission, give the party making the submission written notice of the reasons why the decision cannot be made within the thirty-day period and the date by which the decision will be made.

4.6.2* (Statutory reference: M.G.L. c.30 *§393)* Notwithstanding any contrary provision of the Contract, no decision by the awarding authority or by the Architect on a dispute, whether of fact or of law, arising under the Contract shall be final or conclusive if such decision is made in bad faith, fraudulently, capriciously, or arbitrarily, is unsupported by substantial evidence, or is based upon error of law.

## ARTICLE 5: SUBCONTRACTORS

5.2.1      Delete the last sentence.

5.3.1      Add at the end of the first sentence of subparagraph
        5.3.1:

        "including without limitation the obligations set in subparagraph 3.18.4."

5.4.2      Delete subparagraph 5.4.2.

SUPPLEMENTARY GENERAL CONDITIONS              00800-13

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

## ARTICLE 6: CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

6.1.4          Delete subparagraph 6.1.4.

6.2.4          Add the following at the end of subparagraph 6.2.4:

> "If such separate contractor sues or initiates an arbitration proceeding against the Owner on account of any damage alleged to have been caused by the Contractor, the Owner shall notify the Contractor, who shall defend such proceedings at the Owner's expense, and if any judgment or award against the Owner arises therefrom the Contractor shall pay or satisfy it and shall reimburse the Owner for all attorneys' fees and court or arbitration costs which the Owner has incurred."

6.2.5          Delete subparagraph 6.2.5.

## ARTICLE 7: CHANGES IN THE WORK.

7.1.3          Add the following language to the end of subparagraph 7.1.3:

> Except as permitted in paragraph 7.3 and subparagraph 9.7.2, a change in the Contract Sum or the Contract Time shall be accomplished only by Change Order. Accordingly, no course of conduct or dealings between the parties, nor expressed or implied acceptance of alterations or additions to the Work, and no claim that the Owner has been unjustly enriched by any alteration or addition to the Work whether or not there is, in fact, any unjust enrichment to the Work, shall be the basis of any Claim to an increase in any amounts due under the Contract Documents or a change in any time period provided for in the Contract Documents.

> 7.2.2* (Statutory reference: M.G.L. c.30 §39I) The Contractor shall perform all the Work required by the Contract in conformity with the plans and specifications contained herein. No willful and substantial deviation from the Plans and Specifications shall be made unless authorized in writing by the awarding authority or by the Engineer or Architect in charge of the Work who is duly authorized by the awarding authority to approve such deviations. In order to avoid delays in the prosecution of the Work required by such contract such deviation from the Plans or Specifications may be authorized by a written order of the awarding authority or such Engineer or Architect so authorized to approve such deviation. Within thirty days thereafter, such written order shall be confirmed by a certificate of the awarding authority stating: (1) if such deviation involves any substitution or elimination of materials, fixtures or equipment, the reasons why such materials, fixtures or equipment were included in the first instance and the reasons for substitution or elimination, and, if the deviation is of any other nature, the reasons for such deviation, giving justification therefore; (2) that the specified deviation does not materially injure the Project as a whole; (3) that either the Work substituted for the Work specified is of the same cost and quality, or that an equitable adjustment has been agreed upon between the awarding authority and the Contractor and the amount in dollars of said adjustment; and (4) that the deviation is in the best interest of the awarding authority.

> Such certificates shall be signed under the penalties of perjury and shall be a permanent part of the file record of the Work contracted for.

7.3.3          Add the following as new subparagraph 7.3.3:

> 7.3.3 Upon request of the Owner or the Architect, the Contractor shall without cost to the

SUPPLEMENTARY GENERAL CONDITIONS                                          00800-14

SHREWSBURY MIDDLE SCHOOL - WEST
35 Oak Street
Shrewsbury, Massachusetts

Owner submit to the Architect, in such form as the Architect may require, an accurate written estimate of the cost of any proposed extra Work or change. The estimate shall indicate the quantity and unit cost of each item of materials, and the number of hours of work and hourly rate for each class of labor, as well as the description and amounts of all other costs chargeable under the terms of this Article. Unit labor costs for the installation of each item of materials shall be shown if required by the Architect. The Contractor shall promptly revise and resubmit such estimate if the Architect determines that it is not in compliance with the requirements of this Article, or that it contains errors of fact or mathematical errors. If required by the Architect, in order to establish the exact cost of new Work added or of previously required Work omitted, the Contractor shall obtain and furnish to the Architect bona fide proposals from recognized suppliers for furnishing any material included in such Work. Such estimates shall be furnished promptly so as to occasion no delay in the Work, and shall be furnished at the Contractor's expense. The Contractor shall state in the estimate any extension of time required for the completion of the Work if the change or extra work is ordered.

Renumber former subparagraph 7.3.3 as 7.3.4 and add the following:

7.3.4.1 If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods, as selected by the Owner.

(a) By unit prices stated in the Contract Documents or otherwise mutually agreed upon.

(b) By Cost and Percentages estimated by the Contractor as provided in subparagraph 7.3.3 and accepted by the Owner; the Contractor's estimate shall become a fixed price which shall not be changed by any variation in the actual cost of executing the Work covered by the change.

(c) By actual Cost determined after the Work covered by the change is completed, plus Percentage.

(d) By submission to arbitration or a court, which shall determine the fair value of the Work covered by the change.

As used in this subparagraph, "Cost" shall mean the estimated or actual net increase or decrease in cost to the Contractor, Subcontractor, or Sub—subcontractor for performing the Work covered by the change, including actual payments for materials, equipment rentals, expendable items, wages and associated benefits to workmen and to ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ but not including any administrative, accounting or expediting costs, or other indirect or overhead costs, or any wages or benefits of supervisory personnel not assigned full time to the site, or any amount for profit or fee to the Contractor, Subcontractor or Sub— subcontractor.

"Percentage" shall mean an allowance to be added to or subtracted from the Cost in lieu of overhead and profit and of any other expense which is not included in the Cost of the Work covered by the change, as defined above. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ any net increase or decrease of Cost of any Work performed by the Subcontractor's own forces and by Sub— subcontractors. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-15

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

When in the reasonable judgment of the Architect a series of Construction Change Directives or Change Orders effect a single change, Percentage shall be calculated on the cumulative net increase or decrease in Cost, if any.

7.3.4.2 If the Owner elects to determine the cost of the Work as provided in method (a) using unit prices stated in the Contract Documents or subsequently agreed upon, the unit prices shall be subject to subparagraph 7.1.4. Notwithstanding the inclusion of unit prices in the Contract Documents, it shall be the Owner's option to require the Cost of any given change to be determined by one of the other methods stated in 7.3.4.1. If the Owner elects to determine the Cost of the change by unit prices and the nature of the Work is such that its extent cannot be readily measured after the completion of such Work or any subsequent Work, the Contractor shall keep daily records, available at all times to the Architect for inspection, of the actual quantities of such Work put in place, and deliver receipts or other adequate evidence, acceptable to the Architect, indicating the quantities of materials delivered to the site for use in such unit price Work, and distinguishing such from other similar material delivered for use in Work included in the base Contract Sum. If so required by the Architect, materials for use in unit price Work shall be stored apart from all other materials on the Project site.

7.3.4.3 If the Owner elects to determine the cost of the Work as provided in methods (c) or (d) of subparagraph 7.3.4.1, or if the method of determining the cost has not been established before the Work is begun, the Contractor shall keep detailed daily records of labor and materials costs applicable to the Work.

7.3.4   Renumber former subparagraph 7.3.4 as 7.3.5. In the last line, delete the words "Contract Sum or".

7.3.5   Renumber former subparagraph 7.3.5 as 7.3.6.

7.3.6   Delete former subparagraph 7.3.6 and subparagraphs 7.3.7 and 7.3.9.

7.5   Add new Paragraph 7.5 as follows:

### 7.5* CERTIFICATE OF APPROPRIATIONS

7.5.1*   (Statutory reference: M.G.L. c.44 §31C) The Contract shall not be deemed to have been made until the auditor or accountant or other officer of the city or town having similar duties has certified thereon that an appropriation in the amount of the Contract is available therefore and that an officer or agent of the city, town, or awarding authority has been authorized to execute the Contract and approve all requisitions and change orders. No order to the Contractor for a change in or addition to the Work, whether in the form of a drawing, plan, detail or any other written instruction, unless it is an order which the Contractor is willing to perform without any increase in the Contract Sum, shall be deemed to be given until the auditor or accountant, or other officer of the awarding authority having similar duties, has certified thereon that an appropriation in the amount of such order is available therefore; but such certificate shall not be construed as an admission by the awarding authority of its liability to pay for such Work. The certificate of the auditor or accountant or other officer of the awarding authority having similar duties, that an appropriation in the amount of the Contract or in-the amount of such order is available shall bar any defense by the awarding authority on the grounds of insufficient appropriation.

## ARTICLE 8: TIME

SUPPLEMENTARY GENERAL CONDITIONS                                      00800-16

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

8.2.2                    Delete subparagraph 8.2.2.

8.2.4 –
[stamp]                   Add new subparagraphs 8.2.4 through 8.2.10 as follows:

8.2.4 At least 15 working days before the first Application for Payment, the Contractor shall submit to the Architect a detailed comprehensive bar chart or CPM (Critical Path Method) schedule and plan of operations showing all major and critical ~~minor~~ portions of the Work, ~~as required under Section 300, hot~~ △ sequence and duration of each activity, and critical path of Work, together with a cash flow ~~Schedule △ diagram~~ all as provided in the Contract Documents. Said schedule shall also show for each class of Work included in the Schedule of Values, the percentage completion to be obtained and the total dollar value of Work to be completed as of the first of each month until Substantial Completion. All calculations shall be on the basis of Work in place, but not including the value of materials delivered but not in place.

8.2.5 The Progress Schedule shall be based on an orderly progression of the Work, allowing adequate time for each operation (including adequate time for submission and review of submittals), and leading to a reasonable certainty of Substantial Completion by the date established in the Agreement. ~~The Progress Schedule will be reviewed by the Architect for compliance with the requirements of this Article and will be accepted by the Architect or returned to the Contractor for revision and resubmittal. Unless specifically required by law, no payment under the Contract shall be due until the Progress Schedule has been approved by the Architect. The Architect's review of the Progress Schedule shall not impose any duty on the Architect or the Owner with respect to the timing, planning, scheduling, or execution of the Work~~. In particular, if the Contractor proposes a Progress Schedule indicating a date of Substantial Completion which is earlier than the Contract Time, the Contractor shall not be entitled to additional payment or compensation of any kind if, for any reason, the full Contract Time is required to achieve Substantial Completion of the Work.

8.2.6 If in any Application for Payment the total value of the completed Work in place, as certified by the Architect, is less than 90% of the total value of the Work in place estimated in the Progress Schedule, the Owner may, at the Owner's option, require the Contractor to accelerate the progress of the Work without cost to the Owner by increasing the work force or hours of work, or by other reasonable means approved by the Architect.

8.2.7 If each of three successive applications, as certified. by the Architect, indicate that the actual Work completed is less than 90% of the values estimated in the Progress Schedule to be completed by the respective dates, the Owner may at the Owner's option, treat the Contractor's delinquency as a default justifying the action permitted under Paragraph 14.2.

8.2.8 If the Architect has determined that the Contractor should be permitted to extend the time for completion as provided in Paragraph 8.3, the calendar dates in the Progress Schedule shall be adjusted accordingly to retain their same relationship to the adjusted date of Substantial Completion, and the dollar value of Work to be completed as of the first of each month shall be adjusted pro rata.

8.2.9 If the Contractor fails to submit any Application for Payment in any month, the Architect shall, for the purpose of this evaluation of progress, certify separately to the actual value of the Work in place completed as of the first of the month to the best of the Architect's knowledge.

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

8.2.10 Nothing herein shall limit the Owner's right to liquidated or other damages for delays by the Contractor or to any other remedy which the Owner may possess under other provisions of the Contract Documents or by law.

8.3.1    In subparagraph 8.3.1, change "other causes beyond the Contractor's control" to read "other causes (except weather) beyond the Contractor's control". Delete the words "pending arbitration" in line seven. Delete the words "Change Order" in line 9 and substitute "Construction Change Directive."

8.3.3 —
8.3.6    Change subparagraph 8.3.3 and add new subparagraphs
        8.3.4 through 8.3.6, as follows:

8.3.3 Notwithstanding anything to the contrary in the Contract Documents, an extension of the Contract Time to the extent permitted under subparagraph 8.3.1 shall be the sole remedy of the Contractor for any (a) delay in the commencement, prosecution or completion of the Work, (b) hindrance or obstruction in the performance of the Work, (c) loss of productivity, or (d) other similar claims (collectively referred to in this subparagraph 8.3.3 as "Delays"), whether or not such Delays are foreseeable, unless such Delays are caused by the acts of the Owner constituting active interference with the Contractor's performance of the Work and only to the extent such acts continue after the Contractor furnishes the Owner with notice of such interference. No claim for extension of time shall be allowed on account of failure of the Architect to furnish Drawings, Specifications or instructions or to return Shop Drawings or Samples until 15 days after receipt by the Architect by registered or certified mail of written demand for such instructions, Drawings, or Samples, and not then unless such claim be reasonable. The Owner's exercise of any of its rights or remedies under the Contract Documents (including, without limitation, ordering changes in the Work or directing suspension, rescheduling or correction of the Work), regardless of the extent or frequency of the Owner's exercise of such rights or remedies, shall not be construed as active interference with the Contractor's performance of the Work.

8.3.4 No extension of time shall be granted because of seasonal or abnormal variations in temperature, humidity or precipitation, which conditions shall be wholly at the risk of the Contractor, whether occurring within the time originally scheduled for completion or within the period of any extension granted. There shall be no increase in the Contract Sum on account of any additional costs of operations or conditions resulting therefrom.

8.3.5 The Contractor hereby agrees that the Contractor shall have no claim for damages of any kind against the Owner or the Architect on account of any delay in the commencement of the Work and/or any hindrance, delay or suspension of any portion of the Work, whether such delay is caused by the Owner, the Architect, or otherwise, except as and to the extent expressly provided under M.G.L. c.30, §390 in the case of written orders by the Owner. The Contractor acknowledges that the Contractor's sole remedy for any such delay and/or suspension will be an extension of time as provided in this Article.

8.3.6* (Statutory reference: M.G.L. c.30 §390)
(a) The awarding authority may order the Contractor in writing to suspend, delay, or interrupt all or any part of the Work for such period of time as it may determine to be appropriate for the convenience of the awarding authority; provided, however, that if there is a suspension, delay or interruption for fifteen days or more or due to a failure of the awarding authority to act within the time specified in the Contract, the awarding authority shall make an adjustment in the Contract Sum for any increase in the cost of performance of the Contract but shall not

SUPPLEMENTARY GENERAL CONDITIONS                                00800-18

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

include any profit to the Contractor on such increase; and provided further, that the awarding authority shall not make any adjustment in the Contract Sum under this provision for any suspension, delay, interruption or failure to act to the extent that such is due to any cause for which the Contract provides for an equitable adjustment of the Contract Sum under any other provisions of the Contract.

(b) The Contractor must submit the amount of a Claim under provision (a) of this subparagraph to the awarding authority in writing as soon as practicable after the end of the suspension, delay, interruption or failure to act and, in any event, not later than the date of final payment under the Contract and, except for costs due to a suspension order, the awarding authority shall not approve any costs in the claim incurred more than twenty days before the Contractor notified the awarding authority in writing of the act or failure to act involved in the claim.

In the event a suspension, delay, interruption or failure to act of the awarding authority increases the cost of performance to any Subcontractor, that Subcontractor shall have the same rights against the Contractor for payment for an increase in the cost of his performance as provisions (a) and (b) give the Contractor against the awarding authority, but nothing in provisions (a) and (b) shall in any way change, modify or alter any other rights which the Contractor or the Subcontractor may have against each other.

## ARTICLE 9: PAYMENTS AND COMPLETION

9.1.1          In the second line, change the word "total" to "maximum".

9.2.1          Add at the end of the first sentence of subparagraph 9.2.1:

               "and shall be revised if later found by the Architect to be inaccurate."

9.3.1          Delete in its entirety and substitute the following:

               9.3.1 In order to expedite monthly payments during the course of the Project, the Contractor shall review with the Architect a preliminary draft of each Application for Payment to assure agreement with the Contractor before final copies of the Application are typed and formally submitted. On the first day of each month, the Contractor may submit to the Architect an itemized Application for Payment for Work completed in accordance with the Schedule of Values and the Progress Schedule. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from subcontractors and material suppliers, and reflecting retainage as provided in the Contract Documents.

9.3.1.1        Add to the end of subparagraph 9.3.1.1:

               "when such Construction Change Directives have set forth an adjustment to the Contract Sum."

9.3.3     Change subparagraph 9.3.3 to read as follows:

               9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner either by incorporation in the construction or upon the receipt of payment by the Contractor, whichever occurs first, free and clear of all liens, claims, security interests or encumbrances, hereinafter referred to in this Article 9 as "liens." The Contractor further agrees that the submission of any Application for Payment shall conclusively be

SUPPLEMENTARY GENERAL CONDITIONS                                                    00800-19

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

deemed to waive all liens with respect to said Work to which the Contractor may then be
entitled, provided that such waiver of the lien rights shall not waive the Contractor's right to
payment for such Work.

9.3.4        Add new subparagraph 9.3.4 as follows:

9.3.4  Each Application for Payment or periodic estimate requesting payment shall be
accompanied at the Owner's option by a certificate from each Subcontractor stating that the
Subcontractor has been paid all amounts due the Subcontractor on the basis of the previous
periodic payment to the Contractor, or else stating the amount not so paid and the reason for
the discrepancy. In the event of any such discrepancy, the Contractor shall furnish the
Contractor's own written explanation to the Owner through the Architect. Such certificate shall
be in a form acceptable to the Owner.

9.4.1        Delete in its entirety and substitute the following:

9.4.1  The Architect shall, within seven (7) days of receipt of the Contractor's completed
Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to
the Contractor, for such amount as the Architect determines is properly due, or notify the
Contractor and Owner in writing of the Architect's reasons for withholding the certification in
whole or in part as provided in subparagraph 9.5.1.

*SEE NOTE
  ADD 1  → NEW PARAGRAPH  9.4.2.*

9.5.1        In subparagraph 9.5.1, change item .6 and add a new item 8 as follows:

            .6      reasonable evidence that the Work will not be completed within the Contract Time,
                    and that retainage currently held by the Owner would not be adequate to cover
                    actual or liquidated damage for the anticipated delay;

            .8      failure of mechanical trade or electrical trade subcontractors to comply with
                    mandatory requirements for maintaining record drawings. The Contractor shall
                    check record drawings each month. Written confirmation that the record drawings
                    are current will be required by the Architect before a approval of the Contractor's
                    monthly Application for Payment.

9.6.1        Add new Sub—subparagraphs 9.6.1.1 through 9.6.1.4, as follows: (Statutory reference: M.G.L.
             c.30 §39K)

             9.6.1.1*    Within fifteen days after receipt from the Contractor, at the place designated by the
             awarding authority if such a place is so designated, of a periodic estimate requesting payment
             of the amount due for the preceding month, the awarding authority will make a periodic
             payment to the Contractor for the Work performed during the preceding month and for the
             materials not incorporated in the work but delivered and suitably stored at the site (or some
             location agreed upon in writing) to which the Contractor has title or to which a Subcontractor
             has title and has authorized the Contractor to transfer title to the awarding authority, less (1) a
             retention based on its estimate of the fair value of its claims against the Contractor and less (2)
             a retention for direct payments to Subcontractors based on demands for same in accordance
             with the provisions of the Supplementary General Conditions, and less (3) a retention not
             exceeding five percent of the approved amount of the periodic payment. After the receipt of a
             periodic estimate requesting Final Payment and within sixty-five days after (a) the Contractor
             fully completes the Work or substantially completes the Work so that the value of the Work
             remaining to be done is, in the estimate of the awarding authority, less than one percent of the
             original Contract Sum, or (b) the Contractor substantially completes the Work and the
             awarding authority takes possession for occupancy, whichever occurs first, the awarding

SUPPLEMENTARY GENERAL CONDITIONS                                                00800-20

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

authority shall pay the Contractor the entire balance due under the Contract less (1) a retention based on its estimate of the fair value of its Claims against the Contractor and of the cost of completing the incomplete and unsatisfactory items of Work and less (2) a retention for direct payments to Subcontractors based on demands for same in accordance with the provisions of these Supplementary General Conditions, or based on the record of payments by the Contractor to the Subcontractors under the Contract if such record of payment indicates that the Contractor has not paid Subcontractors as provided in these Supplementary General Conditions. If the awarding authority fails to make payment as herein provided, there shall be added to each such payment daily interest at the rate of three percentage points above the rediscount rate then charged by the Federal Reserve Bank of Boston commencing on the first day after said payment is due and continuing until the payment is delivered or mailed to the Contractor; provided, that no interest shall be due, in any event, on the amount due on a periodic estimate for final payment until fifteen days after receipt of such periodic estimate from the Contractor, at the place designated by the awarding authority if such a place is so designated. The Contractor agrees to pay to each Subcontractor a portion of any such interest paid in accordance with the amount due each Subcontractor.

9.6.1.2*    The awarding authority may make changes in any periodic estimate submitted by the Contractor, and the payment due on said periodic estimate shall be computed in accordance with the changes so made, but such changes or any requirement for a corrected periodic estimate shall not affect the due date for the periodic payment or the date for the commencement of interest charges on the amount of the periodic payment computed in accordance with the changes made, as provided herein; provided, that the awarding authority may, within seven days after receipt, return to the Contractor for correction, any periodic estimate which is not in the required form or which contains computations not arithmetically correct and, in that event, the date of receipt of such periodic estimate shall be the date of receipt of the corrected periodic estimate in proper form and with arithmetically correct computations. The date of receipt of a periodic estimate received on a Saturday shall be the first working day thereafter.

9.6.1.3*    All periodic estimates shall be submitted to the awarding authority, or to its designee as set forth in writing to the Contractor, and the date of receipt by the awarding authority or its designee shall be marked on the estimate. All periodic estimates shall contain a separate item for each filed subtrade and each sub—subtrade listed in sub-bid form as required by specifications and a column listing the amount paid to each subcontractor and sub—subcontractor as of the date the periodic estimate is filed. The person making payment for the awarding authority shall add the daily interest provided for herein to each payment for each day beyond the due date based on the date of receipt marked on the estimate.

9.6.1.4*    A certificate of the Architect to the effect that the Contractor has fully or substantially completed the work shall, subject to the provisions of Subparagraph 4.6.2 be conclusive for the purposes of this Subparagraph 9.6.1.

9.6.5        Delete subparagraph 9.6.5.

9.7.1        Delete the first sentence and insert the following in place thereof:

If the Architect does not issue a Certificate for Payment other than for grounds set forth in paragraphs 9.4 and 9.5 within seven (7) business days after receipt of the Contractor's completed Application for Payment, or if the Owner does not pay the Contractor within seven (7) days after the date established in the Contract Documents the amounts certified by the Architect, then the Contractor may, upon seven (7) additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received.

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-21

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

9.7.2          Add the following subparagraph 9.7.2:

If the Owner is entitled to reimbursement or payment from the Contractor under or pursuant to the Contract Documents, such payment shall be made promptly upon demand by the Owner. Notwithstanding anything contained in the Contract Documents to the contrary, if the Contractor fails to promptly make any payment due the Owner or the Owner incurs any costs or expenses to cure any default of the Contractor or correct defective Work, the Owner shall have an absolute right to offset such amount against the Contract Sum and may, in the Owner's sole discretion, elect either to (a) deduct an amount equal to that which the Owner is entitled from any payment then or thereafter due the Contractor from the Owner, or (b) issue a written notice to the Contractor reducing the Contract Sum by an amount equal to that which the Owner is entitled.

9.8.1          Add at the end of subparagraph 9.8.1:

"and only minor items which can be corrected or completed without any material interference with the Owner's use of the Work remain to be corrected or completed; provided, however, that as a condition precedent to Substantial Completion, the Owner has received all certificates of occupancy and any other permits, approvals, licenses and other documents from any governmental authority having jurisdiction thereof necessary for the beneficial occupancy of the Project."

9.8.2          Replace subparagraph 9.8.2 with the following:

When the Contractor considers that the Work, or a portion thereof designated in the Contract Documents for separate completion, is substantially complete and the premises comply with subparagraph 3.15.1, the Contractor shall submit to the Architect (1) a list of items to be completed or corrected, (2) all special warranties required by the Contract Documents, endorsed by the Contractor and in a form reasonably acceptable to the Architect and (3) the permits and certificates referred to in subparagraph 13.5.4. The failure to include any items on the list mentioned in the preceding sentence does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. When the Architect on the basis of an inspection determines that the Work or designated portion thereof is substantially complete and the other conditions have been met, the Architect will then prepare a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibilities of the Owner and the Contractor for security, maintenance, heat, utilities, damage to the Work, and insurance, and shall fix the time within which the Contractor shall complete the items listed therein. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of the responsibilities assigned to them in such Certificate.

If the Architect identifies any Work requiring completion or correction, the Architect shall assign a value to such Work and include a listing of such Work (the so-called "Punch List") in the Certificate of Substantial Completion. The Contractor agrees to complete or correct each such item within forty—five (45) days after the Architect's delivery of the Certificate of Substantial Completion; if the Contractor fails to complete or correct such Work within the forty-five (45) day period, the Owner may complete such Work and deduct from the Contract Sum and the retainage the estimated cost of completing such Work. The Owner shall complete such Work within sixty (60) days and shall render a report of final actual cost to the Contractor of completing all Punch List items. Failure of the Architect to deliver a Punch List shall in no

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

way waive the Contractor's obligation to complete the Work by the Contract Time.

9.9.3        In the last line, after the words "Contract Documents", add the following:

"and shall not relieve the Contractor from the obligation of performing all the Work required by the Contract Documents but not completed at the time of occupancy or other obligations, including insurance coverage under the Contract Documents."


## ARTICLE 10: PROTECTION OF PERSONS AND PROPERTY

10.1.2
10.1.4       Delete subparagraphs 10.1.2, 10.1.3, and 10.1.4.

10.2.1.2     In subparagraph 10.2.1.2, delete the word "and" at the end of the subparagraph.

10.2.1.3     In subparagraph 10.2.1.3, add the word "and" to the end of the subparagraph.

10.2.1.4     Add new subparagraph 10.2.1.4 as follows:

             .4    any other property of the Owner, whether or not forming part of the Work, located at
                   the Project site or adjacent thereto in areas to which the Contractor has access.

10.2.5       Replace subparagraph 10.2.5 with the following:

             The Contractor shall promptly remedy damage and loss to property referred to in clauses
             10.2.1.2, 10.2.1.3 and 10.2.1.4. If the damage or loss is due in whole or in part to the
             Contractor's failure to take the precautions required by this Paragraph 10.2, the Contractor
             shall, subject to any reimbursement to which the Contractor is entitled under property
             insurance required by the Contract Documents, bear the cost. The Contractor shall be fully and
             solely responsible for all Work and other operations carried out on adjacent properties. The
             insurance required under Article 11 shall cover such Work or operations, and the Contractor
             shall indemnify and defend the Owner, the Architect, and the owners of such adjacent
             properties from and against all claims, suits, losses or costs arising out of such Work or
             operations.

## ARTICLE 11: INSURANCE AND BONDS

11.1.1       In the first sentence of subparagraph 11.1.1 following the word "located" insert the words "and
             to which the Owner has no reasonable objection".

11.1.1.1     Add new Sub—subparagraph 11.1.1.1 to read as follows:

             11.1.1.1* (Statutory reference: M.G.L. c.149, §34A) The Contractor shall, before
             commencing performance of the Contract, provide by insurance for the payment of
             compensation and the furnishing of other benefits under M.G.L. c.152 to all persons to be
             employed under the Contract, and the Contractor shall continue such insurance in full force
             and effect during the term of the Contract. Sufficient proof of compliance with this Sub—
             subparagraph 11.1.1. must be furnished at the time of execution of the Contract. Failure to
             provide and continue in force such insurance as aforesaid shall be deemed a material breach of
             the Contract and shall operate as an immediate termination thereof. No cancellation of such

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

insurance, whether by the insurer or by the insured, shall be valid unless written notice thereof is given by the party proposing cancellation to the other party and to the awarding authority at least fifteen days prior to the intended effective date thereof, which date shall be expressed in said notice.

11.1.1.8    Add the following subparagraph 11.1.1.8

Liability insurance shall include all major divisions of coverage, and be on a comprehensive basis including:

1.  Premises operations (including XCU coverages as applicable)
2.  Independent Contractors' protective.
3.  Products and completed operations.
4.  Personal injury liability with employment exclusion deleted.
5.  Contractual, including specified provision for the Contractor's obligation under paragraph 3.18.
6.  Owned, non-owned and hired motor vehicles.
7.  Broad form property damage, including completed operations.
8.  Umbrella excess liability.

11.1.2    Change subparagraph 11.1.2 to read as follows:

11.1.2 The insurance required by subparagraph 11.1.1 shall include all major divisions of coverage, and shall be on a comprehensive general basis including Premises and Operations (including X-C-U), Owner's and Contractor's Protective, Products and Completed Operations, and Owned, Nonowned, and Hired Motor Vehicles. Products and Completed Operations coverage should be maintained for two (2) years after final payment. Such insurance shall be written for not less than any limits of liability required by law or the following limits, whichever are greater:

Employer's Liability:

Combined single limit = $500,000

Commercial General Liability Insurance:

Bodily Injury:          $1,000,000 per person
                        $2,000,000 per occurrence

Property Damage:        $500,000 per occurrence
                        $3,000,000 annual aggregate

Motor Vehicle Insurance

Bodily Injury:          $500,000 per person  $1,000,000 per occurrence

Property Damage:        $500,000 per occurrence

Excess Liability (Umbrella) Insurance:

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-24

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

Combined Single Limit:                    $10,000,000

All insurance shall be written on an occurrence basis, unless the Owner approves in writing coverage on a claims---made basis. Coverage's, whether written on an occurrence or claims---made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment. The Owner shall be added as an Additional Insured on all policies.

11.1.3    Change the first sentence of subparagraph 11.1.3 to read as follows: Certificates of Insurance acceptable to the Owner and confirming the insurance coverage required by Paragraph 11.1 are attached to the Contract. The Owner shall have no obligation to execute the Contract, and may award the Contract to the next lowest responsible and responsive bidder, if such insurance certificates have not been provided to the Owner within five business days after presentation of the Contract to the Contractor for execution.

Add the following at the end of the second sentence of subparagraph 11.1.3:

These certificates shall set forth evidence of all coverage required by 11.1.1 and 11.1.2. The form of certificate shall be the ACORD form, supplemented as necessary by AIA Document G715. The Contractor shall furnish to the Owner copies of any endorsements that are subsequently issued amending limits of coverage.

11.1.4-    Add the following subparagraphs 11.1.4 — 11.1.8:
11.1.8

11.1.4 In no event shall any failure of the Owner to receive certified copies or certificates of policies required under paragraph 11.1, or to demand receipt of such certified copies or certificates prior to the Contractor commencing the Work, be construed as a waiver by the Owner or the Architect of the Contractor's obligations to obtain insurance pursuant to this Article 11. The obligation to procure and maintain any insurance required by this Article 11 is a separate responsibility of the Contractor and independent of the duty to furnish the certified copy or such certificate of such insurance policies.

11.1.5 If the Contractor fails to purchase and maintain or cause to be purchased and maintained any insurance required under this paragraph 11.1, the Owner may, but shall not be obligated to, upon five (5) days' written notice to the Contractor, purchase such insurance on behalf of the Contractor and shall be entitled to be reimbursed by the Contractor upon demand.

11.1.6 When any required insurance due to the attainment of a normal expiration date or renewal date shall expire, the Contractor shall supply the Owner with certificates of insurance and amendatory riders or endorsements that clearly evidence the continuation of all coverage in the same manner, limits of protection and scope of coverage as was provided by the previous policy. In the event any renewal or replacement policy for whatever reason obtained or required is written by a carrier other than that carrier with whom the coverage was previously placed or the subsequent policy differs in any way from the previous policy, the Contractor shall also furnish the Owner with a certified copy of the renewal or replacement policy, unless the Owner provides the Contractor with prior written consent to submit only a certificate of insurance for any such policy. All renewal and replacement policies shall be in form and substance satisfactory to the Owner and written by carriers acceptable to the Owner.

11.1.7 any aggregate limit under the Contractor's liability insurance shall be by

SUPPLEMENTARY GENERAL CONDITIONS                    00800-25

endorsement applied to this Project separately.

11.1.8 The Contractor shall cause each subcontractor (a) to procure insurance reasonably satisfactory to the Owner, and (b) name the Owner as an additional insured under the subcontractor's Commercial General Liability Policy. The additional insured endorsement included on the subcontractor's Commercial General Liability Policy shall state that coverage is afforded the additional insured with respect to claims arising out of operations performed by or on behalf of the Contractor. If the additional insured has other insurance which is applicable to the loss, such other insurance shall be on an excess or contingent basis and the amount of the insurer's liability shall not be reduced by the existence of such other insurance.

z Note ADD # 4 → Add  Paragraph  11.3.1

11.5    Add the following paragraph to Article 11:

"11.5 GENERAL REQUIREMENTS

11.5.1  All insurance coverage procured by the Contractor shall be provided by insurance companies having policy holder ratings not lower than "A" and financial ratings not lower than "XII" in The Best Insurance Guide, latest edition in effect as of the date of the Contract and subsequently in effect at the time of renewal of any policies required by the Contract Documents.

11.5.2  If the Owner or the Contractor is damaged by the failure of the other party to purchase or maintain insurance required under Article 11, then the party who failed to purchase or maintain the insurance shall bear all reasonable costs (including attorneys' fees and court and settlement expenses) properly attributable thereto."

## ARTICLE 12: UNCOVERING AND CORRECTION OF WORK

12.2.1    Add at the end of subparagraph 12.2.1

", and any cost, loss, or damages to the Owner resulting from such failure or defect. If, prior to the date of Substantial Completion, the Contractor, a subcontractor or any one for whom either is responsible uses or damages any portion of the Work including, without limitation, mechanical, electrical, plumbing and other building systems, machinery, equipment or other mechanical device, the Contractor shall cause such item to be restored to like new condition at no expense to the Owner."

12.2.2    Subparagraph 12.2.2 — Add the following at the end:

"12.2.2.1  The obligations under paragraph 12.2 shall cover any repairs and replacement to any part of the Work or other property caused by the defective work.

12.2.2.2    Upon completion of any Work under or pursuant to this paragraph 12.2, the one—year correction period in connection with the Work requiring correction shall be renewed and recommence."

## ARTICLE 13: MISCELLANEOUS PROVISIONS

13.5.3    Add the following at the end:

The Contractor also agrees that the cost of testing services required for the convenience

SUPPLEMENTARY GENERAL CONDITIONS                                        00800-26

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

> of the Contractor in his scheduling and performance of the Work and the cost of testing
> services related to remedial operations performed to correct deficiencies in the Work
> shall be borne by the Contractor.

13.5.5    Delete subparagraph 13.5.5.

Change Paragraph 13.7 to read as follows:

13.7

13.7    STATUTORY LIMITATION PERIOD

13.7.1  It is expressly agreed that the obligations of the Contractor hereunder arise out
of contractual duties, and that the failure of the Contractor to comply with the
requirements of the Contract Documents shall constitute a breach of contract, not a tort,
for the purpose of applicable statutes of limitation and repose. Any cause of action
which the Owner may have on account of such failure shall be deemed to accrue only
when the Owner has obtained actual knowledge of such failure, not before

13.8    Add the following paragraph 13.8:

13.8  GENERAL PROVISIONS

13.8.1    All personal pronouns used in the Contract, whether used in the masculine,
feminine or neuter gender, shall include all other genders; and the singular shall include
the plural and vice versa. Titles of articles, paragraphs and subparagraphs are for
convenience only and neither limit nor amplify the provisions of the Contract. The use
herein of the word 'including', when following any general statement, term or matter
shall not be construed to limit such statement, term or matter to the specific items or
matters set forth immediately following such word or to similar items or matters,
whether or not non—limiting language (such words as 'without limitation' or 'but not
limited to' or words of similar import) is used with reference thereto, but rather shall be
deemed to refer to all other items or matters that could reasonably fall within the
broadest possible scope of such general statement, term or matter.

13.8.2  Whenever possible, each provision of the Contract shall be interpreted in a
manner as to be effective and valid under applicable law. If, however, any provision of
the Contract, or portion thereof, is prohibited by law or found invalid under any law,
only such provision or portion thereof shall be ineffective without, in any manner,
invalidating or affecting the remaining provisions of the Contract or valid portions of
such provisions which are hereby deemed severable.

13.8.3  Each party hereto agrees to do all acts and things and to make, execute and
deliver such written instruments as shall, from time to time, be reasonably required to
carry out the terms and provisions of the Contract Documents.

13.8.4 Any specific requirement in the Contract that the responsibilities or obligations of
the Contractor also apply to a subcontractor is added for emphasis and deemed to
include a subcontractor of any tier. The omission of a reference to a subcontractor in
connection with any of the Contractor's responsibilities or obligations shall not be
construed to diminish, abrogate or limit any responsibilities or obligations of a
subcontractor of any tier under the Contract Documents or the applicable subcontract.

## ARTICLE 14: TERMINATION OF THE CONTRACT

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-27

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

14.1.1          In the second line, change the phrase "30 days" to "60 days".

14.1.1.3 –
14.1.1.5        Delete in their entirety

14.1.2          Insert the following at the end:

                The Contractor agrees that it shall not suspend the Work or terminate the Contract by
                reason of any Claim that continues to be subject to resolution pursuant to paragraphs
                4.3, 4.4 or 4.5.

14.1.3          In the first line, following the word "days", add the phrase "or if repeated suspensions,
                delays or interruptions by the Owner as described in paragraph 14.3 constitute in the
                aggregate the lesser of an amount equal to the Contract Time or one hundred twenty
                (120) days in any one–-year period."

14.2.1          Change Paragraph 14.2 to read as follows:

                14.2 TERMINATION BY THE OWNER FOR CAUSE

                If the Contractor is adjudged a bankrupt, or if the Contractor makes a general
                assignment for the benefit of the Contractor's creditors, or if a receiver is appointed on
                account of the Contractor's insolvency, or if the Contractor persistently or repeatedly
                refuses or fails, except in cases for which extension of time is provided, to supply
                enough properly skilled workmen or proper materials, or if the Contractor fails to make
                prompt payment to Subcontractors or for materials or labor, or persistently disregards
                laws, ordinances, rules, regulations or orders of any public authority having jurisdiction
                or disregards an instruction, order or decision of the Architect, or otherwise is guilty of a
                substantial violation of any provision of the Contract, then the Contractor shall be in
                default, and the Owner may, without prejudice to any other right or remedy and upon
                written notice to the Contractor, take possession of all materials, tools, appliances,
                equipment, construction equipment and machinery and vehicles, offices and other
                facilities on the Project site, and all materials intended for the Work, wherever stored,
                and, seven (7) days after such notice, may terminate the employment of the Contractor,
                accept assignment of any or all subcontracts pursuant to Paragraph 5.4, and finish the
                Work by whatever method the Owner may deem expedient. The Owner shall be entitled
                to collect from the Contractor all direct, indirect, and consequential damages suffered by
                the Owner on account of the Contractor's default, including without limitation
                additional services and expenses of the Architect made necessary thereby. The Owner
                shall be entitled to hold all amounts due the Contractor at the date of termination until
                all of the Owner's damages have been established, and to apply such amounts to such
                damages.

ARTICLE 15* - CONTRACTOR'S ACCOUNTING METHOD REQUIREMENTS
(Statutory reference: M.G.L. c.30, §29R)

15.1*—
15.5*           Add new paragraphs 15.1 through 15.5, as follows:

                15.1*      The words defined herein shall have the meaning stated below whenever
                they appear in this Article 15:

SUPPLEMENTARY GENERAL CONDITIONS                                    00800-28

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

15.1.1*    "Contractor" means any person, corporation, partnership, joint venture, sole proprietorship, or
other entity awarded a contract pursuant to §39M of c.30, §§44A-- 44H inclusive, of c.149, and §§38A½—380, inclusive, of c.7.

15.1.2*    "Contract" means any contract awarded or executed pursuant to §§38A½-380, inclusive of c.7, and any contract awarded or executed pursuant to §39M of c.2O, or §§44A—44H, inclusive, of c.149, which is for an amount or estimated amount that exceeds the dollar amount set forth in M.G.L . c.30, §39R.

15.1.3*    "Records" means books of original entry, accounts, checks, bank statements and all other banking documents, correspondence, memoranda, invoices, computer printouts, tapes, discs, papers and other documents or transcribed information of any type, whether expressed in ordinary or machine language.

15.1.4*    "Independent Certified Public Accountant" means a person duly registered in good standing and entitled to practice as a certified public account under the laws of the place of his/her residence or principal office and who is in fact independent. In determining whether an accountant is independent with respect to a particular person, appropriate consideration should be given to all relationships between the accountant and that person or any affiliate thereof. Determination of an accountant's independence shall not be confined to the relationships existing in connection with the filing of reports with the awarding authority.

15.1.5*    "Audit," when used in regard to financial statements, means an examination of records by an independent certified public accountant in accordance with generally accepted accounting principles and auditing standards for the purpose of expressing a C~TIFIED opinion thereon, or, in the alternative, a qualified opinion or a declination to express an opinion for stated reasons.

15.1.6*    "Accountant's Report,'ᵗ when used in regard to financial statements, means a document in which an independent certified public accountant indicates the scope of the audit which s/he has made and sets forth his/her opinion regarding the financial statements taken as a whole with a listing of noted exceptions and qualifications, or an assertion to the effect that an overall opinion cannot be expressed. When an overall opinion cannot be expressed the reason therefor shall be stated. An accountant's report shall include as a part thereof a signed statement by the responsible corporate officer attesting that management has fully disclosed all material facts to the independent certified public accountant, and that the audited financial statement is -> a true and complete statement of the financial condition 'of the Contractor.

15.1.7*    "Management," when used herein, means the chief executive officers, partners, principals, or other person or persons primarily responsible for the financial and operational policies and practices of the Contractor.

15.1.8*    Accounting terms, unless otherwise defined herein, shall have a meaning in accordance with generally accepted accounting principles and auditing standards.

15.2*    Subparagraph 15.1.2 hereof notwithstanding, every agreement or contract awarded or executed pursuant to §§33A½-380, inclusive of c.7, and pursuant to §3914 of c.30 or to §§44A-44H, inclusive, of c.149, shall provide that:

15.2.1*    The Contractor shall make, and keep for at least six years after final payment, books, records, and accounts which in reasonable detail accurately and fairly reflect the

SUPPLEMENTARY GENERAL CONDITIONS                                                00800-29

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

transactions and dispositions of the Contractor.

15.2.2*  Until the expiration of six years after final payment, the awarding authority, office
of inspector general, and the deputy commissioner of capital planning and operations shall
have the right to examine any books, documents, papers or records of the Contractor or of
his/her Subcontractors that directly pertain to, and involve transactions relating to, the
Contractor or his/her Subcontractors.

15.2.3*  If the agreement is a contract as defined herein, the Contractor shall describe any
change in the method of maintaining records or recording transactions which materially
affect any statements filed with the awarding authority, including in his/her description the
date of the change and reasons therefor, and shall accompany said description with a letter
from the Contractor's independent certified public accountant approving or otherwise
commenting on the changes.

15.2.4*  If the agreement is a contract as defined herein, the Contractor has filed a
statement of management on internal accounting controls as set forth in Paragraph 15.3
below prior to the execution of the Contract.

15.2.5*  If the agreement is a contract as defined herein, the Contractor has filed prior to the
execution of the contracts and will continue to file annually, an audited financial statement
for the most recent completed fiscal year as set forth in Paragraph 15.5 below.

15.3*  Every Contractor awarded a contract shall file with the awarding authority a
statement of management as to whether the system of internal accounting controls of the
Contractor and its subsidiaries reasonably assures that:

15.3.1*  transactions are executed in accordance with management's general and specific
authorization;

15.3.2*  transactions are recorded as necessary:

(i)      to permit preparation of financial statements in conformity with generally accepted
accounting principles, and

(ii)     to maintain accountability for assets;

15.3.3*  access to assets is permitted only in accordance with management's general or
specific authorization; and

15.3.4*  the recorded accountability for assets is compared with the existing assets at
reasonable intervals and appropriate action was taken with respect to any difference.

15.4*  Every Contractor awarded a contract shall also file with the awarding authority a
statement prepared and signed by an independent certified public accountant, stating that s/he
has examined the statement of management on internal accounting controls, and expressing
an opinion as to

15.4.1*  whether the representations of management in response to this paragraph and
Paragraph 15.2 above are consistent with the result of management's evaluation of the
system of internal accounting controls; and

15.4.2*  whether such representations of management are, in addition, reasonable with

SUPPLEMENTARY GENERAL CONDITIONS                                          00800-30

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

respect to transactions and assets in amounts which would be material when measured in relation to the applicant's financial statements.

15.5*    Every Contractor awarded a contract by the Commonwealth or by any political subdivision thereof shall annually file with the Deputy Commissioner of Planning and Operations during the term of the contract a financial statement prepared by an independent certified public accountant on the basis of an audit by such accountant. The final statement filed shall include the date of final payment. All statements shall be accompanied by an accountant's report.

ARTICLE 16: * EQUAL EMPLOYMENT OPPORTUNITY MID AFFIRMATIVE ACTION
(Statutory reference: M.G.L. c.151B; Executive Orders No. 74, No. 116, and No. 246) The provisions of this Article 16 are intended to comply with the Commonwealth's Supplemental Equal employment Opportunity Anti-Discrimination and Affirmative Action Program, referred to in Executive Order No. 116 and administered by the Massachusetts Commission Against Discrimination. If no specific percentage has been inserted in Subparagraph 16.2.3 below, the applicable minimum percentage provided for in such Supplemental Program shall be deemed to have been so inserted. Contractor shall indemnify and hold the Owner harmless from and against all claims and damages, including reasonable attorneys fees, arising as a result of the Contractor's failure to comply with the provisions of this Article.

16.1*        Definitions. For purposes of the Contract, "minority" refers to Asian—Americans, Blacks, Spanish Surnamed Americans, North American Indians, and Cape Verdeans. "Commission" refers to the Massachusetts Commission Against Discrimination.

16.2*        Non—Discrimination and Affirmative Action Requirements. During the performance of the Contract, the Contractor and all of (his) Subcontractors (hereinafter collectively referred to as the Contractor) , for himself, his assignees, and successors in interest, agree as follows:

16.2.1* In connection with the performance of Work under the Contract, the Contractor shall not discriminate against any employee or applicant for employment because of race, color, religious creed, national origin, age or sex. The aforesaid provision shall include, but not be limited to, the following: employment upgrading, demotion, or transfer; recruitment advertising; recruitment layoff; termination; rates of pay or other forms of compensation; conditions or privileges of employment; and selection for apprenticeship. The Contractor shall post hereafter in conspicuous places, available for employees and applicants for employment, notices to be provided by the Commission setting forth the provisions of the Fair Employment Practices Law of the Commonwealth.

16.2.2* In connection with the performance of Work under the Contract, the Contractor shall undertake in good faith affirmative action measures designed to eliminate any discriminatory barriers in the terms and conditions of employment on the grounds of race, color, religious creed, national origin, age or sex, and to eliminate and remedy any effects of such discrimination in the past. Such affirmative action shall entail positive and aggressive measures to ensure equal opportunity in the areas of hiring, upgrading, demotion or transfer, recruitment, layoff or termination, rate of compensation, and in—service or apprenticeship training programs. This affirmative action shall include all action required to guarantee equal employment opportunity for all persons, regardless of race, color, religious creed, national origin, age, or sex. A purpose of this provision is to ensure to the fullest extent possible an adequate supply of skilled tradesmen for this and future Commonwealth public construction projects.

16.2.3* As part of his obligation of remedial action under the foregoing Subparagraph

SUPPLEMENTARY GENERAL CONDITIONS                                         00800-31

16.2.2, the Contractor shall maintain on the Project a not less than _____ percent ratio of minority employee man hours to total man hours in each job category including but not limited to bricklayers, carpenters, cement masons, electricians, ironworkers, operating engineers, and those "classes of work" enumerated in M.G.L. c.149, §44F.

16.2.4* In the hiring of minority journeymen, apprentices, trainees and advanced trainees. the Contractor shall rely on referrals from a multi—employer affirmative action program approved by the Commission, traditional referral methods utilized by the construction industry, and referrals from agencies, not more than three in number at any one time, designated by the Liaison Committee (described in Subparagraph 16.2.5 below) or the Commission.

16.2.5* At the discretion of the Commission there may be established for the life of the Contract a body to be known as the Liaison Committee. The Liaison Committee shall be composed of one representative each from the agency or agencies administering the Project, hereinafter called the administering agency, the Commission and such other representatives as may be designated by the Commission in conjunction with the administering agency.

16.2.6* The Contractor (or his agent, if any, designated by him as the on-site equal employment opportunity officer) shall recognize the Liaison Committee as an affirmative action body, and shall establish a continuing working relationship with the Liaison Committee, consulting with the Liaison Committee on all matters related to minority recruitment, referral, employment and training.

16.2.7* The Contractor shall prepare projected manning tables on a quarterly basis. These shall be broken down into projections, by week, of workers required in each trade. Copies shall be furnished one week in advance of the commencement of the period covered, and also when updated, to the Commission and Liaison Committee.

16.2.8* Records of employment referral orders, prepared by tile Contractor, shall be made available to the Commission and to the Liaison Committee on request.

16.2.9* The Contractor shall prepare weekly reports in a form approved by the Commission of hours worked in each trade by each employee, identified as minority or non—minority. Copies of these shall be provided at the end of each such week to the Commission and to the Liaison Committee.

If the Contractor shall use any subcontractor on any Work performed under the Contract, he shall take affirmative action to negotiate with qualified minority subcontractors. This affirmative action shall cover both ore-bid and post-bid periods, It shall include notification to the Office of Minority Business Assistance (within the Executive Office of Communities and Development) or its designee, while bids are in preparation, of all products, work or services for which the Contractor intends to negotiate bids.

In the employment of journeymen, apprentices, trainees and advanced trainees, the Contractor shall give preference, first, to citizens of the Commonwealth who have served in the armed forces of the United States in time of war and have been honorably discharged therefrom or released from active duty therein, and who are qualified to perform the work to which the employment relates, and, secondly, to citizens of the Commonwealth generally, and, if such cannot be obtained in sufficient numbers, then to citizens of the United States.

A designee of the Commission and a designee of the Liaison Committee shall each have right of access to the construction site.

SUPPLEMENTARY GENERAL CONDITIONS                                                    00800-32

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

16.3*    Compliance with Requirements. The Contractor shall comply with the provisions of Executive Order No. 74, as amended by Executive Order No. 166, dated May 1, 1975, and of M.G.L. c.151B, both of which are herein incorporated by reference and made a part of the Contract.

16.4*    Non-—Discrimination. The Contractor, in the performance of all work after award, and prior to completion of the contract work, will not discriminate on grounds of race, color, religious creed, national origin, age or sex in employment practices, in the selection or retention of Subcontractors, or in the procurement of materials and rentals of equipment.

16.5*    Solicitations for Sub-—Contracts and for the Procurement of Materials and Equipment. In all solicitations either by competitive bidding or negotiation made by the Contractor either for work to be performed under a subcontract or for the procurement of materials or equipment, each potential Subcontractor or supplier shall be notified in writing by the Contractor of the Contractor's obligations under the Contract relative to non—discrimination and affirmative action.

16.6*    Bidders' Certification Requirement. The Contractor hereby certificates he shall comply with the minority manpower ratio and specific action steps contained herein. The Contractor shall be required to obtain from each of its subcontractors and submit to the contracting or administering agency prior to the performance of any Work under the Contract a certification by said Subcontractor, regardless of tier, that it will comply with the minority manpower ratio and specific affirmative action steps contained herein. Such certification shall be provided on forms furnished by the awarding authority or, in the absence thereof, on forms prescribed by the Commission.

16.7*    Contractor's Certification. The Contractor's certification form must be signed by all successful low bidder(s) prior to award by the contracting agency.

16.8*    Compliance-—Information, Reports and Sanctions.

16.8.1*  The Contractor will provide all information and reports required by the administering agency or the Commission on instructions issued by either of them and will permit access to its facilities and any books, records, accounts and other sources of information which may be determined by the Commission to affect the employment of personnel. This provision shall apply only to information pertinent to the Commonwealth's supplementary affirmative action contract requirements. Where information required is in the exclusive possession of another who fails or refuses to furnish this information, the Contractor shall so certify to the administering agency or the Commission as appropriate and shall set forth what efforts he has made to obtain the information.

16.8.2*  Whenever the administering agency, the Commission, or the Liaison Committee believes the Contractor or any Subcontractor may not be operating in compliance with the terms of this Paragraph 16.8, the Commission directly, or through its designated agent, shall conduct an appropriate investigation, and may confer with the parties, to determine if such Contractor is operating in compliance with the terms of this Paragraph 16.8. If the Commission or its agent finds the Contractor or any Subcontractor not in compliance, it shall make a preliminary report on noncompliance, and notify such Contractor in writing of such steps as will in the judgment of the Commission or its agent bring such Contractor into compliance. In the event that such Contractor fails or refuses to fully perform such steps, the Commission shall make a final report of noncompliance, and recommend to the administering agency the imposition of one or more of the sanctions listed below. If, however, the Commission believes the Contractor or any Subcontractor has taken or is taking every possible measure to achieve compliance, it shall not make a final report of noncompliance. Within fourteen

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

days of the receipt of the recommendations of the Commission, the administering agency shall move to impose one or more of the following sanctions, as it may deem appropriate to attain full and effective enforcement:

(i)  The recovery by the administering agency from the Contractor of 1/100 of 1% of the contract award price or $1,000, whichever sum is greater, in the nature of liquidated damages or, if a Subcontractor is in non-compliance, the recovery by the administering agency from the Contractor, to be assessed by the Contractor as a back charge against the Subcontractor, of 1/10 of 1% of the subcontract price, or $400, whichever sum is greater, in the nature of liquidated damages, for -each week that such party fails or refuses to comply;

(ii)  The suspension of any payment or part thereof due under the Agreement until such time as the Contractor or any Subcontractor is able to demonstrate his compliance with the terms of the Agreement;

(iii)  The termination, or cancellation, of the Agreement, in whole or in part, unless the Contractor or any Subcontractor is able to demonstrate within a specified time his compliance with the terms of the Agreement.

(iv)  The denial to the Contractor or any Subcontractor of the right to participate in any future contracts awarded by the administering agency for a period of up to three years.

If at any time after the imposition of one or more of the above sanctions a Contractor is able to demonstrate that he is in compliance with this Paragraph 16.8, he may request that administering agency, in consultation with the Commission, suspend the sanctions conditionally, pending a final determination by the Commission as to whether the Contractor ~5 in compliance. Upon final determination of the Commission, the administering agency, based on the recommendation of the Commission, shall either lift the sanctions or reimpose them.

Sanctions enumerated under Subparagraph 16.8.2 of this Paragraph 16.8 shall not be imposed by the administering agency except after an adjudicatory proceeding, as that term is used in M.G.L. c.30A, has been conducted. No investigation by the Commission or its agent shall be initiated without prior notice to the Contractor.

16.9*  Severability. The provisions of this Article 16 are severable, and if any of these provisions shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions.

16.10*  Equal Employment Opportunity for the Handicapped. The Contractor shall comply with the provisions of Executive Order No. 246, relating to discrimination against and equal employment opportunity for the handicapped, which is herein incorporated by reference and made a part of the Contract. In connection with the performance of Work under the Contract, the Contractor, Subcontractors and suppliers of goods and services shall not discriminate against the handicapped. Furthermore, Contractors, Subcontractors and suppliers of good and services must give written notice of their commitments under this Paragraph 16.10 to any labor union, association or brotherhood with which they have a collective bargaining contract or other agreement, and must give such notice to handicap contractors and to handicapped contractor associations. A copy of such notice must be furnished to the awarding authority at the time of the signing of the contract.

16.11*  Suspension of Payments.

16.11.1* If the awarding authority determines after investigation that the Contractor or any Subcontractor is not in compliance with the terms of Article 16, it may suspend any

SUPPLEMENTARY GENERAL CONDITIONS                                        00800-34

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

> payment or portion thereof due under them contract until Contractor demonstrates
> compliance with the terms of Article 16.
>
> 16.11.2* Payment shall not be suspended if the awarding authority finds that the
> Contractor made his best efforts to comply with Article 16, or that some other justifiable
> reason exists for waiving the provisions of Article 16 in whole or in part.
>
> 16.11.3* Payment may be suspended only after the Contractor and any other interested
> party shall have been given the opportunity to present evidence in support of its position
> at an informal hearing held by the awarding authority and the awarding authority has
> concluded upon review of all the evidence that such penalty is justified.
>
> 16.11.4* This temporary suspension of payments by the awarding authority is separate
> from the sanctions set forth in Paragraph 16.8 above, which are determined by the
> Commission and recommended to the awarding authority.

### END OF SECTION

## ARTICLE 4
## CONTACT SUM

**4.1** The Owner shall pay the Contractor in current funds for the Contractor's performance of the Contract the Contract Sum Fourteen million six-hundred and eighty six thousand eight-hundred and seventy-two Dollars ($14,686,872.00), subject to additions and deductions as provided in the Contract Documents.

**4.2** The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date until which that amount is valid.)*

Base Bid - $14,125,000.00 plus
Alternate No. 1 - $ 43,122.00
Alternate No. 2 - $221,371.00
Alternate No. 3 - $ 49,756.00
Alternate No. 4 - $156,363.00
Alternate No. 5 - $ 91,260.00

**4.3** Unit prices, if any, are as follows:

Refer to Document 00410, "Form for General Bid" attached to this contract.

## ARTICLE 5
## PROGRESS PAYMENTS

**5.1** Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**5.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**5.3** Provided an Application for Payment is received by the Architect not later than the last day of a month, the Owner shall make payment to the Contractor not later than the fifteenth (15) day of the next month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than fifteen (15) days after the Architect receives the Application for Payment.

AIA DOCUMENT A101 – OWNER-CONTRACTOR AGREEMENT – TWELFTH EDITION – AIA – COPYRIGHT 1987 – THE AMERICAN INSTITUTE OF ARCHITECTS  1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S copyright laws and is subject to legal prosecution. This document was electronically produced under license number 297001995 and can be reproduced without violation until 2/17/97

## ARTICLE 6
## FINAL PAYMENT

Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when (1) the Contract has been fully performed by the Contractor except for the Contractor's responsibility to correct nonconforming Work as provided in Subparagraph 12.2.2 of the General Conditions and to satisfy other requirements, if any, which necessarily survive final payment; and (2) a final Certificate for Payment has been issued by the Architect; such final payment shall be made by the Owner not more than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 7
## MISCELLANEOUS PROVISIONS

7.1  Where reference is made in this Agreement to a provision of the General Conditions or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

7.2  Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision.  Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

7.3  Other provisions:

None

## ARTICLE 8
## TERMINATION OR SUSPENSION

8.1  The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of the General Conditions.

8.2  The Work may be suspended by the Owner as provided in Article 14 of the General Conditions.

AIA DOCUMENT A101 - OWNER-CONTRACTOR AGREEMENT - TWELFTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS . 1735 NEW YORK AVENUE, N.W. WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S copyright laws and is subject to legal prosecution. This document was electronically produced under license number 297001995 and can be reproduced without violation until 2/17/97

9.1.7 Other documents, if any, forming part of the Contract Documents are as follows: *(List here any additional documents which are intended to form part of the Contract Documents. The General Conditions provide that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

Form for General Bid dated 9/5/2002.
Performance Bond and Labor & Materials Bond as specified.
Insurance Certificate as specified.
Specification and Drawing index.

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

OWNER

*(Signature)*

DANIEL J. MORGAN
Town Manager
*(Printed name and title)*

CONTRACTOR

*(Signature)*

Dennis A. DeGrazia, CEO
*(Printed name and title)*

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

TOTAL OF ITEM NO. 2:   $ 8,670,743

F.   SUB-BIDS: The undersigned agrees that each of the above-named Sub-bidders will be used for the work indicated at the amount stated, unless a substitution is made. The undersigned further agrees to pay the premiums for the Performance Bond and Payment Bond furnished by Sub-bidders as requested herein and that all of the cost of all such premiums is included in the amount set forth in Item No. 1 of this Bid. The undersigned agrees that if he is selected as General Contractor, he will promptly confer with the Awarding Authority on the question of sub-bidders; and that the Awarding Authority may substitute for any sub-bid listed above a sub-bid filed with the Awarding Authority by another sub-bidder for the sub-trade against whose standing and ability the undersigned makes no objection; and that the undersigned will use all such finally selected sub-bidders at the amounts named in their respective sub-bids and be in every way responsible for them and their work as if they had been originally named in this General Bid, the total contract price being adjusted to conform thereto.

G.   UNIT PRICES: Should certain additional work be required, or should the quantities of certain classes of work be increased from those required by the Contract Documents, by authorization of the Owner, the below unit prices shall, at the option of the Owner, be the basis of payment to the Contractor or credit to the Owner, for such increase or decrease in the work. The Unit Prices shall represent the exact net amount per unit to be paid the Contractor (in the case of additions or decrease) or to be refunded the Awarding Authority (in the case of decreases). No additional adjustment will be allowed for overhead, profit, insurance, or other direct or indirect expenses of the Contractor or Subcontractors. No additional adjustments will be allowed for over excavation or other work without the prior written approval of the Owner. Unit prices given herein shall be for additional work only.

Site Unit Prices:

1.   Rock Excavation:

1a.   Trench rock excavation for
School Site utilities and disposal
per cubic yard, explosives prohibited
(differing from) ◯ C.Y. estimate):          ADD/DEDUCT; $ 80.00 /CY

2.   Structural Fill:

2a.   Removal and disposal of unsuitable
materials and replacement with
compacted Structural Fill
per cubic yard:                              ADD/DEDUCT; $ 50.00 /CY

3.   Chain Link Fence:

3a.   Furnish and install 3'-6" high
galvanized chain link
fence per linear foot:                       ADD/DEDUCT; $ 19.00 /LF

3b.   Furnish and install 6'-0" high
galvanized chain link
fence per linear foot:                       ADD/DEDUCT; $ 27.00 /LF

FORM FOR GENERAL BID                                          00410 - 4

45 Oak Street
Shrewsbury, Massachusetts

7c.  VCT (Vinyl Composite Tile), over VAT,
     VAT and mastic, per square foot:                ADD/DEDUCT; $ _3.60_ /SF

7d.  Pipe and Hard Joint Insulation,
     throughout the school,
     per linear foot:                                ADD/DEDUCT; $ _2.50_ /LF

7e.  Ceiling Demolition, per square foot             ADD/DEDUCT, $ _4.50_ /SF

7f.  Blackboards/Tackboards, each:                   ADD/DEDUCT; $ _90.00_ /EACH

7g.  Hidden Pipe and Joint Insulation,
     throughout the school,
     per linear foot:                                ADD/DEDUCT; $ _17.50_ /LF

7h.  Pipe and Hard Joint insulation,
     in Crawl Spaces/Tunnels,
     per linear foot:                                ADD/DEDUCT; $ _17.50_ /LF

7i.  Asbestos Debris and Soil,
     in Crawl Spaces/Tunnels
     per cubic foot:                                 ADD/DEDUCT; $ _9.00_ /CF

7j.  Transite Ceiling Tile,
     Music Room/Rear of Stage
     Per square foot:                                ADD/DEDUCT; $ _2.75_ /SF

7k.  Transite inside Fume Hoods,
     Science Rooms, per square foot:                 ADD/DEDUCT; $ _2.75_ /SF

7l.  Counter Lab Tops, Science Rooms,
     per square foot:                                ADD/DEDUCT; $ _4.50_ /SF

7m.  Transite Counter Tops, Greenhouse,
     per square foot:                                ADD/DEDUCT; $ _4.50_ /SF

7n.  Pipe and Hard Joint Insulation, in Boiler
     Room, per linear foot:                          ADD/DEDUCT; $ _17.50_ /LF

7o.  Tank Insulation, in Boiler Room,
     per square foot:                                ADD/DEDUCT; $ _17.50_ /SF

7p.  Boiler Insulation, in Boiler Room, per
     square foot:                                    ADD/DEDUCT; $ _17.50_/SF

7q.  Duct Insulation, in Boiler Room, per
     square foot:                                    ADD/DEDUCT; $ _17.50_ /SF

7v.  Metal Doors, each:                              ADD/DEDUCT; $ _190.00_ /EACH

FORM FOR GENERAL BID                                 00410 - 6

Case 1:05-cv-11397-NMG    Document 12-2    Filed 07/25/2005    Page 38 of 54
SHREWSBURY MIDDLE SCHOOL – WEST
45 Oak Street
Shrewsbury, Massachusetts

REVISED 30.AUGUST.2002
ADDENDUM NO. 4

9.  Aluminum Windows, Entrances,
    Storefront, and Curtainwall

    Provide and install replacement of
    existing aluminum stop window
    units scheduled for reglazing.                ADD/DEDUCT; $ _100.00_ /stop

10. Tile

    Provide and install mudset ceramic
    wall tile on existing substrate.              ADD/DEDUCT; $ _10.00_ /SF

11. Gypsum Board System

    Infill existing interior partition with
    metal studs sized to match existing,
    5/8" gypsum board on each side and
    control joints where infill meets existing.   ADD/DEDUCT, $ _9.00_ /SF

H.  Commencement and Completion of Work:

    1.  The undersigned agrees to commence work on the Contract within ten (10)
        calendar days from receipt of written Notice to Proceed issued by the Owner
        within fourteen (14) calendar days after execution of the Contract Agreement and
        to thereafter diligently and continuously carry on the work.

    2.  Substantial Completion Date: The undersigned agrees to substantially complete
        the work on or before April 2, 2004.

I.  The undersigned agrees that, if he is selected as General Contractor, he will within five
    days, Saturdays, Sundays and legal holidays EXCLUDED, after presentation thereof by the
    Awarding Authority, execute a Contract in accordance with the terms of this bid and
    furnish a performance bond and also a labor and materials or payment bond, each of a
    surety company qualified to do business under the laws of the Commonwealth and
    satisfactory to the Awarding Authority and each in the sum of the contract price, the
    premiums for which are to be paid by the General Contractor and are included in the
    contract price.

J.  The undersigned hereby certifies that he is able to furnish labor that can work in harmony
    with all other elements of labor employed or to be employed on the work and that he will
    comply fully with all laws and regulations applicable to awards made subject to Section
    forty-four A.

K.  The undersigned hereby certifies under the penalties of perjury that this bid is in all
    respects bona fide, fair and made without collusion or fraud with any other person. As
    used in this subsection the word "person" shall mean any natural person, joint venture,
    partnership, corporation or other business or legal entity.

L.  The undersigned further certifies under penalty of perjury that the said undersigned is not
    presently debarred from doing public construction work in the Commonwealth under the
    provisions of section twenty-nine F of chapter twenty-nine, or any other applicable

*The Commonwealth of Massachusetts*

*Executive Office for Administration and Finance*
*Division of Capital Asset Management*
*One Ashburton Place*
*Boston, Massachusetts 02108*
*Tel: (617) 727-4050*
*Fax: (617) 727-5363*

JANE SWIFT
GOVERNOR

STEPHEN P. CROSBY
SECRETARY, ADMINISTRATION
& FINANCE

DAVID B. PERINI
COMMISSIONER

## CERTIFICATE OF ELIGIBILITY

#02-1109

CONTRACTOR: STANDEN CONTRACTING COMPANY, INC.

445 FAUNCE CORNER ROAD

NORTH DARTMOUTH, MA 02747

In accordance with M.G.L. Chapter 149, Section 44D and 810 CMR 4.00, you are hereby certified to file bids under Chapter 149, Section 44 A in the following categories:

| | |
|---|---|
| GENERAL BUILDING CONSTRUCTION | DOORS & WINDOWS |
| HISTORICAL BUILDING RESTORATION | PAINTING |

Your Single Project Limit is          $19,658,000.
Your Aggregate Work Limit is          $50,000,000.

This certificate is valid from _____ MAY 03, 2002 _____ to _____ MAY 03, 2003

George M. Matthews, Deputy General Counsel          5/3/02
for David B. Perini, Commissioner                            Date

| Official Asset Management Amendments | Date | Authorization |
|---|---|---|
| _____Extension to: | | |
| _____Name: | | |
| _____SPL: | | |
| _____AWL: | | |
| _____Category: | | |
| _____Address: | | |

Form CQ7

3

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

| Document/Section No. and Title | Page Numbers | Issue Date | Latest Revision Date |
|---|---|---|---|

## SPECIFICATIONS

### DIVISION 1 - GENERAL REQUIREMENTS

| | | |
|---|---|---|
| Section 01010 | Summary of Work | 01010-1 through 4 |
| Section 01015 | Control of Site Work and Materials | 01015-1 through 5 |
| Section 01025 | Hazardous Materials Procedures | 01025-1 through 4 |
| Section 01026 | Unit Prices | 01026-1 through 5 |
| Section 01030 | Alternates | 01030-1 through 2 |
| Section 01035 | Modification Procedures | 01035-1 through 6 |
| Section 01040 | Coordination | 01040-1 through 6 |
| Section 01045 | Cutting and Patching | 01045-1 through 5 |
| Section 01050 | Field Engineering | 01050-1 through 2 |
| Section 01090 | References | 01090-1 through 4 |
| Section 01200 | Project Meetings | 01200-1 through 6 |
| Section 01300 | Submittals | 01300-1 through 12 |
| Section 01410 | Testing Laboratory Services | 01410-1 through 7 |
| Section 01500 | Construction Facilities and Temporary Controls | 01500-1 through 19 |
| Section 01600 | Material and Equipment | 01600-1 through 4 |
| Section 01631 | Substitution Request Form | 01631-1 through 3 |
| Section 01700 | Contract Closeout | 01700-1 through 10 |

### DIVISION 2 - SITE CONSTRUCTION

| | | |
|---|---|---|
| Section 02060 | Site Demolition | 02060-1 through 3 |
| Section 02070 | Selective Demolition | 02070-1 through 5 |
| Section 02075 | Asbestos Abatement | 02075-1 through 24 |
| Section 02100 | Site Preparation | 02100-1 through 7 |
| Section 02200 | Earthwork | 02200-1 through 23 |
| Section 02240 | Geotextile Fabrics | 02240-1 through 3 |
| Section 02250 | Erosion Control | 02250-1 through 3 |
| Section 02511 | Bituminous Concrete Paving & Markings | 02511-1 through 6 |
| Section 02515 | Concrete Pavement | 02515-1 through 5 |
| Section 02525 | Granite Curbing | 02525-1 through 3 |
| Section 02649 | Tracer Tape | 02649-1 through 2 |
| Section 02705 | Storm Drainage Systems & Sewer Systems | 02705-1 through 10 |
| Section 02710 | Underdrain System – Athletic Fld | 02710-1 through 4 |
| Section 02713 | Water Systems | 02713-1 through 9 |

**** Filed Sub-bid Required

TABLE OF CONTENTS                                                    00010 - 2

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

| Document/Section No. and Title | | Page Numbers | Issue Date | Latest Revision Date |
|---|---|---|---|---|
| | | | | |

## DIVISION 8 - DOORS AND WINDOWS

| | | | | |
|---|---|---|---|---|
| Section 08110 | Steel Doors and Frames | 08110-1 through 7 | | |
| Section 08210 | Wood Doors | 08210-1 through 7 | | |
| Section 08331 | Coiling Counter Door | 08331-1 through 4 | | |
| Section 08360 | Upward Acting Sectional Doors | 08360-1 through 4 | | |
| **** Section 08520 | Aluminum Windows, Entrances, Storefront and Curtainwall | 08520-1 through 13 | | |
| Section 08700 | Finish Hardware | 08700-1 through 16 | | |
| **** Section 08800 | Glass and Glazing | 08800-1 through 10 | | |

## DIVISION 9 - FINISHES

| | | | | |
|---|---|---|---|---|
| **** Section 09200 | Lath & Plaster | 09200-1 through 8 | | |
| **** Section 09260 | Gypsum Board Systems | 09260-1 through 14 | | |
| **** Section 09300 | Tile | 09300-1 through 11 | | |
| **** Section 09510 | Acoustical Ceilings | 09510-1 through 6 | | |
| Section 09520 | Acoustical Wall Panels | 09520-1 through 4 | | |
| Section 09550 | Wood Floor Finishing | 09550-1 through 3 | | |
| Section 09625 | Athletic Flooring | 09625-1 through 5 | | |
| **** Section 09650 | Resilient Flooring | 09650-1 through 8 | | |
| Section 09680 | Carpet | 09680-1 through 5 | | |
| **** Section 09900 | Painting | 09900-1 through 14 | | |

## DIVISION 10 - SPECIALTIES

| | | | | |
|---|---|---|---|---|
| Section 10100 | Visual Display Boards | 10100-1 through 5 | | |
| Section 10160 | Solid Plastic Compartments | 10160-1 through 5 | | |
| Section 10190 | Cubicle Curtain, Track and Hardware | 10190-1 through 2 | | |
| Section 10210 | Metal Wall Louvers | 10210-1 through 6 | | |
| Section 10440 | Interior and Exterior Signage | 10440-1 through 3 | | |
| Section 10505 | Metal Lockers | 10505-1 through 5 | | |
| Section 10522 | Fire Extinguishers, Cabinets, and Accessories | 10522-1 through 4 | | |
| Section 10650 | Operable Partition | 10650-1 through 8 | | |
| Section 10810 | Toilet Accessories | 10810-1 through 4 | | |

## DIVISION 11 - EQUIPMENT

| | | | | |
|---|---|---|---|---|
| Section 11062 | Stage Curtain and Track | 11062-1 through 5 | | |
| Section 11160 | Loading Dock Equipment | 11160-1 through 3 | | |
| Section 11400 | Food Service Equipment | 11400-1 through 17 | | |
| Section 11480 | Athletic Equipment | 11480-1 through 3 | | |
| Section 11486 | Gymnasium Divider | 11486-1 through 4 | | |

**** Filed Sub-bid Required

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

## DOCUMENT 00015

### LIST OF DRAWINGS

#### LANDSCAPE ARCHITECTURAL

| | |
|---|---|
| L1.1 | EXISTING CONDITIONS PLAN |
| L1.2 | SITE PREPARATION/DEMOLITION PLAN |
| L1.3 | SITE GRADING & UTILITY PLAN |
| L1.4 | IRRIGATION PLAN |
| L1.5 | LAYOUT AND MATERIALS PLAN |
| L1.6 | ENLARGED SITE PLAN AND DETAILS |
| L1.7 | PLANTING PLAN |
| L1.8 | MISCELLANEOUS DETAILS |
| L1.9 | ALTERNATES |
| L1.10 | ENLARGED PLANS, PLANTING PLAN AND DETAILS (ALTERNATES) |

#### ARCHITECTURAL

| | |
|---|---|
| D1.1 | DEMOLITION PLANS |
| D1.2 | FIRST FLOOR DEMOLITION PLAN |
| A1.1 | LEGEND, PARTITION TYPES AND MASTER PLANS |
| A2.1 | ROOF PLAN AND DETAILS |
| A3.1 | GROUND FLOOR PLAN |
| A3.2 | FIRST FLOOR PLAN, SECTION A-A |
| A3.3 | FIRST FLOOR PLAN, SECTION B-B |
| A3.4 | FIRST FLOOR PLAN, SECTION C-C |
| A3.5 | FIRST FLOOR PLAN, SECTION D-D |
| A4.1 | GROUND FLOOR REFLECTED CEILING PLAN |
| A4.2 | FIRST FLOOR REFLECTED CEILING PLAN, SECTION A-A |
| A4.3 | FIRST FLOOR REFLECTED CEILING PLAN, SECTION B-B |
| A4.4 | FIRST AND SECOND FLOOR REFLECTED CEILING PLAN, SECTION C-C |
| A4.5 | FIRST FLOOR REFLECTED CEILING PLAN, SECTION D-D |
| A5.1 | EXTERIOR ELEVATIONS |
| A5.2 | EXTERIOR ELEVATIONS |
| A5.3 | EXTERIOR ELEVATIONS/BUILDING SECTIONS AND DETAILS |
| A6.1 | WALL SECTIONS AND DETAILS |
| A6.2 | CANOPY SECTIONS, ELEVATIONS AND DETAILS |
| A6.3 | ALUMINUM WINDOWS, CURTAIN WALL DOOR ENTRY FRAME TYPES & DETAILS |
| A6.4 | MISCELLANEOUS DETAILS |
| A7.1 | STAIR PLANS, SECTIONS AND DETAILS |
| A8.1 | TOILET ROOM PLANS AND ELEVATIONS/INTERIOR ELEVATIONS |
| A8.2 | CORRIDOR ELEVATIONS |
| A9.1 | KITCHEN EQUIPMENT PLAN |
| A10.1 | MILLWORK |
| A10.2 | MILLWORK |
| A10.3 | MILLWORK |
| A10.4 | MILLWORK SECTIONS AND DETAILS |
| A10.5 | EXISTING MILLWORK AND MISC. DETAILS |
| A11.1 | DOOR SCHEDULE |
| A11.2 | DOOR SCHEDULE, HOLLOW METAL FRAME TYPES AND DETAILS |
| A12.1 | ROOM FINISH SCHEDULE |
| A12.2 | ROOM FINISH SCHEDULE AND DETAILS |

#### STRUCTURAL

| | |
|---|---|
| S1.1 | LOWER FOUNDATION PLAN – SECTION A-A AND B-B |
| S2.1 | MAIN LEVEL FOUNDATION PLAN SECTION A-A |
| S2.2 | MAIN LEVEL FOUNDATION PLAN SECTION B-B |
| S2.3 | MAIN LEVEL FOUNDATION PLAN SECTION C-C |
| S2.4 | MAIN LEVEL FOUNDATION PLAN SECTION D-D |
| S2.5 | MAIN LEVEL FOUNDATION PLAN SECTIONS |

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

H5.3    HVAC DETAILS SHEET 3

H6.1    HVAC SCHEDULES SHEET 1
H6.2    HVAC SCHEDULES SHEET 2
H6.3    HVAC SCHEDULES SHEET 3

BUILDING CONTROLS

BC 1.0    BUILDING CONTROL LEGEND & NOTES
BC 1.1    BUILDING CONTROL DIAGRAMS
BC 1.2    BUILDING CONTROL DIAGRAMS
BC 1.3    BUILDING CONTROL DIAGRAMS
BC 1.4    BUILDING CONTROL DIAGRAMS
BC 1.5    BUILDING CONTROL DIAGRAMS

ELECTRICAL

E0.1    ELECTRICAL LEGEND, NOTES & DRAWING LISTE
E0.2    ELECTRICAL SITE PLAN
E0.3    ELECTRICAL LIGHTING DETAILS & SCHEDULES

E1.1    ELECTRICAL DEMOLITION PART PLAN
E1.2    ELECTRICAL FIRST FLOOR DEMOLITION

E2.1    ELECTRICAL LIGHTING PLAN GROUND FLOOR – SECT. A-A, B-B
E2.2    ELECTRICAL LIGHTING PLAN FIRST FLOOR – SECT. A-A
E2.3    ELECTRICAL LIGHTING PLAN FIRST FLOOR – SECT. B-B
E2.4    ELECTRICAL LIGHTING PLAN FIRST FLOOR – SECT. C-C
E2.5    ELECTRICAL LIGHTING PLAN FIRST FLOOR – SECT. D-D

E3.1    ELECTRICAL PWR. PLAN GND. FL. SEC. A-A & B-B
E3.2    ELECTRICAL PWR. PLAN FIRST FLOOR – SECT. A-A
E3.3    ELECTRICAL PWR. PLAN FIRST FLOOR – SECT. B-B
E3.4    ELECTRICAL PWR. PLAN FIRST FLOOR – SECT. C-C
E3.5    ELECTRICAL PWR. PLAN FIRST FLOOR – SECT. D-D
E3.6    ELECTRICAL ROOF PLAN

E4.1    ELECTRICAL POWER RISER & SCHEDULES
E4.2    ELECTRICAL MISC. SCHEDULES
E4.3    ELECTRICAL MECHANICAL SCHEDULES
E4.4    ELECTRICAL KITCHEN EQUIPMENT SCHEDULE & DETAILS
E4.5    ELECTRICAL MISCELLANEOUS RISER DIAGRAMS & DETAILS
E4.6    ELECTRICAL TELECOMMUNICATIONS RISER & MISC. DETAILS

COMMUNICATIONS TECHNOLOGIES

CT0.1    COMMUNICATION TECHNOLOGIES LEGEND & NOTES

CT1.1    COMMUNICATION TECHNOLOGIES GROUND FLOOR – Section A-A/B-B
CT1.2    COMMUNICATION TECHNOLOGIES FIRST FLOOR – Section A-A
CT1.3    COMMUNICATION TECHNOLOGIES FIRST FLOOR – Section B-B
CT1.4    COMMUNICATION TECHNOLOGIES FIRST FLOOR – Section C-C
CT1.5    COMMUNICATION TECHNOLOGIES FIRST FLOOR – Section D-D

CT2.1    COMMUNICATION TECHNOLOGIES DETAIL SHEET
CT2.2    COMMUNICATION TECHNOLOGIES PART PLANS & ELEVATIONS
CT2.3    COMMUNICATION TECHNOLOGIES PART PLANS & ELEVATIONS & RISERS

END OF LIST OF DRAWINGS

LIST OF DRAWINGS                                                    00015 - 3

**4.2** Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

**4.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

**4.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

**5** If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**6** After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

**6.1** The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

**6.2** Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

**6.3** Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**7** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

**8** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**9** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**10** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

**11** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

## 12 DEFINITIONS

**12.1** Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**12.2** Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

**12.3** Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

**12.4** Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

Page 2 of 2

**The St Paul**

## POWER OF ATTORNEY

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
**St. Paul Guardian Insurance Company**
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

Power of Attorney No. 23232

Certificate No. 1411647

KNOW ALL MEN BY THESE PRESENTS: That Seaboard Surety Company is a corporation duly organized under the laws of the State of New York, and that St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, and that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, and that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc. is a corporation duly organized under the laws of the State of Wisconsin *(herein collectively called the "Companies")*, and that the Companies do hereby make, constitute and appoint

Kathleen M. Flanagan, Bette A. Sampsel, Richard A. Leveroni, Gary J. Giulietti, Kelly L. Corso and Kathleen A. Tooley

of the City of _____ Farmington _____, State _____ Connecticut _____, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety to, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

IN WITNESS WHEREOF, the Companies have caused this instrument to be signed and sealed this ___ 12th ___ day of ___ March ___ 2002

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

PETER W. CARMAN, Vice President

THOMAS E. HUIBREGTSE, Assistant Secretary

State of Maryland
City of Baltimore

On this ___ 12th ___ day of ___ March ___ 2002 ___, before me, the undersigned officer, personally appeared Peter W. Carman and Thomas E. Huibregtse, who acknowledged themselves to be the Vice President and Assistant Secretary, respectively, of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc.; and that the seals affixed to the foregoing instrument are the corporate seals of said Companies, and that they, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the names of the corporations by themselves as duly authorized officers.

In Witness Whereof, I hereunto set my hand and official seal.

My Commission expires the 1st day of July, 2006.

REBECCA EASLEY-ONOKALA, Notary Public

86203 Rev. 7-2002 Printed in U.S.A.

# *STANDEN*
## *CONTRACTING COMPANY, INC.*

October 16, 2002

Mr. Daniel J. Morgado, Town Manager
Town of Shrewsbury
100 Maple Street
Shrewsbury, MA 01545-5398

Re:    Shrewsbury Middle School – West
       Shrewsbury, MA

Dear Mr. Morgado;

Enclosed is the Certificate of Vote as you requested.  If you require any additional
information please feel free to call.

Sincerely,

Ronald C. Merlo
Senior Project Manager

Cc;    File

       Enclosure

**CERTIFICATION OF VOTE**
**Shrewsbury Middle School – West Project**
**Shrewsbury, Massachusetts**
**Contract Date – October 1, 2002**

At a duly authorized meeting of the Board of Directors of Standen Contracting Company, Inc. at which all the Directors were present or waived notice, it was VOTED, that

Dennis A. DeGrazia – Chief Executive Officer

of this company, be and hereby is authorized to execute contracts and bonds in the name and behalf of said company, affix its corporate seal hereto; and such execution of any contract or obligation in its company's name on its behalf by such Chief Executive Officer under seal of company, shall be valid and binding upon this company.

A true copy,

ATTEST: _____ Clerk

Place of Business: _495  FAUNCE  CORNER  Road_

_NORTH  DARTMOUTH, MA  02747_

Date of this Contract: _OCTOBER  1, 2002_

I hereby certify that I am the clerk of Standen Contracting Company, Inc. that Dennis A. DeGrazia  is the Chief Executive Officer of said company, and that the above vote has not been amended or rescinded and remains in full force and effect as of the date of this contract.

_____
Clerk

Corporate
Seal

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY)
1/03/03

| PRODUCER | 508 852-8500 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|---|

The Protector Group Insurance
Agency, Inc.
100 Front Street
Worcester, MA 01608

**COMPANIES AFFORDING COVERAGE**

| COMPANY A | Hanover Ins Co |
|---|---|
| COMPANY B | |
| COMPANY C | |
| COMPANY D | |

INSURED

Standen Contracting Company
Inc.
445 Faunce Corner Road
North Dartmouth MA   02747

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN. THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | ZDN5557776 | 12/31/02 | 12/31/03 | GENERAL AGGREGATE | $ 2000000 |
| | X COMMERCIAL GENERAL LIABILITY | | | | PRODUCTS - COMP/OP AGG | $ 2000000 |
| | CLAIMS MADE X OCCUR | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | X OWNER'S & CONTRACTOR'S PROT | | | | EACH OCCURRENCE | $ 1000000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 300000 |
| | | | | | MED EXP (Any one person) | $ 15000 |
| A | AUTOMOBILE LIABILITY | 5557782 | 12/31/02 | 12/31/03 | COMBINED SINGLE LIMIT | $ 1000000 |
| | X ANY AUTO | | | | | |
| | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | SCHEDULED AUTOS | | | | | |
| | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | NON-OWNED AUTOS | | | | | |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | $ |
| | ANY AUTO | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | EXCESS LIABILITY | UHN5557853 | 12/31/02 | 12/31/03 | EACH OCCURRENCE | $ 15000000 |
| | X UMBRELLA FORM | | | | AGGREGATE | $ 15000000 |
| | OTHER THAN UMBRELLA FORM | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | WHN0533509 | 12/31/02 | 12/31/03 | X WC STATU-TORY LIMITS   OTH-ER | |
| | THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: INCL EXCL | | | | EL EACH ACCIDENT | $ 500000 |
| | | | | | EL DISEASE - POLICY LIMIT | $ 500000 |
| | | | | | EL DISEASE - EA EMPLOYEE | $ 500000 |
| A | OTHER Installation Floater-special Contractors Equip | ZDN5557776 | 12/31/02 | 12/31/03 | $3,000,000 Job Site Limit $100,000 Leased Equipment $80,577 Equipment Limit | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
CERTIFICATE HOLDER INCLUDED AS ADDITIONAL INSURED AS RESPECTS GENERAL
LIABILITY, AUTO & UMBRELLA, IF REQUIRED BY WRITTEN CONTRACT, FOR WORK
PERFORMED BY NAMED INSURED RE:SHREWSBURY MIDDLE SCHOOL. 30 DAYS
CANCELLATION EXCEPT 10 DAYS FOR NON PAYMENT OF PREMIUM

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| TOWN OF SHREWSBURY 100 MAPLE ST SHREWSBURY, MA 01545 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES AUTHORIZED REPRESENTATIVE |

ACORD 25-S (1/95)          31-15          © ACORD CORPORATION 1988

Standen Contracting Co. Inc.
445 Faunce Corner Rd.
North Dartmouth, MA 02747

Insurance Certificate
Page 2

*Hanover Insurance Company

*Specific Assumption of Liability applies via Reinsurer: Partner
Reinsurance Company of the U.S. under it's Quota Share Reinsurance
Agreement with Hanover Insurance Co. Partner Reinsurance Company's
A.M. Best Rating of A+

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY)
10-07-02

| PRODUCER    508-852-8500 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

The Protector Group Insurance
Agency, Inc.
100 Front Street
Worcester, MA 01608

| | COMPANIES AFFORDING COVERAGE |
|---|---|
| COMPANY A | Hanover Insurance Co |

| INSURED | COMPANY B | Acadia Insurance Co |
|---|---|---|

Standen Contracting Company
Inc.
445 Faunce Corner Road
North Dartmouth MA   02747

| COMPANY C | RECD OCT 8 2002 |
|---|---|
| COMPANY D | |

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY  [X] COMMERCIAL GENERAL LIABILITY  [ ] CLAIMS MADE [X] OCCUR  [X] OWNER'S & CONTRACTOR'S PROT | ZDN5557778 | 12/31/01 | 12/31/02 | GENERAL AGGREGATE | $ 2000000 |
| | | | | | PRODUCTS - COMP/OP AGG | $ 2000000 |
| | | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | | | | | EACH OCCURRENCE | $ 1000000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 300000 |
| | | | | | MED EXP (Any one person) | $ 15000 |
| A | AUTOMOBILE LIABILITY  [X] ANY AUTO  [ ] ALL OWNED AUTOS  [ ] SCHEDULED AUTOS  [ ] HIRED AUTOS  [ ] NON-OWNED AUTOS | 5557782 | 12/31/01 | 12/31/02 | COMBINED SINGLE LIMIT | $ 1000000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY  [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN AUTO ONLY:  EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | EXCESS LIABILITY  [X] UMBRELLA FORM  [ ] OTHER THAN UMBRELLA FORM | UHN5557853 | 12/31/01 | 12/31/02 | EACH OCCURRENCE | $ 15000000 |
| | | | | | AGGREGATE | $ 15000000 |
| | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  THE PROPRIETOR/ [ ] INCL  PARTNERS/EXECUTIVE  OFFICERS ARE: [ ] EXCL | WHN9533509 | 12/31/01 | 12/31/02 | [X] WC STATU-TORY LIMITS [ ] OTHER | |
| | | | | | EL EACH ACCIDENT | $ 500000 |
| | | | | | EL DISEASE - POLICY LIMIT | $ 500000 |
| | | | | | EL DISEASE - EA EMPLOYEE | $ 500000 |
| 3 | OTHER  Builders Risk  Special Form  $5,000 Deductible | BINDER | 11/04/02 | 06/04/04 | $14,125,000 Limit  $250,000 Temporary Location  $500,000 Transit Limit | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
CERTIFICATE HOLDER INCLUDED AS ADDITIONAL INSURED AS RESPECTS GENERAL
LIABILITY, AUTO & UMBRELLA, IF REQUIRED BY WRITTEN CONTRACT, FOR WORK
PERFORMED BY NAMED INSURED RE:SHREWSBURY MIDDLE SCHOOL. 30 DAYS
CANCELLATION EXCEPT 10 DAYS FOR NON PAYMENT OF PREMIUM

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| TOWN OF SHREWSBURY 100 MAPLE ST SHREWSBURY, MA 01545 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25-S (1/95)                                                    © ACORD CORPORATION 1988

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY) 12/30/02

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| The Dunlap Corporation<br>R.G. Sullivan Building<br>175 Canal Street<br>Manchester, NH  03101 | |
| | **INSURERS AFFORDING COVERAGE** |
| INSURED | INSURER A: MA Approved Self-Insured Trust |
| Standen Contracting Co.<br>445 Faunce Corner Road<br>N. Dartmouth, MA  02747 | INSURER B: |
| | INSURER C: |
| | INSURER D: |
| | INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | EACH OCCURRENCE | $ |
| | COMMERCIAL GENERAL LIABILITY | | | | FIRE DAMAGE (Any one fire) | $ |
| | CLAIMS MADE    OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY   PRO-JECT   LOC | | | | PRODUCTS-COMP/OP AGG | $ |
| | **AUTOMOBILE LIABILITY**<br>ANY AUTO | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ALL OWNED AUTOS<br>SCHEDULED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | HIRED AUTOS<br>NON-OWNED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN   EA ACC | $ |
| | | | | | AUTO ONLY:   AGG | $ |
| | **EXCESS LIABILITY**<br>OCCUR    CLAIMS MADE | | | | EACH OCCURRENCE | $ |
| | | | | | AGGREGATE | $ |
| | | | | | | $ |
| | DEDUCTIBLE | | | | | $ |
| | RETENTION  $ | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | Slf-Ins Fund Year | 01/01/03 | 01/01/04 | X  WC STATU-TORY LIMITS    OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000 |
| | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000 |
| | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
For all operstions during the policy period term subject to policy exclusions.
Evidence of Workers' Compensation Coverage
Project: Shrewsbury Middle School

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER | CANCELLATION |
|---|---|---|
| Town of Shrewsbury<br>100 Maple St<br>Shrewsbury, MA   01545 | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25-S (7/97) 1  of  2    #M133051                    ALR    © ACORD CORPORATION 1988

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YY) |
|---|---|
| | 11/12/02 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| The Dunlap Corporation R.G. Sullivan Building 175 Canal Street Manchester, NH 03102 | |
| | **INSURERS AFFORDING COVERAGE** |
| **INSURED** Standen Contracting Co. 445 Faunce Corner Road N. Dartmouth, MA 02747 | INSURER A: MA Approved Self-Insured Trust |
| | INSURER B: Midwest Emp Casualty Co(Aggregate) |
| | INSURER C: General Re (Specific) |
| | INSURER D: |
| | INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | EACH OCCURRENCE | $ |
| | COMMERCIAL GENERAL LIABILITY | | | | FIRE DAMAGE (Any one fire) | $ |
| | CLAIMS MADE   OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY   PRO-JECT   LOC | | | | PRODUCTS-COMP/OP AGG | $ |
| | **AUTOMOBILE LIABILITY** ANY AUTO | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | HIRED AUTOS NON-OWNED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN   EA ACC AUTO ONLY:   AGG | $ $ |
| | **EXCESS LIABILITY** | | | | EACH OCCURRENCE | $ |
| | OCCUR   CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | $ |
| | DEDUCTIBLE | | | | | $ |
| | RETENTION $ | | | | | $ |
| A B C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | Slf-Ins Fund Year 3050SAE-MA GDX014387A | 01/01/02 01/01/02 01/01/02 | 01/01/03 01/01/03 01/01/03 | X WC STATU-TORY LIMITS   OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000 |
| | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000 |
| | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
For all operations during the policy period term subject to policy exclusions.
Evidence of Workers' Compensation Coverage
Project: Shrewsbury Middle School

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER | CANCELLATION |
|---|---|---|
| Town of Shrewsbury 100 Maple St Shrewsbury, MA 01545 | | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | | **AUTHORIZED REPRESENTATIVE** |

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
12/22/2003

**PRODUCER**    (508) 852-8500

Protector Group Ins. Agency, Inc.
100 Front Street, Suite 800
Worcester, MA 01608

03 DEC 26 AM 9: 28

**INSURED**    Standen Contracting Co.,
445 Faunce Corner Road  TOWN MANAGER'S OFFICE
North Dartmouth, MA 02747

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Hanover Insurance | |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X  X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY  CLAIMS MADE  X  OCCUR | ZDN5557776 | 12/31/2003 | 12/31/2004 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | MED EXP (Any one person) | $ 15,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY  X  PRO-JECT  LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | X | **AUTOMOBILE LIABILITY** ANY AUTO  ALL OWNED AUTOS  X SCHEDULED AUTOS  X HIRED AUTOS  X NON-OWNED AUTOS | ADN5557782 | 12/31/2003 | 12/31/2004 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC  AUTO ONLY:  AGG | $ |
| A | X  X | **EXCESS/UMBRELLA LIABILITY** OCCUR  CLAIMS MADE | UHN5557853 | 12/31/2003 | 12/31/2004 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | DEDUCTIBLE  RETENTION  $ | | | | | $ |
| A | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | WHN6251993 | 12/31/2003 | 12/31/2004 | X  WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| A | | **OTHER** Installation Floater | ZDN5557776 | 12/31/2003 | 12/31/2004 | Job Site Limit | $3,000,000 |
| A | | Contractors Equipment | ZDN5557776 | 12/31/2003 | 12/31/2004 | Leased Equipment | $100,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Certificate Holder included as Additional Insured as respects General Liability, Auto & Umbrella, if required by written contract, for work performed by Named Insured.
Re: Shrewsbury Middle School.
Non-Payment Cancellation Notice is 10 Days.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **Town of Shrewsbury** 100 Maple Street Shrewsbury, MA 01545- | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **30** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE  *Michelle Larson* |

ACORD 25 (2001/08)    © ACORD CORPORATION 1988

## TAKEOVER AGREEMENT
## BETWEEN
## UNITED STATES FIDELITY AND GUARANTY COMPANY
## AND
## TOWN OF SHREWSBURY

This Takeover Agreement is between United States Fidelity and Guaranty Company a Maryland corporation (hereinafter "Surety"), and Town of Shrewsbury a Massachusetts (hereinafter "Obligee").

### I.

### RECITALS

A.    On October 1, 2002, the Town of Shrewsbury, Massachusetts ("Obligee") entered into a contract in the amount of $14,686,872 (hereinafter the "Contract") for a project known as Shrewsbury Middle School (hereinafter "Project") with Standen Contracting Company (hereinafter "Principal"). A copy of the Contract is attached hereto as Exhibit A (Contract).

B.    As required by the Obligee, Surety issued Performance and Payment Bonds numbered SW5041 dated October 3, 2002, each bond in the amount of $14,686,872 (hereinafter the "Performance and Payment Bonds") naming Standen Contracting Company, Inc. as Principal and Town of Shrewsbury as Obligee. The Bonds are attached hereto as Exhibit B.

C.    On or about February 25, 2004 Principal executed a voluntary letter of default and requested Surety complete the project.

D.    Obligee accepted Contractor's voluntary default and has requested Surety complete the project.

E.      Without waiving any of the rights of its Principal or the rights of Surety, Surety

has agreed to procure the completion of the Remaining Work under the Contract subject to the

terms and conditions of this Agreement.

NOW, THEREFORE, based on the exchange of valuable consideration, the receipt and

sufficiency of which is acknowledged, and based on the Recitals set forth above which form a

part of this Agreement, Surety and Obligee agree to the following terms and conditions:

II.

**TERMS AND CONDITIONS**

1.      Recitals.      The above recitals are adopted and made a part of this Agreement.

2.      Incorporation of the Contract.  The Contract is incorporated by reference into this

Agreement, including, without limitation, the Instructions for Bidders, the Contract Terms and

Conditions, the Plans or Drawings, and any Special Conditions and Specifications, and all

addenda, change orders and modifications to those documents issued in accordance with the

Contract, including, without limitation, the Memorandum Agreement dated September 2, 2003.

3.      The Current Contract Amount.  As of the date of this Agreement, the adjusted

Contract Amount is $15,032,821.50 (hereinafter "Contract Amount").  Principal has been paid

$7,165,061.00 to date and Obligee has retained $431,937.00 as retainage. The owner currently

holds the amount of $1,041,739.00 as earned, billed and unpaid contract funds.

4.      Surety to Procure Completion of Contract.   Surety shall be responsible for

procuring the completion of the Remaining Work.  Surety shall procure the performance of the

Remaining Work through one or more Completing Contractors (hereinafter "Completing

Contractor") which it shall engage.  Surety is acting as a Performance Bond Surety and not a

Contractor. Surety shall have the sole discretion to choose the completion Contractor or Contractors.

5. Obligee's Obligations under the Contract. Except to the extent provided in this Agreement, Obligee and Surety shall have all rights, claims, interests, obligations and responsibilities under the Contract with respect to each other to the same extent and effect as if Surety had executed the Contract initially instead of Principal.

6. Obligee's Right With Respect to Changes in the Work. Obligee reserves the right, to the extent appropriate under the Contract, to issue further change orders. The terms of these change orders, including the attendant extensions of time and valuation of the change order work, shall be determined as provided in the Contract. Further, in the event the Obligee seeks the performance of additional work which is not subject to valuation by application of the unit and/or lump sum prices set under the Contract, it shall negotiate the appropriate value for such work with Surety. Surety and its Completing Contractor acknowledge that time is of the essence in this Agreement and in the Contract.

7. Schedule for Completion of Contract and New Completion Date. Surety, through its Completing Contractor or Subcontractors, will advise the Obligee of a schedule for the completion of the Contract. The balance of the contract work will be accomplished on a schedule agreed among Obligee and Surety and Completion Contractor. Obligee agrees to grant to Surety the full benefit of whatever extensions of time and other associated relief, including for excusable delays, that are appropriate under the Contract. All other terms and conditions in the Contract regarding the completion of the Project, including the assessment of future liquidated damages shall remain unchanged. Surety reserves the right to request additional extensions of time and does not waive its right to time extensions.

8.   Completing Contractors.  Each Completing Contractor shall be a Contractor to Surety and no contractual relationship pursuant to this Agreement shall exist between Obligee and any Completing Contractor.   Each Completing Contractor shall provide all insurance required under the Contract, but shall not be required to provide payment and/or performance bonds, unless requested to do so by Surety.  Surety reserves the right to terminate its contract with a Completing Contractor at any time and to contract with another Completing Contractor. Routine day-to-day operations and decisions as to the manner of performance of the Contract shall be made by the Completing Contractor, subject to the terms and conditions of the Contract, provided, however, that the Completing Contractor must obtain Surety's written prior consent to agree to any changes in the Contract.  The work shall be subject to inspection and acceptance by the Obligee, as provided in the Contract.  All communications concerning matters of contract administration of the Contract (i.e., contractual or other notices required by law, payments, change orders, extensions of time, delays, claims, among other matters) shall be communicated to a Completing Contractor only in writing, with a copy forwarded to Surety and Obligee on a current basis by telecopier as provided in this Agreement.

9.   Payments to Surety.  The remaining contract amount work will be paid by Obligee to Surety as provided herein and as further set forth in the contract documents.  Payments shall be made at the address set forth in paragraph 15 of this Agreement.  The total liability of the Surety under this Agreement and the Performance Bond for the completion of the work under the Contract is limited to and shall not exceed the penal sum of the Performance Bond in the amount of $14,686,872.00.  All payments made by the Surety, less any amounts paid to Surety by Obligee, for the performance of the work under the contract from and after the default of the original Contractor on February 25, 2004 shall be credited against the penal sum of the

Performance Bond. It is acknowledged and understood by the parties that any credits taken against the penal sum shall be net of any funds paid to the Surety by the Obligee pursuant to this Agreement. Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of the Surety under the Performance Bond.

10. Payment Bond. Surety's Payment Bond under the Contract shall remain in full force and effect according to its terms. Surety agrees to investigate all proper payment claims made against it, but shall have the right to settle, compromise, defend, appeal, pay or dispute such claims as it, in its sole and complete discretion, may deem appropriate. Except as required by law, in no event shall the Obligee withhold any portion of the estimated Contract amount, on account of claims, liens, suits or demands by person or entities furnishing or alleging to have furnished labor and/or materials to the Project; except for payments that must be made pursuant to Massachusetts General Laws chapter 149, which pertains to "direct filing" sub bidders, so called. Provided, however, that the Surety shall defend, indemnify and hold harmless the Obligee from any loss which may arise by virtue of such claims, liens, suits and demands.

11. Payment Requisitions. Surety, through its Completing Contractor or Contractors, shall submit to Obligee the information or documentation required regarding the work performed as set forth in the Contract.

12. Offset. All monies due, and to become due, pursuant to the Contract and this Agreement, including, without limitation, progress payments, payments for extra work or additional work orders, retention, final payment for work on behalf of Surety by the Completing Contractors, shall be made to Surety unconditionally and without offset except as set forth in this agreement, the Contract and as allowed by law. All payments shall be made directly to Surety by check payable to the Surety at the address stated in paragraph 15 of this Agreement.

13.    <u>Mutual Reservation of Rights</u>.  This Agreement is solely for the benefit of the Obligee and the Surety.  The Obligee and the Surety do not intend by any provision of this Agreement to create any rights in or increase the rights of any third party beneficiaries, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon any one other than the Obligee and the Surety.  The Surety and the Obligee mutually reserve all rights, claims, causes of actions, demands and defenses, known or unknown, now existing or accruing hereafter that they have or may have against each other.  It is not the intention of the Surety in entering into this Takeover Agreement to waive, prejudice, amend, alter, revise, release or in any way adversely affect any claim, cause of action or defense, known or unknown, that it, as Surety, or the Principal, might have against the Obligee or any other person, party or entity.  Furthermore, it is not the intention of the Obligee in entering into this Takeover Agreement to waive, prejudice, amend, alter, revise, release or in any way adversely affect any claim, cause of action or defense, known or unknown, that it might have against the Surety or Principal or any other person, party or entity.  The Surety explicitly reserves its rights associated with any Owner Default.  The Surety has agreed to complete the project as contemplated herein because it believes it is in the best position to do so, it has not made any determination with respect to Owner Default and its actions do not constitute a waiver of the defense or affirmative action to recover.

14.    <u>Claims Preserved</u>. All claims, rights, causes of action (claims) of principal arising prior to the execution of this Agreement are preserved. Surety shall have the right to pursue these claims in its own name or in the name of the principal.

15.    Notices. All notices and correspondence to Obligee shall be sent by first class

U.S. mail, postage prepaid, with a copy by telecopier or by certified U.S. mail, return receipt

requested, to:

    Daniel J. Morgado, Town Manager
    100 Maple Avenue
    Shrewsbury, Massachusetts 01545
    Fax No.:       (508) 842-0587
    Phone No.:    (508) 841-8408

With a copy to:

    T. Philip Leader
    34 Mechanic Street
    Worcester, Massachusetts 01608
    Fax No.:       (508) 799-6522
    **Phone No.:    (508) 798-1819**

**All notices and correspondence to Surety shall be sent by first class U.S. mail, postage prepaid**

with a copy by telecopier or by certified U.S. mail, return receipt requested to:

    Tiffany Schaak
    Senior Claim Attorney
    St. Paul Surety
    MC41
    5801 Smith Avenue
    Baltimore, MD 21209

    Fax No.:       (410) 205-0605
    Phone No.:    (410) 205-0494

With a copy to:

    Russ Werner
    Senior Surety Engineer
    St. Paul Surety
    Construction Services Department
    MC41
    5801 Smith Avenue
    Baltimore, MD 21209

    Fax No.:       (410) 205-0605

Phone No.:     **(410) 578-2025**

16.     No Third-Party Rights. Nothing in this Agreement shall be deemed to create any rights in favor of, or to inure to the benefit of, any third party or parties, or to waive or release any defense or limitation against third party claims.

17.     All Claims Referred to Surety. Obligee agrees to refer all inquiries to Surety related to payment of suppliers and/or subcontractors on the Project.

18.     Warranties. It is understood and agreed that upon completion of the Project the Surety and Completing Contractor shall be responsible for any warranty obligations as set forth in the Contract.

19.     Agreement Binding on Successors. This Agreement shall be binding upon the successors and assignees of Surety and Obligee.

20.     No Modification Except in Writing. This Agreement cannot be modified except in a writing signed by all Parties.

21.     Conflict Among Documents. This Agreement, the Contract, the Memorandum **Agreement dated September 2, 2003, and the Performance and Payment Bonds constitute the entire agreement between Obligee and Surety and, together, supersede all prior negotiations, representations, offers, other writings and oral statements of every description.**

22.     Law Applies and Dispute Resolution. This Agreement and the performance under **this Agreement, shall be governed by, and construed in accordance with, the laws of the State of Massachusetts and that, in any suit, action, or proceeding that may be brought arising out of, in connection with, or by reason of this Agreement, the laws of the State of Massachusetts shall be**

applicable and shall govern to the exclusion of the law of any other forum. The parties agree that any dispute arising out of, or related to this Agreement, shall be resolved by litigation.

23.    No Waiver. The failure of either party to exercise in any respect a right provided for in this Agreement shall not be deemed to be a subsequent waiver of the same right or of any other right unless expressly agreed to by the party in writing.

24.    Severability. The invalidity or enforceability of any particular provision of this Agreement shall not affect the other provision of this Agreement and the Agreement shall be construed as if the invalid or unenforceable provisions were omitted.

25.    Additional Documents. The parties agree to execute, acknowledge and deliver such other instruments, releases or documents as may be reasonably necessary to carry out or fulfill each party's covenants and obligations under this Agreement.

26.    Survival of Warranties. All representations and warranties made in this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transaction contemplated thereby.

27.    Counterparts. This Agreement may be executed in any number of counterparts each of which when executed and delivered shall be deemed to be an original with all counterparts constituting but one and the same instrument. The execution of this Agreement by any parties hereto will not become effective until counterparts hereof have been executed by all parties. The parties executing this Agreement hereby represent and warrant that they are properly authorized to bind the respective party.

28.    Construction. The Obligee and Surety have been represented by counsel who have materially participated in the authorship of this Agreement, it being understood that the rule

of construction that a written agreement is construed against the party drafting or preparing such agreement shall not specifically be applicable to the interpretation of this Agreement.

WHEREFORE, Surety and Obligee have executed this Agreement by their authorized representatives.

DATED: 3/18/2004

TOWN OF SHREWSBURY

By: _____
Its _Town Manager_ and lawfully
    authorized representative

DATED: 3/17/2004

UNITED STATES FIDELITY AND GUARANTY COMPANY

By: _____
Its _Senior Claims Attorney_ and lawfully
    authorized representative

of construction that a written agreement is construed against the party drafting or preparing such agreement shall not specifically be applicable to the interpretation of this Agreement.

WHEREFORE, Surety and Obligee have executed this Agreement by their authorized representatives.

DATED: _____          TOWN OF SHREWSBURY

By: _____
Its _____ and lawfully
    authorized representative

DATED: _3/17/2004_          UNITED STATES FIDELITY AND GUARANTY
                            COMPANY

By: _____
Its _Senior Claim Attorney_ and lawfully
    authorized representative

TAKEOVER AGREEMENT
BETWEEN UNITED STATES FIDELITY AND GUARANTY COMPANY
AND
TOWN OF SHREWSBURY

MODIFICATION NO. 1

Effective with the date of this Modification, delete the notice provisions applicable to
Surety found in Paragraph 15 Notices and add to Paragraph 15 Notices the following
language:

> All notices and correspondence to Surety shall be sent by first class U.S. mail,
> postage prepaid with a copy by telecopier or by certified U.S. Mail, return receipt
> requested to:
>
> > James M. Peters, Jr.
> > Vice President
> > Bond Claim 4 PB
> > St Paul Travelers Companies
> > One Tower Square 4 PB
> > Hartford, CT 06183
>
> > Fax No:      (860) 277-5722
> > Phone No:    (860) 954-6497

With a copy to:

> > William (Russ) Werner
> > Senior Surety Engineer
> > **Construction Services Department**
> > **St Paul Travelers Companies**
> > **111 Shilling Road**
> > **Hunt Valley, MD 21031-1110**
>
> > Fax:        (443) 353-2117
> > Phone No:   (443) 353-1135

**All payments to Surety shall be sent to the attention of William (Russ) Werner at
the Hunt Valley, MD address indicated above.**

**TAKEOVER AGREEMENT
BETWEEN UNITED STATES FIDELITY AND GUARANTY COMPANY
AND
TOWN OF SHREWSBURY**

MODIFICATION NO. 1

TOWN OF SHREWSBURY

DATED: 3/28/2005          By: _____

UNITED STATES FIDELITY AND
GUARANTY COMPANY

DATED: MARCH 31, 2005     By: _____
                              James M. Peters, Jr.
                              Vice President

PROJECT MANUAL
1 July 2002
<u>Revised with Addenda</u>
26 September 2002

# VOLUME 1 OF 2

DIVISIONS 0 - 14



RENOVATIONS TO
# SHREWSBURY MIDDLE SCHOOL - WEST

45 Oak Street
Shrewsbury, Massachusetts



Town of Shrewsbury
Office of the Town Manager
100 Maple Avenue
Shrewsbury, Massachusetts 01545



LAMOUREUX · PAGANO
ASSOCIATES, ARCHITECTS
14 East Worcester Street   Worcester   Massachusetts   01604
tel 508.752.2831    fax 508.757.7769   www.lamoureuxpagano.com

SET NO.

SHREWSBURY MIDDLE SCHOOL – WEST
45 Oak Street
Shrewsbury, Massachusetts

Revised w/ Addenda
26.September.2002

## DOCUMENT 00020

### INVITATION TO BID

1.01    INVITATION TO BID

A.    The Town of Shrewsbury, the Awarding Authority, invites sealed bids for construction of the Renovations to Shrewsbury Middle School – West, 45 Oak Street, Shrewsbury, Massachusetts, in accordance with Bidding and Contract Documents prepared by Lamoureux, Pagano Associates, Inc., Architects.

B.    Bidding procedures and award of Contract and Subcontracts shall be in accordance with the provisions of Massachusetts General Laws, Chapter 30, Section 39M, as amended and Chapter 149, Sections 44A through 44L, inclusive, of the General Laws of the Commonwealth of Massachusetts, including all current amendments; and the guidelines established by the Deputy Commissioner of the Commonwealth of Massachusetts Division of Capital Asset Management (DCAM), dated June 30, 1981, including any and all amendments.

1.02    PROJECT SCOPE & PROJECT SCHEDULE

A.    The project scope generally consists of renovating the $\pm$ 169,000 SF former Shrewsbury High School as a middle school. The scope of work includes demolition of existing building systems and finishes; selective reconstruction of offices, classrooms and support spaces. Replacement of mechanical, electrical, plumbing and communications systems, installation of a fire suppression system, structural reinforcement, selective window and exterior wall panel replacement, ballfield reconstruction, utility replacement, lighting and other sitework.

B.    Project Schedule: Owner use of athletic fields, north parking area, etc., until July 1, 2003; Substantial Completion by April 2, 2004; school prepared for occupancy by September, 2004.

1.03    RECEIPT OF BIDS

A.    Bids shall be received by the Awarding Authority, the Town of Shrewsbury, acting by and through its Town Manager, at the Office of the Town Manager, Shrewsbury Town Hall, 100 Maple Avenue, Shrewsbury, Massachusetts, no later than the times and dates specified below, at which time and place they will be publicly opened and forthwith read aloud. Any bid received after the time and date specified will not be considered.

   1.   GENERAL BIDS: 11:00 AM, local legal time, Thursday, August 29, 2002.*September 5, 2002* (Add. #3)

   2.   FILED SUB-BIDS: 11:00 AM, local legal time, Thursday, August 15, 2002.

B.    Required Filed Sub-bids: Filed Sub-bids are required for the following classifications of work:

| Class of Work | Specification Section No. and Title |
|---|---|
| Masonry: | Section 04200, UNIT MASONRY |

**INVITATION TO BID**

SHREWSBURY MIDDLE SCHOOL    WEST
45 Oak Street
Shrewsbury, Massachusetts

| | |
|---|---|
| Miscellaneous and Ornamental Iron: | Section 05500, METAL FABRICATIONS |
| Class of Work | Specification Section No. and Title |
| Waterproofing, Dampproofing, and Caulking: | Section 07100, WATERPROOFING, DAMP-PROOFING, AND CAULKING |
| Roofing and Flashing: | Section 07500, ROOFING AND FLASHING |
| Metal Windows: | Section 08520, ALUMINUM WINDOWS, ENTRANCES, STOREFRONT & CURTAINWALL |
| Glass and Glazing: | Section 08800, GLASS AND GLAZING |
| Lath and Plaster: | Section 09200, LATH AND PLASTER |
| Gypsum Board: | Section 09260, GYPSUM BOARD SYSTEMS |
| Tile: | Section 09300, TILE |
| Acoustical Ceilings: | Section 09510, ACOUSTICAL CEILINGS |
| Resilient Floors: | Section 09650, RESILIENT FLOORING |
| Painting: | Section 09900, PAINTING |
| Fire Protection: | Section 15300, FIRE PROTECTION |
| Plumbing: | Section 15401, PLUMBING |
| HVAC: | Section 15600, HEATING, VENTILATING, AND AIR CONDITIONING (HVAC) |
| Electrical: | Section 16100, ELECTRICAL |

C. General Bids: General Bids shall be submitted on the prescribed form and must b accompanied by:

1. A Certificate of Eligibility issued by the Division of Capital Asset Management (DCAM), showing that the Bidder has been approved to bid on projects the size an nature of this project;

2. A Contractor Update Statement, DCAM Form CQ3. It is the Bidder's responsibility obtain the necessary forms from DCAM and make application to DCAM in sufficie time for DCAM to evaluate the application and issue a Certificate of Eligibility;

3. A bid deposit for the general bid in the amount of 5% of the actual base bid proposal the form of a bid bond, cash, certified check, or a treasurer's or cashier's check issue

MIDDLE SCHOOL - WEST

Massachusetts

**CONTRACTOR'S USE OF PREMISES**

Contractor shall have complete use of the building for execution of the Work within the limits of Work indicated and shall coordinate use of the site with other contractors performing work for the Owner. Contractor's use of premises is limited only to the Owner's right to perform work with his own forces. The site work shall be sequenced to coordinate with owner use of the athletic fields and north parking lot as detailed in the Project Schedule.

Prior to beginning work of the Contract, the General Contractor shall meet with the Owner and the Architect to determine procedures regarding access to and use of site, exterior staging, parking, and storage areas, tree protection, special site conditions, and any other restrictions regarding the use of the site areas surrounding the construction.

1. Coordinate use of premises under direction of the Awarding Authority and the Architect.

2. Assume full responsibility for the protection and safekeeping of Products under this Contract, stored on the site.

3. Obtain and pay for the use of additional storage or work areas needed for operations.

4. Move any stored Products, under Contractor's control, which interfere with operations of the Owner or separate contractor.

5. The Owner shall utilize the site for various ball games, parking, and other "outdoor" events throughout the fall of 2002 through summer of 2003 period. The coordination of construction under this contract includes the Owners use of the site described above.

Where work on public roads or walks, or other work on municipal property or easements is done, all such work shall conform to applicable portions of this Specification and the rules, regulations, and specifications of the public agencies having jurisdiction. Wherever work on a public street is done, a Town of Shrewsbury special duty police officer must be present. All permits and fees in relation to such off-site work shall be obtained and paid for by the General Contractor.

The General Contractor shall keep the site and all public and private access roads and walks clear of debris caused by this work during the entire term of the Contract. He shall repair all public and private streets, drives, curbs, walks, and other improvements where disturbed by work of, or related to, building operations, leaving them in as good condition after completion of the work as before operations started, in accordance with rules, regulations, and specifications of the public agencies having jurisdiction.

Parking for workmen's personal vehicles shall be permitted only within the Contract Limit Lines on the Drawings.

Access roads and fire-lanes on and about the site shall be kept open and free at all times, including public roads and access to private homes and roads.

**OWNER'S OCCUPANCY**

Partial Owner Occupancy: The Owner reserves the right to place and install equipment in completed areas of the building prior to Substantial Completion, provided that such occupancy does not interfere with the remainder of the Work.

OF WORK

SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street
Shrewsbury, Massachusetts

1.  Execute Certificate of Substantial Completion for each specific Porti
    prior to Owner occupancy. After Owner occupancy Contractor shall
    clear access to all partially occupies areas.

2.  Upon occupancy, Owner will provide:

    a.  Operation of elevators, mechanical, and electrical systems.

1.08    EXAMINATION OF SITE

A.  Prior to bidding the General Contractor and each of the Filed Subcontrac
    examine the site and the Contract Documents to ensure their knowledge
    requirements affecting the work. No claim for extra compensation or ext
    will be allowed for General Contractor's or Filed Subcontractor's failure
    this requirement nor will any condition at the site, whether or not in agre
    conditions shown or called for on the Contract Documents, be allowed as
    claims, except as otherwise specifically provided for.

PART 2   PRODUCTS

Not Used.

PART 3   EXECUTION

Not Used.

END OF SECTION

**SUMMARY OF WORK**

# MEMORANDUM AGREEMENT
## TOWN OF SHREWSBURY
## AND
## STANDEN CONTRACTING COMPANY, INC.

1)     Subject to the approval of the Building Committee an extension of time of six weeks from April 2, 2004 until May 14, 2004 will be granted for substantial completion.

2)     The contract sum will not be adjusted for any work associated with the fire of May 29, 2003 and for the general conditions associated with this extension of time.

3)     A new cash flow schedule reflective of the new project schedule is to be provided with the new project schedule by September 10, 2003. The cash flow schedule will be subject to the approval of the Construction Manager.

4)     All claims against the Town of Shrewsbury arising out of the fire of May 29, 2003 and any claim for acceleration of work to achieve the modified date of substantial completion date of May 14, 2004, related to the fire are waived with prejudice. As of the date of this agreement, Standen is not aware of and has not advised the Town of any claims or basis of claims for acceleration other than those that which may be associated with the fire of May 29, 2003.

5)     The Town of Shrewsbury will pay the amount owed under application number eight no later than by the close of business on Friday, September 5, 2003 provided all lien releases in the form of exhibit A attached hereto from subcontractors are received by facsimile by that date and time.

6)     Contractor will complete the clean-up work resulting from the fire. Contractor will perform CCD number 13 dated July 29, 2003 at its own cost and will schedule such work in the construction schedule. The Town may use available contract remedies if such work is not performed as scheduled.

7)     The Town of Shrewsbury waives its notice relative to the default process pursuant to Section 3.1 of the performance bond that was dated August 20, 2003 without prejudice to future notices.

8)     The Town of Shrewsbury waives any claims against Standen for the cost of property or liability insurance for this project.

9)     This agreement is the signatory parties hereto, it is not intended to benefit any third parties.

_____      _____
Town of Shrewsbury      Standen Contracting Company, Inc.

9/2/2003         9/2/03
Date            Date

# STANDARD FORM OF COMPLETION AGREEMENT
# BETWEEN SURETY AND COMPLETION CONTRACTOR

## COMPLETION AGREEMENT

This Agreement is made with regard to the following:

## **PARTIES**

SURETY:

> United States Fidelity and Guaranty Company
> MC 41
> 5801 Smith Avenue
> Baltimore, MD 21209

COMPLETION CONTRACTOR:

> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191

## **PROJECT**

PROJECT:

> Renovation of former Shrewsbury High School into a Middle School
> 45 Oak Street
> Shrewsbury, MA 01545

## **ARCHITECT/ENGINEER**

ARCHITECT/ENGINEER:

> Lamoureux Pagano Associates
> 14 East Worcester Street
> Worcester, MA 01604

## **OWNER**

OWNER:

> Town of Shrewsbury
> 100 Maple Avenue
> Shrewsbury, MA 01545

The Surety and the Completion Contractor agree as set forth below:

## Article 1
### Definitions

1.1    *Obligee:* Means the party or parties in whose favor the Surety has executed a Performance Bond, and may or may not be either an Owner or a General Contractor.

1.2    *Principal:* Means the entity or Contractor(s) or Subcontractor(s) on whose behalf the Surety executed Bonds.

1.3    *Project:* Means the work required under the Contract or Subcontract bonded by Surety.

1.4    *Surety:* Means United States Fidelity and Guaranty Company

1.5    *Bond(s):* Mean any Surety agreements, undertakings, or instruments of guarantee signed by Surety on behalf of Principal.

1.6    *Owner:* Means the Owner of the Project or the party who has a contract for Construction of the Project with either the Obligee(s), or Principal, and who may or may not also be an Obligee.

1.7    *Completion Contractor:* Means the entity the Surety Contracts with to complete the project.

## Article 2
### The Relationship of the Parties

2.1    *Relationships.* On or about October 1, 2002, the Owner awarded a contract in the amount of $14,686,872.00 for the Renovation of former Shrewsbury High School (the Project) to Standen Contracting Company (Principal).

As required by the Contract, and pursuant to the request of the Principal, Surety issued Performance and Payment bonds numbered SW5041, (the Performance and Payment Bonds), naming Standen Contracting Company as Principal and Town of Shrewsbury as Obligee, in the amount of $14,686,872.00. On or about February 25, 2004, Principal executed a letter of voluntary default. As of the date of Principal's default, work remained to be performed under the Contract. Surety has agreed to complete the work, and is negotiating a Takeover Agreement with the Obligee. In turn, the Contractor has agreed to complete the work for the Surety, subject to the terms and conditions of this agreement.

2

## Article 3
## Contract Documents

3.1    *The Contract Documents and Incorporation of the Contract to Complete.* The Contract Documents consist of the Standard Form of Completion Agreement between Surety and Contractor (the Contractor and the Contract or Subcontract (collectively called the Contract)) for the Project for which the Surety provided bonds. The Contract is incorporated by reference into this Agreement. The Contract includes, without limitation, the Instructions for Bidders, the Contract Terms and Conditions, the Special Provisions, the General Conditions thereto and the Standard Specifications, and any and all other documents or agreements incorporated into the Contract. The Contract also includes the plans or drawings, schedules, other specifications, addenda, and any modifications thereto. The Contract also includes the change orders, or additional work orders. All of the above are collectively referred to as the "Contract Documents."

3.2    *Contractor's Review and Examination.* The Contractor has reviewed the Contract, including all of its component parts, and understands all of the terms and conditions of the Contract, including those terms and conditions which govern the performance and acceptability of work at the Project. The Contractor has also sufficiently examined the Project site and determined, through its own forces, the nature, quantity and quality of work to be performed under the Contract. Surety does not warrant or guarantee, impliedly or expressly, the accuracy of any of the plans, specifications, drawings, schedules or like documents, or that Contractor can complete the Project within the time provided by the Obligee or Principal's schedule. On the basis of the Contractor's examination of the Contract and the status of the work in place at the site, the Contractor has submitted a proposal to Surety for the completion of the work under the Contract, subject to the terms and conditions of the Contract Documents. Execution of the Standard Agreement by the Contractor is a representation that the Contractor has visited each Project site, become familiar with local conditions under which each Project is to be completed, including, but not limited to, the Contractor's familiarity with the special and unique circumstances of completing work started and partially performed by another contractor.

3.3    *Contractor's Representations and Acknowledgments.* The Contractor represents to Surety that it possesses the skill, licenses, experience and financial strength to complete the work remaining under the Contract expeditiously and in a first-class manner, in strict compliance with the requirements of the Contract. The Contractor also represents that it is not presently debarred from performing work for the Owner of the Project or for any other agency or department of the Owner.

3.4    *Strict Compliance with the Contract.* The Contractor shall be bound to Surety, instead of the Obligee, by all of the provisions of the Contract, as if Contractor had initially executed the Contract in place of the Principal, with respect to the work remaining to be performed under the Contract.

3.5    *Principal's Liabilities.* Notwithstanding Article 3.1, the Contractor shall not have any liability to Surety or the Obligee for the Principal's breach of the Contract, except as specifically set forth in the Standard Agreement. The Contractor shall not be financially responsible for the Principal's billed, but unpaid accounts payable obligations.

3

## Article 4
## The Remaining Work to be Performed

4.1     *Remaining Work.* The Contractor shall perform, furnish and pay for all testing, labor, materials, equipment costs of any nature, quality control, insurances, subcontractors and suppliers, and do all other things necessary, to complete the remaining physical work and all related obligations under each Contract subject to a Purchase Order, promptly and in a first-class manner, in strict compliance with the Contract. (The remaining physical work, and all related contractual obligations, shall be referred to in this Standard Agreement, collectively, as the Remaining Work).

4.2     *The Contractor is bound by Obligee Decisions.* The Contractor shall be bound by all decisions, interpretations, judgments and directives, of every description, issued by the Obligee under the Contract with respect to the Remaining Work, including all decisions, interpretations, judgments and directives resulting from any contractual dispute resolution or mediation process established under the Contract. Any claims arising after Surety issues a Notice to Proceed are the Contractors to pursue and collect from the obligee.

4.3     *Materials and Equipment.* Contractor may use all materials or equipment presently on site or stored without any financial obligation to pay for same. However, Surety does not warrant the sufficiency, quantity, quality, or conformity of any such materials to the Contract Document requirements and any necessary replacements therefore are the Contractor's sole responsibility and expense.

4.4     *Salvage.* Any excess or leftover materials or equipment at the end of the Project shall be the property of and turned over to Surety.

## Article 5
## Schedule for Completion of Remaining Work

5.1     *Commencement and Completion.* The Contractor agrees to commence work at the Project site within five (5) calendar days of Contractor's receipt of a Notice to Proceed and to substantially complete the Remaining Work on or before the date set forth in the Standard Agreement, if any, with final completion to be achieved on or before the date set forth in the Standard Agreement (the Project Schedule), notwithstanding any delays, disruptions, or accelerations, encountered by the Contractor, or previously encountered by the Principal; provided, however, that the Contractor shall be afforded whatever extensions of time or other relief that is granted by the Obligee to Surety based on excusable delays arising after execution of the Standard Agreement, but only to the extent provided by the Obligee to Surety under the Contract, all as provided for in this Agreement.

5.2     *Revision of Project Schedule.* The Project Schedule is also subject to revision by the Obligee (including the re-establishment of new substantial and final completion dates), as provided in the Contract.

5.3     *Delays in Completion.* The Contractor acknowledges that any improper performance on its part under the Contract Documents, may cause damages to Surety, including but not limited to either liquidated damages assessed by the Obligee, or the liability of Surety to others, and agrees to compensate Surety for all such direct and consequential damages suffered as a result of such causes, including but not limited to reasonable counsel fees and costs, additional equipment costs, insurance and consultant's costs, if any.

4

5.4    *Surety Direction to Accelerate.* Surety, in its sole discretion, may direct the Contractor to work on an accelerated basis (e.g., increased manpower, overtime, holidays, double-shift). When so directed, the Contractor shall immediately comply. If the Remaining Work is proceeding in accordance with the Project Schedule, and the Contractor is not in default under any material provision of the Contract Documents, Surety shall reimburse the Contractor for the actual additional costs for premium time wages, insurance, taxes and actual costs for increased or additional material or equipment required for the acceleration. The Contractor shall not be entitled to any other compensation or damages, except a 10% mark-up of these additional costs for profit, overhead or general and administrative expenses.

5.5    *Surety Direction to Accelerate - Uncompensated.* If the Contractor fails to perform the Remaining Work expeditiously and in accordance with the Project Schedule, the Contractor shall, at its own expense, work on an accelerated basis, as and when directed by Surety, until the Remaining Work is again proceeding as required by the Project Schedule.

5.6    *Acceleration Claims.* If the Contractor is ordered to accelerate the Remaining work without an offer of compensation under Article 5, the Contractor shall accelerate the Remaining work, as and when directed by Surety. To preserve any claim for compensation based upon a direction to accelerate, the Contractor shall provide a written protest to Surety within seventy-two (72) hours of the direction to accelerate and strictly comply with the provisions of Article 6 of the General Conditions. Any recovery by the Contractor pursuant to the written protest shall be limited to the costs set forth in this Agreement.

## Article 6
## The Contract Sum

6.1    *Not to Exceed Price.* The Contractor agrees to take over and fully and faithfully perform and complete the Remaining Work, in strict compliance with the Contract, assuming all obligations with respect to the Contract that were to be performed by the Principal, except as otherwise specifically provided to the contrary, in the Standard Agreement or General Conditions. Under no circumstances shall the Surety be obligated to pay the Contractor any sums in excess of the Not to Exceed Price of $8,051,366.72, (Contract Sum), except as provided for to the contrary in the Standard Agreement or the General Conditions; provided further, however, that Overages or under runs of quantities shall be processed in accordance with, and governed by Article 7.2, hereof.

The Contractor agrees to accept the Contract Sum as full compensation for all testing, labor, material, equipment costs of any nature, quality control, cartage, profit and overhead reasonably necessary or proper to complete the Remaining Work, and whether or not there is a line item or a schedule of value for that testing, labor, material, equipment costs of any nature, quality control, cartage, overhead and profit in any pay estimates, or otherwise.

## Article 7
## Submission of Pay Estimates for Progress
## Payments and Final Payment to the Obligee

7.1    *Pay Estimates to Obligee under the Contract if Applicable.* In the Surety's name, the Contractor shall prepare for the Surety's benefit and review and approval, the monthly or periodic progress pay estimates, and the final pay estimate, permitted by the Contract, if those pay

5

estimates were to be prepared by the Principal, instead of the Obligee, in the same form and at the same time, and with the same breakdown by items, quantities and unit prices and/or lump sum amounts as provided for in the Contract. Contractor agrees to cooperate with Surety and the Obligee, and their agents during any preparation for or review process pursuant to the Contract provisions, leading up to and after the issuance of any and all Pay Estimates. This shall include but will not be limited to, the Contractor providing all documents and certifications required under the Contract to justify quantities and/or payment to Surety, including, but not limited, to lien waivers from the Contractor and its subcontractors and suppliers, and payroll certifications attesting to compliance with any applicable labor laws, including but not limited to the Davis Bacon Act or any other applicable prevailing wage law. Additionally, any local, municipal, state or federal taxes or assessments required to be paid by a contracting entity shall also be included in the pay applications. Upon receipt of the pay estimate, whether for a progress or final payment, the Surety shall review and approve or disapprove the pay estimate and, if approved, promptly forward that pay estimate to the Obligee with a copy of that transmittal furnished to the Contractor. If the Surety or the Obligee disapproves a pay estimate, the Surety and Contractor shall confer with or without the Obligee, to resolve any dispute, but in the event they are unable to resolve the dispute, then the Contractor shall be bound by the provisions of this agreement for the resolution of any dispute. Notwithstanding the foregoing, the Surety may, at its sole option, submit a pay estimate to the Obligee, in whatever amount or form the Surety deems appropriate. The Surety reserves the right to reject any pay estimate that is not in conformance with the Contract. The Contractor's failure to diligently and promptly submit Pay Estimates, monthly or final, to the Obligee is an act of default, justifying termination.

Surety shall make progress payments and final payment to the Contractor using the format, schedule of values, and quantities set forth on the attached proposal or as agreed by the parties.

For Quantity Items , Surety shall pay the Contractor for the quantities completed during the billing period at the unit prices set forth in the proposal.

Subject to the provisions of this agreement, Surety shall remit progress payments and final payment to the Contractor within twenty (20) working days from approval of the work by the Obligee.

## Article 8
## Pay Estimates from Contractor to Surety
## and Contract Sum

8.1     *Format and Schedule of Values - Progress Payments and Final Payment, if Principal Prepared Pay Estimates.* The Contractor shall prepare and present pay estimates for progress payments and final payment to the Surety using the format, schedule of values, unit prices and lump sum values set forth on the work order. The Contractor shall submit all pay estimates for progress payments and final payment to the Surety on the same billing cycle as the pay estimates the Contractor prepares on Surety's behalf for submission to the Obligee, e.g., by the 25th of the month. The pay estimate for quantity items shall be based on the format of the Owner's schedule of values. Other items may be listed on a separate invoice with the quantity items added as a separate line item.

8.2     *Complete Documentation for All Pay Estimates.* The Surety shall not consider any Pay Estimates under this Standard Agreement, unless they are accompanied by: (i) the corresponding Pay Estimate from Surety to Obligee, prepared by Contractor for Surety, if

6

applicable, and/or (ii) with all of the documents and certifications required under the Contract to justify payment to Surety under the Contract.

 8.3 *Payment of Subcontractor and Suppliers.* On receipt of payment from Surety, the Contractor shall promptly pay its subcontractors and suppliers that are entitled to payment. The Contractor shall in all cases, comply with any and all applicable State or Federal laws requiring the prompt payment of subcontractors, laborers, and suppliers.

 8.4 *Work During Pendency of Dispute.* In the event of a dispute over a Pay Estimate, whether a progress payment or final payment, or a change order or claim whether between the Obligee and Surety, or Surety and Contractor, or any combination thereof, such dispute shall not delay performance of the Remaining Work and the Contractor specifically agrees to continue to complete the Remaining Work, during the pendency of the dispute.

 8.5 *Payment on Occupancy - Not Acceptance.* The Surety's payments to the Contractor shall not constitute evidence of proper performance by the Contractor or acceptance by Surety or Obligee of latent or patent defects in the Remaining Work, including any work, materials or equipment installed as part of the Remaining Work. Occupancy or use of the Project shall not, under any circumstances, constitute conditional full or final acceptance of the Remaining Work, including any aspect of the Remaining Work.

 8.6 *Contract Sum/Uncompleted Work.* The Surety shall not be obligated to make payments to Contractor, whether progress payments or final payment, if such payment(s) will result in an unexpended contract sum, including retainage, less than an amount adequate to satisfy the Contractor's obligations under the Contract Documents, as determined by Surety.

 8.7 *Surety Independent Withholdings.* Surety may withhold payment from the Contractor to the extent necessary, in Surety's estimation, to protect Surety from loss on account of the Contractor: (i) failing to remedy defective work, materials or equipment; (ii) causing or permitting the filing of liens or claims, in violation of the Contract Documents; (iii) failing to make prompt payment to Subcontractors and others; (iv) failing to prosecute the Remaining Work in accordance with the Project Schedule or to perform expeditiously all other aspects of the Remaining Work; (v) causing damage to the property; (vi) causing damages to others for which Surety may be responsible; or (vii) failing in any other respect to perform fully each of its obligations under the Contract and the Contract Documents. Any amount withheld shall not be paid until the cause for withholding has been removed by the Contractor and satisfactory evidence to that effect has been furnished to Surety. Surety reserves the right, and may, in its sole discretion, apply the payment withheld from Contractor to pay or remedy, in whole or in part, items (i) through (vii), inclusive, and deduct those amount(s) from the payment withheld, or any future payments due under the Contract Documents.

 8.8 *Contractor's Acceptance Waiver and Release.* Acceptance of final payment by the Contractor shall constitute a complete waiver and release by the Contractor of all claims for damages or additional compensation whatsoever against Surety, and those for whom Surety is responsible or to whom it may be liable, under the Contract and the common law, arising from, or any manner relating to, the Contract Documents, the Remaining Work or the Project, except as specifically noted by to the contrary by the Contractor in writing.

 8.9 *Contractor to Discharge Claims or Liens.* Contractor agrees not to allow any lien or claim to be filed on the project and agrees to discharge or bond around any lien or claim within 7 days of notice by the Surety or the Obligee. If, after final payment, a claim, lien or

7

charge is asserted against Surety, the Obligee, the Project, the Contract, or the funds allocated to the Contract, relating to, or arising from the Remaining Work, by a Subcontractor, supplier or other, the Contractor shall, at its own expense, promptly obtain the discharge of the claim or lien.

## Article 9
### Subcontractors and Suppliers

9.1     *Subcontractors and Suppliers.* The Contractor shall use its best efforts, subject to competitive pricing, to assume Principal's existing or former subcontracts or purchase orders with Subcontractors and Suppliers. The Contractor shall also use its best efforts to administer those subcontracts and purchase orders in such a manner as to limit or eliminate claims related to the Remaining Work. At the Contractor's request, the Surety shall assign to Contractor all of Surety's right, title and interest in and to Principal's subcontracts or purchase orders with third parties for the performance of the work. The Surety may execute such assignment(s) in a blanket form, or separately, as the Contractor requests. The Contractor agrees to request such an assignment for each (or all) of the Principal's subcontracts or purchase orders the Contractor assumes. Upon assumption, and the Surety's subsequent assignment, the Contractor shall assume the Principal's subcontracts or purchase orders, and shall be responsible for paying all sums then due, or due in the future thereunder, including but not limited to, any retention. The Contractor's substitutions of Subcontractors or others or the retention of new Subcontractors or others must conform to the requirements of the Contract. The Contractor is not entitled to any time or price adjustments in the Project Schedule or Contract Sum for: (i) any substitution for existing Subcontractors or others; or (ii) the retention of new Subcontractors, or others; or (iii) the performance or lack of performance of the Principal's existing or former Subcontractors or Suppliers.

## Article 10
### Changes to the Remaining Work

10.1     *Obligee Change Orders.* Without invalidating the Contract Documents, the Obligee may direct the Contractor, in writing, to perform extra, additional or changed work, or to delete work from the Remaining Work, to the extent permitted by the Contract (collectively, a Change Order). The Contractor shall comply with the Change Order, provided however, that the Contractor must obtain Surety's written consent to a Change Order if it involves work valued at more than $5,000 and an adjustment to the Project Schedule of more than five (5) working days. The Contractor has no authority to agree to deductive Change Orders or backcharges of any nature without the Surety's express prior written approval.

10.2     *Contract Documents Apply.* The Contract Documents shall apply to all such Change Orders as if the covered work were initially a part of the Contract. Further, the Contract Documents shall not be terminated as a result, and the Contractor's surety shall not be released or discharged, regardless of the aggregate nature, scope or cost of all Change Orders.

10.3     *Change Order Valuation.* All Change Orders shall be valued in accordance with the relevant provisions of the Contract. Further, the Contractor agrees to accept, as full and complete compensation for each Change Order, regardless of the aggregate number or value of all Change Orders, the compensation and the adjustment to the Project Schedule determined by the

8

Obligee under the Contract, including, where applicable, by reference to rates or unit and/or lump-sum prices, established under the Contract by the Principal, without any claim for additional compensation or extension of time from Surety. In the event the Contractor disagrees with the Obligee's adjustment to the Project Schedule and/or its valuation of the Change Order, the Contractor shall proceed with the work or changes required by the Change Order and give notice of its claim in accordance the terms of the contract.

10.4    *Action to Avoid Casualty.* Notwithstanding any provision of the Contract Documents to the contrary, the Contractor is expected, at all times, to take whatever action is required to avoid casualty to life and significant property. If the Contractor can subsequently establish, to Surety's satisfaction, that its actions, taken without Surety's prior approval, were necessary and appropriate to avoid such casualty to life and property, associated costs shall be compensable on a time-and-material basis in accordance with the provisions of Article 5.4 of the General Conditions concerning the valuation of corrective work. Notice of any claim for such costs, however, must be given in compliance with Article 6 of the General Conditions.

10.5    *Minor Changes.* Surety may direct, in writing, minor changes in the Remaining Work. The Contractor shall comply immediately. These changes shall not result in an adjustment to the Project Schedule or to the Contract Sum set forth in the Standard Agreement.

## Article 11
## Defective Work, Defects in Existing Work
## and Surety Change Orders

11.1    *Defective work of Contractor and Others.* The Contractor shall be responsible for all defects or defective work on work put in place after the Contractor's receipt of the Notice to Proceed which are caused by or performed by the Contractor or any of its subcontractors or suppliers. The Contractor shall repair such defects or defective work at its own expense and without delay to the Project Schedule.

11.2    *Existing Defects and Latent Existing Defects.* The Contractor shall be responsible for correcting or repairing any existing defects or existing deficient work (Existing Defects) performed by the Principal or its subcontractors or suppliers, at its own cost as part of completing the Remaining Work; provided, however, if the Contractor corrects or repairs Latent Existing Defects then the Contractor shall be compensated in accordance with this Article, so long as the Surety's prior written approval is secured. "Latent Existing Defects" means a hidden defect in the work put in place prior to the Contractor's receipt of the Notice to Proceed, which a reasonably careful inspection would not reveal, or that cannot be discovered by any known and customary tests. The Contractor shall promptly notify Surety of the Latent Existing Defect in writing at the address set forth in Article 23, and obtain Surety's prior written approval as to scope and cost of the work, before proceeding with any corrective work for which the Contractor intends to seek compensation. For corrective work performed on a Latent Existing Defect by the Contractor with Surety's prior written approval, which is: (i) completed to the satisfaction of the Obligee and Surety; and (ii) accepted under the Contract (Compensable Corrective/Additional Work), Surety shall pay the Contractor an amount equal to its reasonable and necessary direct costs for field labor, associated fringe benefits, taxes and insurances, materials and equipment, together with a mark-up on those direct costs of _10% as full compensation for all other associated elements of direct and indirect cost (excluding field superintendent including for field and home-office overhead) and profit, regardless of the extent or aggregate number of all corrective work items and any resulting impact or delay to the Contractor's other operations.

9

11.3    *Surety Change Orders.* Surety may also, without a corresponding Change Order from the Obligee, require the Contractor in writing to perform extra, additional or change work, or to delete work from the Remaining Work, without invalidating the Contract Documents or releasing or discharging the Contractor's surety. Such Surety Change Order work shall also be compensated as provided in the contract.

11.4    *Payment of Compensable Corrective/Additional Work.* The Contractor may requisition payment for Compensable Corrective/Additional Work on a percentage-complete or unit price basis with its monthly pay estimate, less 5% retainage which shall be withheld until final payment under the Contract Documents. The Contractor shall maintain current cost records showing its compensable costs under this Article in a form, and with content, acceptable to Surety. These cost records shall be made available to Surety for review and audit upon reasonable notice during normal business hours.

## Article 12
## Claims for Additional Compensation, Damages and Extensions

12.1    *Notice of Claim.* The Contractor agrees that it shall not make a claim against Surety under the Contract Documents for an extension of time to complete the Remaining Work, or for additional compensation or damages under the Contract Documents for breach of the Contract Documents or in any manner related to the Remaining Work on the Project, unless it shall first have provided Surety with notice of such claim at the address set forth in Article 23 of this Agreement, at least ten (10) full working days before Surety is, or may be, required to provide such claim notice to the Obligee under the Contract. In the event of a claim by the Contractor against Surety which would not support, in whole or in part, a corresponding claim by Surety against the Obligee, notice shall be given to Surety no later than five (5) working days after the inception of the claim or causes of delay, injury, damages or entitlement.

12.2    *Claim Notice Contents.* All notices required under this Article shall be in writing and contain whatever information is required by the Contract and, at a minimum, a specific description of: (i) the cause or causes of the injury, extra cost, damages or delay; (ii) the identity of those entities claimed to be responsible; (iii) the contractual basis, if any, entitling the Contractor to the relief sought; (iv) an estimate of the quantification of the extension, extra costs or damages sought; and (v) a statement setting forth how Surety might mitigate or avoid any further delay, injury or damages.

12.3    *Limited Remedy.* Where the claim has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from Obligee on account of the claim. The Obligee granting relief on the claim, and Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor. The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with this Article or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to the Surety by the Obligee on account of the claim. The sole remedy of Contractor

10

shall be whatever relief the Obligee grants to Surety, with the Obligee's granting that relief to Surety an express condition precedent to Surety's obligation to remit the same to the Contractor. If the Surety does not receive any relief from the Obligee, then the Contractor, likewise, shall not receive any relief.

12.4    *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

12.5    *Costs of Claims Preparation and Prosecution.* The Contractor and Surety agree that they must jointly agree to prosecute or settle the claim on whatever terms they deem appropriate, which consent or agreement each party shall not unreasonably withhold, and for which they may provide full releases therefore to the Obligee or others.

### Article 13
### No Damage for Delay/Delay Claims

13.1    *No Damages for Delay - Limited Relief.* Contractor acknowledges that during the course of completion of the Remaining Work, Contractor may experience delays and additional costs related to governmental regulations, acts or omissions of Obligee, subcontractors, suppliers or others. The Contractor also acknowledges that it may experience difficulty in obtaining the type of services, labor, equipment and materials and approvals required for the Remaining Work, including clearance from the Obligee to proceed with some or all of the Remaining Work. The Contractor represents that it has considered these risks in agreeing to the Contract Sum stated in the Standard Agreement. Thus, except as expressly provided to the contrary in contract, the Contractor agrees not to make any claim for an increase in the Contract Sum based upon the escalation of these costs, regardless of the number or extent of delays, disruptions or extensions of the Project Schedule or the Remaining Work.

13.2    *Extension Request - Contractor Limited to Claim against Obligee.* Where a claim for extension has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by the Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to the Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from the Obligee on account of the claim. The Obligee granting relief on the claim, and the Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor. The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with the contract or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to Surety by the Obligee on account of the claim. The cost of any claim's preparation, and presentation, and the prosecution thereof by the Contractor and Surety, is strictly governed by Article 12.5. The sole remedy of Contractor for any delays shall be the Obligee's extension of time for completion and payment of costs directly associated with that extension, with the Surety's obtaining a similar extension from the Obligee for the same amount of time and payment of costs, if any, an express condition precedent to Surety's obligation to remit the same to the

Contractor. If the Surety does not receive an extension of time, or payment of costs from the Obligee, then the Contractor shall not receive an extension or payments.

13.3    *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting that relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

## Article 14
## Administration of the Contract, Reports
## Warranty & Guarantees

14.1    *Administration of the Contract.* The Contractor shall process and handle, for itself and Surety, all Pay Estimates, all paper work, shop and other drawing submittals, sample and cut-sheet submittals, as-built drawings, manual submissions, change orders, additional work orders and supplemental agreements, and all other matters required for the prosecution of the Remaining Work, and in order to obtain acceptance of the Remaining Work in strict accordance with the requirements of the Contract.

14.2    *Books and Records.* The Contractor shall maintain current books, records, accounts and reports, including copies of all submittals and correspondence with the Obligee and/or others concerning the Project (the Project Records) so as to enable Surety to be fully informed at all times as to the progress of the Remaining Work and the administration of the Contract. The Project Records shall be maintained for a minimum of six (6) years following final acceptance of the Remaining Work and shall be made available to Surety for copying promptly upon reasonable notice during normal working hours.

14.3    *Guarantees and Warranty.* Contractor fully assumes at no additional cost all guarantees and warranties relating to work performed, workmanship, material, and job supervision and other acts of Contractor and its subcontractors and suppliers. The guarantee and warranty obligations of the Contractor shall endure for the length of time stated in the Contract and shall be subject to all the conditions and requirements provided for therein. Contractor shall furnish all labor, equipment, tools, material, testing and appurtenances that may be required or necessary to carry out such guarantee and warranty work. Contractor shall be paid its actual costs incurred in performing any warranty work of the Principal plus a markup of 10%.

## Article 15
## Termination of the Agreement/
## Declaration of Default

15.1    *Termination.* The Remaining Work shall be performed in accordance with the Contract. In the event that the Contractor fails to make progress in accordance with the Project Schedule and the delay is not excused under the Contract and the Contract Documents, Surety may provide a written termination notice. If the Contractor does not proceed with the Remaining Work within three (3) calendar days of the written termination notice, Surety may terminate the Contract Documents for default, without further notice or delay.

12

15.2    *Notice of Default.* Surety may, upon written notice to Contractor, declare the Contractor in default of the Contract Documents, if: (i) the Obligee notifies Surety or determines that Surety is in default of its obligations under the Contract and that default is a consequence of the Contractor's breach of the Contract, as incorporated into the Contract Documents; (ii) the Contractor fails to make payment to subcontractors and suppliers in accordance with applicable State and Federal laws; (iii) the Contractor otherwise commits a material breach of the Contract Documents; (iv) a petition under the Bankruptcy Act is filed by or against the Contractor; (v) the Contractor becomes insolvent; (vi) a receiver is appointed for the Contractor; or (vii) the Contractor violates any laws, code, rule, regulation or lawful order of any governmental agency having jurisdiction over the Project or the Contractor, including any safety-related law, code, rule, regulation or lawful order. Unless Contractor cures the event of default to Surety's satisfaction within three (3) calendar days of receipt of the Notice of Default, Surety may immediately terminate the Contract Documents.

15.3    *Assumption/Completion of Remaining Work.* Upon a termination, Surety, in addition to whatever rights it might have by reason of the incorporation of the Contract, may assume and complete the Remaining Work by whatever means it deems expedient and proper. The Contractor shall not be entitled to any payment under the Contract Documents, under any circumstances, until the Remaining Work is finally complete and accepted by the Obligee. Further, if the costs of completing the Remaining Work, including, but not limited to the architectural, engineering, construction and other services, and reasonable counsel fees, if any, together with all deductions, withholdings and damages, suffered or owed to Surety under the Contract Documents, and all other consequential damages arising from the default, exceed the unpaid balance of the Contract Sum stated in the Standard Agreement, then the Contractor and its surety shall immediately pay the difference to Surety. If Surety chooses not to complete the Remaining Work, the Contractor and its surety shall be liable to Surety for all damages, including the damages described in this Article, arising from its default. The Contractor's (and its surety's) obligation to pay Surety under this Article, and the Contractor's (and its surety's) liability to Surety for all damages under the Contract Documents, shall be cumulative with Surety's other rights under the Contract, the Contract Documents and applicable law, and shall survive termination.

15.4    *Taking Possession of Material.* In the event that Surety exercises its right to terminate the contractor's right to proceed and to complete the Remaining Work, Surety may take possession of all materials, appliances and equipment located at the Project for use in completing the Remaining Work. Further, the Contractor shall assign to Surety, upon request, its rights under any subcontracts and purchase orders in connection with the Remaining Work and otherwise cooperate with Surety's efforts to resume and complete the Remaining Work.

15.5    *Termination for Convenience.* The contract may be terminated in whole or in part by the Surety at any time for the Surety's convenience, provided the Contractor is given not less than ten (10) calendar days written notice of the Surety's intent to terminate and an opportunity for consultation with the Surety prior to termination. Upon receipt of the termination notice, the Contractor shall promptly discontinue all services (unless the notice directs otherwise) and deliver or otherwise make available to the Surety all data, drawings, specifications, reports, estimates, summaries, and such other information and materials that may have been accumulated by the Contractor in performing under the contract. The termination of the contract for any reason, whether for convenience or for cause as described in Articles 15.1 and 15.2, shall not relieve the Contractor of its responsibilities under the contract for the work performed and materials supplied, nor shall it relieve the Contractor's surety or the Contractor of its obligations

13

under the Contractor's Performance Bond and Payment Bond for any claims arising out of the work performed and the materials supplied by the Contractor.

If the Contractor is terminated for cause in accordance with Articles 15.1 and 15.2 of these General Conditions, and it is later determined that the Contractor did not fail to fulfill its contractual obligations, then any such termination by the Surety shall be deemed to have been a termination for convenience, and in such event, the Contractor's recovery shall be limited to an adjustment of the Contract Sum as provided for in Article 15.6 for a termination for convenience.

Under any and all circumstances, the Surety shall not be responsible to the Contractor for damages for wrongful termination in excess of the payments set forth in Article 15.6, whether or not such damages are defined as direct or consequential and whether or not determined to be in tort, contract, negligence, strict liability, warranty, expressed or implied, or otherwise.

15.6    *Termination for Convenience - Equitable Settlement.* In the event the Contract is terminated for convenience, then an equitable settlement for the work performed under the Contract prior to such termination shall be made, with the Contractor's measure of damages limited to the amount due under the Contract against prior pay estimates already submitted to Surety prior to termination, plus 10% of the unpaid balance of the Contract Sum, plus all other reasonable and unavoidable costs incurred for demobilizing field forces, plant and equipment, quitting the project site, and terminating subcontracts and purchase orders.

## Article 16
## Indemnification

16.1    *Indemnification.* To the fullest extent permitted by applicable law, the Contractor shall assume the entire responsibility and liability for all damage (including purely economic loss) or injury of any nature (including death) to persons and property, including intangible property, arising out of the execution of the Remaining Work, and hereby expressly waives any Workman's Compensation Immunity, whether granted by statute or otherwise, and agrees to defend (if required by Surety), indemnify and hold harmless Surety and its respective directors, officers, agents, servants, employees, affiliates and subsidiaries (the Indemnitees), from all demands, claims, causes of action, (including but not limited to any claims for payment or otherwise by any of Contractor's subcontractors, suppliers, employees and laborers and also including, but not limited to, the Principal's subcontractors or suppliers, when the Contractor has assumed or accepted assignments of those subcontracts or purchase orders), even if devoid of merit, and losses, costs and expenses, including reasonable counsel fees, arising out of, or related to, in any manner, the execution of the Remaining Work, or asserted against any of the Indemnitees by reason of the acts or omissions of the Contractor, or any entity directly or indirectly engaged by the Contractor in connection with the Remaining Work. In jurisdictions in which the indemnification provided for in this Article is broader than that allowed by applicable law, this Article shall be interpreted as providing the broadest indemnification permitted and should be limited only to the extent necessary to comply with that law.

16.2    *Withholds for Indemnity.* If a demand, claim, cause of action, loss, cost or expense covered by Article 16 is asserted against one or more Indemnitees, the Surety may withhold from any payment otherwise due under the Contract Documents an amount sufficient to protect and indemnify the Indemnitee or Indemnitees to the full extent required under Article 16. If final payment has been made to the Contractor, or if the balance due under the Contract Documents is insufficient to protect and indemnify the Indemnitee or Indemnitees involved, Surety, in its discretion, may require the Contractor to furnish a surety bond, from a surety and

14

upon terms acceptable to Surety, in an amount guaranteeing such protection and indemnity. This bond shall be furnished by the Contractor within seven (7) calendar days after receipt of Surety's written demand.

16.3     *Obligations Survive.*  The obligations of the Contractor under Article 14 shall survive final acceptance of the Remaining Work and final payment to the Contractor and shall be in addition to all other rights and remedies available to Surety under the Contract Documents and applicable law.

## Article 17
## Performance and Payment Bonds and Insurance

17.1     *Performance and Payment Bonds.*  The Contractor shall, at the option of the Surety, furnish separate performance and payment bonds, naming Surety and the Obligee as dual-obligees, in penal amounts equal to the Contract Sum. The terms of the performance and payment bonds, and the surety issuing the bonds, shall be subject to Surety's prior approval. No surety shall be accepted if that surety is not approved by the U.S. Treasury.

17.2     *Contract Documents Incorporated into Bonds.*  The Contractor's performance and payment bonds shall expressly incorporate the Contract Documents, and provide that the surety's obligations and liabilities shall be co-extensive with those of the Contractor. The Contractor's surety shall also expressly agree to join in, and to be bound by, any contractually mandated mediation or arbitration process, or legal action, involving Surety and the Contractor arising from the Project. Finally, the surety shall agree that Change Orders under the Contract Documents may be issued without notice to it and that these modifications, including the addition or deletion of work, shall not operate to discharge the surety, regardless of the scope, nature or extent of all modifications to the Contract Documents.

17.3     *Filing of Bonds.*  The Contractor shall, on its behalf and on behalf of Surety, comply with any applicable law requiring the public filing of all labor and material payment bonds, if any, and it shall, at its own expense, defend (if requested by Surety), indemnify and hold harmless Surety against any and all damages or loss of any nature (including purely economic loss), arising out of, or resulting from, the failure to comply with such law, including counsel fees and court costs to any payment bond claimant.

17.4     *Insurance.*  The Contractor shall obtain and maintain the insurances required under the Contract, with the coverages and in the amounts specified in the Contract. The Obligee and Surety shall be named as co-insureds or additional insureds under all policies of insurance required of the Contractor. Further, the Contractor shall ensure that its insurers waive all rights of subrogation against the Obligee and Surety. The Contractor shall deliver endorsements confirming that the insurances required under the Contract has been obtained and that the Obligee and Surety have been named as co-insureds, or additional insureds. Failure to obtain this insurance, or permitting this insurance to lapse, shall constitute a material breach of the Contract Documents.

## Article 18
## Conditions Precedent to Contract Documents

18.1     *Conditions Precedent.*  Unless waived in writing by the Surety, the Contract Documents and all related agreements, shall be null and void and of no effect unless and until the following conditions precedent occur: (i) a Takeover Agreement mutually satisfactory to Surety

15

and the Obligee has been executed covering completion of the Remaining Work; (ii) the Contractor has furnished to Surety the bonds and insurance required under this Agreement (if required); and (iii) the Obligee provides written authorization for Surety to utilize Contractor as the Completing Contractor under the Contract. If the Contract Documents fail to become effective, the Contractor shall have no claim against Surety of any description.

## Article 19
## Independent Contractor

19.1    *Independent Contractor.* Except as otherwise provided in the Standard Agreement and General Conditions or the Contract, the Contractor shall be permitted to exercise the full prerogatives of a contractor in prosecuting the Remaining Work, including, but not limited to, selection and classification of supervisors and workers, scheduling, determination of equipment and material requirements and the establishment of work hours and work week, including over time, it being further understood and agreed that the Contractor is an independent contractor in connection with all work to be performed by it pursuant to the Contract. Additionally, pursuant to the Contract, the Contractor shall subsequently designate its project superintendent. The Contractor specifically agrees that it is an employing unit subject as an employer to all applicable Unemployment Compensation statutes so as to relieve the Surety of any responsibility or liability for treating Contractor's employees as employees of the Surety for the purpose of keeping records, making reports and payment of Unemployment Compensation taxes or contributions; and the Contractor agrees to defend, indemnify and hold the Surety harmless and reimburse it for any expense or liability alleged or incurred under said statutes in connection with employees of the Contractor.

## Article 20
## Offset

20.1    *Offset.* All amounts owed to Surety by the Contractor under the Contract Documents may be deducted, at Surety's option, from any amounts owed by Surety to the Contractor.

## Article 21
## Cumulative Remedies

21.1    *Cumulative Remedies.* Surety's various rights and remedies under the Standard Agreement, the General Conditions and the incorporated provisions of the Contract and law are cumulative and shall not be waived by payment for, or acceptance of, the Remaining Work.

## Article 22
## Compliance with Laws

22.1    *Compliance with Laws.* The Contractor shall comply with all applicable provisions of federal, state and local laws and regulations, including provisions of law imposing trust obligations on the Contractor to insure the prompt and full payment of all legitimate debts owed by the Contractor to others for work performed in connection with the Remaining Work. The Contractor shall also comply with all federal, state and local safety and health laws and regulations. The Contractor shall also comply with all laws mandating the payment of prevailing wages and supplements and controlling other terms and conditions of employment. The Contractor further agrees as regards: (i) the production, purchase and sale, furnishing and delivering, pricing and use or consumption of materials, supplies and equipment; (ii) the hire,

16

tenure or conditions of employment of employees and their hours of work and rates of and the payment of their wages, and (iii) the keeping of records, making of reports, and the payment, collection, and/or deduction of Federal, State and local taxes and contributions, that the Contractor will keep and have available all necessary records and make all payments, reports, collections and deductions, and otherwise do any and all things so as to fully comply with all Federal, State and local laws, ordinances and regulations in regard to any and all said matters insofar as they affect or involve the Contractor's performance of the Contract Documents, all so as to fully relieve the Surety from and protect it against any and all responsibility or liability therefore or in regard thereto.

## Article 23
## Notices

23.1   *Notices - Designated Addresses.* Notices under the Contract Documents, or pursuant to any law or regulation, shall be in writing, unless otherwise required by the specific law or regulation, and shall be deemed to have been given three (3) calendar days after mailing, provided mailing was by certified mail, with a copy transmitted by telecopier, addressed to the intended recipient at its address set forth below:

To Surety:

> Tiffany Schaak
> Senior Claim Attorney
> MC41
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:   (410) 205-0605

With copy to:

> Russ Werner
> Senior Construction Engineer
> MC41
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:   (410) 205-0605

To the Contractor:

> Robert B. Barton, Jr., P.E., Executive Vice President
> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191
> FAX:   (781) 737-1550

17

All pay estimates or other documents or Notices shall be mailed to the Surety at the above address.

## Article 24
## Conflicts and Interpretations/
## Order of Precedence

24.1    *Conflicts, Interpretations, Order of Precedence.* The Standard Agreement, General Conditions and their component parts, including the incorporated Contract and the attached Exhibits, are intended to be complimentary and are intended to require all work and services by the Contractor necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. The Contractor shall review the Contract Documents, including the Contract and the Exhibits, before signing the Standard Agreement and advise Surety whether any of the parts of the Contract Documents conflict and whether any of the Contract Documents fail to require of the Contractor all work and services necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. In the case of a conflict between the terms of the Standard Agreement, the General Conditions, or the terms of the Contract or of an annexed Exhibit, the following Order of Precedence applies:

(i)     The Standard Agreement (and its Exhibits) has priority over the Contract (and its Exhibits) and any other agreement or document;

(ii)    The Contract (and its Exhibits) has priority over any other agreement or document, except for the Standard Agreement (and its Exhibits).

## Article 25
## Assignment

25.1    *Non-Assignment by Contractor.* The Contractor shall not assign or sublet the Contract Documents or any right or interest therein nor shall the Contractor assign any moneys due or to become due hereunder. Any such assignment of the Contract Documents shall be null and void and of no force and effect and the Surety shall not be required to recognize any such assignment or subletting. The Contractor shall not sub-contract the Contract Documents or any part thereof without the prior written consent of the Surety. If the Contractor shall sub-contract the Contract Documents or any part thereof with the prior written consent of the Surety, the Contractor shall cause to be inserted in every Subcontract the Indemnity and Insurance requirements of Article 16 and Article 17.4 hereof. The Contractor also agrees to comply with all Subcontractor listing or substitution requirements mandated by the Contract or law.

25.2    *Assignment by Surety.* The Surety reserves the right to assign the Contract Documents to the Obligee or others. If the Surety so assigns the Contract Documents, then upon the Contractor's receipt of the notice of that assignment, the Contractor shall complete the Remaining Work for the assignee listed in the notice, all in accordance with the Contract Documents. Any such assignment shall constitute a novation and the Surety shall be automatically released from any liability to the Contractor, and the Contractor shall not have a claim or cause of action against the Surety, arising out of or related to, the Contract Documents, or otherwise.

## Article 26
## Governing Law

18

26.1 *Governing Law.* This Agreement shall be governed by the laws of the State of Massachusetts.

**Article 27**
**Modification**

27.1 *Modifications.* This Agreement may not be modified orally. All modifications must be in writing and signed by Surety and the Contractor.

**Article 28**
**Drug and Substance Abuse**

28.1 *Drugs.* The Contractor shall not permit drug or substance abuse by any of its employees, or any employees of its subcontractors or suppliers, and it shall fully and promptly comply, at its own expense, with every rule, regulation and program initiated by the Obligee with respect to this subject matter.

**Article 29**
**Confidentiality**

29.1 *Confidentiality.* The Contractor shall not divulge to third parties, or use for its own benefit, without prior written consent (which shall not be unreasonably withheld) from Surety, any information obtained from or about Surety, its businesses, transactions and personnel.

**Article 30**
**Merger**

30.1 *Merger.* The Standard Agreement and the incorporated provisions of the Contract (the Contract Documents), constitute the complete expression of the agreement between Surety and the Contractor. No prior statements, course of dealing or trade usage, shall supplement the terms of the Contract Documents.

**Article 31**
**Dispute Resolution**

31.1 *Dispute Resolution.* It is the intention of the parties that the Contract Documents and the performance under the Contract Documents, and all suits, actions, and proceedings under the Contract Documents, be construed in accordance with and under and pursuant to the laws of the State of Massachusetts, and that, in any suit, action, or proceeding that may be brought arising out of, in connection with, or by reason of the Contract Documents, the laws of the State of Massachusetts shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any suit, action, or proceeding may be instituted. If any suit or action is filed by either Surety or Contractor, as a result of a dispute arising under the Contract Documents solely between Surety and Contractor, venue shall be in U.S. District Court, District of ________, ____________ Division. However in the event Surety believes, at its sole discretion, that the Obligee should be joined in any action, Contractor shall be bound by the dispute resolution procedures set forth in the Contract, and agrees to stay or dismiss any such suit

or action and otherwise follow and comply with the terms of either Article 12 and/or Article 13 of the General Conditions.

## Article 32
## Audit

32.1 If all or a portion of the Completion Contract is performed on a time and material basis with a mark up or a fixed fee, the Contractor agrees that Surety shall have the full right, on reasonable notice and during regular business hours, of access to the books and records of the Contractor to justify and establish the Contractor's entitlement to all costs billed to the Surety. In the event an overpayment is established Contractor shall promptly, on request of Surety, refund the amount of the overpayment to the Surety. If Surety is required to present evidence of costs or payments made pursuant to this Completion Contract, Contractor agrees to cooperate with Surety and provide access to books and records and reasonable assistance necessary to respond to the request.

## Article 33
## Validity of Agreement

33.1 *Validity.* Invalidity of any portion or provisions of the Contract Documents by reason of the laws of any State or for any other reason shall not render any other provisions or portions of the Contract Documents invalid.

## Article 34
## Counterparts/Facsimile Signatures

34.1 *Counterparts/Facsimile.* This Standard Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original with all counterparts constituting but one and the same instrument. The execution of this Standard Agreement by any party hereto will not be effective until counterparts have been executed by all parties. Additionally, facsimile signature shall bind the undersigned.

This Agreement is entered into as of the day and year first written above.

JACKSON CONSTRUCTION COMPANY

Robert B. Barton, Jr., P.E.
Executive Vice President
Name & Title

Dated: May 11th, 2004

UNITED STATES FIDELITY AND GUARANTY COMPANY

TIFFANY SCHAML, SENIOR CLAIM ATTORNEY
Name & Title

Dated: 5/12/04

20

### SUBCONTRACTOR HOLD AGREEMENT
### CONDITIONAL PARTIAL RELEASE

| | | |
|---|---|---|
| Principal | Standen Contracting Company Inc | Electronics Service Company of America Inc. d/b/a ESCOA (Subcontractor) |
| Project: | Shrewsbury Middle School | |
| Project Owner: | Town of Shrewsbury, MA | |
| Claim No: | 0400SW504129S001      Bond No.: SW5041 | |

We, having terminated our subcontract with Standen Contracting Co., Inc. for nonpayment on the above-named contract for the work on the above described project, hereby ratify the previously terminated subcontract agreement  A copy of the subcontract and approved change orders are attached hereto as Exhibit A and by this reference fully incorporated herein.

| | | |
|---|---|---|
| 1. | Amount of our original subcontract/purchase order: | $1,930,810.00 |
| 2. | Changes in subcontract amount approved by Standen Contracting Co., Inc. (C.O. #1-6 and approved T & M) | $ 81,469.00 |
| 3. | Total or adjusted subcontract amount | $2,012,279.00 |
| 4. | Approved value of work performed and material stored through 1/31/04: | $1,402,860.00 |
| 5. | Total payments received from Standen Contracting Co., Inc. | $1,054,473.00 |
| 6 | Retainage on No. 4 above: | $ 70,143.00 |
| 7. | Net amount due within 10 days of signing contract | $ 278,244.00 |
| 8. | Value of work performed in February 2004 and work to be performed after 3/1/04: | $ 609,419.00 |

In consideration payment to ESCOA by the Surety within ten days from the date of this Agreement by United States Fidelity and Guarantee or their successors or assigns (collectively Surety), the net amount of $278,244.00 due (No. 7 above) and its agreement to pay us our retainage of $70,143.00 (No. 6 above) within 30 days of acceptance of the project by the Owner and pursuant to MGL c. 30 s.39F(1), the expiration of the applicable lien or claim period, we hereby agree to perform the balance of the work amounting to $609,419.00 (No. 8 above) as a subcontractor in accordance with the terms and conditions of the Undersigned's subcontract with Standen Contracting Co., Inc. In further consideration of the payment of the sum stated in No. 6 above paid by Surety and when the check has cleared the bank and has been paid, this agreement shall release and forever discharge Surety from all actions, causes of action, claims and demands that the Undersigned, any heirs, legal representatives, or assigns of the Undersigned may now have arising out of any of the work performed on the above-referenced project, but only to the extent of the payment set forth in No. 6 above and through the date set forth in No. 4 above, except as noted below:

| | |
|---|---|
| 1. Outstanding Change Proposals (See attached Proposal Log) | $26,407.00 |
| 2. Estimated Impact Costs ( See attached Preliminary Estimate) | $45,000.00 |
| 3. Estimated Acceleration Costs (Assuming mid-August 04 substantial completion) | $60,000.00 |

The Undersigned hereby agrees to perform the balance of the work as a subcontractor for the Surety or Surety's designee or assignee in accordance with the terms and conditions of the Undersigned subcontract. The Surety acknowledges that no evidence to date has arisen indicating that ESCOA is responsible for or has in any way caused the delays and impacts to the construction schedule that currently exist and have made it impossible to achieve the April/May 2004 substantial completion date.

*IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned, to the extent of the payment made hereunder, for the time period ending 1/31/04, and except as reserved above, hereby assigns its claims for labor, material, or equipment rental, lien rights, stop notice rights and causes of action against Standen Contracting Co., Inc. and the Owner to Surety with the Undersigned appointing Surety its irrevocable attorney to demand payment for and enforce payment of said lien, stop notices and causes of action including but not limited to, bringing suit hereon, providing releases therefore, and taking all steps to perfect the same, and all at the Surety's sole discretion, election and expense. Nothing in this agreement shall prohibit or prevent the subcontractor from making claims against Surety which do not involve the Owner and/or from exercising his rights under MGL c.30 s.39F to file for direct payment from the Owner if payment is not received by him within the statutory time limits.*

*IT IS FURTHER UNDERSTOOD AND AGREED that the agreement of Surety or its designee or assignee to pay retainage or any future payments is subject to any defenses or claims of the principal, Surety or its designee or assignee has or may have arising out of the subcontract that exists now or that may arise in the future that entitle the Owner, the principal or Surety and/or its designee or its assignee to back charge, set off, or deduct from the retainage or any future payments any amounts for which the Undersigned may be or is responsible for. The execution of this Agreement shall not waive or estop the Surety from raising any such defenses or claims. The Surety acknowledges that no back charge, set-off or deduct amounts against the subcontractor currently exist as of the date of the execution of this agreement.*

*IT IS FURTHER UNDERSTOOD AND AGREED that Surety is in the process of negotiations with the Owner on the referenced contract. If proper arrangements can be made for takeover and re-let of this project, your subcontract, purchase order, change orders or agreement may be assigned to a new general contractor or construction manager.*

*IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned certifies that any labor, material and/or subcontractor furnished by the Undersigned, was actually furnished, delivered and used in the construction of the aforementioned project.*

*THE UNDERSIGNED FURTHER WARRANTS AND REPRESENTS AND HEREBY certifies that all just and lawful billings, accounts and/or amounts due from the Undersigned and/or its subcontractors or material suppliers for labor, material and equipment employed in the performance of this contract have been fully paid in accordance with the terms and conditions of said contract(s), to the extent that payments have been received by the subcontractor, and that there are no amounts for which the Undersigned would be responsible under the above agreement, all amounts having been fully paid and other terms of the relevant subcontract, material supply contract or purchase order having been fully complied by the Undersigned.*

*IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned covenants with Surety and the Owner that the money received hereby will be used to pay all persons or companies who have furnished labor and/or materials at the subcontractor's request on the aforementioned project, and that a good and sufficient release of all claims and waiver of lien will be obtained from all such persons or companies. In addition, all costs incurred by the Surety from any breach of these covenants or promises made by the Undersigned in this Agreement will be paid by the Undersigned.*

*IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned has carefully read this Hold Agreement and the same is signed with the proper authority as the free act and deed of said Undersigned.*

*DATED this 18th day of March, 2004*

*Electronics Service Company of America Inc. d/b/a ESCOA (Subcontractor)*

*Robert A. Shriberg – President*

*DATED this 25 day of March, 2004*

*The St. Paul Co. /St. Paul Surety*     (Surety) *VSF5 G*

_____ (Authorized Reresentative), *Senior Claim Attorney*

OUTSTANDING CHANGE PROPOSAL LOG - AWAITING DIRECTION                                        DATE: 3/18/2004

JOB: SHREWSBURY MIDDLE SCHOOL

| PROP # | DESCRIPTION OF WORK | PROP VALUE | PROP DATE | G.C REF# | ARCH REF# | AUTH.TO PROCEED | % DONE | CHANGE ORDER | COMMENT |
|---|---|---|---|---|---|---|---|---|---|
| 10 | Audit. Dimming Override | $ 1,204.40 | 08/02/03 | | PR-7 | NONE | 0% | NOT RECEIVED | |
| 11 | Add Wiring for 4 Door Holders | $ 1,175.17 | 06/06/03 | RFI-155E | | NONE | 0% | NOT RECEIVED | |
| 12AR | Power for Card Readers | $ 3,254.45 | 10/24/03 | PCO-44 | | NONE | 0% | NOT RECEIVED | |
| 16 | Add Smoke Det. in 103 & 370A | $ 1,393.77 | 08/20/03 | RFI-178 | | NONE | 0% | NOT RECEIVED | |
| 17 | Add Power TV-TP Faculty 153 | $ 1,127.41 | 09/18/03 | RFI-201E | | NONE | 0% | NOT RECEIVED | |
| 18 | Add Switch & Relay | $ 1,044.18 | 10/13/03 | PCO-50 | | NONE | 0% | NOT RECEIVED | |
| 19 | Change ACCU-2 Feeder | $ 3,039.42 | 10/23/03 | RFI-208E | | NONE | 0% | NOT RECEIVED | |
| 20 | Add Dedic.Receptacle at P2B5 | $ 649.98 | 10/27/03 | RFI-198 | | NONE | 0% | NOT RECEIVED | |
| 22 | Relocate Emerg. Generator | $ 5,607.00 | 01/14/04 | PCO-62 | | NONE | 0% | NOT RECEIVED | |
| 23 | Change to Transf. & CDP211 | $ 3,971.00 | 01/28/04 | ESCOA RFI-40 | | NONE | 0% | NOT RECEIVED | |
| 24 | 200 Student Add'l Balance | $ 3,940.00 | 01/28/04 | PCO-70 | | NONE | 0% | NOT RECEIVED | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| TOTAL | | $26,406.78 | | | | | | | |

Friday, October 29, 2004

Mr. Russ Werner
St. Paul Surety
111 Schilling Cir.
Hunt Valley, MD  21031

RE:   Potential Change Order # 99-035
      Shrewsbury Middle School 2 - Job No. 381A

Dear Mr. Werner ,

This letter is to provide official notification of a potential project change as follows:

| | |
|---|---|
| PCO Number: | 035 |
| Date: | 27-Oct-04 |
| Description: | ESCOA Abandonment of the Project |
| Proposed Amt: | $975,789.00 |
| Days Requested: | 15 |
| Reference: | Coghlin Quote Dated 9/24/04 |
| Notes: | This PCO is for hiring Coghlin Electric Contractors, Inc. on a T&M basis not to exceed Price of $1,287,228.00. ESCOA had $357, 905.15 left in their contract. Coghlin Electric Contractors, Inc. price of $1,287,228.00 minus $357,905.15 leaves a balance of $929,322.90. This will be for the completion of the project having any unforeseen deficiencies. |

This PCO is comprised of the following items:

| Item Description | Proposed Amount | Contractor |
|---|---|---|
| Coghlin Electric Contractors, Inc. | $929,323.00 | Coghlin Electric |
| 5.00% Profit | $46,466.00 | Jackson Construction Company |
| Total: | $975,789.00 | |

The costs included in this proposal do not include any amounts for changes in the sequence of work, disruptions, and interferences and/or impact work. The right is expressly reserved to make claims for any and all of these related items of cost prior to any final settlement of this contract including any related time extensions. Per the terms of our contract, we request that this official PCO be signed and returned to our office by The St. Paul Companies, Inc.. If you have any questions, please contact the undersigned at  as soon as possible.

Respectfully,

*Richard M<sup>c</sup>Guinness*

Project Manager
Jackson Construction Company

Russ Werner
Authorized Owner's Representative

Date

++++++



September 24, 2004

Mr. Bob Barton
Jackson Construction Company
20 Dan Road
Canton, MA 02021

Reference: Shrewsbury Middle School
45 Oak Street – Shrewsbury MA
Electrical and Communication Renovation
Our Quote # JRC04-25

Dear Bob,

We are pleased to present the following rough order of magnitude to furnish and install the electrical and communication requirements to complete the above referenced facility.

REWORK (Electrical):

1) Switchboard, panel feeder, general feeders and repair junction box splices ............................................................................................. $9,380.00

2) Repair M.I. Cable supports, banding and terminations........................ $12,060.00

3) F.A. System was wired for Class "B" System. Rewire for Specified Class "A" System............................................................................. $17,964.00

4) Low voltage lighting relay improper connections Replace Damaged Cable ............................................................................. $11,960.00

5) Grounding and Bonding Repair .................................................................. $19,916.00

6) New branch circuits needed for auditorium lighting and Pipe Emergency Lighting and Dimming Interconnection......................... $72,180.00

7) Tone & Trace Misc. F.A., sound, Branch Security not labeled............. $16,420.00

8) Broken Neutral Bars in Panels ................................................................... $2,492.00



Mr. Bob Barton
September 24, 2004
Page 2 Of 4

9) **Transformers not anchored**
   **No Vibration Pads** ................................................................................ **$4,920.00**

10) *Underground between Poles & Poles and building not complete* .......... **$5,634.00**

11) **Low Voltage Control. Relays**
    **Troubleshoot Trace – Time Clocks & Contactors not**
    **in for site lighting** ................................................................................... **$5,984.00**

12) **F.A. interior missing modules, Voice Evac missing,**
    **Remote annunciation missing** ............................................................... **$12,492.00**

13) **Many missing fixtures, wrong fixtures**
    **Some fixtures are being hung twice to complete for occupancy and will have**
    **to be replaced when proper fixtures are received** ................................ **$26,610.00**

14) **Missing panels & Trough covers throughout building** ........................... **$4,288.00**

15) **Install 20 amp outlets several areas for dedicated circuits** ..................... **$4,142.00**

16) **Re-support – 50% of installed fixtures, many fixtures in but not supported,**
    **additional support for branch mc, and Tel/Data** .................................... **$25,600.00**

17) **No Grounding Tel/Data closets, and**
    **No outlets for closets** ............................................................................. **$39,900.00**

18) **Circuits not pulled for exterior lighting** ................................................. **$4,304.00**

19) **Missing Panel Feeders not pulled, S.S. Disconnect SW's missing for**
    **kitchen dishwasher** ................................................................................ **$2,940.00**

20) **Bypass all Classroom Life Safety Light Switches** .................................. **$3,300.00**

Coghlin

Mr. Bob Barton
September 24, 2004
Page 3 of 4

## Rework (Tel/Data):

21)  All Page – sound no Head end
     Not Complete – Incompatible Room speakers...................................... $9,430.00

22)  Tel/Data – No equipment or racks installed or terminated – 50% cable pulled.
     Re-Pin all voice jacks miswired
     10% Terminated................................................................... $3,370.00

23)  Tel/Data – cables mislabeled – had to be traced and re-labeled........... $2,370.00


## WORK NOT COMPLETED BY ESCOA:

Security System Material ............................................................. $30,000.00
                    Labor ............................................................. $45,900.00

Lightning Protection & Grounding Material ......................................... $64,500.00
                    Labor          ................................................. $14,800.00

Ice Melting System Material ........................................................ $5,300.00
                    Labor ............................................................ $3,700.00

Fire Alarm System Material ......................................................... $35,700.00
                    Labor ............................................................ $23,600.00

Branch Circuit Lighting & Power Material ........................................... $73,600.00
                    Labor ........................................................... $207,000.00

Classroom By-pass Relays (owned by contract) Material .............................. $9,600.00    Ext..
                    Labor ............................................................ $7,400.00

Multi-Media Retrieval Management & Video Head End Material ......................... $80,680.00
                    Labor ............................................................ $4,724.00

Auditorium Sound ................................................................... $12,650.00
                    Labor ............................................................ $2,835.00

Gym Sound Material ................................................................. $9,785.00
                    Labor ............................................................ $2,362.00

Café Sound Material ................................................................ $9,785.00
                    Labor ............................................................ $2,362.00

*Coghlin*

Mr. Bob Barton
September 24, 2004
Page 4 of 4

Classroom Clock & Sound Wiring, Testing, Etc Material ...................................... $73,265.00
Labor ...................................... $55,335.00

Classroom Voice/Data & Video Wiring, Testing, Etc Material ........................... $52,354.00
Labor ........................ $127,411.00

Patch Cords for 1700 Locations Material ............................................................... $10,200.00
Labor ................................................................... $4,724.00

The Total Not to Exceed Cost is ........................................................................... $1,287,228.00

**PROPOSED CHANGE ORDERS:**

Classroom By-pass Relays Scope Change add ..................................................... $37,000.00
Auditorium Dimming System ................................................................................... $110,000.00
I/R System Per R.F.I. #2 ........................................................................................... $30,000.00

Schedule of completion is October 29th 2004 with the exception of some light
fixtures. Thank you for the opportunity to quote this work. If you have any questions
or require additional information, please feel welcome to contact me.

Sincerely,
Coghlin Electrical Contractors, Inc.

James R. Chapdelaine
Project Manager



**ELECTRICAL CONTRACTORS, INC.**

May 27, 2005

RECEIVED

JUN 0 3 2005

JMP

Mr. James M. Peters Jr.
Vice President Bond Claim, 4PB
St Paul Travelers
1 Tower Square
Hartford, CT 06183

RE: Shrewsbury Middle School
Jackson Construction Co.

Dear Mr. Peters,

Coghlin Electrical Contractors, Inc. is hereby notifying St. Paul Travelers of our intent to file a claim on the bond for non-payment of services performed relating to the work at the Shrewsbury Middle School.

Coghlin Electrical Contractors, Inc. was hired by Jackson Construction Company during August of 2004 to complete electrical work at the Shrewsbury Middle School. To date Coghlin has billed Jackson $1,708,827 and has been paid $1,289,207. We are owed $410,442. We have a small amount of work left to complete. Our last payment was received February 25, 2005, for an invoice dated 12/14/04.

My expectation was that resolution of this matter was imminent, and that formal claim procedures would be unnecessary, but after recent discussion with Bob Barton and no progress payments, my hope has diminished.

I'd welcome the opportunity to discuss the matter, please contact me directly at (508) 793-0373.

Sincerely,

Susan Mailman

Susan Mailman
President

cc: Mr. Bob Barton
Jackson Construction

*100 Prescott Street*
*Worcester*
*Massachusetts*
*01605*

*Voice*
*(508) 793.0300*
*(800) 420.5945*

*Facsimile*
*(508) 793.0303*

*Massachusetts*
*License*
*A13033*



James M. Peters, Jr.

*Vice President*
*Bond Claim, 4 PB*
St. Paul Travelers
One Tower Square
Hartford, CT 06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
E-mail : james.m.petersjr@stpaultravelers.com

June 22, 2005

Robert B. Barton, Jr.
Executive Vice President
Jackson Construction Co.
20 Dan Road
Canton, MA 02021

Re:  Principal:  Standen Contracting Co. Inc.
    Claim No:  092SCSW504101RG
    Obligee:  Town of Shrewsbury, MA
    Contract :  Shrewsbury Middle School - West
    Claimant:  Coghlin Electrical Contractors, Inc.

Dear Mr. Barton:

By letter dated May 27, 2005, Coghlin Electrical Contractors, Inc., made claim on the above referenced bond in the amount of $410,442. Copies of that claim notice and our letter in reply are enclosed for your review.

United States Fidelity and Guaranty Company, as surety on the above bond, has an obligation to promptly investigate and respond to this claim.

Detailed input from Jackson Construction Company ("Jackson") is important to our independent investigation and understanding of the claim. We request, therefore, that Jackson provide us with a written statement detailing its response. Included with the written statement should be copies of all documentation supporting the position of Jackson, in particular, documents relating to disputes and valid defenses, if any, which Jackson believes it is entitled to assert. We also request that Jackson identify any actions it has taken or intends to take to resolve all or any portion of the claim."

Further, in accordance with the terms and conditions of that certain Standard Form of Completion Agreement Between Surety and Completion Contractor, dated on or about May 11, 2004, Jackson agreed:

"to defend (if required by Surety), indemnify and hold harmless Surety and its respective directors, officers, agents, servants, employees, affiliates and subsidiaries (the

Robert B. Barton, Jr.
April 30, 2005
Page 2

Indemnitees), from all demands, claims, causes of action, (including but not limited to any claims for payment or otherwise by any of Contractor's subcontractors, suppliers, employees and laborers and also including, but not limited to, the Principal's subcontractors or suppliers, when the Contractor has assumed or accepted assignments of those subcontracts or purchase orders)....."

We look forward to your prompt reply.

Sincerely,

Russell Fuller
Associate Claim Counsel

Enclosure
cc:     Russ Werner – Bond Claim – Hunt Valley

 **ST PAUL TRAVELERS**

One Tower Square - Bond
4 PB
Hartford, CT 06183

Russ W. Fuller
Bond Claim Manager
St. Paul Travelers Bond
Phone: (860) 954-1723
Fax: (860) 277-5722

June 22, 2005

Susan Mailman, President
Coghlin Electric Contractors Inc.
100 Prescott Street
Worcester, MA 01605

| | |
|---|---|
| Surety: | United States Fidelity and Guaranty Co. |
| Our File No.: | 090-SC-SW504101-RG |
| Bond No.: | 007-SB-SW5041 |
| Principal: | Standen Contracting Co. Inc. |
| Obligee: | Town of Shrewsbury |
| Claimant: | Coghlin Electric Contractors Inc. |
| Project: | Performance Other-Renovation of Former Shrewsbury High School Contract #573-000 |

Dear Ms. Mailman:

We are in receipt of communication from you indicating that you wish to file a claim on the above-referenced bond. To facilitate our independent investigation of the claim, we request that you fill out and return the enclosed claim form, attaching copies of all documents requested in the claim form.

Our purpose in requesting information from you is to develop a complete understanding of the circumstances surrounding the claim. As such, if other information or documents exist which you feel would assist our evaluation of the claim we ask that you furnish that information as well. In the interim, we will correspond with Jackson Construction Company to gain an understanding of their position.

This correspondence and all prior or subsequent communications and/or investigative efforts are made with the express reservation of all rights and defenses the Surety or Standen Contracting Co. Inc. has or may have at law, equity or under the terms and provisions of the bond and contract documents. This reservation includes, without limitation, defenses that may be available under any applicable notice and suit limitation provisions. Subject to this strict and continuing reservation, we look forward to hearing from you.

Sincerely,

Russell Fuller
Bond Claim Manager

encl: Claim Form

cc: Jackson Construction Company

# APPLICATION AND CERTIFICATE FOR PAYMENT AIA DOCUMENT G702 (Instructions on reverse side) PAGE ONE OF 9 PAGES

| TO OWNER: | St. Paul Companies, Inc.<br>5801 Smith Avenue<br>Baltimore, MD 21209 | PROJECT: | Shrewsbury Middle School | APPLICATION NO.<br>8<br>JCC JOB #381 | Distribution to:<br>☐ OWNER<br>☐ ARCHITECT<br>☐ CONTRACTOR |
|---|---|---|---|---|---|
| | | | | PERIOD TO<br>12/31/2004 | |
| FROM CONTRACTOR: | Jackson Construction Company<br>20 Dan Road    P.O. Box 9191<br>Canton, MA 02021-9191 | VIA ARCHITECT: | Lamoureux Pagano Associates<br>14 East Worcester Street<br>Worcestr, MA 01604 | CONTRACT DATE<br>10/1/2002 | |

CONTRACT FOR: Renovations

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM.................$ | | 8,051,367 |
| 2. Net change by Change Orders | | 2,263,835 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2).....$ | | 10,315,202 |
| 4. TOTAL COMPLETED & STORED TO DATE ...$<br>(Column G on G703) | | 9,960,097<br>9,146,742 |
| 5. RETAINAGE: | | |
| a.    5    % of Completed Work<br>(Columns D + E on G703) | 497,295<br>458,087 | |
| b.         % of Stored Material<br>(Column F on G703) | 0 | |
| Total Retainage (Line 5a + 5b or<br>Total in Column 1 of G703).........$ | | 468,097   497,295 |
| 6. TOTAL EARNED LESS RETAINAGE.........$<br>(Line 4 less Line 5 Total) | | 8,319,655  9,463,604 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT<br>(Line 6 from prior Certificate).....$ | | 8,443,613 |
| 8. CURRENT PAYMENT DUE..............$ | | 275,042   1,019,900 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE<br>(Line 3 less Line 6) | | 864,601  1,596,547 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in<br>previous months by Owner | 1,920,750.00 | |
| Total approved this Month | 343,085.00 | |
| TOTALS | 2,263,835.00 | |
| NET CHANGES by Change Order | 2,263,835.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:  Jackson Construction Company

By: _Richard M'Shumann_    Date: __February 18, 2005__

State of:  Massachusetts
County of:  Norfolk

Subscribed and sworn to before
me this   18   day of   February 2005

Notary Public:   Debra M. Turok

My Commission expires:  September 03, 2010

## ARCHITECT'S CERTIFICATE FOR PAYMENT

AMOUNT CERTIFIED ...................... $ _____

(Attach explanation if amount certified differs from the amount applied for. Initial
all figures on this Application and on the Continuation Sheet that are changed to
conform to the amount certified.)

ARCHITECT:  Lamoureux Pagano Associates

By: _____    Date: _____

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

_Okay to pay - purchase of ___ con ___ to legal prosecution._

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • AIA® • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

CAUTION: You should use an original AIA document which has this caution printed in red.

G702-1992

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER
APPLICATION DATE   January 21, 2005
PERIOD TO   December 31, 2004
ARCHITECT'S PROJECT NO:

SHREWSBURY MIDDLE SCHOOL - JCC #361

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 01000-000 | **GENERAL CONDITIONS** | | | | | | | | |
| | **Office Personnel** | | | | | | | | |
| | Project Executive | | | | | | | | |
| | Project Manager | 61,490 | 60,661 | 829 | | 61,490 | 100% | 0 | 3,074.50 |
| | Assistant Project Manager | 21,285 | 21,178 | 107 | | 21,285 | 100% | 0 | 1,064 |
| | Admin Assistant | 4,300 | 4,256 | 44 | | 4,300 | 100% | 0 | 215 |
| | Estimating labor | 4,960 | 4,960 | | | 4,960 | 100% | 0 | 248 |
| | **Field Personnel** | | | | | | | | |
| | Superintendent | 61,490 | 61,171 | 319 | | 61,490 | 100% | 0 | 3,074.50 |
| | Superintendent per diem | 0 | 0 | | | 0 | 0% | 0 | 0.00 |
| | Asst. Superintendent | 9,675 | 9,618 | 57 | | 9,675 | 100% | 0 | 483.75 |
| | Secretarial | 4,300 | 4,276 | 24 | | 4,300 | 100% | 0 | 215.00 |
| | **Temporary Utilities** | | | | | | | | |
| | Monthly electric power use | 17,500 | 17,405 | 95 | | 17,500 | 100% | 0 | 875.00 |
| | Temp. Phone Job (Phone, Fax, Computer) | 6,000 | 5,922 | 78 | | 6,000 | 100% | 0 | 300.00 |
| | Cellular telephones (2) | 1,000 | 994 | 6 | | 1,000 | 100% | 0 | 50.00 |
| | Temp. Toilets | 1,500 | 1,490 | 10 | | 1,500 | 100% | 0 | 75.00 |
| | Temp. Water | 1,000 | 989 | 11 | | 1,000 | 100% | 0 | 50.00 |
| | Temporary heating | 20,000 | 20,000 | | | 20,000 | 100% | 0 | 1,000.00 |
| | **Temporary Project Requirements** | | | | | | | | |
| | Temp. Fence | 2,675 | 2,652 | 23 | | 2,675 | 100% | 0 | 133.75 |
| | **Small Tools** | | | | | | | | |
| | Small Tools / Cleaning Supplies | 2,675 | 2,675 | | | 2,675 | 100% | 0 | 133.75 |
| | **Temporary Project Offices** | | | | | | | | |
| | Job office set up / pickup | 1,070 | 1,058 | 12 | | 1,070 | 100% | 0 | 53.50 |
| | Jobsite office lease | 2,675 | 2,652 | 23 | | 2,675 | 100% | 0 | 133.75 |
| | Radios | 0 | | | | 0 | 0% | 0 | 0 |
| | Fax (Equipment) | 535 | 535 | | | 535 | 100% | 0 | 26 |
| | Copier | 1,605 | 1,605 | | | 1,605 | 100% | 0 | 80.25 |
| | Computer | 2,675 | 2,675 | | | 2,675 | 100% | 0 | 133.75 |
| | Office Supplies | 1,070 | 1,070 | | | 1,070 | 100% | 0 | 53.50 |
| | Office Furniture | 0 | 0 | | | 0 | 0% | 0 | 0.00 |
| | Delivery / Postage Services | 500 | 495 | 5 | | 500 | 100% | 0 | 25.00 |
| | **Project Clean-up** | | | | | | | | |
| | Clean-up / labor / 2 men / 22 weeks | 50,600 | 50,307 | 293 | | 50,600 | 100% | 0 | 2,530.00 |
| | Final Clean-up | 11,050 | 10,956 | 94 | | 11,050 | 100% | 0 | 552.50 |
| | Dumpster | 21,000 | 20,878 | 122 | | 21,000 | 100% | 0 | 1,050.00 |
| | Street Clean-up | 0 | | | | 0 | 0% | 0 | 0.00 |
| | **Project Safety & Security** | | | | | | | | |
| | Safety Officer | 7,435 | 7,392 | 43 | | 7,435 | 100% | 0 | 371.73 |
| | General Safety costs | 0 | | | | 0 | 0% | 0 | 0.00 |
| | First Aid Equip. | 428 | 423 | 5 | | 428 | 100% | 0 | 21.40 |
| | Fire Extinguishers | 428 | 423 | 5 | | 428 | 100% | 0 | 21.40 |
| | Security Guard Service | 0 | | | | 0 | 0% | 0 | 0.00 |

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER:
APPLICATION DATE: January 21, 2005
PERIOD TO: December 31, 2004
ARCHITECT'S PROJECT NO.

**SHREWSBURY MIDDLE SCHOOL - JCC #38**

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C - G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| | **Project Misc. Requirements** | | | | | | | | |
| | Additional Blueprints | 3,210 | 3,184 | 26 | | 3,210 | 100% | 0 | 160.50 |
| | Job Sign | 0 | | | | 0 | 0% | 0 | 0.00 |
| | Drinking water, Ice, cups | 268 | 264 | 4 | | 268 | 100% | 0 | 13.44 |
| | Progress Photographs | 535 | 529 | 6 | | 535 | 100% | 0 | 26 |
| | **Project Travel Expenses** | | | | | | | | |
| | Project manager travel | | 0 | | | 0 | 0% | 0 | 0.00 |
| | Meals | 375 | 371 | 4 | | 375 | 100% | 0 | 18.75 |
| | Fuel reimbursement | 300 | 296 | 4 | | 300 | 100% | 0 | 15.00 |
| | Rental Car | 0 | | | | 0 | 0% | 0 | 0 |
| | Air Travel | 0 | | | | 0 | 0% | 0 | 0 |
| | **Superintendent travel** | | | | | | | | |
| | Fuel reimbursement | 1,500 | 1,490 | 10 | | 1,500 | 100% | 0 | 75. |
| | Hotel Expenses | 0 | | | | 0 | 0% | 0 | 0 |
| | Rental Car | 0 | | | | 0 | 0% | 0 | 0 |
| | Air Travel | 0 | | | | 0 | 0% | 0 | 0 |
| | **Senior management travel** | | | | | | | | |
| | Fuel reimbursement | 300 | 290 | 10 | | 300 | 100% | 0 | 15.00 |
| | Hotel Expenses | 0 | | | | 0 | 0% | 0 | 0 |
| | Rental Car | 0 | | | | 0 | 0% | 0 | 0 |
| | Air Travel | 0 | | | | 0 | 0% | 0 | 0 |
| | **Miscellaneous** | | | | | | | | |
| | Builders Risk Insurance | 0 | | | | 0 | 0% | 0 | 0 |
| | General Liability Insurance | 6,000 | 5,963 | 37 | | 6,000 | 100% | 0 | 300 |
| | Temporary heat | 0 | | | | 0 | 0% | 0 | 0 |
| | Contingency | 0 | | | | 0 | 0% | 0 | 0 |
| | **Burden on Direct Labor** | | | | | | | | |
| | Burden | 90,022 | 90,022 | | | 90,022 | 100% | 0 | 4,501 |
| | Fringes | 0 | | | | 0 | 0% | 0 | 0 |
| 01100-1 | Insurance on JCC Labor | 0 | | | | 0 | 0% | 0 | 0 |
| 01300-1 | Builders Risk | 15,000 | 15,000 | | | 15,000 | 100% | 0 | 0 |
| | Remove Construction Fence | 10,000 | 5,000 | 4,000 | | 9,000 | 90% | 1,000 | 450 |
| | Bldg Layout | 3,000 | 3,000 | | | 3,000 | 100% | 0 | 150 |
| | Pest Control | 2,000 | 2,000 | | | 2,000 | 100% | 0 | 100 |
| | Bldg Sign | 500 | 500 | | | 500 | 100% | 0 | 25 |
| | Job Photos | 644 | 644 | | | 644 | 100% | 0 | 32 |
| | Job Site Toilets | 1,003 | 1,003 | | | 1,003 | 100% | 0 | 50 |
| 01300-3 | Job Schedule | 11,800 | 11,800 | | | 11,800 | 100% | 0 | 590 |
| 01300-3 | Waste Dumpsters | 8,772 | 8,772 | | | 8,772 | 100% | 0 | 438.60 |
| 01500-1 | Additional Dumpsters | 7,500 | 7,500 | | | 7,500 | 100% | 0 | 375 |
| 01500-2 | Temporary Fencing | 249 | 249 | | | 249 | 100% | 0 | 12.45 |
| | Lumber for Temporary | 0 | | | | 0 | 0% | | 0.00 |
| | Temporary Heat | 0 | | | | 0 | 0% | | 0.00 |

G703-78, Pro-Fs Requisition 08 December 2004
2/18/2005

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER
APPLICATION DATE     January 21, 2005
PERIOD TO            December 31, 2004
ARCHITECT'S PROJECT NO.

**SHREWSBURY MIDDLE SCHOOL - JCC #365**

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED — FROM PREVIOUS APPLICATION | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| 02040-1 | Site Layout | 1,663 | 1,663 | | | 1,663 | 100% | 0 | 83 |
| | Damaged Alum Glazing Stops | 20,000 | 20,000 | | | 20,000 | 100% | 0 | 1,000 |
| | Damaged Fascia | 25,045 | | | | 0 | 0% | 25,045 | 0 |
| | Fire Repairs - Steel | 24,545 | 24,545 | | | 24,545 | 100% | 0 | 1,227 |
| | Fire Repairs - Clean-up - Retainage | 15,364 | 15,364 | | | 15,364 | 100% | 0 | 768 |
| | Selective Demolition | 2,400 | 2,400 | | | 2,400 | 100% | 0 | 120 |
| | 1st Asbestos Removal Retainage | 49,195 | 49,195 | | | 49,195 | 100% | 0 | 2,459 |
| | 2nd Asbestos Removal Contractor - Retainage | 6,550 | 6,550 | | | 6,550 | 100% | 0 | 327 |
| | New Asbestos Removal Contractor | 121,000 | 120,000 | | | 120,000 | 99% | 1,000 | 6,000 |
| | Earthwork | 294,374 | 273,301 | | | 273,301 | 93% | 21,073 | 13,665 |
| | Landworks Contingency | 9,884 | 9,884 | | | 9,884 | 100% | 0 | 483 |
| | Foundation Excavation | 15,847 | 15,847 | | | 15,847 | 100% | 0 | 792 |
| | Recreation Equipment | 4,000 | | | | 0 | 0% | 4,000 | 0 |
| | Relocate Ticket Booth | 2,000 | | | | 0 | 0% | 2,000 | 0 |
| | Relocate Storage Building | 5,000 | 5,000 | | | 5,000 | 100% | 0 | 250 |
| | Traffic Signs | 3,800 | | | | 0 | 0% | 3,800 | 0 |
| | Steel Pipe Bollards | 1,800 | | | | 0 | 0% | 1,800 | 0 |
| | Foul line posts | 1,500 | | | | 0 | 0% | 1,500 | 0 |
| | Remove and Reinstall Granite Signs | 1,000 | 1,000 | | | 1,000 | 100% | 0 | 50 |
| | Replace Flagpole Collar | 300 | | | | 0 | 0% | 300 | 0 |
| | School Sign | 2,000 | 2,000 | | | 2,000 | 100% | 0 | 100 |
| | Synthetic All Weather Track | 67,585 | 25,000 | | | 25,000 | 37% | 42,585 | 1,250 |
| | Price Adjustment All Weather Track | 1,650 | 1,550 | | | 1,550 | 100% | 0 | 77 |
| | Irrigation System | 11,452 | 11,452 | | | 11,452 | 100% | 0 | 572 |
| | Chain Link Fence | 83,025 | 78,000 | | 5,025 | 78,000 | 94% | 5,025 | 3,900 |
| | Price Adjustment Chain Link Fence | 45,000 | 45,000 | | | 45,000 | 100% | 0 | 2,250 |
| | Lawns & Grasses with $20K Contingency | 71,100 | 71,100 | | | 71,100 | 100% | 0 | 3,555 |
| 03300-1 | Concrete Work - Exterior Flatwork | 7,600 | 7,600 | | | 7,600 | 100% | 0 | 380 |
| 03350-1 | Concrete Material | 11,074 | 11,074 | | | 11,074 | 100% | 0 | 553 |
| 04200-1 | Masonry Work | 123,170 | 123,170 | | | 123,170 | 100% | 0 | 6,158 |
| 04150-1 | Additional Cut and Patch | 20,000 | 20,000 | | | 20,000 | 100% | 0 | 1,000 |
| 05120-1 | Structural Steel | 53,520 | 53,520 | | | 53,520 | 100% | 0 | 2,676 |
| | Structural Steel - Contingency | 9,380 | 9,380 | | | 9,380 | 100% | 0 | 469 |
| 05500-1 | Misc Metal | 107,875 | 98,500 | 9,375 | | 107,875 | 100% | 0 | 5,393 |
| 05500-2 | Misc Metal - Contingency | 2,470 | 2,470 | | | 2,470 | 100% | 0 | 123 |
| | Price Adjustment - Misc Metals | 700 | 700 | | | 700 | 100% | 0 | 35 |
| 06100-1 | Rough Carpentry - In Wall Blocking | 50,000 | 50,000 | | | 50,000 | 100% | 0 | 2,500 |
| 06100-1 | LVL Material | 3,500 | 3,500 | | | 3,500 | 100% | 0 | 175 |
| 06100-1 | LVL Labor | 2,500 | 2,500 | | | 2,500 | 100% | 0 | 125 |

a742 B. Paul's Resolution 08 December 2004
2/18/2005

## CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER: 8
APPLICATION DATE: January 21, 2005
PERIOD TO: December 31, 2004
ARCHITECT'S PROJECT NO:

**SHREWSBURY MIDDLE SCHOOL, JCC #381**

| A ITEM NO | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 06200-1 | Millwork | 742,216 | 732,318 | 9,898 | | 742,216 | 100% | 0 | 37,110.80 |
| 06200-2 | Millwork Material Price Adjustment | 14,400 | 14,400 | | | 14,400 | 100% | 0 | 720.00 |
| 07130-1 | Water/Dampproof/Caulking | 42,450 | 41,970 | 480 | | 42,450 | 100% | 0 | 2,122.50 |
| | Price Adjustment - Waterproofing | 1,000 | 1,000 | | | 1,000 | 100% | 0 | 50 |
| 07160-1 | Building Insulation | 25,690 | 25,690 | | | 25,690 | 100% | 0 | 1,284.50 |
| 07160-1 | General Firestopping | 21,360 | 21,360 | | | 21,360 | 100% | 0 | 1,068.00 |
| | Additional Firestopping | 5,000 | 5,000 | | | 5,000 | 100% | 0 | 250.00 |
| 07160-1 | Metal Wall Panels | 157,362 | 156,440 | 922 | | 157,362 | 100% | 0 | 7,868.10 |
| | Price Adjustment - Metal Wall Panels | 1,935 | 1,935 | | | 1,935 | 100% | 0 | 96.75 |
| 07145-1 | Roofing and Flashing | 121,028 | 83,200 | | | 83,200 | 69% | 37,828 | 4,160.00 |
| | Fire Damage at New Roof Area | 94,800 | 94,800 | | | 94,800 | 100% | 0 | 4,740.00 |
| | Price Adjustment for Roof Delay | 3,983 | 3,983 | | | 3,983 | 100% | 0 | 199.15 |
| | Heat and Smoke Vents | 2,000 | 2,000 | | | 2,000 | 100% | 0 | 100.00 |
| 08100-1 | Hollow Metal Drs and Frames (Material) | 34,494 | 33,300 | 1,194 | | 34,494 | 100% | 0 | 1,724.70 |
| 08150-3 | Coiling Fire Dr | 38,811 | 38,811 | | | 38,811 | 100% | 0 | 1,940.55 |
| 08200-1 | Alum Entrances/Storefront | 109,708 | 109,708 | | | 109,708 | 100% | 0 | 5,485.40 |
| 08220-2 | Finish Hardware (464 ea.) | 192,262 | 192,226 | 36 | | 192,262 | 100% | 0 | 9,613 |
| 08220-3 | Field Measure Openings | 750 | 750 | | | 750 | 100% | 0 | 37 |
| | Fire Damage Repairs | 760 | 760 | | | 760 | 100% | 0 | 38.00 |
| 08305-1 | Glass and Glazing | 79,311 | 79,311 | | | 79,311 | 100% | 0 | 3,965.55 |
| | Glass and Glazing - remobilization | 1,700 | 1,700 | | | 1,700 | 100% | 0 | 85.00 |
| 09250-1 | Drywall Work | 427,324 | 427,324 | | | 427,324 | 100% | 0 | 21,366.20 |
| 09250-2 | Tile Work | 342,615 | 342,615 | | | 342,615 | 100% | 0 | 17,130.75 |
| 09510-1 | Acoustical Ceilings | 158,900 | 155,100 | 3,800 | | 158,900 | 100% | 0 | 7,945.00 |
| 09250-1 | Wood Floor Refinishing | 7,000 | 7,000 | | | 7,000 | 100% | 0 | 350.00 |
| | Price Adjustment - Wood Floor Refinishing | 1,000 | 1,000 | | | 1,000 | 100% | 0 | 50.00 |
| 09650-2 | Resilient Flooring | 159,964 | 158,955 | 1,009 | | 159,964 | 100% | 0 | 7,998.20 |
| 09250-3 | Floor Leveling | 80,550 | 80,550 | | | 80,550 | 100% | 0 | 4,027.50 |
| 09510-2 | Seamless Flooring | 13,950 | 5,000 | 8,950 | | 13,950 | 100% | 0 | 697.50 |
| | Seamless Flooring - Adjustment | 1,000 | 1,000 | | | 1,000 | 100% | 0 | 50.00 |
| 09680-1 | Carpeting | 62,167 | 62,167 | | | 62,167 | 100% | 0 | 3,108.35 |
| | Price Adjustment - Carpeting | 10,000 | 10,000 | | | 10,000 | 100% | 0 | 500.00 |

g702 St. Paul's Regulation 08 December 2004
2/14/2005

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER: 8
APPLICATION DATE: January 21, 2005
PERIOD TO: December 31, 2004
ARCHITECT'S PROJECT NO.

SHREWSBURY MIDDLE SCHOOL - JCC #381

| A | B | C | D | E | F | G | | H | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| 09680-1 | Painting | 55,641 | 52,500 | 3,141 | | 55,641 | 100% | 0 | 2,782.05 |
| 09680-1 | Floor Underlayment & Patch | 1,103 | 1,103 | | | 1,103 | 100% | 0 | 55.15 |
| 09680-1 | Materials for Floor Underlayment | 16,800 | 16,800 | | | 16,800 | 100% | 0 | 840.00 |
| 09680-1 | Miscellaneous Tools/Equip for Floor Patch | 3,000 | 3,000 | | | 3,000 | 100% | 0 | 150.00 |
| 10100-1 | Markerboards | 71,163 | 71,163 | | | 71,163 | 100% | 0 | 3,558 |
| 10150-1 | Toilet Partitions | 23,500 | 23,500 | | | 23,500 | 100% | 0 | 1,175.00 |
| 10150-2 | Toilet Partitions - Contingency | 845 | 845 | | | 845 | 100% | 0 | 42.25 |
| | Install Cubicle Curtains | 1,200 | | 1,200 | | 1,200 | 100% | 0 | 60.00 |
| 10522-1 | Metal Wall Louvers | 3,500 | 3,500 | | | 3,500 | 100% | 0 | 175.00 |
| 10500-1 | Install Metal Wall Louvers | 2,100 | 2,100 | | | 2,100 | 100% | 0 | 105.00 |
| | Interior and Exterior Signs | 4,140 | 4,140 | | | 4,140 | 100% | 0 | 207.00 |
| 10500-1 | Metal Lockers | 100,500 | 82,000 | 15,000 | | 97,000 | 97% | 3,500 | 4,850.00 |
| | Price Adjustement- Metal Lockers | 0 | | | | 0 | 0% | 0 | 0.00 |
| 10100-1 | Fire Extinguishers (5 ea.) | 141 | 141 | | | 141 | 100% | 0 | 7.00 |
| 10400-1 | Operable Partitions | 14,615 | 14,615 | | | 14,615 | 100% | 0 | 730.7 |
| 10010-30 | Toilet Accessories | 4,500 | 4,500 | | | 4,500 | 100% | 0 | 225.00 |
| | Install Toilet Accessories | 1,500 | 1,500 | | | 1,500 | 100% | 0 | 75.00 |
| 11452-1 | Food Service | 299,500 | 299,500 | | | 299,500 | 100% | 0 | 14,975. |
| | Food Service - Price Adjustement | 7,500 | 7,500 | | | 7,500 | 100% | 0 | 375.00 |
| 11460-1 | Stage Curtain | 7,916 | 7,916 | | | 7,916 | 100% | 0 | 395.80 |
| 11410 | Athletic Equip | 15,750 | | 15,750 | | 15,750 | 100% | 0 | 787.5 |
| 12690-2 | Window Shades | 10,147 | 5,000 | 5,147 | | 10,147 | 100% | 0 | 507.3 |
| 15500-1 | Sprinkler | 117,123 | 117,123 | | | 117,123 | 100% | 0 | 5,856 |
| 15600-1 | Plumbing Work | 211,183 | 211,183 | | | 211,183 | 100% | 0 | 10,559. |
| 15600-2 | HVAC Work | 812,254 | 812,254 | | | 812,254 | 100% | 0 | 43,612. |
| | HVAC Time Extension | 150,032 | 150,032 | | | 150,032 | 100% | 0 | 7,501.60 |
| | HVAC Contingency - Protest Work | 44,696 | | 44,696 | | 44,696 | 100% | 0 | 2,234.80 |
| 16000-1 | Electrical Work | 679,562 | 679,562 | | | 679,562 | 100% | 0 | 33,978.10 |
| 16100-1 | Electrical Price Increases | 5,963 | 5,963 | | | 5,963 | 100% | 0 | 298.15 |

G702 & G703 Requisition 08 December 2004
2/14/2005

# CONTINUATION SHEET

AIA DOCUMENT G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER: 8
APPLICATION DATE: January 21, 2005
PERIOD TO: December 31, 2004
ARCHITECT'S PROJECT NO:

**SHREWSBURY MIDDLE SCHOOL - JCC #38**

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 16000-1 | Electrical Work Acceleration | 148,512 | 148,512 | | | 148,512 | 100% | 0 | 7,425.60 |
| | FEE 1% | 373,844 | 370,769 | 3,075 | | 373,844 | 100% | 0 | 18,692.20 |
| | Construction Contingency | 145,000 | 145,000 | | | 145,000 | 100% | 0 | 7,250.00 |
| | *Original Base Contract Sub-Total* | 8,051,367.00 | | | | 7,900,911.00 | 98% | 150,456.00 | 394,295. |
| **PROJECT CHANGES** | | | | | | | | | |
| | **Change Order No. 1** | 20,460.0 | 20,460 | | | 20,460 | 100% | 0 | 1,023. |
| | **Change Order No. 2** | | | | | | | | |
| | PCO 2R Credit CCD02 | (778.00) | (778) | | | (778) | 100% | 0 | (38. |
| | PCO 4R Epoxy Floor Rms. 460 and 470 | 16,300.00 | 0 | 16,300 | | 16,300 | 100% | 0 | 815. |
| | PCO 5R Delete Partitions Rm. 128 | 1,285.00 | 1,285 | | | 1,285 | 100% | 0 | 64. |
| | PCO 6R Add Construction Fence | 521.00 | 521 | | | 521 | 100% | 0 | 26. |
| | PCO 7 Add Circuit Panel P214 | 981.00 | 687 | 294 | | 981 | 100% | 0 | 49. |
| | PCO 9 Add Speakers per CCD 04 | 596.00 | 274 | 322 | | 596 | 100% | 0 | 29. |
| | PCO 12 Repair Bonk in Wall per CCD 03 | 3,245.00 | 0 | 3,245 | | 3,245 | 100% | 0 | 162. |
| | **Change Order No. 3** | | | | | | | | |
| | PCO 1A Remove Athletic Equipment | 8,588.00 | 8,588 | | | 8,588 | 100% | 0 | 429.40 |
| | PCO 8R Add Card Reader | (1,624.00) | (1,624) | | | (1,624) | 100% | 0 | (81.20 |
| | PCO 13 Add Fire Alarm Horn / Strobe | 749.00 | 749 | | | 749 | 100% | 0 | 37. |
| | PCO 14 Fire Alarm per RFI #032 | 1,851.00 | 1,851 | | | 1,851 | 100% | 0 | 92. |
| | PCO 15 Fire Alarm per ASI #3 | 371.00 | 371 | | | 371 | 100% | 0 | 18. |
| | PCO 16 Add Audit Trail | 141.00 | 0 | 141 | | 141 | 100% | 0 | 7. |
| | PCO 17R Raise Roof Drains | 1,341.00 | 1,341 | | | 1,341 | 100% | 0 | 67. |
| | PCO 18 Add Security Door Contacts | 1,510.00 | 1,510 | | | 1,510 | 100% | 0 | 75. |
| | PCO 19 Relocate Roof Drain | 2,497.00 | 2,497 | | | 2,497 | 100% | 0 | 124. |
| | **Change Order No. 4** | | | | | | | | |
| | PCO 11 Provide Additional Work to Accomidate 200 Students | 243,829.00 | 243,829 | | | 243,829 | 100% | 0 | 12,191.45 |
| | **Change Order No. 5** | | | | | | | | |
| | Time Extension 42 Days | 0.00 | 0 | | | 0 | 0% | 0 | 0. |
| | **Change Order No. 6** | | | | | | | | |
| | Sod for Athletic Fields | 25,000.00 | 25,000 | | | 25,000 | 100% | 0 | 1,250. |
| | **Change Order No. 7** | | | | | | | | |
| | PCO 37 Add Two (2) Sinks per FRI #183 | 1,043.00 | 1,043 | | | 1,043 | 100% | 0 | 52.15 |
| | PCO 45 Repair Chimney per CCD #15 | 26,843.00 | 26,843 | | | 26,843 | 100% | 0 | 1,342.15 |
| | PCO 48 Provide 70% Kynar Finish | 2,530.00 | 2,530 | | | 2,530 | 100% | 0 | 126.50 |
| | RFP #1 Credit for Clip Angles | (5,330.00) | (5,330) | | | (5,330) | 100% | 0 | (266.50) |
| | AWI Certification for Millwork | (6,000.00) | (6,000) | | | (6,000) | 100% | 0 | (300.00) |

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER       8
APPLICATION DATE       January 21, 2005
PERIOD TO       December 31, 2004
ARCHITECT'S PROJECT NO

SHREWSBURY MIDDLE SCHOOL - JCC #381

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C - G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| **St. Paul Change Order No. 1** | | | | | | | | | |
| PCO 1 | Replacing Existing Fin Tube (KMD) | 20,327.00 | 20,327 | 20,327 | | 20,327 | 100% | 0 | 1,016.35 |
| PCO 2 | Leade Paint Abatement | 43,602.00 | 43,602 | 43,602 | | 43,602 | 100% | 0 | 2,180.10 |
| PCO 3 | Robie Ratification | 15,996.00 | 15,996 | 15,996 | | 15,996 | 100% | 0 | 799.80 |
| PCO 4 | Barto Signs | 1,055.00 | 1,055 | 1,055 | | 1,055 | 100% | 0 | 52.75 |
| PCO 5 | Overhead Track Change AFCO) | 406.00 | 406 | 406 | | 406 | 100% | 0 | 20.30 |
| PCO 6 | Recovery Express (For Asbestos) | 6,934.00 | 6,934 | 6,934 | | 6,934 | 100% | 0 | 346.70 |
| PCO 7 | SELPCC (Previous Electric Bill for Trailer) | 961.00 | 961 | 961 | | 961 | 100% | 0 | 48.05 |
| PCO 8 | SELPCC (Previous Electric Bill for Trailer) | 15,504.00 | 15,504 | 15,504 | | 15,504 | 100% | 0 | 775.20 |
| PCO 9 | Missing Strike for doors Thompson | 1,477.00 | 1,477 | 1,477 | | 1,477 | 100% | 0 | 73.85 |
| PCO 10 | Relocate Exterior Wall (Century) | 1,035.00 | 1,035 | 1,035 | | 1,035 | 100% | 0 | 51.75 |
| PCO 11 | New Wall and Frame (Century) | 3,566.00 | 3,566 | 3,566 | | 3,566 | 100% | 0 | 178.30 |
| PCO 12 | North Wall Plumbing Chase (Century) | 710.00 | 710 | 710 | | 710 | 100% | 0 | 35.50 |
| PCO 13 | Repalce Wall (Century) | 413.00 | 413 | 413 | | 413 | 100% | 0 | 20.65 |
| PCO 14 | Second Coat Wall (Century) | 130.00 | 130 | 130 | | 130 | 100% | 0 | 6.50 |
| PCO 15 | Patch Elevator Room (Century) | 338.00 | 338 | 338 | | 338 | 100% | 0 | 16.90 |
| PCO 16 | Frame Chase Room(Century) | 1,305.00 | 1,305 | 1,305 | | 1,305 | 100% | 0 | 65.25 |
| PCO 17 | Repalce Wall (Century) | 393.00 | 393 | 393 | | 393 | 100% | 0 | 19.65 |
| PCO 18 | Repair Walls (Century) | 805.00 | 805 | 805 | | 805 | 100% | 0 | 40.25 |
| PCO 19 | Replace Walls (Century) | 8,908.00 | 8,908 | 8,908 | | 8,908 | 100% | 0 | 445.40 |
| PCO 20 | Replace Millwork Cabinet (Bristol) | 1,068.00 | 1,068 | 1,068 | | 1,068 | 100% | 0 | 53.40 |
| **St. Paul Change Order No. 2** | | | | | | | | | |
| PCO 19A | Century Painting | 2,404.00 | 2,404 | 2,404 | | 2,404 | 100% | 0 | 120.20 |
| PCO 21 | Raise Blocking | 632.00 | 632 | 632 | | 632 | 100% | 0 | 31.60 |
| PCO 22 | Site Work Extra Costs | 10,698.00 | 10,698 | 10,698 | | 10,698 | 100% | 0 | 534.90 |
| PCO 23 | Machine rental | 65,205.00 | 65,205 | 65,205 | | 65,205 | 100% | 0 | 3,260.25 |
| PCO 24 | Work Not In Contract | 5,390.00 | 5,390 | 5,390 | | 5,390 | 100% | 0 | 269.50 |
| PCO 25 | Clifford & Galvin Outside Work | 4,460.00 | 4,460 | 4,460 | | 4,460 | 100% | 0 | 223.00 |
| PCO 26 | Clifford & Galvin Not In Contract | 4,418.00 | 4,418 | 4,418 | | 4,418 | 100% | 0 | 220.90 |
| **St. Paul Change Order No. 3** | | | | | | | | | |
| PCO 19B | Mold Damage Scissor Lift | 720.00 | 720 | 720 | | 720 | 100% | 0 | 36.00 |
| PCO 19C | Mold Damage Mold Insulation | 243.00 | 243 | 243 | | 243 | 100% | 0 | 12.15 |
| PCO 19D | Mold Damage Exterior Work | 8,962.00 | 8,962 | 8,962 | | 8,962 | 100% | 0 | 448.10 |
| PCO 19E | Mold Damage Exterior Work | 3,841.00 | 3,841 | 3,841 | | 3,841 | 100% | 0 | 192.05 |
| PCO 19F | Mold Damage Exterior Work | 10,436.00 | 10,436 | 10,436 | | 10,436 | 100% | 0 | 521.80 |
| PCO 19G | Mold Damage Exterior Work | 5,682.00 | 5,682 | 5,682 | | 5,682 | 100% | 0 | 284.10 |
| PCO 19H | Mold Damage Exterior Work | 5,137.00 | 5,137 | 5,137 | | 5,137 | 100% | 0 | 256.85 |
| PCO 19I | Mold Damage Century Drywall CE #11 | 649.00 | 649 | 649 | | 649 | 100% | 0 | 32.45 |
| PCO 19J | Mold Damage Clifford Drywall CE #10 | 1,181.00 | 1,181 | 1,181 | | 1,181 | 100% | 0 | 59.05 |
| PCO 19K | Mold Damage Clifford & Galvin COR #19 | 3,696.00 | 3,696 | 3,696 | | 3,696 | 100% | 0 | 184.30 |
| PCO 19L | Mold Damage Clifford & Galvin COR #18 | 6,261.00 | 6,261 | 6,261 | | 6,261 | 100% | 0 | 313.05 |
| PCO 27 | Clifford & Galvin COR #6 | 14,994.00 | 14,994 | 14,994 | | 14,994 | 100% | 0 | 749.70 |
| PCO 28 | Equipment Rental | 17,980.00 | 17,980 | 17,980 | | 17,980 | 100% | 0 | 899.00 |
| PCO 29 | Clifford & Galvin COR #7 | 3,160.00 | 3,160 | 3,160 | | 3,160 | 100% | 0 | 158.00 |
| PCO 30 | Stainless Steel Tubes | 1,588.00 | 1,588 | 1,588 | | 1,588 | 100% | 0 | 79.40 |
| PCO 31 | PIPE Main Fire Damaged Area | 902.00 | 902 | 902 | | 902 | 100% | 0 | 45.10 |
| PCO 32 | Yankee Sprinkler Added Work | 1,986.00 | 1,986 | 1,986 | | 1,986 | 100% | 0 | 99.30 |

g702 SL Paul's  Reduction 04 December 2004
21/4/2005

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703 (Instructions on reverse side)

APPLICATION NUMBER    8
APPLICATION DATE    January 21, 2005
PERIOD TO    December 31, 2004
ARCHITECT'S PROJECT NO

SHREWSBURY MIDDLE SCHOOL - JCC #38

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED THROUGH PREVIOUS APPLICATION | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| PCO 33 | Sprinkler Shut Down Costs | 3,000.00 | 3,000 | | | 3,000 | 100% | 0 | 150.00 |
| PCO 34 | Barb Signs | 690.00 | 690 | | | 690 | 100% | 0 | 34.50 |
| | **St. Paul Change Order No. 4** | | | | | | | | |
| PCO 19M | Mold Clifford & Galvin Silo #5684 | 1,280.00 | 1,280 | | | 1,280 | 100% | 0 | 64.00 |
| PCO 19N | Mold Damage - Clifford & Galvin | 1,238.00 | 1,238 | | | 1,238 | 100% | 0 | 61 |
| PCO 19P | Mold Remediation-Suburban Middlesex | 19,051.00 | 19,051 | | | 19,051 | 100% | 0 | 952 |
| PCO 19Q | Mold Damage - Clifford & Galvin | 1,238.00 | 1,238 | | | 1,238 | 100% | 0 | 61 |
| PCO 36 | Temp Goal Post | 719.00 | 719 | | | 719 | 100% | 0 | 35.99 |
| PCO 37 | Cleaning | 49,112.00 | 49,112 | | | 49,112 | 100% | 0 | 2,455.60 |
| PCO 38 | Added Caulking | 91,114.00 | 91,114 | | | 91,114 | 100% | 0 | 4,555. |
| | **St. Paul Change Order No. 5** | | | | | | | | |
| PCO 35R | Coughlin Electrical Work | 1,101,811 | 317,656 | 784,155 | O | 1,101,811 | 100% | 0 | 55,090. |
| | **St. Paul Change Order No. 6** | | | | | | | | |
| PCO 39 | Bituminous Adds Unforseen in original contract | 45,167 | 0 | 45,167 | | 45,167 | 100% | 0 | 2,258 |
| PCO 40 | Roof Repairs | 62,473 | 0 | 62,473 | | 62,473 | 100% | 0 | 3,129 |
| PCO 41 | Football Goal Posts | 8,228 | 0 | 8,228 | | 8,228 | 100% | 0 | 411. |
| PCO 42 | Floor Leveling | 26,499 | 0 | 23,368 | | 23,368 | 88% | 3,131 | 1,168 |
| PCO 43 | Classroom By-pass | 41,958 | 0 | | | 0 | 0% | 41,958 | 0 |
| PCO 44 | Auditorium Dimming System | 124,740 | 0 | | | 0 | 0% | 124,740 | 0 |
| PCO 45 | I/R System Pair R.F.I. #2 | 34,020 | 0 | | | 0 | 0% | 34,020 | 0 |
| | **Change Order Sub-Total** | 2,263,835 | 1,116,293 | 945,658 | 0 | | | 203,849 | |
| | **TOTAL** | 10,315,202 | 8,887,225 | 1,026,672 | | 9,906,897 | 97% | 354,305 | 497,294 |

289,517    91,176,742    1,138,460    89    458✓

g702 & Paul's Requisition 04 December 2004
2/16/2005

OFFICE OF THE
TOWN MANAGER

Richard D. Carney
Municipal Office Building
100 Maple Avenue
Voice: 508 841-8508
Fax: 508-841-8599
dmorgado @ th.ci.shrewsbury.ma.us



## Town of Shrewsbury

MASSACHUSETTS 01545-5398

**RECEIVED**

APR 2 2 2005

**JMP**

April 19, 2005

Robert Barton
Jackson Construction Company
20 Dan Road – Suite 3
P.O. Box 9191
Canton, Ma 02027

Dear Mr. Barton:

Pursuant to our discussions on Friday, April 15th, I have processed application for payment #23 as follows:

| Item | Amount | |
|---|---|---|
| Original Contract Sum | $14,686,872.00 | |
| Net Change from Change Orders (#1 to #8) | $391,079.00 | |
| Contract Sum to Date | $15,077,951.00 | |
| Payments Made to Date* | $13,166,697.20 | |
| Balance Due Before Offsets | $1,911,253.80 | |
| Monetized Punch List Summary | $495,745.00 | See LPA letter to CTM dated 2/2/2005 |
| Allowances for Unfinished Items | $1,195,675.00 | See LPA letter to CTM dated 2/2/2005 |
| Other Deficiencies Identified by CTM | $194,000.00 | See CTM letter to Morgado dated 2/6/2005 |
| Owner Incurred Expenses (As of 2/9/2005) | $553,181.64 | Attributed to Standen |
| Owner Incurred Expenses (As of 2/9/2005) | $68,796.94 | Attributed to Jackson |
| **Amount to be Paid** | **($596,144.78)** | |

| *Payments to Date | |
|---|---|
| Standen Contracting Company, Inc. | $7,165,061.00 |
| USF&G | $5,960,600.20 |
| Century Drywall (Direct Payment) | $41,036.00 |
| **Payments to Date** | **$13,166,697.20** |

As you will note there is no payment due on this payment application as you surmised when we met last week.

April 19, 2005
Robert Barton,
Page 2

Please contact me with any questions.

Truly yours,

Daniel E. Morgado
Town Manager

Cc      James M. Peters
        William Werner
        T. Philip Leader
        Michael Pagano
        Kathryn Crockett
        Jack Ferguson



**OFFICE OF THE
TOWN MANAGER**

**Richard D. Carney
Municipal Office Building
100 Maple Avenue
Voice: 508-841-8508
Fax: 508-841-8599
dmorgado@th.ci.shrewsbury.ma.us**

## Town of Shrewsbury
### MASSACHUSETTS 01545-5398

**RECEIVED**

June 21, 2005

**JUN 2 3 2005**

**JMP**

Robert Barton
Jackson Construction Company
20 Dan Road – Suite 3
P.O. Box 9191
Canton, Ma 02021

Mr. James M. Peters, Jr.
Vice President
Bond Claim 4 PB
St Paul Travelers Companies
One Tower Square 4 PB
Hartford, CT 06183

### Via email and first class mail

Gentlemen:

I have concluded my review of Application for Payment #24 which is processed as follows:

| Item | Amount | Comment |
|---|---|---|
| Original Contract Sum | $14,686,872.00 | Taken from payment application |
| Net Change from Change Orders (#1 to #8) | $391,079.00 | Taken from payment application |
| Contract Sum to Date | $15,077,951.00 | Taken from payment application |
| Payments Made to Date* | | See payment history below; Payment application does not reflect direct payment to Century Drywall ($41,036.00) |
| Balance Due Before Allowance for Balance to Finish | $1,911,253.80 | |
| Allowances for Balance to Finish | $1,377,346.00 | See CTM Letter of June 17, 2005; Payment application carriues figure of $1,377,347 |
| Potential Payment Before Offsets | $533,907.80 | |
| Owner Incurred Expenses Change Order #10 | $56,884.71 | Part I Expenses |
| Owner Incurred Expenses Change Order #11(Pending) | $38,392.50 | Part III Expenses |
| Owner Incurred Expenses | $527,395.60 | Part II Expenses (As of June 8, 2005) |
| Owner Incurred Expenses | $88,304.36 | Attributal to Jackson (As of June 8, 2005) |
| Direct Payment K&K Acoustical Ceilings | $22,320.55 | See letter of June 6, 2005 |
| Direct Payment Ralph's Blacksmith Shop Inc | $37,083.68 | See letter of June 6, 2005 |
| **Amount to be Paid** | **($236,473.60)** | |

Robert Barton
James Peters, Jr.
June 21, 2005
Page 2

| *Payments to Date | |
|---|---|
| Standen Contracting Company, Inc. | $7,165,061.00 |
| USF&G | $5,960,600.20 |
| Century Drywall (Direct Payment) | $41,036.00 |

As you will note there is no payment due on this payment application since owner charges and direct payments exceed the amount of the potential payment.

The above recapitulation does not take into consideration pending change order proposals that were reviewed on May 6, 2005 (see Ms. Crockett's letter to me dated May 27, 2005).

Please contact me with any questions.

Truly yours,

Daniel J. Morgado
Town Manager

Cc    William Werner
       T. Philip Leader
       Michael Pagano
       Kathryn Crockett
       Jack Ferguson

## Payment Application #24
## Shrewsbury Middle School - West Project

| Item | Amount | Comment |
|---|---|---|
| Original Contract Sum | $14,686,872.00 | Taken from payment application |
| Net Change from Change Orders (#1 to #8) | $391,079.00 | Taken from payment application |
| Contract Sum to Date | $15,077,951.00 | Taken from payment application |
| Payments Made to Date* | | See payment history below; Payment application does not reflect direct payment to Century Drywall ($41,036.00) |
| Balance Due Before Allowance for Balance to Finish | $1,911,253.80 | |
| Allowances for Balance to Finish | $1,377,346.00 | See CTM Letter of June 17, 2005; Payment application carriues figure of $1,377,347 |
| Potential Payment Before Offsets | $533,907.80 | |
| Owner Incurred Expenses Change Order #10 | $56,884.71 | Part I Expenses |
| Owner Incurred Expenses Change Order #11(Pending) | $38,392.50 | Part III Expenses |
| Owner Incurred Expenses | $527,395.60 | Part II Expenses (As of June 8, 2005) |
| Owner Incurred Expenses | $88,304.36 | Attributal to Jackson (As of June 8, 2005) |
| Direct Payment K&K Acoustical Ceilings | $22,320.55 | See letter of June 6, 2005 |
| Direct Payment Ralph's Blacksmith Shop Inc | $37,083.68 | See letter of June 6, 2005 |
| **Amount to be Paid** | ($236,473.60) | |

**\*Payments to Date**

| | |
|---|---|
| Standen Contracting Company, Inc. | $7,165,061.00 |
| USF&G | $5,960,600.20 |
| Century Drywall (Direct Payment) | $41,036.00 |



**James M. Peters, Jr.**

*Vice President*
*Bond Claim, 4 PB*
St. Paul Travelers
One Tower Square
Hartford, CT  06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
E-mail : james.m.petersjr@stpaultravelers.com

**Interoffice Communication**

May 11, 2005

Re:    Principal:     Standen Contracting Co.
       Projects:      Renovation to Middle School-West,  Shrewsbury, MA
                      New Highway Facility, Westford, MA

On 5/10/05, I received voice message from Paul Bordieri of Jackson Construction Co.:

> This is Paul Bordieri at Jackson Construction Company. The number here is 781-737-1500.
>
> Jim would get back to me as soon as you pick this up. Needless to say it is about money.
>
> We are really being squeezed now. We took receivables from other projects to subsidize Shrewsbury and now I got problems.  You must be getting a lot of bond claims down there.
>
> I know it is well over $1 million dollars that we are looking for.
>
> **Can you overnight us $750,000 or something so we can get rid of some of this pressure?**

Please get back to me.



James M. ters, Jr.

*Vice President*
*Bond Claim, 4 PB*
**St. Paul Travelers**
**One Tower Square**
**Hartford, CT 06183**

(860) 954-6497 (tel)
(860) 277-5722 (fax)
E-mail : james.m.petersjr@stpaultravelers.com

**VIA DHL EXPRESS AND FACSIMILE TO: 781-737-1550**

May 11, 2005

Mr. Paul Bordieri, President
Jackson Construction Co.
20 Dan Road
Canton, MA 02021

Re: Renovation of Middle School – West, Shrewsbury, MA
    New Highway Facility, Westford, MA

Dear Mr. Bordieri:

Jackson Construction Co. ("Jackson") entered into agreements with United States Fidelity and Guaranty Company ("USF&G") by which Jackson undertook to complete the above referenced construction contracts ("Projects").

During the course of the past several months, an increasing number of payment complaints and claims have come to our attention from subcontractors and suppliers to Jackson on the Projects.

Yesterday you called and left a message that you wanted to talk to me about mounting financial pressures that Jackson was under. You indicated that the need for outside assistance could exceed **$1 million and that Jackson had used receivables from other projects to fund obligations on the Shrewsbury project.**

Subsequently, in our phone conversation yesterday afternoon, you confirmed that Jackson was unable to continue with these projects without substantial financial assistance from USF&G.

At the outset, we ask that Jackson identify more specifically the amount of financial assistance that it requires and how such assistance would be applied. A schedule identifying the intended purposes for such funding by contract and subcontractor/vendor should be promptly made available.

Before USF&G can respond to your request, an investigation must be conducted by its representatives. You must not construe any statement or action of USF&G's representatives during such investigation to be an agreement or promise to render financial assistance to Jackson or to engage in any course of conduct for the benefit of Jackson.

We understand that Jackson is representing that it has no other source of funding available to it and that it is unable to continue to perform its obligations under the Projects without such assistance.

We understand that Jackson gives its permission to USF&G and its representatives to conduct such investigation as USF&G's representatives deem necessary including, but not limited to: a review of Jackson's books, records and files; interviews with all officers and employees of Jackson; interviews with Jackson's attorneys, accountants and other professionals retained by Jackson; interviews with Jackson's banker and other creditors and interviews with the owner's representatives.

Attached, as Exhibit A, is an Information Request which identifies the information that we will require access to as a part of our investigation. While this list is intended to be comprehensive, we reserve the right to revise or supplement it as the circumstances may require.

Be advised that: the decision with respect to giving financial or other assistance to Jackson will be made by the executives of USF&G in its Home Office and that no other representative of USF&G, including its attorney, has the authority to make such a decision. Lastly, USF&G, by agreeing to conduct its due diligence in response to Jackson's request for financial assistance has not undertaken any obligation to Jackson to provide such financial assistance.

Before we can proceed with our consideration of Jackson's request and schedule a meeting, we ask that Jackson complete and return to us the Acknowledgement and Acceptance that appears below.

Sincerely,

UNTIED STATES FIDELITY AND GUARANTY COMPANY

James M. Peters, Jr.

Enclosure


ACKNOWLEDGED AND ACCEPTED:


JACKSON CONSTRUCTION CO.


By:    _____
        Paul Bordieri, President



**EXHIBIT A**

## Jackson Construction Co.
### INFORMATION REQUEST

**Schedule of Items to support St. Paul Travelers Bond Accounting Review**

The following information is requested for the parent/holding company and/or all operating entities as of the most recent financial period-ended. Please provide all information as of the same cut-off date. Projects subject to review will include any "open" projects defined as jobs with outstanding work to complete, bills to pay or funds to collect.

1.  Organizational Chart

2.  Current Business Plan

3.  Copy of most recent CPA prepared corporate financial statement including;
    3.1. CPA Management Letter & Notes of Financial Statements
    3.2. Supplementary Schedules including, but not limited to;
        3.2.1.  Schedule of Work in Progress
        3.2.2.  Schedule of Completed Contracts
        3.2.3.  Schedule of Indirect Operating Expenses (Allocated & Unallocated)
        3.2.4.  Schedule of Notes Payable
        3.2.5.  Schedule of Lease Obligations
        3.2.6.  Schedule of Accounts Receivable and Accounts Payable with Reconciliations to Balance
                Sheet

4.  Copy of most recent internally prepared financial statement including;
    4.1. Trial Balance
    4.2. Income Statement
    4.3. Balance Sheet
    4.4. Schedule of Accounts Receivable
    4.5. Schedule of Accounts Payable
    4.6. Schedule of Work in Progress
    4.7. Schedule of Completed Contracts
    4.8. Schedule of Notes Payable (Bank Letter and / or Line of Credit and Equipment Term Notes)
    4.9. Account Reconciliations for significant Balance Sheet Accounts

5.  Copies of any recent correspondence with the bank regarding the status of letter and /or line of credit.

6.  Copy of the most recent CPA prepared Financial Statement for affiliated entities that are indemnitors.

7.  Listing of all bank accounts, account numbers and a brief description of each account

8.  Summary of bank and book cash balances and copies of most recent bank reconciliations and statements

9.  Summary of outstanding bank debt, Letters of Credit, copies of Loan Agreements, Line(s) of Credit and
    most recent invoices for payment

10. Detailed Schedule of Fixed Assets

11. Depreciation Schedule of Fixed Assets

12. Corporate Tax Returns
    12.1.    Federal 1120 Return

**ST. PAUL TRAVELERS**

    12.2.    Quarterly 941 Returns
    12.3.    State and Local Returns

13. Affiliated entities that are indemnitors corporate Tax Returns

14. Current Schedule of Work In Progress

15. Job Cost Reports summarizing costs by category per job

16. Access to Job Cost Detail Reports by Job

17. Schedule of Accounts Payable (including retainage) by Job

18. Schedule of Accounts Payable (including retainage) by Vendor

19. Subcontractor and Significant Purchase Order Summary Schedule by Job

20. Detail of any accrued liabilities not included in the Schedule of Accounts Payable such as payroll taxes and withholdings, unemployment insurance, worker's compensation, insurance premiums or other items.

21. Current Aged Schedule of Accounts Receivable (including retainage) by Job

22. Current Aged Schedule of Accounts Receivable (including retainage) by Customer

23. Copies of the last paid and unpaid requisition(s) to the owners on all bonded jobs. Access to requisitions on all unbonded jobs.

24. Contract Status Summary reflecting Original Contract Amount, Revised Contract Amount, Billings and Receipts to Date, Accounts Receivable, Retention and Unbilled Balance.

25. Access to files including Contract Change Orders, Contract Agreements, Purchase Orders, and correspondence

26. Current detailed cost to complete estimates on bonded projects by significant cost category

27. Schedule of contract completion dates reflecting the company's projected completion dates and the contractual completion dates

28. Schedule of self-performed work (per trade) on bonded contracts

29. Monthly financial projections for the remainder of 2005 including; income statement, balance sheet, work-in-progress and statement of cash flow

30. Monthly financial projections for 2005 including; income statement, balance sheet, work-in-progress and statement of cash flow

31. Detailed monthly cash flow projections for the remainder of 2005 and 2006

32. Information regarding any claims against the company

33. Information regarding any affirmative claims (e.g. against owners, subcontractors, or suppliers)

34. Detail of monthly and annual overhead

35. Copies of all signatory Collective Bargaining Agreements

36. Benefit Fund Contribution Remittances

**ST. PAUL TRAVELERS**

37. Availability of personnel (accounting, and senior management)

38. Identify the types of financial accounting software that are presently in use.



— — — — — — — — — Please fold or cut in half — — — — — — — —
**DO NOT PHOTOCOPY**
Using a photocopy could delay the delivery of your package and will result in additional shipping charge
For Tracking, please go to www.dhl-usa.com or call 1-800-225-5345
Thank you for shipping with DHL

**Create new shipment** ▶     ▶ **View pending shipments**     **Print waybill** ▶

```
** TX STATUS REPORT **                    AS OF   MAY 11 2005 17:19   PAGE.01

                                              TRAVELERS BOND CLAIM


        DATE  TIME       TO/FROM      MODE   MIN/SEC   PGS   JOB#   STATUS
   02   05/11 17:17     7817371550 EC--S   01'46"    007   245    OK
```



James M. Peters, Jr.

*Vice President*
*Bond Claim, 4 PB*
St. Paul Travelers
One Tower Square
Hartford, CT 06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
E-mail : james.m.petersjr@stpaultravelers.com


## FAX COVER SHEET

**Date:**    May 11, 2005

| | | | |
|---|---|---|---|
| **To:** | Mr. Paul Bordieri | Tel: | (781) 737-1529 |
| | Jackson Construction Co. | Fax: | (781) 737-1550 |

| | | | |
|---|---|---|---|
| **From:** | James M. Peters, Jr. | Tel: | (860) 954-6497 |
| | St. Paul Travelers Bond Claim | Fax: | (860) 277-5722 |

**Re:**    Principal:  Standen Contracting Co. Inc.
Contracts: Renovation to Middle Schol – West, Shrewsbury, MA
New Highway Facility, Westford, MA

**Number of pages including cover sheet: 6**

**Message**

Attached is a copy of my letter dated May 11, 2005.



**ST PAUL**
**TRAVELERS**

*James M. Peters, Jr.*
*Vice President*
*Bond Claim, 4 PB*
St. Paul Travelers
One Tower Square
Hartford, CT 06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
*E-mail : james.m.petersjr@stpaultravelers.com*

## VIA DHL EXPRESS AND FACSIMILE TO: 781-737-1550

May 19, 2005

Mr. Paul Bordieri, President
Jackson Construction Co.
20 Dan Road
Canton, MA 02021

Re: Renovation of Middle School – West, Shrewsbury. MA
New Highway Facility, Westford, MA

Dear Mr. Bordieri:

I write in response to your letters to me dated May 11 and 12, 2005.

In your letter to me dated May 11, 2005, you state that "[Your] request for financial assistance was requested by [you] since USF&G has had a request for payment since December, 2004 in the amount of $1,019,988." I presume that you make reference to Jackson Construction Co. ("Jackson") Pay Estimate No. 8 for work performed through December 31, 2004 on the Shrewsbury Middle School Project.

As you are well aware, Jackson Payment Application No. 8 to USF&G is directly related to the Payment Application No. 23 submitted to the Town of Shrewsbury ("Shrewsbury") for work performed through December 31, 2004. Shrewsbury's position with respect to that Payment Application has been articulated on many occasions and most recently in its letter dated April 19, 2005 addressed to Robert Barton of your office, a copy of which is attached for your review.

As you are also aware, Shrewsbury has asserted, on a number of occasions and in numerous communications its right to withhold payment from USF&G as a consequence of Jackson's alleged failure to timely complete the project, failure to correct deficient work and to failure to address numerous punch list items.

As result of the position taken by Shrewsbury, no payments have been made to USF&G on Payment Application No. 23. To the contrary, the Town of Shrewsbury asserts that USF&G is accountable to the Town of Shrewsbury for a deficiency in the amount of $596,144.78.

It is Jackson's obligation to correct the deficient items of work and to complete the scope of work under the Completion Agreement.

Page 1

The Completion Agreement that was executed by Jackson and USF&G. dated on or about May 11. 2004 provides. in part:

"Surety's receipt of relief from the Obligee shall be and is an express condition precedent to Surety remitting or granting relief to Contractor. ......If the Surety does not receive payment or relief from the Obligee. then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor."

Please advise on what basis you assert an entitlement to be paid for Payment Application No. 8 given the present circumstances.

In your letter to me dated May 12, 2005, you assert that Jackson has "incurred the sum of $2,263,834.90 in additional work at the Shrewsbury School." While you make the comment that I should be aware of this fact, the record would suggest otherwise.

As an example, Jackson asserts in its PCO No. 23 that it is entitled to be paid for electrical work apparently performed by Coghlin Electrical Contractors ("Coghlin"). The only documentation that I have found in our files with respect to the arrangements between Jackson and Coghlin is a copy of a September 24, 2004 letter in which Coghlin describes a proposal to do certain work on a rough order of magnitude with a total not to exceed cost of $1,287,228. While we do not acknowledge any responsibility for these asserted extra costs, Jackson has not provided us with any documentation of the actual agreement that it was entered into with Coghlin, if any. Further, Jackson has not provided us with any evidence of its actual incurred and paid costs.

We are receiving an increasing chorus of complaints from Jackson subcontractors and suppliers on both the Shrewsbury and Westford projects. We have been providing Jackson with copies of these claims and complaints as they are received. Most recently, on May 16, 2005, we wrote to Bob Barton and furnished a copy of a letter from the Town of Westford, dated May 9, 2005. In that letter Mr. Dold reports on several subcontractors who have filed direct payment demands with the Town of Westford.

Jackson is obligated under the aforementioned Completion Agreement to:

"to defend (if required by Surety), indemnify and hold harmless Surety and its respective directors, officers, agents, servants, employees, affiliates and subsidiaries (the Indemnitees), from all demands, claims, causes of action, (including but not limited to any claims for payment or otherwise by any of Contractor's subcontractors, suppliers, employees and laborers and also including, but not limited to, the Principal's subcontractors or suppliers, when the Contractor has assumed or accepted assignments of those subcontracts or purchase orders)….."

Given these accumulating circumstances, I would suggest that a meeting between USF&G and Jackson is necessary to discuss Jackson's intentions with respect to these matters as soon as possible.

Sincerely,

UNITED STATES FIDELITY AND GUARANTY COMPANY

James M. Peters, Jr.

Enclosure

cc:     Bradford R. Carver, Esq.

# Jackson Construction Company
## Income Statement
### For the Period Ended April 30, 2005

| Account | Title | Current Activity | Current Balance |
|---|---|---|---|
| **Income** | | | |
| | Contract Income | $ 1,776,730.57 | $ 15,723,099.00 |
| Total Income | | $ 1,776,730.57 | $ 15,723,099.00 |
| **Cost of Sales** | | | |
| | Subcontractor Cost | $ 3,010,452.41 | $ 14,924,521.38 |
| | Material Cost | 101,492.23 | 573,936.48 |
| | Labor Cost | 259,061.65 | 1,305,068.81 |
| | Other Cost | 145,978.42 | 1,536,799.92 |
| Total Cost of Sales | | $ 3,516,984.71 | $ 18,340,326.59 |
| Gross Margin | | $ (1,740,254.14) | $ (2,617,227.59) |
| **Expenses** | | | |
| | Officers' salaries | $ 8,000.00 | $ 34,000.00 |
| | Office & admin salaries | 25,688.40 | 118,926.00 |
| | Estimating salaries | 11,500.40 | (37,167.20) |
| | Other salaries | 6,160.00 | 26,180.00 |
| | Insurance-officers' life | | 15,075.00 |
| | Ins-health, dental, disab | 12,109.40 | 34,761.64 |
| | Rent & utilities | 23,729.64 | 72,544.62 |
| | Automobile expense | 5,215.34 | 16,985.69 |
| | Bank charges | 411.70 | 1,605.53 |
| | Computer network | 607.25 | 1,901.50 |
| | Consultants | | 7,000.00 |
| | Contributions | | (49,900.00) |
| | Dues & subscriptions | 232.00 | 2,966.08 |
| | Fees | 9,455.46 | 14,433.14 |
| | Insurance | 60.40 | 301.59 |
| | Legal & audit | 4,552.98 | 12,139.85 |
| | Marketing | | 543.64 |
| | Miscellaneous | (22.56) | 3,468.56 |
| | Office Supplies | 5,251.82 | 20,551.66 |
| | Payroll taxes | 4,631.57 | 28,752.27 |
| | Plan expense | | 14,943.23 |
| | Repairs & maint-office | 1,245.90 | 4,436.11 |
| | Telephone | 1,268.87 | 6,056.77 |
| | Travel & entertainment | 3,712.65 | 9,351.89 |
| Total Expenses | | $ 123,811.22 | $ 359,857.57 |
| **Other Income** | | | |
| | Other Income | $ 2,568.56 | $ 30,216.42 |
| Total Other Income | | $ 2,568.56 | $ 30,216.42 |
| Net Income (Loss) | | $ (1,861,496.80) | $ (2,946,868.74) |

Confidential:  For Internal Use Only

Jackson Construction Company
**Balance Sheet**
**April 30, 2005**

RECEIVED

JUN 1 3 2005

JMP

### Assets

**Current Assets**

| | | |
|---|---|---|
| Cash & Cash Equivalents | $ 240,859.50 | |
| Accts Receivable Contracts | 12,844,558.20 | |
| Accounts Receivable-Other | 115,650.10 | |
| Cost in Excess of Billings | 924,488.00 | |
| Prepaids and Other Assets | 31,705.88 | |
| Total Current Assets | | $ 14,157,261.68 |

**Fixed Assets**

| | | |
|---|---|---|
| Property and Equipment-Net | $ 370,811.99 | |
| Total Fixed Assets | | $ 370,811.99 |
| Total Assets | | $ 14,528,073.67 |

### Liabilities and Equity

**Current Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ 17,004,601.46 | |
| Billings in Excess of Cost | 1,082,397.00 | |
| Payroll & Taxes | 122,462.59 | |
| Accrued Expenses | | |
| Corporate Income Taxes | (22,000.00) | |
| Total Current Liabilities | | $ 18,187,461.05 |
| Total Liabilities | | $ 18,187,461.05 |

**Equity**

| | | |
|---|---|---|
| Capital Stock | $ 450,000.00 | |
| Paid in Capital | 79,427.00 | |
| Retained Earnings | 4,710,745.16 | |
| Net Unrealized (loss) Gain on | (11,530.80) | |
| Treasury Stock | (5,941,160.00) | |
| Net Income | (2,946,868.74) | |
| Total Equity | | $ (3,659,387.38) |
| Total Liabilities & Equity | | $ 14,528,073.67 |

Confidential:  For Internal Use Only

# STANDARD FORM OF COMPLETION AGREEMENT BETWEEN SURETY AND COMPLETION CONTRACTOR

## COMPLETION AGREEMENT

This Agreement is made with regard to the following:

### PARTIES

SURETY:

> United States Fidelity and Guaranty Company
> MC 41
> 5801 Smith Avenue
> Baltimore, MD 21209

COMPLETION CONTRACTOR:

> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191

### PROJECT

PROJECT:

> Westford Highway Facility
> 20 North St
> Westford, MA 01886

### ARCHITECT/ENGINEER

ARCHITECT/ENGINEER:

> Earth Tech
> 196 Baker Avenue Extension
> Concord, MA 01742

### OWNER

OWNER:

> Town of Westford
> Highway Building Committee
> 55 Main St
> Westford, MA 01886

**The** Surety and the Completion **Contractor** agree as set forth below:

RECEIVED
MAY 1 8 2004
SURETY CLAIM

### Article 1
### Definitions

1.1    *Obligee:* Means the party or parties in whose favor the Surety has executed a Performance Bond, and may or may not be either an Owner or a General Contractor.

1.2    *Principal:* Means the entity or Contractor(s) or Subcontractor(s) on whose behalf the Surety executed Bonds.

1.3    *Project:* Means the work required under the Contract or Subcontract bonded by Surety.

1.4    *Surety:* Means United States Fidelity and Guaranty Company

1.5    *Bond(s):* Mean any Surety agreements. undertakings, or instruments of guarantee signed by Surety on behalf of Principal.

1.6    *Owner:* Means the Owner of the Project or the party who has a contract for Construction of the Project with either the Obligee(s), or Principal, and who may or may not also be an Obligee.

1.7    *Completion Contractor:* Means the entity the Surety Contracts with to complete the project.

### Article 2
### The Relationship of the Parties

2.1    *Relationships.* On or about October 1, 2002, the Owner awarded a contract in the amount of $14,686,872.00 for the Renovation of former Shrewsbury High School (the Project) to Standen Contracting Company (Principal).

As required by the Contract, and pursuant to the request of the Principal, Surety issued Performance and Payment bonds numbered SW5041, (the Performance and Payment Bonds), naming Standen Contracting Company as Principal and Town of Shrewsbury as Obligee. in the amount of $14,686,872.00. On or about February 25, 2004, Principal executed a letter of voluntary default. As of the date of Principal's default, work remained to be performed under the Contract. Surety has agreed to complete the work, and is negotiating a Takeover Agreement with the Obligee. In turn, the Contractor has agreed to complete the work for the Surety, subject to the terms and conditions of this agreement.

2

### Article 3
### Contract Documents

3.1     *The Contract Documents and Incorporation of the Contract to Complete.* The Contract Documents consist of the Standard Form of Completion Agreement between Surety and Contractor (the Contractor and the Contract or Subcontract (collectively called the Contract)) for the Project for which the Surety provided bonds. The Contract is incorporated by reference into this Agreement. The Contract includes, without limitation, the Instructions for Bidders, the Contract Terms and Conditions, the Special Provisions, the General Conditions thereto and the Standard Specifications, and any and all other documents or agreements incorporated into the Contract. The Contract also includes the plans or drawings, schedules, other specifications, addenda, and any modifications thereto. The Contract also includes the change orders, or additional work orders. All of the above are collectively referred to as the "Contract Documents."

3.2     *Contractor's Review and Examination.* The Contractor has reviewed the Contract, including all of its component parts, and understands all of the terms and conditions of the Contract, including those terms and conditions which govern the performance and acceptability of work at the Project. The Contractor has also sufficiently examined the Project site and determined, through its own forces, the nature, quantity and quality of work to be performed under the Contract. Surety does not warrant or guarantee, impliedly or expressly, the accuracy of any of the plans, specifications, drawings, schedules or like documents, or that Contractor can complete the Project within the time provided by the Obligee or Principal's schedule. On the basis of the Contractor's examination of the Contract and the status of the work in place at the site, the Contractor has submitted a proposal to Surety for the completion of the work under the Contract, subject to the terms and conditions of the Contract Documents. Execution of the Standard Agreement by the Contractor is a representation that the Contractor has visited each Project site, become familiar with local conditions under which each Project is to be completed, including, but not limited to, the Contractor's familiarity with the special and unique circumstances of completing work started and partially performed by another contractor.

3.3     *Contractor's Representations and Acknowledgments.* The Contractor represents to Surety that it possesses the skill, licenses, experience and financial strength to complete the work remaining under the Contract expeditiously and in a first-class manner, in strict compliance with the requirements of the Contract. The Contractor also represents that it is not presently debarred from performing work for the Owner of the Project or for any other agency or department of the Owner.

3.4     *Strict Compliance with the Contract.* The Contractor shall be bound to Surety, instead of the Obligee, by all of the provisions of the Contract, as if Contractor had initially executed the Contract in place of the Principal, with respect to the work remaining to be performed under the Contract.

3.5     *Principal's Liabilities.* Notwithstanding Article 3.1, the Contractor shall not have any liability to Surety or the Obligee for the Principal's breach of the Contract, except as specifically set forth in the Standard Agreement. The Contractor shall not be financially responsible for the Principal's billed, but unpaid accounts payable obligations.

3

### Article 4
### The Remaining Work to be Performed

4.1     *Remaining Work.* The Contractor shall perform, furnish and pay for all testing, labor, materials, equipment costs of any nature, quality control, insurances, subcontractors and suppliers, and do all other things necessary, to complete the remaining physical work and all related obligations under each Contract subject to a Purchase Order, promptly and in a first-class manner, in strict compliance with the Contract. (The remaining physical work, and all related contractual obligations, shall be referred to in this Standard Agreement, collectively, as the Remaining Work).

4.2     *The Contractor is bound by Obligee Decisions.* The Contractor shall be bound by all decisions, interpretations, judgments and directives, of every description, issued by the Obligee under the Contract with respect to the Remaining Work, including all decisions, interpretations, judgments and directives resulting from any contractual dispute resolution or mediation process established under the Contract. Any claims arising after Surety issues a Notice to Proceed are the Contractors to pursue and collect from the obligee.

4.3     *Materials and Equipment.* Contractor may use all materials or equipment presently on site or stored without any financial obligation to pay for same. However, Surety does not warrant the sufficiency, quantity, quality, or conformity of any such materials to the Contract Document requirements and any necessary replacements therefore are the Contractor's sole responsibility and expense.

4.4     *Salvage.* Any excess or leftover materials or equipment at the end of the Project shall be the property of and turned over to Surety.

### Article 5
### Schedule for Completion of Remaining Work

5.1     *Commencement and Completion.* The Contractor agrees to commence work at the Project site within five (5) calendar days of Contractor's receipt of a Notice to Proceed and to substantially complete the Remaining Work on or before the date set forth in the Standard Agreement, if any, with final completion to be achieved on or before the date set forth in the Standard Agreement (the Project Schedule), notwithstanding any delays, disruptions, or accelerations, encountered by the Contractor, or previously encountered by the Principal; provided, however, that the Contractor shall be afforded whatever extensions of time or other relief that is granted by the Obligee to Surety based on excusable delays arising after execution of the Standard Agreement, but only to the extent provided by the Obligee to Surety under the Contract, all as provided for in this Agreement.

5.2     *Revision of Project Schedule.* The Project Schedule is also subject to revision by the Obligee (including the re-establishment of new substantial and final completion dates), as provided in the Contract.

5.3     *Delays in Completion.* The Contractor acknowledges that any improper performance on its part under the Contract Documents, may cause damages to Surety, including but not limited to either liquidated damages assessed by the Obligee, or the liability of Surety to others, and agrees to compensate Surety for all such direct and consequential damages suffered as a result of such causes, including but not limited to reasonable counsel fees and costs, additional equipment costs, insurance and consultant's costs, if any.

4

5.4 *Surety Direction to Accelerate.* Surety, in its sole discretion, may direct the Contractor to work on an accelerated basis (e.g., increased manpower, overtime, holidays, double-shift). When so directed, the Contractor shall immediately comply. If the Remaining Work is proceeding in accordance with the Project Schedule, and the Contractor is not in default under any material provision of the Contract Documents, Surety shall reimburse the Contractor for the actual additional costs for premium time wages, insurance, taxes and actual costs for increased or additional material or equipment required for the acceleration. The Contractor shall not be entitled to any other compensation or damages, except a 10% mark-up of these additional costs for profit, overhead or general and administrative expenses.

5.5 *Surety Direction to Accelerate - Uncompensated.* If the Contractor fails to perform the Remaining Work expeditiously and in accordance with the Project Schedule, the Contractor shall, at its own expense, work on an accelerated basis, as and when directed by Surety, until the Remaining Work is again proceeding as required by the Project Schedule.

5.6 *Acceleration Claims.* If the Contractor is ordered to accelerate the Remaining work without an offer of compensation under Article 5, the Contractor shall accelerate the Remaining work, as and when directed by Surety. To preserve any claim for compensation based upon a direction to accelerate, the Contractor shall provide a written protest to Surety within seventy-two (72) hours of the direction to accelerate and strictly comply with the provisions of Article 6 of the General Conditions. Any recovery by the Contractor pursuant to the written protest shall be limited to the costs set forth in this Agreement.

### Article 6
### The Contract Sum

6.1 *Not to Exceed Price.* The Contractor agrees to take over and fully and faithfully perform and complete the Remaining Work, in strict compliance with the Contract, assuming all obligations with respect to the Contract that were to be performed by the Principal, except as otherwise specifically provided to the contrary, in the Standard Agreement or General Conditions. Under no circumstances shall the Surety be obligated to pay the Contractor any sums in excess of the Not to Exceed Price of $8,792,501, (Contract Sum), except as provided for to the contrary in the Standard Agreement or the General Conditions; provided further, however, that Overages or under runs of quantities shall be processed in accordance with, and governed by Article 7.2, hereof.

The Contractor agrees to accept the Contract Sum as full compensation for all testing, labor, material, equipment costs of any nature, quality control, cartage, profit and overhead reasonably necessary or proper to complete the Remaining Work, and whether or not there is a line item or a schedule of value for that testing, labor, material, equipment costs of any nature, quality control, cartage, overhead and profit in any pay estimates, or otherwise.

### Article 7
### Submission of Pay Estimates for Progress
### Payments and Final Payment to the Obligee

7.1 *Pay Estimates to Obligee under the Contract if Applicable.* In the Surety's name, the Contractor shall prepare for the Surety's benefit and review and approval, the monthly or periodic progress pay estimates, and the final pay estimate, permitted by the Contract, if those pay

5

estimates were to be prepared by the Principal, instead of the Obligee, in the same form and at the same time, and with the same breakdown by items, quantities and unit prices and/or lump sum amounts as provided for in the Contract. Contractor agrees to cooperate with Surety and the Obligee, and their agents during any preparation for or review process pursuant to the Contract provisions, leading up to and after the issuance of any and all Pay Estimates. This shall include but will not be limited to, the Contractor providing all documents and certifications required under the Contract to justify quantities and/or payment to Surety, including, but not limited, to lien waivers from the Contractor and its subcontractors and suppliers, and payroll certifications attesting to compliance with any applicable labor laws, including but not limited to the Davis Bacon Act or any other applicable prevailing wage law. Additionally, any local, municipal, state or federal taxes or assessments required to be paid by a contracting entity shall also be included in the pay applications. Upon receipt of the pay estimate, whether for a progress or final payment, the Surety shall review and approve or disapprove the pay estimate and, if approved, promptly forward that pay estimate to the Obligee with a copy of that transmittal furnished to the Contractor. If the Surety or the Obligee disapproves a pay estimate, the Surety and Contractor shall confer with or without the Obligee, to resolve any dispute, but in the event they are unable to resolve the dispute, then the Contractor shall be bound by the provisions of this agreement for the resolution of any dispute. Notwithstanding the foregoing, the Surety may, at its sole option, submit a pay estimate to the Obligee, in whatever amount or form the Surety deems appropriate. The Surety reserves the right to reject any pay estimate that is not in conformance with the Contract. The Contractor's failure to diligently and promptly submit Pay Estimates, monthly or final, to the Obligee is an act of default, justifying termination.

Surety shall make progress payments and final payment to the Contractor using the format, schedule of values, and quantities set forth on the attached proposal or as agreed by the parties.

For Quantity Items , Surety shall pay the Contractor for the quantities completed during the billing period at the unit prices set forth in the proposal.

Subject to the provisions of this agreement, Surety shall remit progress payments and final payment to the Contractor within twenty (20) working days from approval of the work by the Obligee.

## Article 8
## Pay Estimates from Contractor to Surety
## and Contract Sum

8.1     *Format and Schedule of Values - Progress Payments and Final Payment, if Principal Prepared Pay Estimates.* The Contractor shall prepare and present pay estimates for progress payments and final payment to the Surety using the format, schedule of values, unit prices and lump sum values set forth on the work order. The Contractor shall submit all pay estimates for progress payments and final payment to the Surety on the same billing cycle as the pay estimates the Contractor prepares on Surety's behalf for submission to the Obligee, e.g., by the 25th of the month. The pay estimate for quantity items shall be based on the format of the Owner's schedule of values. Other items may be listed on a separate invoice with the quantity items added as a separate line item.

8.2     *Complete Documentation for All Pay Estimates.* The Surety shall not consider any Pay Estimates under this Standard Agreement, unless they are accompanied by: (i) the corresponding Pay Estimate from Surety to Obligee, prepared by Contractor for Surety, if

6

applicable; and/or (ii) with all of the documents and certifications required under the Contract to justify payment to Surety under the Contract.

8.3    *Payment of Subcontractor and Suppliers.* On receipt of payment from Surety, the Contractor shall promptly pay its subcontractors and suppliers that are entitled to payment. The Contractor shall in all cases, comply with any and all applicable State or Federal laws requiring the prompt payment of subcontractors, laborers, and suppliers.

8.4    *Work During Pendency of Dispute.* In the event of a dispute over a Pay Estimate, whether a progress payment or final payment, or a change order or claim whether between the Obligee and Surety, or Surety and Contractor, or any combination thereof, such dispute shall not delay performance of the Remaining Work and the Contractor specifically agrees to continue to complete the Remaining Work, during the pendency of the dispute.

8.5    *Payment on Occupancy - Not Acceptance.* The Surety's payments to the Contractor shall not constitute evidence of proper performance by the Contractor or acceptance by Surety or Obligee of latent or patent defects in the Remaining Work, including any work, materials or equipment installed as part of the Remaining Work. Occupancy or use of the Project shall not, under any circumstances, constitute conditional full or final acceptance of the Remaining Work, including any aspect of the Remaining Work.

8.6    *Contract Sum/Uncompleted Work.* The Surety shall not be obligated to make payments to Contractor, whether progress payments or final payment, if such payment(s) will result in an unexpended contract sum, including retainage, less than an amount adequate to satisfy the Contractor's obligations under the Contract Documents, as determined by Surety.

8.7    *Surety Independent Withholdings.* Surety may withhold payment from the Contractor to the extent necessary, in Surety's estimation, to protect Surety from loss on account of the Contractor: (i) failing to remedy defective work, materials or equipment; (ii) causing or permitting the filing of liens or claims, in violation of the Contract Documents; (iii) failing to make prompt payment to Subcontractors and others; (iv) failing to prosecute the Remaining Work in accordance with the Project Schedule or to perform expeditiously all other aspects of the Remaining Work; (v) causing damage to the property; (vi) causing damages to others for which Surety may be responsible; or (vii) failing in any other respect to perform fully each of its obligations under the Contract and the Contract Documents. Any amount withheld shall not be paid until the cause for withholding has been removed by the Contractor and satisfactory evidence to that effect has been furnished to Surety. Surety reserves the right, and may, in its sole discretion, apply the payment withheld from Contractor to pay or remedy, in whole or in part, items (i) through (vii), inclusive, and deduct those amount(s) from the payment withheld, or any future payments due under the Contract Documents.

8.8    *Contractor's Acceptance Waiver and Release.* Acceptance of final payment by the Contractor shall constitute a complete waiver and release by the Contractor of all claims for damages or additional compensation whatsoever against Surety, and those for whom Surety is responsible or to whom it may be liable, under the Contract and the common law, arising from, or any manner relating to, the Contract Documents, the Remaining Work or the Project, except as specifically noted by to the contrary by the Contractor in writing.

8.9    *Contractor to Discharge Claims or Liens.* Contractor agrees not to allow any lien or claim to be filed on the project and agrees to discharge or bond around any lien or claim within 7 days of notice by the Surety or the Obligee. If, after final payment, a claim, lien or

7

charge is asserted against Surety, the Obligee, the Project, the Contract, or the funds allocated to the Contract, relating to, or arising from the Remaining Work, by a Subcontractor, supplier or other, the Contractor shall, at its own expense, promptly obtain the discharge of the claim or lien.

## Article 9
## Subcontractors and Suppliers

9.1   *Subcontractors and Suppliers.* The Contractor shall use its best efforts, subject to competitive pricing, to assume Principal's existing or former subcontracts or purchase orders with Subcontractors and Suppliers. The Contractor shall also use its best efforts to administer those subcontracts and purchase orders in such a manner as to limit or eliminate claims related to the Remaining Work. At the Contractor's request, the Surety shall assign to Contractor all of Surety's right, title and interest in and to Principal's subcontracts or purchase orders with third parties for the performance of the work. The Surety may execute such assignment(s) in a blanket form, or separately, as the Contractor requests. The Contractor agrees to request such an assignment for each (or all) of the Principal's subcontracts or purchase orders the Contractor assumes. Upon assumption, and the Surety's subsequent assignment, the Contractor shall assume the Principal's subcontracts or purchase orders, and shall be responsible for paying all sums then due, or due in the future thereunder, including but not limited to, any retention. The Contractor's substitutions of Subcontractors or others or the retention of new Subcontractors or others must conform to the requirements of the Contract. The Contractor is not entitled to any time or price adjustments in the Project Schedule or Contract Sum for: (i) any substitution for existing Subcontractors or others; or (ii) the retention of new Subcontractors, or others; or (iii) the performance or lack of performance of the Principal's existing or former Subcontractors or Suppliers.

## Article 10
## Changes to the Remaining Work

10.1   *Obligee Change Orders.* Without invalidating the Contract Documents, the Obligee may direct the Contractor, in writing, to perform extra, additional or changed work, or to delete work from the Remaining Work, to the extent permitted by the Contract (collectively, a Change Order). The Contractor shall comply with the Change Order, provided however, that the Contractor must obtain Surety's written consent to a Change Order if it involves work valued at more than $5,000 and an adjustment to the Project Schedule of more than five (5) working days. The Contractor has no authority to agree to deductive Change Orders or backcharges of any nature without the Surety's express prior written approval.

10.2   *Contract Documents Apply.* The Contract Documents shall apply to all such Change Orders as if the covered work were initially a part of the Contract. Further, the Contract Documents shall not be terminated as a result, and the Contractor's surety shall not be released or discharged, regardless of the aggregate nature, scope or cost of all Change Orders.

10.3   *Change Order Valuation.* All Change Orders shall be valued in accordance with the relevant provisions of the Contract. Further, the Contractor agrees to accept, as full and complete compensation for each Change Order, regardless of the aggregate number or value of all Change Orders, the compensation and the adjustment to the Project Schedule determined by the

8

Obligee under the Contract, including, where applicable, by reference to rates or unit and/or lump-sum prices, established under the Contract by the Principal, without any claim for additional compensation or extension of time from Surety. In the event the Contractor disagrees with the Obligee's adjustment to the Project Schedule and/or its valuation of the Change Order, the Contractor shall proceed with the work or changes required by the Change Order and give notice of its claim in accordance the terms of the contract.

10.4   *Action to Avoid Casualty.* Notwithstanding any provision of the Contract Documents to the contrary, the Contractor is expected, at all times, to take whatever action is required to avoid casualty to life and significant property. If the Contractor can subsequently establish, to Surety's satisfaction, that its actions, taken without Surety's prior approval, were necessary and appropriate to avoid such casualty to life and property, associated costs shall be compensable on a time-and-material basis in accordance with the provisions of Article 5.4 of the General Conditions concerning the valuation of corrective work. Notice of any claim for such costs, however, must be given in compliance with Article 6 of the General Conditions.

10.5   *Minor Changes.* Surety may direct, in writing, minor changes in the Remaining Work. The Contractor shall comply immediately. These changes shall not result in an adjustment to the Project Schedule or to the Contract Sum set forth in the Standard Agreement.

## Article 11
## Defective Work, Defects in Existing Work
## and Surety Change Orders

11.1   *Defective work of Contractor and Others.* The Contractor shall be responsible for all defects or defective work on work put in place after the Contractor's receipt of the Notice to Proceed which are caused by or performed by the Contractor or any of its subcontractors or suppliers. The Contractor shall repair such defects or defective work at its own expense and without delay to the Project Schedule.

11.2   *Existing Defects and Latent Existing Defects.* The Contractor shall be responsible for correcting or repairing any existing defects or existing deficient work (Existing Defects) performed by the Principal or its subcontractors or suppliers, at its own cost as part of completing the Remaining Work; provided, however, if the Contractor corrects or repairs Latent Existing Defects then the Contractor shall be compensated in accordance with this Article, so long as the Surety's prior written approval is secured. "Latent Existing Defects" means a hidden defect in the work put in place prior to the Contractor's receipt of the Notice to Proceed, which a reasonably careful inspection would not reveal, or that cannot be discovered by any known and customary tests. The Contractor shall promptly notify Surety of the Latent Existing Defect in writing at the address set forth in Article 23, and obtain Surety's prior written approval as to scope and cost of the work, before proceeding with any corrective work for which the Contractor intends to seek compensation. For corrective work performed on a Latent Existing Defect by the Contractor with Surety's prior written approval, which is: (i) completed to the satisfaction of the Obligee and Surety; and (ii) accepted under the Contract (Compensable Corrective/Additional Work), Surety shall pay the Contractor an amount equal to its reasonable and necessary direct costs for field labor, associated fringe benefits, taxes and insurances, materials and equipment, together with a mark-up on those direct costs of _10% as full compensation for all other associated elements of direct and indirect cost (excluding field superintendent including for field and home-office overhead) and profit, regardless of the extent or aggregate number of all corrective work items and any resulting impact or delay to the Contractor's other operations.

9

11.3    *Surety Change Orders.*  Surety may also, without a corresponding Change Order from the Obligee, require the Contractor in writing to perform extra, additional or change work, or to delete work from the Remaining Work, without invalidating the Contract Documents or releasing or discharging the Contractor's surety. Such Surety Change Order work shall also be compensated as provided in the contract.

11.4    *Payment of Compensable Corrective/Additional Work.*  The Contractor may requisition payment for Compensable Corrective/Additional Work on a percentage-complete or unit price basis with its monthly pay estimate, less 5% retainage which shall be withheld until final payment under the Contract Documents. The Contractor shall maintain current cost records showing its compensable costs under this Article in a form, and with content, acceptable to Surety. These cost records shall be made available to Surety for review and audit upon reasonable notice during normal business hours.

## Article 12
## Claims for Additional Compensation, Damages and Extensions

12.1    *Notice of Claim.*  The Contractor agrees that it shall not make a claim against Surety under the Contract Documents for an extension of time to complete the Remaining Work, or for additional compensation or damages under the Contract Documents for breach of the Contract Documents or in any manner related to the Remaining Work on the Project, unless it shall first have provided Surety with notice of such claim at the address set forth in Article 23 of this Agreement, at least ten (10) full working days before Surety is, or may be, required to provide such claim notice to the Obligee under the Contract. In the event of a claim by the Contractor against Surety which would not support, in whole or in part, a corresponding claim by Surety against the Obligee, notice shall be given to Surety no later than five (5) working days after the inception of the claim or causes of delay, injury, damages or entitlement.

12.2    *Claim Notice Contents.*  All notices required under this Article shall be in writing and contain whatever information is required by the Contract and, at a minimum, a specific description of: (i) the cause or causes of the injury, extra cost, damages or delay; (ii) the identity of those entities claimed to be responsible; (iii) the contractual-basis, if any, entitling the Contractor to the relief sought; (iv) an estimate of the quantification of the extension, extra costs or damages sought; and (v) a statement setting forth how Surety might mitigate or avoid any further delay, injury or damages.

12.3    *Limited Remedy.*  Where the claim has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from Obligee on account of the claim. The Obligee granting relief on the claim, and Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor. The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with this Article or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to the Surety by the Obligee on account of the claim. The sole remedy of Contractor

10

shall be whatever relief the Obligee grants to Surety, with the Obligee's granting that relief to Surety an express condition precedent to Surety's obligation to remit the same to the Contractor. If the Surety does not receive any relief from the Obligee, then the Contractor, likewise, shall not receive any relief.

12.4    *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

12.5    *Costs of Claims Preparation and Prosecution.* The Contractor and Surety agree that they must jointly agree to prosecute or settle the claim on whatever terms they deem appropriate, which consent or agreement each party shall not unreasonably withhold, and for which they may provide full releases therefore to the Obligee or others.

## Article 13
## No Damage for Delay/Delay Claims

13.1    *No Damages for Delay - Limited Relief.* Contractor acknowledges that during the course of completion of the Remaining Work, Contractor may experience delays and additional costs related to governmental regulations, acts or omissions of Obligee, subcontractors, suppliers or others. The Contractor also acknowledges that it may experience difficulty in obtaining the type of services, labor, equipment and materials and approvals required for the Remaining Work, including clearance from the Obligee to proceed with some or all of the Remaining Work. The Contractor represents that it has considered these risks in agreeing to the Contract Sum stated in the Standard Agreement. Thus, except as expressly provided to the contrary in contract, the Contractor agrees not to make any claim for an increase in the Contract Sum based upon the escalation of these costs, regardless of the number or extent of delays, disruptions or extensions of the Project Schedule or the Remaining Work.

13.2    *Extension Request - Contractor Limited to Claim against Obligee.* Where a claim for extension has been submitted to the Obligee for action or decision, which submission is at the Surety's sole option, then the Contractor shall be limited to whatever relief, if any, as may be provided by the Obligee to Surety by reason of the claim. Surety's obligation or liability, if any, to the Contractor arising as a consequence of a claim submitted to the Obligee shall be fully satisfied and liquidated by Surety's submission of the claim to the Obligee and by Surety providing to the Contractor whatever relief, if any, it received from the Obligee on account of the claim. The Obligee granting relief on the claim, and the Surety's receipt thereof, is a condition precedent to Surety providing that relief to the Contractor. The Contractor specifically releases and agrees not to assert any claim against Surety in any forum, which has not been the subject of full and timely notice in strict compliance with the contract or which has been satisfied by submission to Obligee and by Surety offering the Contractor the equivalent relief provided to Surety by the Obligee on account of the claim. The cost of any claim's preparation, and presentation, and the prosecution thereof by the Contractor and Surety, is strictly governed by Article 12.5. The sole remedy of Contractor for any delays shall be the Obligee's extension of time for completion and payment of costs directly associated with that extension, with the Surety's obtaining a similar extension from the Obligee for the same amount of time and payment of costs, if any, an express condition precedent to Surety's obligation to remit the same to the

11

Contractor. If the Surety does not receive an extension of time, or payment of costs from the Obligee, then the Contractor shall not receive an extension or payments.

13.3     *Contingent Relief/Payment.* Surety's receipt of relief from the Obligee shall be, and is an express condition precedent to Surety remitting or granting that relief to Contractor. The Contractor agrees to accept the credit risk of the Obligee not providing that relief to the Surety, and the Surety, in turn, not paying or granting that relief to the Contractor. The Contractor is relying on the credit of the Obligee, and not the Surety, and if the Surety does not receive payment or relief from the Obligee, then the Surety has no obligation to make the corresponding payment, or grant the corresponding relief, if any, otherwise due to the Contractor.

## Article 14
## Administration of the Contract, Reports
## Warranty & Guarantees

14.1     *Administration of the Contract.* The Contractor shall process and handle, for itself and Surety, all Pay Estimates, all paper work, shop and other drawing submittals, sample and cut-sheet submittals, as-built drawings, manual submissions, change orders, additional work orders and supplemental agreements, and all other matters required for the prosecution of the Remaining Work, and in order to obtain acceptance of the Remaining Work in strict accordance with the requirements of the Contract.

14.2     *Books and Records.* The Contractor shall maintain current books, records, accounts and reports, including copies of all submittals and correspondence with the Obligee and/or others concerning the Project (the Project Records) so as to enable Surety to be fully informed at all times as to the progress of the Remaining Work and the administration of the Contract. The Project Records shall be maintained for a minimum of six (6) years following final acceptance of the Remaining Work and shall be made available to Surety for copying promptly upon reasonable notice during normal working hours.

14.3     *Guarantees and Warranty.* Contractor fully assumes at no additional cost all guarantees and warranties relating to work performed, workmanship, material, and job supervision and other acts of Contractor and its subcontractors and suppliers. The guarantee and warranty obligations of the Contractor shall endure for the length of time stated in the Contract and shall be subject to all the conditions and requirements provided for therein. Contractor shall furnish all labor, equipment, tools, material, testing and appurtenances that may be required or necessary to carry out such guarantee and warranty work. Contractor shall be paid its actual costs incurred in performing any warranty work of the Principal plus a markup of 10%.

## Article 15
## Termination of the Agreement/
## Declaration of Default

15.1     *Termination.* The Remaining Work shall be performed in accordance with the Contract. In the event that the Contractor fails to make progress in accordance with the Project Schedule and the delay is not excused under the Contract and the Contract Documents, Surety may provide a written termination notice. If the Contractor does not proceed with the Remaining Work within three (3) calendar days of the written termination notice, Surety may terminate the Contract Documents for default, without further notice or delay.

12

15.2    *Notice of Default.* Surety may, upon written notice to Contractor, declare the Contractor in default of the Contract Documents, if: (i) the Obligee notifies Surety or determines that Surety is in default of its obligations under the Contract and that default is a consequence of the Contractor's breach of the Contract, as incorporated into the Contract Documents; (ii) the Contractor fails to make payment to subcontractors and suppliers in accordance with applicable State and Federal laws; (iii) the Contractor otherwise commits a material breach of the Contract Documents; (iv) a petition under the Bankruptcy Act is filed by or against the Contractor; (v) the Contractor becomes insolvent; (vi) a receiver is appointed for the Contractor; or (vii) the Contractor violates any laws, code, rule, regulation or lawful order of any governmental agency having jurisdiction over the Project or the Contractor, including any safety-related law, code, rule, regulation or lawful order. Unless Contractor cures the event of default to Surety's satisfaction within three (3) calendar days of receipt of the Notice of Default, Surety may immediately terminate the Contract Documents.

15.3    *Assumption/Completion of Remaining Work.* Upon a termination, Surety, in addition to whatever rights it might have by reason of the incorporation of the Contract, may assume and complete the Remaining Work by whatever means it deems expedient and proper. The Contractor shall not be entitled to any payment under the Contract Documents, under any circumstances, until the Remaining Work is finally complete and accepted by the Obligee. Further, if the costs of completing the Remaining Work, including, but not limited to the architectural, engineering, construction and other services, and reasonable counsel fees, if any, together with all deductions, withholdings and damages, suffered or owed to Surety under the Contract Documents, and all other consequential damages arising from the default, exceed the unpaid balance of the Contract Sum stated in the Standard Agreement, then the Contractor and its surety shall immediately pay the difference to Surety. If Surety chooses not to complete the Remaining Work, the Contractor and its surety shall be liable to Surety for all damages, including the damages described in this Article, arising from its default. The Contractor's (and its surety's) obligation to pay Surety under this Article, and the Contractor's (and its surety's) liability to Surety for all damages under the Contract Documents, shall be cumulative with Surety's other rights under the Contract, the Contract Documents and applicable law, and shall survive termination.

15.4    *Taking Possession of Material.* In the event that Surety exercises its right to terminate the contractor's right to proceed and to complete the Remaining Work, Surety may take possession of all materials, appliances and equipment located at the Project for use in completing the Remaining Work. Further, the Contractor shall assign to Surety, upon request, its rights under any subcontracts and purchase orders in connection with the Remaining Work and otherwise cooperate with Surety's efforts to resume and complete the Remaining Work.

15.5    *Termination for Convenience.* The contract may be terminated in whole or in part by the Surety at any time for the Surety's convenience, provided the Contractor is given not less than ten (10) calendar days written notice of the Surety's intent to terminate and an opportunity for consultation with the Surety prior to termination. Upon receipt of the termination notice, the Contractor shall promptly discontinue all services (unless the notice directs otherwise) and deliver or otherwise make available to the Surety all data, drawings, specifications, reports, estimates, summaries, and such other information and materials that may have been accumulated by the Contractor in performing under the contract. The termination of the contract for any reason, whether for convenience or for cause as described in Articles 15.1 and 15.2, shall not relieve the Contractor of its responsibilities under the contract for the work performed and materials supplied, nor shall it relieve the Contractor's surety or the Contractor of its obligations

13

under the Contractor's Performance Bond and Payment Bond for any claims arising out of the work performed and the materials supplied by the Contractor.

If the Contractor is terminated for cause in accordance with Articles 15.1 and 15.2 of these General Conditions, and it is later determined that the Contractor did not fail to fulfill its contractual obligations, then any such termination by the Surety shall be deemed to have been a termination for convenience, and in such event, the Contractor's recovery shall be limited to an adjustment of the Contract Sum as provided for in Article 15.6 for a termination for convenience.

Under any and all circumstances, the Surety shall not be responsible to the Contractor for damages for wrongful termination in excess of the payments set forth in Article 15.6, whether or not such damages are defined as direct or consequential and whether or not determined to be in tort, contract, negligence, strict liability, warranty, expressed or implied, or otherwise.

15.6    *Termination for Convenience - Equitable Settlement.*  In the event the Contract is terminated for convenience, then an equitable settlement for the work performed under the Contract prior to such termination shall be made, with the Contractor's measure of damages limited to the amount due under the Contract against prior pay estimates already submitted to Surety prior to termination, plus 10% of the unpaid balance of the Contract Sum, plus all other reasonable and unavoidable costs incurred for demobilizing field forces, plant and equipment, quitting the project site, and terminating subcontracts and purchase orders.

## Article 16
## Indemnification

16.1    *Indemnification.*  To the fullest extent permitted by applicable law, the Contractor shall assume the entire responsibility and liability for all damage (including purely economic loss) or injury of any nature (including death) to persons and property, including intangible property, arising out of the execution of the Remaining Work, and hereby expressly waives any Workman's Compensation Immunity, whether granted by statute or otherwise, and agrees to defend (if required by Surety), indemnify and hold harmless Surety and its respective directors, officers, agents, servants, employees, affiliates and subsidiaries (the Indemnitees), from all demands, claims, causes of action, (including but not limited to any claims for payment or otherwise by any of Contractor's subcontractors, suppliers, employees and laborers and also including, but not limited to, the Principal's subcontractors or suppliers, when the Contractor has assumed or accepted assignments of those subcontracts or purchase orders), even if devoid of merit, and losses, costs and expenses, including reasonable counsel fees, arising out of, or related to, in any manner, the execution of the Remaining Work, or asserted against any of the Indemnitees by reason of the acts or omissions of the Contractor, or any entity directly or indirectly engaged by the Contractor in connection with the Remaining Work. In jurisdictions in which the indemnification provided for in this Article is broader than that allowed by applicable law, this Article shall be interpreted as providing the broadest indemnification permitted and should be limited only to the extent necessary to comply with that law.

16.2    *Withholds for Indemnity.*  If a demand, claim, cause of action, loss, cost or expense covered by Article 16 is asserted against one or more Indemnitees, the Surety may withhold from any payment otherwise due under the Contract Documents an amount sufficient to protect and indemnify the Indemnitee or Indemnitees to the full extent required under Article 16. If final payment has been made to the Contractor, or if the balance due under the Contract Documents is insufficient to protect and indemnify the Indemnitee or Indemnitees involved, Surety, in its discretion, may require the Contractor to furnish a surety bond, from a surety and

14

upon terms acceptable to Surety, in an amount guaranteeing such protection and indemnity. This bond shall be furnished by the Contractor within seven (7) calendar days after receipt of Surety's written demand.

16.3    *Obligations Survive.* The obligations of the Contractor under Article 14 shall survive final acceptance of the Remaining Work and final payment to the Contractor and shall be in addition to all other rights and remedies available to Surety under the Contract Documents and applicable law.

## Article 17
## Performance and Payment Bonds and Insurance

17.1    *Performance and Payment Bonds.* The Contractor shall, at the option of the Surety, furnish separate performance and payment bonds, naming Surety and the Obligee as dual-obligees, in penal amounts equal to the Contract Sum. The terms of the performance and payment bonds, and the surety issuing the bonds, shall be subject to Surety's prior approval. No surety shall be accepted if that surety is not approved by the U.S. Treasury.

17.2    *Contract Documents Incorporated into Bonds.* The Contractor's performance and payment bonds shall expressly incorporate the Contract Documents, and provide that the surety's obligations and liabilities shall be co-extensive with those of the Contractor. The Contractor's surety shall also expressly agree to join in, and to be bound by, any contractually mandated mediation or arbitration process, or legal action, involving Surety and the Contractor arising from the Project. Finally, the surety shall agree that Change Orders under the Contract Documents may be issued without notice to it and that these modifications, including the addition or deletion of work, shall not operate to discharge the surety, regardless of the scope, nature or extent of all modifications to the Contract Documents.

17.3    *Filing of Bonds.* The Contractor shall, on its behalf and on behalf of Surety, comply with any applicable law requiring the public filing of all labor and material payment bonds, if any, and it shall, at its own expense, defend (if requested by Surety), indemnify and hold harmless Surety against any and all damages or loss of any nature (including purely economic loss), arising out of, or resulting from, the failure to comply with such law, including counsel fees and court costs to any payment bond claimant.

17.4    *Insurance.* The Contractor shall obtain and maintain the insurances required under the Contract, with the coverages and in the amounts specified in the Contract. The Obligee and Surety shall be named as co-insureds or additional insureds under all policies of insurance required of the Contractor. Further, the Contractor shall ensure that its insurers waive all rights of subrogation against the Obligee and Surety. The Contractor shall deliver endorsements confirming that the insurances required under the Contract has been obtained and that the Obligee and Surety have been named as co-insureds, or additional insureds. Failure to obtain this insurance, or permitting this insurance to lapse, shall constitute a material breach of the Contract Documents.

## Article 18
## Conditions Precedent to Contract Documents

18.1    *Conditions Precedent.* Unless waived in writing by the Surety, the Contract Documents and all related agreements, shall be null and void and of no effect unless and until the following conditions precedent occur: (i) a Takeover Agreement mutually satisfactory to Surety

and the Obligee has been executed covering completion of the Remaining Work; (ii) the Contractor has furnished to Surety the bonds and insurance required under this Agreement (if required); and (iii) the Obligee provides written authorization for Surety to utilize Contractor as the Completing Contractor under the Contract. If the Contract Documents fail to become effective, the Contractor shall have no claim against Surety of any description.

### Article 19
### Independent Contractor

19.1    *Independent Contractor.* Except as otherwise provided in the Standard Agreement and General Conditions or the Contract, the Contractor shall be permitted to exercise the full prerogatives of a contractor in prosecuting the Remaining Work, including, but not limited to, selection and classification of supervisors and workers, scheduling, determination of equipment and material requirements and the establishment of work hours and work week, including over time, it being further understood and agreed that the Contractor is an independent contractor in connection with all work to be performed by it pursuant to the Contract. Additionally, pursuant to the Contract, the Contractor shall subsequently designate its project superintendent. The Contractor specifically agrees that it is an employing unit subject as an employer to all applicable Unemployment Compensation statutes so as to relieve the Surety of any responsibility or liability for treating Contractor's employees as employees of the Surety for the purpose of keeping records, making reports and payment of Unemployment Compensation taxes or contributions; and the Contractor agrees to defend, indemnify and hold the Surety harmless and reimburse it for any expense or liability alleged or incurred under said statutes in connection with employees of the Contractor.

### Article 20
### Offset

20.1    *Offset.* All amounts owed to Surety by the Contractor under the Contract Documents may be deducted, at Surety's option, from any amounts owed by Surety to the Contractor.

### Article 21
### Cumulative Remedies

21.1    *Cumulative Remedies.* Surety's various rights and remedies under the Standard Agreement, the General Conditions and the incorporated provisions of the Contract and law are cumulative and shall not be waived by payment for, or acceptance of, the Remaining Work.

### Article 22
### Compliance with Laws

22.1    *Compliance with Laws.* The Contractor shall comply with all applicable provisions of federal, state and local laws and regulations, including provisions of law imposing trust obligations on the Contractor to insure the prompt and full payment of all legitimate debts owed by the Contractor to others for work performed in connection with the Remaining Work. The Contractor shall also comply with all federal, state and local safety and health laws and regulations. The Contractor shall also comply with all laws mandating the payment of prevailing wages and supplements and controlling other terms and conditions of employment. The Contractor further agrees as regards: (i) the production, purchase and sale, furnishing and delivering, pricing and use or consumption of materials, supplies and equipment; (ii) the hire,

16

tenure or conditions of employment of employees and their hours of work and rates of and the payment of their wages, and (iii) the keeping of records, making of reports, and the payment, collection, and/or deduction of Federal, State and local taxes and contributions, that the Contractor will keep and have available all necessary records and make all payments, reports, collections and deductions, and otherwise do any and all things so as to fully comply with all Federal, State and local laws, ordinances and regulations in regard to any and all said matters insofar as they affect or involve the Contractor's performance of the Contract Documents, all so as to fully relieve the Surety from and protect it against any and all responsibility or liability therefore or in regard thereto.

## Article 23
## Notices

23.1    *Notices - Designated Addresses.*  Notices under the Contract Documents, or pursuant to any law or regulation, shall be in writing, unless otherwise required by the specific law or regulation, and shall be deemed to have been given three (3) calendar days after mailing, provided mailing was by certified mail, with a copy transmitted by telecopier, addressed to the intended recipient at its address set forth below:

To Surety:

> Tiffany Schaak
> Senior Claim Attorney
> MC41
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:   (410) 205-0605

With copy to:

> Russ Werner
> Senior Construction Engineer
> MC41 ·
> 5801 Smith Avenue
> Baltimore, MD 21209
> FAX:   (410) 205-0605

To the Contractor:

> Robert B. Barton, Jr., P.E., Executive Vice President
> Jackson Construction Company
> 20 Dan Road
> P.O. Box 9191
> Canton, MA 02021-9191
> FAX:   (781) 737-1550

All pay estimates or other documents or Notices shall be mailed to the Surety at the above address.

## Article 24
## Conflicts and Interpretations/
## Order of Precedence

24.1    *Conflicts, Interpretations, Order of Precedence.* The Standard Agreement, General Conditions and their component parts, including the incorporated Contract and the attached Exhibits, are intended to be complimentary and are intended to require all work and services by the Contractor necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. The Contractor shall review the Contract Documents, including the Contract and the Exhibits, before signing the Standard Agreement and advise Surety whether any of the parts of the Contract Documents conflict and whether any of the Contract Documents fail to require of the Contractor all work and services necessary to complete the Remaining Work in a first-class manner in strict compliance with the Contract. In the case of a conflict between the terms of the Standard Agreement, the General conditions, or the terms of the Contract or of an annexed Exhibit, the following Order of Precedence applies:

  (i)    The Standard Agreement (and its Exhibits) has priority over the Contract (and its Exhibits) and any other agreement or document;

  (ii)   The Contract (and its Exhibits) has priority over any other agreement or document, except for the Standard Agreement (and its Exhibits).

## Article 25
## Assignment

25.1    *Non-Assignment by Contractor.* The Contractor shall not assign or sublet the Contract Documents or any right or interest therein nor shall the Contractor assign any moneys due or to become due hereunder. Any such assignment of the Contract Documents shall be null and void and of no force and effect and the Surety shall not be required to recognize any such assignment or subletting. The Contractor shall not sub-contract the Contract Documents or any part thereof without the prior written consent of the Surety. If the Contractor shall sub-contract the Contract Documents or any part thereof with the prior written consent of the Surety, the Contractor shall cause to be inserted in every Subcontract the Indemnity and Insurance requirements of Article 16 and Article 17.4 hereof. The Contractor also agrees to comply with all Subcontractor listing or substitution requirements mandated by the Contract or law.

25.2    *Assignment by Surety.* The Surety reserves the right to assign the Contract Documents to the Obligee or others. If the Surety so assigns the Contract Documents, then upon the Contractor's receipt of the notice of that assignment, the Contractor shall complete the Remaining Work for the assignee listed in the notice, all in accordance with the Contract Documents. Any such assignment shall constitute a novation and the Surety shall be automatically released from any liability to the Contractor, and the Contractor shall not have a claim or cause of action against the Surety, arising out of or related to, the Contract Documents, or otherwise.

## Article 26
## Governing Law

18

20.1   *Governing Law.* This Agreement shall be governed by the laws of the State of Massachusetts.

## Article 27
## Modification

27.1   *Modifications.* This Agreement may not be modified orally. All modifications must be in writing and signed by Surety and the Contractor.

## Article 28
## Drug and Substance Abuse

28.1   *Drugs.* The Contractor shall not permit drug or substance abuse by any of its employees, or any employees of its subcontractors or suppliers, and it shall fully and promptly comply, at its own expense, with every rule, regulation and program initiated by the Obligee with respect to this subject matter.

## Article 29
## Confidentiality

29.1   *Confidentiality.* The Contractor shall not divulge to third parties, or use for its own benefit, without prior written consent (which shall not be unreasonably withheld) from Surety, any information obtained from or about Surety, its businesses, transactions and personnel.

## Article 30
## Merger

30.1   *Merger.* The Standard Agreement and the incorporated provisions of the Contract (the Contract Documents), constitute the complete expression of the agreement between Surety and the Contractor. No prior statements, course of dealing or trade usage, shall supplement the terms of the Contract Documents.

## Article 31
## Dispute Resolution

31.1   *Dispute Resolution.* It is the intention of the parties that the Contract Documents and the performance under the Contract Documents, and all suits, actions, and proceedings under the Contract Documents, be construed in accordance with and under and pursuant to the laws of the State of Massachusetts, and that, in any suit, action, or proceeding that may be brought arising out of, in connection with, or by reason of the Contract Documents, the laws of the State of Massachusetts shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any suit, action, or proceeding may be instituted. If any suit or action is filed by either Surety or Contractor, as a result of a dispute arising under the Contract Documents solely between Surety and Contractor, venue shall be in U.S. District Court, District of _____, _____ Division. However in the event Surety believes, at its sole discretion, that the Obligee should be joined in any action, Contractor shall be bound by the dispute resolution procedures set forth in the Contract, and agrees to stay or dismiss any such suit

19

or action and otherwise follow and comply with the terms of either Article 12 and/or Article 13 of the General Conditions.

### Article 32
### Audit

32.1 If all or a portion of the Completion Contract is performed on a time and material basis with a mark up or a fixed fee, the Contractor agrees that Surety shall have the full right, on reasonable notice and during regular business hours, of access to the books and records of the Contractor to justify and establish the Contractor's entitlement to all costs billed to the Surety. In the event an overpayment is established Contractor shall promptly, on request of Surety, refund the amount of the overpayment to the Surety. If Surety is required to present evidence of costs or payments made pursuant to this Completion Contract, Contractor agrees to cooperate with Surety and provide access to books and records and reasonable assistance necessary to respond to the request.

### Article 33
### Validity of Agreement

33.1 *Validity.* Invalidity of any portion or provisions of the Contract Documents by reason of the laws of any State or for any other reason shall not render any other provisions or portions of the Contract Documents invalid.

### Article 34
### Counterparts/Facsimile Signatures

34.1 *Counterparts/Facsimile.* This Standard Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original with all counterparts constituting but one and the same instrument. The execution of this Standard Agreement by any party hereto will not be effective until counterparts have been executed by all parties. Additionally, facsimile signature shall bind the undersigned.

This Agreement is entered into as of the day and year first written above.

JACKSON CONSTUCTION
COMPANY

Robert B. Barton, Jr., P.E.
Executive Vice President
Name & Title

Dated: May 11th, 2004

UNITED STATES FIDELITY AND GUARANTY
COMPANY

TIFFANY SCHAAK, SENIOR CLAIM ATTORNEY
Name & Title

Dated: 5/12/04

20

RECEIVED

JUN 1 3 2005

JMP

## Westford Payables

| Subcontractor/Supplier | March Invoice | April Invoice | May Invoice |
|---|---|---|---|
| Triumph Leasing | $ 395.21 | $ 225.00 | |
| New England Spring Water | | $ 24.00 | |
| Baker Fence | $ 2,126.60 | | |
| Rivinius & Sons | $ 66.00 | $ 450.00 | |
| American Warming & Ventillating | $ 2,030.00 | | |
| Houlihan Mobile Modular | $ 385.00 | $ 225.00 | |
| Atlantic Waste | | $ 950.00 | |
| Brand Scaffold | | $ 13,470.00 | |
| Folan Waterproofing | $ 7,791.61 | $ 6,520.74 | |
| Sani-Kan | | | $ 425.00 |
| Back Bay Concrete | | $ 12,793.65 | |
| AMSCO | | $ 25,461.43 | |
| Park Lane Construction | $ 1,566.00 | | |
| K&R Painting | $ 9,186.50 | | |
| Commonwealth Tile | | $ 10,450.00 | |
| Chas Moran Plumbing | $ 4,750.00 | $ 37,178.72 | |
| IKG | | $ 1,012.00 | |
| Vtech | | $ 819.00 | |
| Granite State Concrete | $ 14,891.25 | $ 7,153.00 | $ 8,244.00 |
| Door Systems | | | |
| Romeiro's Landscape | $ 24,468.20 | $ 4,320.00 | |
| Interclean Equipment | $ 38,045.60 | | |
| Elgin Building Corp | | $ 2,128.00 | |
| Rustic Fire Protection | $ 34,478.82 | $ 21,203.29 | |
| Phillips Electric | | $ 81,121.45 | |
| Lawrence Tank | $ 1,420.00 | | |
| R.L. Legacy | | $ 1,072.50 | |
| Kessell & Morse | $ 3,895.00 | | |
| HC Miller | | $ 18,900.00 | |

## Westford Payables

| Subcontractor/Supplier | March Invoice | April Invoice | May Invoice |
|---|---|---|---|
| Thybar | | $ 12,641.00 | |
| The Northern Corp | | $ 11,927.25 | |
| SOS Corp | $ 428.00 | | |
| Pro Equipment | $ 765.00 | | |
| Stanley Elevator | $ 28,842.00 | $ 15,238.00 | |
| Independent Conc | | $ 1,000.00 | |
| Pyro Bain | $ 12,700.00 | | |
| Capital Carpet | $ 6,812.45 | | |
| Millis Plumbing | | $ 79,713.55 | |
| Clifford and Galvin Contracting | $ 35,100.00 | $ 68,580.00 | |
| Desideiro Masonry | $ 61,750.00 | $ 18,321.70 | |
| Universal Construction | $ 84,154.00 | | |
| Donato Tools | $ 501.49 | $ 205.74 | |
| Heritage Ironworks | | $ 6,000.00 | |
| Jackson Glass | $ 3,111.25 | | |
| Rusco Steel | $ 11,385.56 | | |
| | | | |
| Totals | $391,045.54 | $459,105.02 | |

 **ST PAUL**
**TRAVELERS**

**James M. Peters, Jr.**

*Vice President*
*Bond Claim, 4 PB*
**St. Paul Travelers**
One Tower Square
Hartford, CT 06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
*E-mail : james.m.petersjr@stpaultravelers.com*

**VIA DHL EXPRESS AND FACSIMILE TO: 781-858-7796**

June 28, 2005

Robert B. Barton, Jr.
Executive Vice President
Jackson Construction Co.
20 Dan Road
Canton, MA 02021

Re:  Principal:   Standen Contracting Co. Inc.
      Claim No:   092SCSW504101RG
      Obligee:   Town of Shrewsbury, MA
      Contract :   Shrewsbury Middle School - West

Dear Bob:

Reference is made to that certain Completion Agreement dated on or about May 11, 2005
executed by and between Jackson Construction Co. ("Jackson") and United States Fidelity and
Guaranty Company ("USF&G") ("Completion Agreement").

By the terms of the section 4.1 of the Completion Agreement Jackson undertook to:

> "perform, furnish and pay for all testing, labor, materials, equipment costs of any nature,
> quality control, insurances, subcontractors and suppliers, and do all other things necessary
> to complete the remaining physical work and all related obligations under each Contract
> subject to a Purchase Order, promptly and in a first-class manner, in strict compliance
> with the Contract"

As you are aware, The Town of Shrewsbury ("Shrewsbury") and its representatives has identified
a substantial number of punch list and defective items and has called for completion and/or
correction of these items. Further, Shrewsbury has withheld from payment substantial sums as
security in the event that Jackson fails to properly and timely address these issues. As noted in
Shrewsbury Town Manager Dan Morgado's letter to you and to me dated June 21, 2005, a total
of $1,377,346 is being withheld just for unfinished items. Additional amounts have been
withheld for various owner incurred delay damages. Lastly, the sums of $22,320.55 and
$37,083.68 have been withheld in order to make direct payments to two Jackson subcontractors
who filed demands for direct payment with Shrewsbury.

Robert B. Barton, Jr.
June 28, 2005
Page 2

While the need for Jackson to promptly and effectively to address the uncompleted and defective work has been the subject to many meetings spanning many months with Shrewsbury and its representatives, Jackson has failed bring these matters to a conclusion.

It is our understanding that Jackson has not awarded a subcontract for the performance of the remaining site work. Observations from job site visits suggest that Jackson and its subcontractors have staffed this project in recent months with minimal resources. Another major open issue is with regard to the doors and related hardware. We are aware of no meaningful progress on this issue for the past several months.

We have a substantial volume of claims from subcontractors and suppliers for past due payments. In most of these instances, the explanation that we have from Jackson Construction Co. is that these items are in dispute. However, very little in the way for tangible support for Jackson's position has been provided, notwithstanding our request that Jackson's position with regard to all payment bond claims be properly documented.

With school now out of session, and no apparent plan from Jackson to timely address these issues, we have no reason to believe that the current efforts by Jackson will be result in completion of this project. Jackson has an obligation to do its work on a timely basis. Clearly, it has not. Further, Jackson has an obligation to pay its subcontractors and suppliers in accordance with applicable laws. Jackson has failed to establish that it has done so.

Please take this letter as notice that USF&G hereby declares Jackson to be in default under the Completion Agreement. Pursuant to section 15.2 of the Completion Agreement, if Jackson fails to cure the default to USF&G's satisfaction within three (3) calendar days of receipt of this Notice of Default, USF&G may immediately terminate the Contract Documents.

This notice is written with an expressed reservation of any and all rights and defenses that USF&G may have under the circumstances.

Sincerely,

UNITED STATES FIDELITY AND GUARANTY COMPANY

James M. Peters, Jr.

cc:     Bradford Carver
        Russ Werner
        Russ Fuller



**James M. Peters, Jr.**

*Vice President*
*Bond Claim, 4 PB*
St. Paul Travelers
One Tower Square
Hartford, CT 06183

(860) 954-6497 (tel)
(860) 277-5722 (fax)
E-mail : james.m.petersjr@stpaultravelers.com

**VIA DHL EXPRESS AND FACSIMILE TO: 781-858-7796**

July 7, 2005

Robert B. Barton, Jr.
Executive Vice President
Jackson Construction Co.
20 Dan Road
Canton, MA 02021

Re:    Principal:    Standen Contracting Co. Inc.
        Claim No:    092SCSW504101RG
        Obligee:    Town of Shrewsbury, MA
        Contract :    Shrewsbury Middle School - West

Dear Bob:

Reference is made to that certain Completion Agreement dated on or about May 11, 2005
executed by and between Jackson Construction Co. ("Jackson") and United States Fidelity and
Guaranty Company ("USF&G") ("Completion Agreement") and to our letter to you dated June
28, 2005.

**In light of Jackson's failure to make satisfactory progress in accordance with the Project Schedule
and in the absence of any attempt to cure the default cited in our letter to you dated June 28,
2005, please consider this formal notification that pursuant to the terms of Section 15.5 of the
Completion Agreement, USF&G hereby terminates Jackson's right to proceed with respect to the
Completion Agreement.**

The terms of Section 15.4 of the Completion Agreement provide:

> "In the event that Surety exercises its right to terminate the contractor's right to proceed
> and to complete the Remaining Work, Surety may take possession of all materials,
> appliances and equipment located at the Project for use in completing the Remaining
> Work. Further the Contractor shall assign to Surety, upon request, its rights under any
> subcontracts and purchase orders in connection with the Remaining Work and otherwise
> cooperate with Surety's efforts to resume and complete the Remaining Work."

We expect that Jackson will cooperate with the Surety's efforts as provided above.

Robert B. Barton, Jr.
July 7, 2005
Page 2


This notice is written with an expressed reservation of any and all rights and defenses that USF&G may have under the circumstances.

Sincerely,

UNITED STATES FIDELITY AND GUARANTY COMPANY


James M. Peters, Jr.


cc:    Bradford Carver
        Russ Werner
        Russ Fuller